**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**Green Bay Division**

| | | |
|---|---|---|
| ALICE GILL, RACHEL BUTLER, | : | |
| MORGAN RICE, PATREESE WILLIAMS, | : | Civil Action No. _____ |
| JESSE WILSON, GLORIA APPIAH, | : | |
| DOROTHEA FULMORE, DARLENE MOORE, | : | |
| JEROME COLE, RUBEN VILLANUEVA, | : | |
| JOSE ROSARIO, ANDREW FUENTES, | : | |
| SPENCER THOMPSON, JOSEPH | : | |
| GREENWOOD, KATHLEEN ZACCHEO, | : | |
| JEREMY RICKABAUGH, and NICOLE MATOS, | : | |
| *on behalf of themselves and all individuals* | : | |
| *similarly situated,* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SOAREN MANAGEMENT, LLC, | : | |
| KRAKEN HOLDINGS, LLC, | : | |
| GENA KAKKAK, JOEY AWONOHOPAY, | : | |
| SPENCER GAUTHIER, MICHAEL FISH, JR., | : | |
| DANA WAUBANASCUM, JOAN DELABREAU, | : | |
| REBECCA BRUNETTE, DAYNELL GRIGNON, | : | |
| RANDY CHEVALIER, and CRYSTAL | : | |
| CHAPMAN-CHEVALIER, and | : | |
| JOHN DOES Nos. 1-15, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**CLASS ACTION COMPLAINT**

Plaintiffs, *on behalf of themselves and all individuals similarly situated*, by counsel, and

for their Complaint against Defendants, allege as follows:

**INTRODUCTION**

1.     Usury—the practice of lending money at unreasonably high rates of interest—"is

an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr.*

*Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020).  And "[a]s ancient as the practice of

usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id.* This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as a "rent-a-tribe" scheme, a "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

2. Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions on usurious lending go searching for a small, easily dominated tribe that will be willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs. The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections created by state usury and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

3. Federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation of state usury restrictions. On the contrary, it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). Nonetheless, the tribal leaders and employees named as Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

4.     In this case, Eagle Lending, LLC d/b/a Fineday Funds ("Fineday") holds itself out as a tribal lending entity owned and operated by the Menominee Indian Tribe of Wisconsin ("Tribe" or "MITW").  Upon information and belief, Fineday is wholly owned by Wolf River Development Company ("Wolf River" or "WRDC").  According to its website, Wolf River's purpose is "to investigate, review, consider, pursue and conduct any nongaming commercial activity of the Menominee Indian Tribe of Wisconsin deemed advisable by the [Wolf River] Board of Directors in order to generate profit, whether on or off the Menominee Reservation."[1]

5.     Wolf River—and, in turn, Fineday—is controlled and directed by a Board of Directors, the membership of which is not publicly available but will be confirmed through discovery.  It is also led by its Chief Executive Officer, Defendant Crystal Chapman-Chevalier.

6.     Defendants Gena Kakkak, Joey Awonohopay, Spencer Gauthier, Michael Fish Jr., Dana Waubanascum, Joan Delabreau, Rebecca Brunette, Daynell Grignon, and Randy Chevalier (collectively, the "Tribal Legislature Defendants") are members of the Tribe's Legislature.  The Tribe's Constitution established the Legislature as the governing body "vested with all executive and legislative powers of the Tribe."  Exhibit 1 art. III § 1.  The Legislature also has the power to charter all enterprises of the Tribe, *id.* art. XII, and it "retain[s] all authority and power to exercise all proper governmental and sovereign functions over the tribal business[es] and over property managed and owned by the tribal business[es]," *id.* art. XIII § 1.  The Tribe's Code further empowers the Tribal Legislature Defendants to appoint and remove members of the Board of Directors for Wolf River.  Exhibit 2 § 740-6.  Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Legislature Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe, including Wolf River and Fineday.

---

[1] https://www.wolfriverdevelopment.com/purpose/.

7.     Defendants Soaren Management, LLC and Kraken Holdings, LLC, and their non-tribal owners, managers, and investors, are the true operators of the Fineday usurious lending scheme and provide the day-to-day management, operation, investment, and customer service functions of the enterprise from their headquarters in Arizona, far from the Tribe's reservation.

8.     Defendants have actively participated in the scheme and have conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the members of the class described below.

9.     Defendants and others not yet known to Plaintiff have been knowingly participating in the illegal lending enterprise, which has made and is making and has collected and is collecting on grossly usurious loans.  This lawsuit challenges the legality of Fineday's high-interest loans and seeks damages and declaratory relief against co-conspirators participating in this illegal scheme, including, most importantly, those whose identities have been deliberately concealed. More specifically, Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and various state usury and lending statutes. Fineday and others have likely collected tens of millions of dollars on void loans in violation of federal and state usury, licensing, and criminal statutes.

## JURISDICTION

10.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc.*

4

*v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Wisconsin, including in this District and Division, where the Tribe's reservation is located and from which it chartered and continues to authorize the operations of Fineday and Wolf River.

## PARTIES

13.     Plaintiff Alice Gill is a natural person and resident of California.

14.     Plaintiff Rachel Butler is a natural person and resident of Colorado.

15.     Plaintiff Morgan Rice is a natural person and resident of Indiana.

16.     Plaintiff Patreese Williams is a natural person and resident of California.

17.     Plaintiff Jesse Wilson is a natural person and resident of Minnesota.

18.     Plaintiff Gloria Appiah is a natural person and resident of California.

19.     Plaintiff Dorothea Fulmore is a natural person and resident of Florida.

20.     Plaintiff Darlene Moore is a natural person and resident of Georgia.

21.     Plaintiff Jerome Cole is a natural person and resident of Oregon.

22.     Plaintiff Ruben Villanueva is a natural person and resident of Florida.

23.     Plaintiff Jose Rosario is a natural person and resident of Florida.

24.     Plaintiff Andrew Fuentes is a natural person and resident of New Jersey.

25.     Plaintiff Spencer Thompson is a natural person and resident of Michigan.

26.     Plaintiff Joseph Greenwood is a natural person and resident of Georgia.

27.     Plaintiff Kathleen Zaccheo is a natural person and resident of Arizona.

28.     Plaintiff Jeremy Rickabaugh is a natural person and resident of Nebraska.

5

29. Plaintiff Nicole Matos is a natural person and resident of New Jersey.

30. Defendant Soaren Management, LLC is a limited liability company incorporated in Delaware with offices in Las Vegas, Nevada, and Scottsdale, Arizona. As detailed below, Soaren Management is instrumental in the creation, operation, and management of the Fineday usurious lending enterprise described herein.

31. Defendant Kraken Holdings, LLC is a limited liability company with offices in Arizona. Kraken Holdings, LLC is registered as the manager of Soaren Management with the Nevada Secretary of State, but it is not registered to do business in the states of Arizona or Nevada. As manager of Soaren Management, Kraken Holdings is responsible for the operations of Soaren and, through it, the operations of the Fineday usurious lending enterprise described herein.

32. Defendant Gena Kakkak is a natural person residing in Wisconsin. She is the chairperson of the Tribe's Legislature. Both as chairperson and a general member of the Legislature, Defendant Kakkak's duties include the chartering and oversight of Wolf River, Fineday, and the other lending operations under the Tribe's control, including, at a minimum, Five Clans Lending, LLC ("Five Clans"), and Four Directions Lending, LLC ("Four Directions") (collectively, including Wolf River and Fineday, the "MITW Lending Entities" and each a "MITW Lending Entity"). In performing these duties, Defendant Kakkak meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Kakkak only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

6

33.     Defendant Joey Awonohopay is a natural person residing in Wisconsin.  He is the vice-chairperson of the Tribe's Legislature.  Both as an officer and a general member of the Legislature, Defendant Awonohopay's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Awonohopay meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Awonohopay only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Legislator.

34.     Defendant Spencer Gauthier is a natural person residing in Wisconsin.  He is the secretary of the Tribe's Legislature.  Both as an officer and a general member of the Legislature, Defendant Gauthier's duties include the chartering and oversight of the MITW Lending Entities. In performing these duties, Defendant Gauthier meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Gauthier only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Legislator.

35.     Defendant Michael Fish, Jr. is a natural person residing in Wisconsin.  He is a member of the Tribe's Legislature.  As a member of the Legislature, Defendant Fish's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties,

7

Defendant Fish meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Fish only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Legislator.

36. Defendant Dana Waubanascum is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature. As a member of the Legislature, Defendant Waubanascum's duties include the chartering and oversight of the MITW Lending Entities. In performing these duties, Defendant Waubanascum meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Waubanascum only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

37. Defendant Joan Delabreau is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature. As a member of the Legislature, Defendant Delabreau's duties include the chartering and oversight of the MITW Lending Entities. In performing these duties, Defendant Delabreau meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board

8

members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Delabreau only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

38. Defendant Rebecca Brunette is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature. As a member of the Legislature, Defendant Brunette's duties include the chartering and oversight of the MITW Lending Entities. In performing these duties, Defendant Brunette meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Brunette only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

39. Defendant Daynell Grignon is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature. As a member of the Legislature, Defendant Grignon's duties include the chartering and oversight of the MITW Lending Entities. In performing these duties, Defendant Grignon meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Grignon only in

9

her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

40. Defendant Randy Chevalier is a natural person residing in Wisconsin. He is a member of the Tribe's Legislature. As a member of the Legislature, Defendant Chevalier's duties include the chartering and oversight of the MITW Lending Entities. In performing these duties, Defendant Chevalier meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Chevalier only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Legislator.

41. Defendant Crystal Chapman-Chevalier is a natural person residing in Wisconsin. She is the chief executive officer of Wolf River. In this role, she directs and controls Wolf River's operations, including the operation of Fineday and the Tribe's other lending portfolios. Plaintiff seeks monetary damages against Defendant Chapman-Chevalier only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as CEO of Wolf River.

42. The John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the Fineday enterprise. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

# FACTUAL BACKGROUND

## A.     State usury and licensing laws protect consumers from usurious loans.

43.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

44.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including California, Colorado, Indiana, Minnesota, Florida, New Jersey, Georgia, Oregon, Michigan, Arizona, and Nebraska, *i.e.*, the home states of each of the Plaintiffs where they applied for, received, and repaid their loans.

### i.     California

45.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872.  Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

46.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

47.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

11

48.     "California state law currently limits the amount collected on a loan to "twelve dollars upon one hundred dollars for one year," or 12 percent.  Cal. Civ. Code § 1916-2.  "Any agreement or contract of any nature in conflict with [the interest rate cap] shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed."  *Id.*

49.     Thus, "[a]n interest rate in excess of [12%] is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest."  *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1164 (citing Cal. Civ. Code § 1916-2).

50.     California law further provides that any person who pays any amount exceeding the interest-rate cap may recover "treble the amount of the money so paid or value delivered in violation of said [cap]."  Cal. Civ. Code § 1916-3(a).

51.     California has also deemed the willful lending of usurious loans without a license a felony "punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year."  Cal. Civ. Code § 1916-3(b).

52.     In addition to abiding by California's usury cap, lenders issuing loans to California residents are also required to obtain a license under the California Financing Law.  *See* Cal. Fin. Code §§ 22000*, et seq.*

53.     Even if licensed, moreover, a licensee is still limited in the interest rates it can charge based on the unpaid principal balance remaining.  *See* Cal. Fin. Code § 22303 (setting, for example, a "two and one-half percent per month" rate maximum on "that part of the unpaid

principal balance . . . up to, including, but not in excess of [$225]," while limiting the rate for the portion between $225 and $900 to 2 percent, and the rate for $900-$1,650 to 1.5 percent).

54.     Loans willfully issued by even unlicensed lenders in violation of these requirements are deemed "void" and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction."  Cal. Fin. Code § 22750.

55.     Those who willfully violate the licensing requirements are also subject to fines and imprisonment.  Cal. Fin. Code §§ 22753, 22780.

56.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'"  *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1166 (quoting *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

57.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices.  Cal. Bus. & Prof. Code § 17200.

**ii.     Colorado**

58.     In Colorado, a consumer loan issued by a lender without a license to issue such loans may not exceed "twelve percent per year on the unpaid balance of the amount financed." Colo. Stat. § 5-2-201(1).

59.     Even loans issued by a licensed lender cannot exceed 36 percent for the first one thousand dollars financed, 21 percent for the next two thousand dollars, and 15 percent of the remaining amount financed.  *Id.* § 5-2-201(2).

60.     Colorado consumers are "not obligated to pay a charge in excess of that allowed by [Colorado law]" and are entitled to "a refund" of amounts paid in excess of the lawful interest rate. *Id.* § 5-5-201(2).

13

61.     If a lender refuses to refund the amounts paid above the lawful rate, the consumer is entitled to "a penalty in an amount determined by a court not exceeding the greater of either the amount of the finance charge or ten times the amount of the excess of the charge." *Id.* § 5-5-201(3). The consumer may also recover his or her attorney's fees. *Id.* § 5-5-201(7).

**iii.     Indiana**

62.     Like other states, Indiana's lending and usury protections are a part of Indiana's clearly delineated public policy against usurious loans and predatory lending. Indeed, "Indiana's first usury statutes were passed before the turn of the 20th century . . . ." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009).

63.     In 2002, Indiana's legislature enacted the Indiana Small Loans Act to specifically respond to the growth of predatory payday lenders, like Fineday here. *Id.*

64.     As the Court of Appeals of Indiana has observed, some lenders believe that they may "ignore the historically moral and practical foundations for usury statutes and charge any amount of interest that the so-called payday loan 'free market' will bear." *Id*. at 1062.

65.     Such contracts, however, are unenforceable because of "public policy considerations." *Id.*

66.     Consistent with this, a usurious loan violates Indiana law if: (1) it is made without the license required by Indiana law; (2) it is made in excess of Indiana's interest rate caps for licensed lenders, which varies from 10% to 15% for loans of less than $550; *or* (3) it was made in excess of Indiana's general usury cap on consumer loans, which prohibits a finance charge in excess of 25%.

### iv. Minnesota

67. Minnesota "sets its permissible rate of interest by statute, capping it at 8 percent annually." *Maslowski v. Prospect Funding Partners LLC*, 994 N.W.2d 293, 299 (Minn. 2023) (Minn. Stat. § 334.01).

68. A borrower who pays any sum greater than the legal rate is entitled to recover "the full amount of interest or premium so paid, with costs . . . ." Minn. Stat. § 334.02.

69. All usurious loans are also considered void. *Id.* § 334.03.

### v. Florida

70. Florida has enacted usury laws that prohibit lenders from making high interest loans.

71. The Florida legislature passed laws prohibiting usury as early as 1822, before Florida even became a state in 1845.[2] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

72. Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged, or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

---

[2] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

15

73.    Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1). Neither the Defendants nor the MITW Lending Entities, including Fineday, have obtained licenses to make loans in Florida.

74.    If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

75.    Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758–59 (Fla. 1935).

76.    The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

**vi.    New Jersey**

77.    New Jersey law caps the interest rate on loans issued pursuant to a written contract at 16 percent per year.  N.J. Code § 31:1-1.

78.    Lenders who issue loans above this amount forfeit the right to any interest on the loan and are entitled to recover only the principal amount of the loan, minus any interest paid. *Id.* § 31:1-3.

16

### vii.  Georgia

79.    Short-term loans of $3,000 or less fall under the Georgia Installment Loan Act (formerly known as the Georgia Industrial Loan Act, with both referred to herein as "GILA"), O.C.G.A. §§ 7-3-1, *et seq.*

80.    The purpose of GILA is "to define and prevent usury."  *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (Ga. Ct. App. 2012).

81.    Unless expressly exempted by the terms of the Act, a lender must obtain a license from the Department of Banking and Finance to make loans not to exceed $3,000 at an interest rate exceeding 10% per annum, and with a loan fee not greater than 8% of the first $600 of the face amount of the contract plus 4% of the excess.  O.C.G.A. §§ 7-3-3, 7-3-4, 7-3-11.

82.    Pursuant to O.C.G.A. § 7-3-50, "[a]ny person, including the executive officers, directors, trustees, owners, agents, and employees of any such person, that willfully engages in the business of making installment loans without a license . . . shall be guilty of a felony,"  and "[a]ny contract made under [the Act] by such person shall be null and void."  O.C.G.A. § 7-3-50(a) and (c).  Further, lenders may be liable to the borrowers for double the amount of all interest and loan fees, or $100, whichever is greater.

83.    Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less unless done in compliance with certain legal exceptions, most pertinently GILA.  *See* O.C.G.A. § 16-17-2(a).  Thus, the Payday Lending Act prohibits unlicensed lenders from issuing installment loans to Georgia consumers and prohibits such loans from having an interest rate exceeding 10%.

84.    A lender who violates the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." O.C.G.A. § 16-17-2(d).

85.    The Payday Lending Act further bars any lender of an unlawful loan from collecting any indebtedness and declares the loan "void ab initio." O.C.G.A. § 16-17-3. Borrowers may also institute civil actions on behalf of themselves and classes of similarly situated individuals under the Act and obtain three times the "amount of interest or other charges to the borrower," as well as the costs and fees of bringing the action. *See id.*

86.    The Payday Lending Act also expressly recognizes that "payday lenders have created certain schemes and methods in order to attempt to disguise" their transactions and evade Georgia law's protections against usury. O.C.G.A. § 16-17-1(c). The Act was passed, in part, to impose "substantial criminal and civil penalties over and above those currently existing under state law . . . in order to prohibit this activity in the State of Georgia and to cause the cessation of this activity once and for all." *Id*.

### viii.    Oregon

87.     Oregon prohibits lenders of consumer loans less than $50,000 from charging more than 12 percent interest or 5 percent more than the then-existing discount rate on a 90-day commercial paper in the relevant Federal Reserve district of the lender. Or. Stat. § 82.010(3)(b).

88.    Any lender who violates this prohibition "shall forfeit the right to collect or receive any interest" and the "borrower upon such loan shall be required to repay only the principal amount borrowed." *Id.* § 82.010(4).

### ix. Michigan

89.     Although there are certain exceptions not applicable here, "the generally applicable civil usury rate has consistently hovered around the level set by the 1838 statute," which is 5%, or 7% if stipulated in writing. *Id*. (citing MCL 438.31).

90.     Moreover, Michigan criminalizes usury on any loan at a rate exceeding 25%. Mich. Comp. Laws Ann. § 438.41.

### x. Arizona

91.     Arizona limits the interest rate on "any loan, indebtedness or obligation other than medical debt . . . [to] ten percent a year."  Ariz. Rev. Stat. Ann. § 44-1201(A)(2).

92.     Lenders who issue loans exceeding this amount must forfeit all interest, and borrowers are entitled to judgment for all amounts paid in excess of the usurious rate. *Id.* §§ 44-1203, 1204.

### xi. Nebraska

93.      Nebraska law limits the interest on loans issued pursuant to a written agreement at 16 percent.  Neb. Stat. § 45-101.03.

94.     A lender issuing a loan with interest exceeding the usury rate may recover only the principal balance, "without interest," and the borrower may recover "costs."  *Id.* § 45-105.  If the borrower has paid any interest, moreover, that interest is deducted from the recoverable principal balance.  *Id.*

19

xii.     **Other State Usury Laws**

95.     Each state of residence of the putative class members in the below RICO Class definition also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[3]

**B.     Overview of the Tribal Lending Business Model.**

96.     Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

97.     Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[4] The collection of unlawful and usurious debt continues to be a major problem, in

---

[3] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ark. Const. Art. XIX § 13; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1); S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

[4] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

20

part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

98.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

99.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

100.     Over the years, payday lenders have used various schemes to evade applicable state and federal protections.  In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally granted power to make loans exceeding state usury rates.  Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fess without assuming much, if any, financial risk for the lending.

101.     Because banks are insulated from state examination and regulation by virtue of federal bank preemption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like Georgia, payday lending is illegal.  However, beginning in 2005, the Federal Deposit and Insurance Corporation began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders.  *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also*

*see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

102.    As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[5] the shadow payday loan industry turned to Native American tribes to replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers.

103.    Under this new "rent-a-tribe" model, the leadership of an economically impoverished tribe would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered.  In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[6]

104.    For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be

---

[5] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams.  *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

[6] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

22

subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

105.    Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

106.    Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

107.    Often at the table were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

108.    Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received only a nominal amount of the proceeds from the loans.

109.    Upon information and belief, Rosette has represented the Tribe, including in the creation and implementation of its lending activities.

110.    To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights.  Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

23

111.    Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving the unlawful, usurious loans. The loan agreements are typically structured to include a waiver of all state and/or federal rights, in favor of tribal law and dispute resolution provisions. That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

112.    Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

113.    Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[7]

114.    During the last decade, federal and state law enforcement agencies have also taken various actions to combat tribal lending schemes, including by example:

a.    In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 2017 of Scott Tucker and his attorney, Timothy Muir,

---

[7] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

on all fourteen felony counts brought against them);[8] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[9]

b.     The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc*., No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

115.    In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in

---

[8] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[9] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

116.    Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**D.    The Tribe's Usurious Fineday Lending Enterprise.**

117.    The Fineday lending enterprise is just another example of a rent-a-tribe scheme designed to circumvent state usury regulation while taking advantage of vulnerable consumers who are in such dire circumstances that they are willing to accept triple-digit interest rates on relatively small sums just to pay their bills.

118.    For several years, the Tribe has been openly inviting and accepting rent-a-tribe partnerships with the shadow payday loan industry, using as a vehicle for these arrangements its limited liability company, Wolf River, and Wolf River's subsidiaries, including Fineday.

119.    The Tribe has neither the financial resources, the expertise, nor the technology needed to operate a national, multi-million-dollar lending enterprise.

120.    The Tribe's website indicates that the Tribe owns and operates several lending entities under the direction of Wolf River, including Fineday, Five Clans, and Four Directions.

Upon information and belief, despite these portfolios being worth tens of millions of dollars, only a small portion of the profits from the lending business benefits the Tribe.

121.    For example, despite the apparent value of the tribal lending business that claims to be wholly owned and operated by the Tribe, Wolf River's own website does not identify the lending businesses as part of its portfolio of companies.[10]

122.    The Tribe's 2023 Annual Report also identified several "priority areas as key to economic resiliency for our community," none of which included its lending operations. *See* Exhibit 3 at 7.  And the Tribe's 2023 budget identifies only $536,778 in revenue from Wolf River as of the date of the report, with no other specific revenue line for its lending businesses, while its total revenues were over $9 million as of the report date. *See id.* at 169.  Additionally, other annual reports show revenues of only $0 (2020) and $61,819 (2022) from Wolf River in recent years.[11]

123.    Upon information and belief, instead of receiving meaningful benefits from the lending operation, the Tribe sanctions the operations of Fineday, Five Clans, and Four Directions and its other lending businesses on behalf of nontribal participants who design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.

124.    These nontribal coconspirators include Defendants Soaren Management and Kraken Holdings, as well as their yet-to-identified owners, officers, and investors, who are the true drivers of Fineday's lending operations.

---

[10] Wolf River Development Company, https://www.wolfriverdevelopment.com/.

[11] The 2021 Annual Report did not include financial statements due to delays from the COVID-19 pandemic.

125.    To engage in this extremely profitable, but illegal business, Soaren Management, Kraken Holdings, and the deliberately concealed nontribal coconspirators have entered into agreements with the Tribe, Defendants, Fineday, Wolf River, and others to make and collect on usurious loans in states across the country, including in Wisconsin, and to keep their identity hidden from consumers and regulators.

126.    For example, Soaren Management is the operator of Fineday's website, which is the sole avenue through which Fineday accepts applications for, issues, and services its usurious loans.

127.    Upon information and belief, Soaren Management and Kraken Holdings, as well as their nontribal owners, managers, and investors, are also the primary—if not sole—source of funds for Fineday's operations, and they produce all of the leads for Fineday; manage the technology and call centers that issue and service Fineday's loans; collect payments on the loans; and sell off nonperforming debts.

128.    According to its own website, Soaren Management provides "tailored portfolio management, software development, customer service telecommunications, automated application processing, and asset recovery services" for tribal lenders like Fineday.[12]

129.    Soaren Management and its nontribal coconspirators have also been identified in other litigation for their involvement in very similar lending schemes. *See, e.g.*, *Beckford v. Niibin*, No. 8:20-cv-02718, ECF No. 1 (M.D. Fla. Nov. 18, 2020); *Dearry v. Soaren Management, LLC*, No. 2:21-cv-02548, ECF No. 1 (E.D. Pa. June 4, 2021).

130.    In return for their central role in Fineday's ostensibly "tribal" lending business, Soaren Management, Kraken Holdings, and their nontribal owners, managers, and investors reap

---

[12] About Soaren, https://soaren.io/about/ (last visited Feb. 28, 2025).

nearly all of the benefits from the lending scheme, raking in, upon information and belief, millions of dollars a year from the triple-digit loans issued by Fineday and other lending entities under their control to thousands of low-income borrowers across the United States.

131.   Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

132.   Indeed, Fineday's website states that it no longer offers loans in several jurisdictions, each of which correlate with jurisdictions in which courts have found similar lending practices unlawful.[13]

133.   Additionally, each of Defendants is aware that many consumers have complained about the abusive lending practices used by Fineday and other MITW Lending Enterprises.

134.   For example, Defendants have responded to numerous consumer complaints on Fineday's Better Business Bureau ("BBB") profile.  In fact, the BBB has refused to accredit Fineday due to the number of complaints (77) filed during the company's short time in business (2 years).

135.   Many of these complaints have cited Fineday's practice of charging high-interest, triple-digit interest rates on small-dollar loans like Plaintiff's, and even changing the interest rates after the loans were issued.

136.   Soaren Management has also taken steps to actively conceal its management structure and involvement in the Fineday lending scheme.  For example, its website claims that it

---

[13] *See* Fineday Funds, https://finedayfunds.com/ (footer) (stating "Fineday Funds does not lend to residents of AR, CT, DC, IL, MA, ME, NM, NC, MD, NY, PA, SC, VA, VT, WI, and WV (MA, NM, NC, SC, MD Exemption: Returning Customers)").

is a subsidiary of another Native American Tribe—the Big Valley Band of Pomo Indians—but this, too, is a facade designed to shield Soaren from liability.

137. In reality, Soaren Management is managed by Kraken Holdings, a nontribal company owned and operated by individuals who are not citizens of any federally recognized Native American tribe, let alone the Tribe here. Indeed, one of Soaren Management's two business locations is listed at the same address to which Kraken Holdings is registered.

138. Soaren Management has also concealed the ownership of the Fineday website using a domain proxy service, concealing its role in operating and maintaining the site.

139. Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee and operate Fineday to facilitate the issuance of high-interest, triple-digit loans that violate usury laws across the country.

140. Upon information and belief, Fineday, Wolf River, and the other MITW Lending Entities operate under the oversight of the Tribal Legislature Defendants and Defendant Chapman-Chevalier, without whose approval and legal sanction Fineday could not operate.

141. The Tribal Legislature Defendants continue to facilitate the illegal lending scheme by allowing Fineday, Five Clans, Four Directions and the other MITW Lending Entities to make and collect on usurious and void loans in multiple jurisdictions, including Wisconsin.

142. Upon information and belief, none of the Defendants have applied for a consumer lending license any state with such laws.

143. Fineday's website includes the following disclaimer:

Eagle Lending, LLC dba Fineday Funds is a commercial enterprise and instrumentality of the Menominee Indian Tribe of Wisconsin, a federally recognized sovereign Indian nation (the "Tribe"), which abides by the principles of federal consumer finance laws, as incorporated by the Tribe, and operates within the interior boundaries of the Menominee Indian Reservation, WI. Eagle Lending, LLC dba Fineday Funds is chartered under and operates pursuant to Tribal law.

30

144.    The Tribe's Code also purports to establish a "Tribal Consumer Financial Services Regulatory Authority" (the "Authority") for the licensure and regulation of each tribal lending entity, including Fineday.

145.    Despite these representations, Plaintiffs are unable to locate any information regarding Fineday's operations within the Tribe's reservation or the existence of a Tribal Consumer Financial Regulatory Authority.  The Tribe's 2023 Annual Report makes no mention of Fineday or any other lending entities, for that matter.  Ex. 3.  Nor does it identify any members or actions by the Authority in the past year.  *Id.* at 143.  In fact, the most recent report that identified any action by the Authority was the 2020 Annual Report, which simply stated that the Authority (whose members were again unidentified) had issued several licenses.  Plaintiff could not identify any evidence that the Authority has taken any regulatory actions with respect to the MITW Lending Entities, including Fineday.  Based on this information, and upon other information and belief, the Authority is in fact illusory and has no active members.

146.    Defendants' attempts to evade state usury protections also extend to the form Fineday consumer loan agreements, which prospectively waive the application of all state laws, including those that could challenge the application of the Tribe's laws under the choice-of-law provision, stating, *inter alia*, that "Tribal law and applicable federal law shall exclusively apply" to all disputes.

147.    As such, the form agreements purport to strip consumers like Plaintiff of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including Wisconsin, which have a long and robust history of precluding usurious lending operations like Fineday's that burden their citizens with insurmountable debts.

31

148.    Further, the consumer loan agreement includes a mandatory "dispute resolution procedure" available to a consumer for any claims.

149.    Notably, while claiming to be "an accommodation to consumers," this dispute resolution procedure only applies to a consumer's complaint, and Fineday is not restricted in the manner of enforcement of the agreement against a consumer.

150.    In addition to only applying to consumers' claims, the dispute resolution procedure requires consumers to first file complaints with Fineday for an investigation and response.

151.    If a consumer is unhappy with the result of Fineday's investigation, a consumer can then pursue arbitration, but the arbitrator can apply only the laws of the Tribe and "applicable federal law." The arbitrator could not consider any possible state law defenses to enforcement of the loan agreement, including that the agreement's selection of tribal law to the exclusion of state law violates the state's public policy against unlicensed usurious lending. As such, the agreement prospectively waives any right of consumers like Plaintiff and others in states with usury regulations to challenge the choice-of-law provision that exclusively selects the law of the Tribe.

152.    Similarly, while the agreement purports to require arbitration of "all… state law claims," it precludes arbitrators from ever applying the law of any state to determine those claims, including in instances where the law of the state applies regardless of any choice of law provision. And in the same vein, it also precludes the application of any state defenses to arbitrability, as those would necessarily require the application of state law that the agreement expressly prohibits. As such, the arbitration provision in the form agreement is wholly unenforceable.

E.    **Plaintiffs' Experience and Loan Histories.**

153.    Because of the ostensible protections created by the tribal business model, the interest rates charged on the loans were more than 40 to 75 times the amount permitted by state usury and licensing laws.

154.    For example, Plaintiff Alice Gill applied for and obtained a loan from Fineday in October 2023 from her home in California for a principal amount of $1,500, which had an interest rate of 351%, far exceeding California's 12-percent interest rate cap.  Ms. Gill paid back more than $4,000 on this loan from her bank account maintained in California.

155.    From her home in Colorado, Plaintiff Rachel Butler applied for and obtained a loan from Fineday for $1,400 in August 2024, which had an interest rate of 795%, far exceeding Colorado's 12-percent usurious interest cap. Using her bank account maintained in Colorado, Ms. Butler made payments on this loan.

156.    From her home in Indiana, Plaintiff Morgan Rice applied for and obtained three loans from Fineday for $400, $250, and $400, respectively, which had a minimum interest rate of 650%, far higher than even Indiana's general usury cap of 25 percent. Using her bank account maintained in Indiana, Ms. Rice has paid off all but one of these loans to date.

157.    From her home in California, Plaintiff Patreese Williams applied for and obtained a loan from Fineday for $750, which had an interest rate of 500%, far exceeding California's 12-percent rate cap. Using her bank account maintained in California, Ms. Williams paid back more than $2,000 on this loan.

158.    From his home in Minnesota, Plaintiff Jesse Wilson applied for and obtained a loan from Fineday for $1,300, which had an interest rate of 400%, far exceeding Minnesota's 8-percent

rate cap. Using his bank account maintained in Minnesota, Mr. Wilson paid nearly $3,000 on this loan to Defendants.

159.    From her home in California, Plaintiff Gloria Appiah applied for and obtained a loan from Fineday for $1,300, which had an interest rate of 695%, far exceeding California's 12-percent rate cap. Using her bank account maintained in California, Ms. Appiah paid back more than she borrowed on this loan.

160.    From her home in Florida, Plaintiff Dorothea Fulmore applied for and obtained a two loans from Fineday for $1,300 and $1,700, respectively, each of which had an interest rate of 499.99%, far exceeding Florida's 18-percent rate cap. Using her bank account maintained in Florida, Ms. Fulmore paid back more than she borrowed on at least one of her loans.

161.    From her home in Georgia, Plaintiff Darlene Moore applied for and obtained a loan from Fineday for $500.00, which had an interest rate of 350% far exceeding Georgia's 10-percent rate cap.

162.    From his home in Oregon, Plaintiff Jerome Cole applied for and obtained three loans from Fineday for $300, $300, and $1,725, respectively, each of which had a triple-digit interest rate far exceeding Oregon's 12-percent rate cap. Using his bank account maintained in Oregon, Mr. Cole has paid back more than he borrowed on at least two of these loans.

163.    From his home in Florida, Plaintiff Ruben Villanueva applied for and obtained a loan from Fineday for $600, which had an interest rate of 500%. Using his bank account maintained in Florida, Mr. Villanueva paid back nearly double the amount he originally borrowed on this loan.

34

164.    From his home in Florida, Plaintiff Jose Rosario applied for and obtained a loan from Fineday for $1,500, which had an interest rate of 795%. Using his bank account maintained in Florida, Mr. Rosario paid back over $7,000 on this loan.

165.    From his home in New Jersey, Plaintiff Andrew Fuentes applied for and obtained a loan from Fineday for $700, which had an interest rate of 795%. Using his bank account maintained in New Jersey, Mr. Fuentes paid back more than he borrowed on this loan.

166.    From his home in Michigan, Plaintiff Spencer Thompson applied for and obtained five loans from Fineday for $2,000 or less, each of which had triple-digit interest rates far exceeding Michigan's 7-percent interest rate cap. Using his bank account maintained in Michigan, Mr. Thompson paid back more than he borrowed on all but one of these loans.

167.    From his home in Georgia, Plaintiff Joseph Greenwood applied for and obtained a loan from Fineday for $1,200, which had an interest rate of 500%. Using his bank account maintained in Georgia, Mr. Greenwood paid back more than he borrowed on this loan.

168.    From her home in Arizona, Plaintiff Kathleen Zaccheo applied for and obtained a loan from Fineday for $1,300, which had a triple-digit interest rate far exceeding Arizona's 10-percent rate cap. Using her bank account maintained in Arizona, Ms. Zaccheo paid back more than she borrowed on this loan.

169.    From his home in Nebraska, Plaintiff Jeremy Rickabaugh applied for and obtained a loan from Fineday for $1,300, which had a 795% interest rate far exceeding Nebraska's 16-percent rate cap. Using his bank account maintained in Nebraska, Mr. Rickabaugh paid back more than he borrowed on this loan.

170.    From her home in New Jersey, Plaintiff Nicole Matos applied for and obtained three loans from Fineday for $500, $500, and $1,300, respectively, which had a minimum interest rate

of 300%. Using her bank account maintained in New Jersey, Ms. Matos paid back more than she borrowed on all but one of these loans.

171.    Upon information and belief, none of the Defendants, nor the Tribe, the Tribal Legislature Defendants, or the Tribal Lending Entities has ever obtained a license to issue loans to consumers in any state, including Plaintiffs' states of residence, let alone a license to issue the triple-digit interest loans to Plaintiffs and the putative class members.

172.    Plaintiffs all applied for their loans on the internet while located in their respective states of residence. None of the Plaintiffs traveled to the Tribe's reservation to obtain their loans.

173.    Plaintiffs all used their home addresses when applying for the loans, and they used bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits used to pay down the loans.

174.    As outlined above, the loans issued to Plaintiffs violated the respective usury statutes of each of their home states and entitle Plaintiffs to the remedies provided under those states' laws, including avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.

175.    Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here.[14]

---

[14] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. §

176.     Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

## COUNT ONE:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

177.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

178.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Damages Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan,

---

286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

37

Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loan.

All Plaintiffs except Plaintiff Butler are members of this class.

179.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Injunctive Class"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming.

All Plaintiffs are members of this class.

180.    **Numerosity**. **Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Fineday and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

181.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans;

and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

182.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

183.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

184.   Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3), and are being sued in their individual capacities with regard to their own individual conduct.

185.   Defendants, along with the Tribe and others, were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

186.   The Usurious Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

187.   The members and associates of the Usurious Lending Organization shared various common purposes, including the evasion of state usury and licensing law, the operation of the "Fineday Funds" website, the processing of applications from consumers across the United States,

39

the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

188.     The Usurious Lending Organization assigned specific roles to the members and associates. The John Doe Defendants designed and directed the Organization and distributed the revenues generated in accordance with the said written agreements.  The role of the named Defendants was primarily to establish and organize the tribal façade for the Organization and to take various measures designed to reinforce the fiction that the Organization is a tribal-run business.

189.     The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

190.     The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce.  The named Defendants perform their roles from the tribal lands in Wisconsin but the John Doe non-tribal Defendants who are operating the Organization do so, upon information and belief, from locations in other states.  The Organization sends loan proceeds into and collects payments from locations throughout the United States.

191.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

192.     Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

193.     All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

194.     As alleged, each of Defendants participated in the collection of unlawful debt.

195.     Plaintiffs and the RICO Damages Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

196.     Additionally, Plaintiffs and the RICO Injunctive Class members will be irreparably harmed absent an injunction prohibiting the continued collection and attempted collection of the illegal loans, including ongoing harm to their credit capacities and eligibility for credit.

197.     Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Damages Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).  Plaintiffs further seek an injunction against Defendants to prevent the continued collection or attempted collection of the disputed debts from the RICO Injunctive Class pursuant to 18 U.S.C. § 1964 and *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001).

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

198.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

199.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of the RICO Damages Class and RICO Injunctive Class in Count One.

200.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained

41

by Fineday and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

201. **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

202. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

203. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

204. Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(c).

205.     Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

206.     Plaintiff and the RICO Damages Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

207.     Additionally, Plaintiffs and the RICO Injunctive Class members will be irreparably harmed absent an injunction prohibiting the continued collection and attempted collection of the illegal loans, including ongoing harm to their credit capacities and eligibility for credit.

208.     Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Damages Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).  Plaintiffs further seek an injunction against Defendants to prevent the continued collection or attempted collection of the disputed debts from the RICO Injunctive Class pursuant to 18 U.S.C. § 1964 and *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001).

**COUNT THREE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

209.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

210.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California,

43

Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loans.

Plaintiffs except Plaintiff Butler are members of the Unjust Enrichment Class.

211.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Gill, Williams and Appiah bring this claim for themselves and the following subclass—the "California Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Fineday; (2) from California, and (3) repaid more than the principal balance of the loans.

Plaintiffs Gill, Williams and Appiah are each a member of this subclass.

212.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Rice brings this action for herself and the following subclass—the "Indiana Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Indiana, and (3) repaid more than the principal balance of the loans.

Plaintiff Rice is a member of this subclass.

213.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Wilson brings this claim for himself and the following subclass—the "Minnesota Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Fineday (2) from Minnesota, and (3) repaid more than the principal balance of the loans.

Plaintiff Wilson is a member of this subclass.

214.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Fulmore, Villanueva, and Rosario bring this action for themselves and the following subclass—the "Florida Unjust Enrichment Subclass"—initially defined as:

44

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Florida, and (3) repaid more than the principal balance of the loans.

Plaintiffs Fulmore, Villanueva, and Rosario are members of this subclass.

215.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Fuentes and Matos bring this action for themselves and the following subclass—the "New Jersey Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from New Jersey, and (3) repaid more than the principal balance of the loans.

Plaintiffs Fuentes and Matos are each a member of this subclass.

216.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Moore and Greenwood bring this action for themselves and the following subclass—the "Georgia Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Georgia, and (3) repaid more than the principal balance of the loans.

Plaintiffs Moore and Greenwood are each a member of this subclass.

217.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Cole brings this action for himself and the following subclass—the "Oregon Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Oregon, and (3) repaid more than the principal balance of the loans.

Plaintiff Cole is a member of this subclass.

218.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thompson brings this action for himself and the following subclass—the "Michigan Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Michigan, and (3) repaid more than the principal balance of the loans.

Plaintiff Thompson is a member of this subclass.

45

219. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Zaccheo brings this action for herself and the following subclass—the "Arizona Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Arizona, and (3) repaid more than the principal balance of the loans.

Plaintiff Zaccheo is a member of this subclass.

220. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Rickabaugh brings this action for himself and the following subclass—the "Nebraska Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Nebraska, and (3) repaid more than the principal balance of the loans.

Plaintiff Rickabaugh is a member of this subclass.

221. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Fineday and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

222. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust

benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

223. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

224. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

225. As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

226. Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

47

227.    Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans issued by Fineday.

## COUNT FOUR
### Declaratory Judgment Under 28 U.S.C. § 2201
### (CLASS CLAIM AGAINST THE TRIBAL LEGISLATURE DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

228.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

229.    Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

230.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

> Plaintiffs Moore, Greenwood, Fulmore, Villanueva, Rosario, Zaccheo, Gill, Williams, Appiah, Wilson, and Cole are members of this class.

231.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Moore and Greenwood bring this claim for themselves and on behalf of a subclass initially defined as follows (the "Georgia Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Georgia; and (3) has an outstanding balance on their loan.

> Plaintiffs Moore and Greenwood are each a member of this subclass.

48

232.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Fulmore, Villanueva, and Rosario bring this claim for themselves and on behalf of a subclass initially defined as follows (the "Florida Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Florida; and (3) has an outstanding balance on their loan.

> Plaintiffs Fulmore, Villanueva, and Rosario are each a member of this subclass.

233.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Zaccheo brings this claim for herself and on behalf of a subclass initially defined as follows (the "Arizona Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Arizona; and (3) has an outstanding balance on their loan.

> Plaintiff Zaccheo is a member of this subclass.

234.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Gill, Williams, and Appiah bring this claim for themselves and on behalf of a subclass initially defined as follows (the "California Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from California; and (3) has an outstanding balance on their loan.

> Plaintiffs Gill, Williams, and Appiah are each a member of this subclass.

235.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Wilson brings this claim for himself and on behalf of a subclass initially defined as follows (the "Minnesota Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Minnesota; and (3) has an outstanding balance on their loan.

> Plaintiff Wilson is a member of this subclass.

236.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Cole brings this claim for himself and on behalf of a subclass initially defined as follows (the "Oregon Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with Fineday; (2) from Oregon; and (3) has an outstanding balance on their loan.

> Plaintiff Cole is a member of this subclass.

237.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Fineday and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

238.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious and/or made without a license under the respective state laws governing the loans; (4) whether the loans are void under the respective state laws governing the loans; and (5) whether Plaintiffs are entitled to declaratory relief.

239.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative classes. All are based on the same facts and legal theories.

50

240.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

241.  Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

242.  None of the Defendants nor Fineday were licensed to make loans in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

243.  Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

244.  Plaintiffs and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

245.  The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

246. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

247. Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are void and invalid and the loans of the Void Debt Class and subclass members are uncollectable. Plaintiffs also seek to enjoin the Tribal Legislature Defendants, in their official capacity, from allowing collection on the loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged herein;

D. An Order providing for any and all injunctive relief the Court deems appropriate;

E. An Order declaring the loans of the Void Debt Class void and uncollectable;

F. An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

G. An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

H.      An Order awarding interest at the maximum allowable legal rate on the foregoing

sums;

I.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including

attorneys' fees; and

J.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Thomas Scott-Railton*
Thomas Scott-Railton[†]
Attorney Bar Number: 5687330
Matthew W.H. Wessler*
Attorneys for Plaintiffs
**GUPTA WESSLER LLP**
Email: thomas@guptawessler.com
Email: matt@guptawessler.com
2001 K Street NW, Suite 850 North
Washington, DC 20001
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

Kristi Cahoon Kelly*
Andrew J. Guzzo*
Matthew G. Rosendahl*
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

---

[†] *Admitted in New York; practicing under direct supervision of members of the District of Columbia Bar under Rule 49(c)(8).*

53

Email: matt@kellyguzzo.com

*Counsel for Plaintiffs*

*\*Applications for admission forthcoming*