**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**Green Bay Division**

| | | |
|---|---|---|
| ALICE GILL, *et al.*, *on behalf of themselves and all individuals similarly situated,* | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 1:25-cv-00489-BBC |
| | : | |
| SOAREN MANAGEMENT, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**PLAINTIFFS' OPPOSITION TO THE TRIBAL DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION AND STAY, OR IN THE ALTERNATIVE, TO**
<u>**DISMISS UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**</u>

Plaintiffs, by counsel, respectfully submit this Opposition to the Motion to Compel

Arbitration and Stay, or in the Alternative, to Dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)

(Dkt. 18) filed by the Tribal Defendants Gena Kakkak, Joey Awonohopay, Spencer Gauthier,

Michael Fish, Jr., Dana Waubanascum, Joan Delabreau, Rebecca Brunette, Daynell Grignon,

Randy Chevalier, and Crystal Chapman-Chevalier.

# INTRODUCTION

This case, and the tribe-payday lending partnership it challenges, "is not unique." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019). Over the last decade, "[c]ourts across the country" have repeatedly confronted these "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *Id.* Under this model, payday lenders use "Native American tribal entities" as "the nominal lender in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in doing so, to preclude enforcement of the interest rate caps in state usury laws." *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352, at *2 (E.D. Va. Nov. 18, 2020) (citing Nathalie Martin & Joshua Swartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012)).

Part and parcel with this tribal lending model, the Tribal Defendants in this case purposefully sought out and engaged with non-tribal coconspirators to establish Eagle Lending, LLC d/b/a Fineday Funds ("Fineday"), a payday lending business holding itself out as an entity owned and operated by the Menominee Indian Tribe of Wisconsin (the "Tribe" or "MITW"). The Tribal Defendants also set up similar lending fronts under the Five Clans and Four Directions tradenames. Through their scheme, the Tribal Defendants and their identified (Soaren Management) and yet-to-be-identified nontribal coconspirators made loans to consumers with annual percentage rates as high as ***795%***—more than ***thirty times*** the highest applicable state usury rate. Such egregiously high interest rates not only violate federal law, but also the usury laws of almost every state, which "[f]rom times immemorial" have sought to "protect desperately poor people from the consequences of their own desperation." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (citation omitted). It is no

1

wonder that, to date, courts have repeatedly rejected attempts by participants in these schemes to evade responsibility, including denying motions to compel arbitration and to dismiss raising the same arguments as the Tribal Defendants here. Those cases have since resulted in landmark settlements cancelling billions in unlawful debt and returning ill-gotten gains to consumers.[1]

Repeating arguments already rejected by numerous courts, the Tribal Defendants seek to compel arbitration under the terms of Plaintiffs' loan agreements. But as the Supreme Court has explained, a party to an arbitration provision "does not forgo the substantive rights afforded by" statutory claims; rather, "it only submits to their resolution in an arbitral forum." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022). Applying this reasoning, the Court in *Viking River* explained that the Federal Arbitration Act (FAA) does not permit enforcement of arbitration provisions that prevent the application of state-law rights and remedies. *See id.* at 653 n.5.

*Viking River* follows the reasoning that other circuit courts have adopted when addressing arbitration provisions that prospectively waive the application of state and/or federal substantive rights and remedies, all of which have concluded that such provisions are unenforceable under the FAA. *See, e.g.*, *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674-76 (4th Cir. 2016) (labeling similar tribal arbitration contracts a "farce," designed specifically "to avoid state and federal law,"

---

[1] *See, e.g.*, *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Hengle v. Asner*, No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

2

and deployed "to game the entire system"); *see also Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023); *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. July 21, 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. July 21, 2020); *Gingras*, 922 F.3d at 117; *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3d Cir. 2018); *Dillon v. BMO Harris Bank*, 856 F.3d 330 (4th Cir. 2017). District courts in the Seventh Circuit have likewise refused to enforce arbitration provisions that prospectively waive state or federal rights. *See, e.g.*, *Fahy v. Minto Dev. Corp.*, 2024 WL 1116050, at *14 (N.D. Ill. 2024) ("[M]ultiple federal courts that have considered the issue both pre- and post-*Viking River Cruises, Inc.* have concluded that the prospective waiver doctrine also applies to waivers of state rights and remedies."); *Harris v. FSST Mgmt. Servs., LLC*, 686 F. Supp. 3d 734, 741-42 (N.D. Ill. 2023) (refusing to compel arbitration under provision that required application of only tribal law and the FAA). And the Seventh Circuit has applied the prospective waiver doctrine in other contexts. *See Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 615, 621 (7th Cir. 2021) (applying prospective waiver in ERISA context and concluding that arbitration agreement that prohibited relief explicitly permitted by federal statute was unenforceable).

The contracts in this case are no different from the provisions at issue in the above cases. Most notably, the "Governing Law" section of the loan agreements is explicit that state substantive law shall not apply to the agreements:

> The laws of the Tribe and applicable federal law will govern this Agreement, ***without regard to the laws of any state or other jurisdiction***, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, ***Tribal law and applicable federal law shall exclusively apply to such dispute***.

*See, e.g.*, Dkt. 20-1 at 11 (emphasis added). The Arbitration Provision then confirms that "the Arbitrator shall apply applicable substantive law consistent with the Governing Law set forth

above." *Id.* at 18. The effect of these provisions is that any arbitrator is prohibited from applying otherwise applicable state substantive rights and remedies, including state defenses to arbitrability, and is instead limited to "exclusively apply[ing]" only tribal and "applicable federal law." This language is virtually identical to the language that the Western District of Virginia found unenforceable in another tribal lending case involving the prospective waiver of state substantive remedies. *See Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 777 (W.D. Va. 2023) ("[B]ased on the reasoning underlying Fourth Circuit and Supreme Court precedent, an arbitration agreement prospectively waiving all state substantive rights and remedies can be found unenforceable for violating public policy."). And it is the same impermissible waiver of state rights that the Northern District of Illinois found unenforceable in *Fahy*. 2024 WL 1116050, at *10-14.

And make no mistake: The intentional waiver of state substantive rights and remedies is no accident. As in *Fitzgerald* and *Fahy*, the Governing Law and Arbitration Provisions in Plaintiffs' loan agreements work in tandem to (a) require the arbitration of all possible claims by Plaintiffs and the class members, including explicitly requiring the arbitration of state law claims, while (b) depriving the arbitrator of the ability to even apply state law, including possible public policy and contract defenses that would prevent the Tribal Defendants from evading state usury protections. In other words, the loan agreements further attempt to achieve Defendants' and their coconspirators' objective to avoid state usury protections and allow them to issue triple-digit-interest loans to desperate consumers. It is no wonder that courts have repeatedly rejected such a "farce." *Hayes*, 811 F.3d at 674-76.

Faced with their explicit waiver of state law, Defendants attempt to distinguish this case by asserting, without any support in the text of the loan agreements, that there is no prospective waiver of state rights and remedies here because the arbitrator can "look to Tribal and federal case

4

law," including state law that might be cited in such cases. Defs.' Mem., Dkt. 19 at 13-14. But this is not what the loan agreements allow. Rather, the agreements explicitly require that the arbitrator "**exclusively apply**" only tribal law and federal law, "**without regard to the laws of any state or other jurisdiction**," which by their plain terms prevents the application of any substantive state law. The prospective waiver doctrine prevents enforcement of arbitration provisions that preclude the application of substantive rights and remedies (state or federal) that would otherwise be available in a non-arbitral forum. That is precisely what the Governing Law provision accomplishes here, and the ability to merely look at federal cases that may have applied state law does not equate to the ability to apply state substantive rights and remedies. Under the reasoning in *Viking River* and every other court of appeals case to address similar provisions, therefore, the Arbitration Provision here is unenforceable as a prospective waiver of state substantive rights and remedies, including state law defenses to arbitration itself.

In addition to expressly waiving state law, the loan contracts surreptitiously waive the only federal statute related to usurious loans that they purport to incorporate: the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Although the loan contracts do not expressly waive RICO, they require the application of the Tribe's law, which conveniently omits RICO from the available protections. And, the contracts and tribal code also prevent arbitrators from applying state laws that are used to define what constitutes an unlawful debt under RICO in the first place. *See* 18 U.S.C. § 1961(6) (defining "unlawful debt" as debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury[.]"). Because there is no federal usury statute, by prohibiting application of state law, the loan contracts ensure that a consumer may not bring a RICO claim for the collection of unlawful debt—a result the Fourth Circuit found constitutes a prohibited prospective waiver. *Hengle*, 19 F.4th at 343

(explaining that "a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy," thereby violating the prospective waiver doctrine).

Faced with the unavoidable prospective waiver on multiple fronts, the Tribal Defendants alternatively ask the Court to dismiss Plaintiffs' claims under the doctrines of tribal sovereign immunity and legislative immunity. But again, courts have addressed these same arguments and rejected them. Indeed, "a suit for damages against a tribal officer, in his individual capacity, means that 'the real party in interest is the individual, not the sovereign,'" so sovereign immunity does not apply. *Fitzgerald*, 687 F. Supp. 3d at 779 (quoting *Lewis v. Clarke*, 581 U.S. 155 (2017)). And, as here, Plaintiffs may also seek injunctive and declaratory relief against the Tribal Defendants in their official capacities under *Ex parte Young* to prevent continued violations of the law. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014); *Hengle*, 19 F.4th at 345. The Tribal Defendants' status as legislators does not save them, either, as courts have found the oversight of lending schemes like the one at issue in this case does not touch on the Tribe's legislative functions, and the Tribal Defendants are not being held liable for those functions. Rather, the Tribal Defendants are liable for their oversight of and personal involvement in conducting the affairs of the lending entities at issue in this case. Such conduct is not protected by legislative immunity. *Fitzgerald*, 687 F. Supp. 3d at 781.

In sum, Defendants' effort to compel arbitration fails. By their terms, the loan contracts prospectively and improperly waive state and federal rights and remedies available to borrowers like Plaintiffs. As the Tribal Defendants' arguments for dismissal under Rule 12(b)(1) and 12(b)(6) are likewise without merit, their Motion should be denied entirely.

<u>**MOTION TO COMPEL ARBITRATION**</u>

**A.      Overview of the Prospective Waiver Doctrine**

The FAA provides that arbitration contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Hengle*, 19 F.4th at 334 (quoting 9 U.S.C. § 2).  Thus, courts may only invalidate an arbitration contract "based on 'generally applicable contract defenses.'"  *Id.* (quoting *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017)).  "One such generally applicable defense is the so-called 'prospective waiver' doctrine, under which an agreement that prospectively waives 'a party's right to pursue statutory remedies' is unenforceable as a violation of public policy."  *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)).

The prospective waiver doctrine boils down to a simple proposition: An arbitration agreement that "forbid[s] the assertion of certain statutory rights" is a violation of public policy and cannot be enforced under the FAA.  *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (the FAA's "effective vindication" exception to the enforceability of arbitration agreements "would certainly cover" this type of arbitration agreement); *see also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) ("[A] substantive waiver of federally protected civil rights will not be upheld.").  Put differently, "[a]lthough parties possess broad latitude to specify the rules under which their arbitration will be conducted, they must preserve the ability to assert federal statutory causes of action so that 'the statute[s] will continue to serve both [their] remedial and deterrent function[s].'"  *Hengle*, 19 F.4th at 334 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)).

Although most cases applying the doctrine revolve around the prospective waiver of federal rights and remedies, the Supreme Court has recently confirmed that the doctrine also

applies to prospective waivers of state rights and remedies as well. *See Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919, n.5 (2022). In *Viking River*, the Supreme Court expressly rejected an argument that "the principle that the FAA does not mandate enforcement of provisions waiving substantive rights is limited to federal statutes." *Id*. In doing so, the Court explained that there "is not anything unique about federal statutes" that limits the application of the prospective waiver doctrine to only federal laws. *Id*. "That is why," the Court added, it had previously considered the application of the doctrine in a case concerning "claims arising under state law." *Id*. (citing *Preston v. Ferrer*, 552 U.S. 346, 359 (2008) (enforcing an arbitration contract because it relinquished "no substantive rights the TAA or other California law may accord him").[2]

Waiving substantive claims is a hallmark feature of tribal lending agreements—and it has now been rejected by the Second, Third, and Fourth Circuits *in eight separate cases*. In each case, the circuits held that the prospective waiver doctrine invalidates arbitration provisions that have the same effect as the agreement here: "an unambiguous attempt to apply tribal law to the exclusion of federal and state law." *Dillon*, 856 F.3d at 336; *see also Martorello*, 59 F.4th 68; *Hengle*, 19 F.4th at 349; *Gibbs v. Haynes Invs., LLC*, 967 F.3d at 332; *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d at 286; *Gingras*, 922 F.3d at 117; *MacDonald*, 883 F.3d at 232.

Although the Seventh Circuit has yet to squarely take up the issue in the context of tribal lending, district courts in the Seventh Circuit have refused to enforce arbitration provisions in tribal loan agreements that, like the agreements here, prospectively waive state and/or federal substantive rights and remedies.

---

[2] Plaintiffs anticipate that the Defendants will try to brush off *Viking River*'s statements as "dicta," but even if that characterization were correct—and it isn't—Supreme Court dicta "provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it." *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994).

First, in *Harris v. FSST Management Services*, Judge Leinenweber of the Northern District of Illinois found that an arbitration provision that requried application of "applicable tribal and substantive law of the Flandreau Santee Sioux tribe" evidenced that the "animating purpose of the arbitration agreement is to incorporate tribal law to the exclusion of federal and state law, representing an 'integrated scheme to contravene public policy.'" 686 F. Supp. 3d at 740. The court found this impermissible waiver even though the provision also purported to invoke "applicable substantive law consistent with the FAA" as part of the agreement, because this generic language did not expand the otherwise restrictive governing provision. *See id.* Thus, the court held, the arbitration provision, including its delegation clause, was an unenforceable prospective waiver because consumers had no effective way to challenge arbitration or vindicate their federal and state rights through the arbitral forum. *See id.* at 741-42.

Second, in *Fahy v. Minto Development Corporation*, Judge Kennelly of the Northern District of Illinois refused to compel arbitration under the prospective waiver doctrine. First, the court refused to enforce an arbitration provision that explicitly excluded the "laws of any state or other jurisdiction," which the court found was an obvious prospective waiver of federal and state rights. *See* 772 F. Supp. 3d at 799-800. The court then considered a separate loan agreement that included revised language that—like the loan contracts here—applied "the laws of the Tribe and applicable federal law" while still precluding the application of state law, including, as in this case, language that precluded the application of the "laws of any state or other jurisdiction." *See id.* at 802-03. Although permitting the application of federal law, the court found that this provision still created an impermissible prospective waiver of "state-law rights" that was unenforceable. *See id.* In reaching this conclusion, the court observed that "multiple federal courts that have considered the issue both pre- and post-*Viking River Cruises, Inc.* have concluded that the prospective waiver

9

doctrine also applies to waivers of state rights and remedies." *Id.* at 803 (collecting cases). Because the provision at issue precluded the application of state substantive law, including state contract defenses to the arbitrability of any disputes in the first place, the court denied the defendants' motion to compel arbitration. *See id.*

### B. Defendants' Arbitration Provision, including the Delegation Clause, is Unenforceable under the Prospective Waiver Doctrine

Here, the Tribal Defendants' effort to compel arbitration of Plaintiffs' claims fails for a simple reason: By its terms, the arbitration provision and tribal law have *multiple* provisions that prospectively waive all rights and remedies available to borrowers. To begin, each of the Plaintiffs signed a loan contract containing a "Governing Law" provision, which states:

> The laws of the Tribe and applicable federal law will govern this Agreement, ***without regard to the laws of any state or other jurisdiction***, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, ***Tribal law and applicable federal law shall exclusively apply to such dispute***.

*See, e.g.*, Dkt. 20-1 at 11 (emphasis added). The contract's Arbitration Provision, in turn, provides "limitations on the arbitrator," including that the "arbitrator shall apply applicable substantive law consistent with the Governing Law set forth above . . . ." *Id.* at 18. In other words, the Arbitration Provision explicitly limits the arbitrator to "exclusively apply" the law of the Tribe and "applicable federal law," "without regard to the laws of any state or other jurisdiction," thereby excluding the application of any state substantive laws and remedies.

In doing so, the Governing Law provision and Arbitration Provision work in tandem to "'convert a choice of law clause into a choice of no law clause' by renouncing the authority of any state statutes," in violation of the prospective waiver doctrine. *Fitzgerald*, 687 F. Supp. 3d at 777, n.13 (quoting *Hayes*, 811 F.3d at 675). The Governing Law provision thus ensures that the arbitrator could not invalidate the contract based on state law, *i.e.*, the precise grounds the district

10

court and Fourth Circuit identified as rendering the contract invalid in *Hengle*. 19 F.4th at 352

("Our review likewise leads us to conclude that the Supreme Court of Virginia would not enforce

the governing-law clause because it violates Virginia's compelling public policy against

unregulated usurious lending."), *aff'g*, 433 F. Supp. 3d 825 (E.D. Va. 2020).

Indeed, the Governing Law provision in this contract is almost identical to a provision held

invalid by the Fourth Circuit in *Dillon*. Just as in the contracts in this case, one of the provisions

in *Dillon* stated: "[t]his Agreement and the Agreement to Arbitrate are governed by [tribal law]"

and "[n]either this Agreement nor the Lender is subject to the laws of any state of the United

States." *Dillon*, 856 F.3d at 335. Another provision stated: "I further understand, acknowledge

and agree that this loan is governed by the laws of the Otoe-Missouria Tribe of Indians and is not

subject to the provisions or protections of the laws of my home state or any other state." *Id*. at 336.

In rejecting this language under the prospective waiver doctrine, the Fourth Circuit explained:

> We hold that the above provisions in the Great Plains Agreement are not
> distinguishable in substance from the related provisions in the Western Sky
> Agreement that we held unenforceable in *Hayes*. The arbitration agreement in this
> case implicitly accomplishes what the Western Sky Agreement explicitly stated,
> namely, that the arbitrator shall not allow for the application of any law other than
> tribal law. Just as we did in *Hayes*, we interpret these terms in the arbitration
> agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal
> and state law*.

*Id*. at 335–36 (emphasis in the original, internal citations omitted).

The Governing Law provision also mirrors the same language invalidated by the court in

*Fahy*. As there, the Governing Law provision here—and the Arbitration Provision that

incorporates it—requires exclusive application of "Tribal law and applicable federal law," and

explicitly states that it shall be applied "without regard to the laws of any state or other

jurisdiction," which the court in *Fahy* found constituted an impermissible waiver of state

substantive rights. *See* 772 F. Supp. 3d at 802-803.

11

As there is no material difference between the language at issue in this case and the language in other cases finding the same prospective waiver, the Arbitration Provision, including the language delegating questions of arbitrability to an arbitrator (the so-called "Delegation Clause"), is unenforceable under the prospective waiver doctrine. Indeed, "to challenge an agreement's delegation clause, 'a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions.'" *Fahy*, 722 F. Supp. 3d at 797 (quoting *MacDonald*, 883 F.3d at 226-27); *see also Hengle*, F.4th at 335 ("A party may contest the enforceability of the delegation clause with the same arguments it employs to contest the enforceability of the overall arbitration agreement"). Because an arbitrator would be precluded from applying state law even in deciding questions of arbitrability (such as the unconscionability or mutual assent), the delegation of such questions is itself impermissible as a matter of public policy under the prospective waiver doctrine. *See Hengle*, F.4th at 338 (refusing to enforce delegation clause that precluded application of contractual defenses to arbitrability).[3] And because a consumer could not effectively vindicate any state law claims, including state usury protections, in the arbitral forum, the Arbitration Provision as a whole is likewise unenforceable as a prospective waiver, under the reasoning in *Viking River*, *Fitzgerald*, and *Fahy*.

C.      **Defendants' Arguments Fail to Avoid the Prospective Waiver Issue.**

In an attempt to distinguish this case from *Fahy* and others finding an impermissible prospective waiver, the Tribal Defendants argue that the loan agreements do not in fact "waive

---

[3] *See also Fitzgerald*, 687 F. Supp. 3d at 776 (holding that "the delegation clause and the entire Arbitration Provision here violate public policy because the loan agreements prospectively waive the vindication of any state substantive remedies and rights in arbitration, including Plaintiffs' rights to pursue state usury claims."); *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 786 (E.D. Pa. 2016) (explaining that enforcement of "the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement without authority to apply any applicable federal or state law.").

12

substantive claims, statutory remedies, or state law." Defs.' Br. at 10-13. This is so, Defendants claim, because the Arbitration Provision: (1) requires arbitration of "'all U.S. federal or state law claims'" and (2) requires the arbitrator to "'apply applicable substantive law consistent with the Governing Law set forth above.'" *Id.* at 11-12 (quoting loan agreements). According to Defendants, this language "allow[s] consumers to bring all claims, state, federal, common law or otherwise, and directs the Arbitrator to apply Tribal law, federal law, and all other substantive law pursuant to Tribal and federal law." *Id.* at 13. With respect to state substantive law, Defendants argue that the arbitrator could apply state law in the same manner it is applied in any federal case law that they might rely upon. *See id.* at 13-14. But this argument defies logic and the plain language of the agreements.

Indeed, the mere fact that the Arbitration Provision requires arbitration of state law claims does not mean that an arbitrator can effectively apply state law to those claims to vindicate Plaintiffs' state-law rights. To the contrary, as the district court observed in *Hengle*, "that the disputes covered by the Arbitration Provision include those arising under federal and state law merely serves the Tribal Lending Entities' apparent purpose in crafting the Provision to compel arbitration of all possible disputes only to nullify the disputes by preluding the application of federal and state law—the precise problem highlighted by the Fourth Circuit in *Hayes*." *Hengle v. Asner*, 433 F. Supp. 3d 825, 858 (E.D. Va. 2020) (citation omitted). The language Defendants cite achieves this same objective, and it fails to overcome the express exclusion of the "laws of any state or other jurisdiction" and the mandate that the arbitrator "exclusively apply" only tribal and applicable federal law. *See id.* at 855 (noting that courts "must read the Arbitration Provision to give effect to all of its terms and render them consistent with each other").

Likewise, although Defendants rely on the Arbitration Provision's language requiring the arbitrator to "apply applicable substantive law consistent with the Governing Law set forth above," such language in fact reinforces the preclusion of state law by the arbitrator. Indeed, the only "applicable substantive law" that could be applied "consistent with the Governing Law set forth above" is, as the Governing Law provision states, "[t]he laws of the Tribe and applicable federal law . . . *without regard to the laws of any state or other jurisdiction*." To hold otherwise would render the highlighted language, as well as the separate clause requiring the "exclusive[]" application of tribal and federal law a nullity—a result the court should avoid. *See Hengle*, 433 F. Supp. 3d at 855.

Finally, the Tribal Defendants' claim that the arbitrator could apply state law insofar as it is applied by federal courts in similar cases again finds no support in the language of the agreement itself. For one, the cases Defendants cite for this proposition are cases in which arbitration *was not compelled* to avoid the very prospective waiver at issue here, thus allowing the application of state substantive rights and remedies by those courts. If anything, this underscores why the prospective waiver doctrine exists, as the Supreme Court has been clear that the FAA is merely a mechanism to have claims decided in another forum; it is not a means to avoid substantive rights through forum shopping. *See Viking River*, 596 U.S. at 693. Based on the language of the Governing Law and Arbitration Provisions, an arbitrator could not apply state law in the same manner as the courts Defendants cite in their brief—the precise problem that the prospective waiver doctrine is meant to avoid and that should also be avoided here.

**D.      The Arbitration Provision is also Unenforceable because the Tribe's Financial Regulations Deprive Consumers of their Federal Rights and Remedies**

In addition to the prospective waiver of state law in the loan contracts, the Arbitration Provision is unenforceable for another reason: the Tribe's Consumer Financial Services Regulation

14

("Tribal Regulation"), which the arbitrator must "exclusively apply," prospectively waives a borrowers' rights and deprives them of any meaningful opportunity to vindicate their claims. "Like other contractual provisions, forum selection clauses—even those designating arbitral fora—are not immune from the general principle that unconscionable contractual provisions are invalid." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 778 (7th Cir. 2014).

In *Jackson*, the Seventh Circuit found that a tribal arbitration agreement was unconscionable because "the Tribe has neither a set of procedures for the selection of arbitrators nor one for the conduct of arbitral proceedings," thereby making it impossible to "to ascertain the dispute resolution processes and rules to which they were agreeing." *Id*. Moreover, the Seventh Circuit found that the arbitration agreement was substantively unconscionable because the "dispute-resolution mechanism set forth in the loan agreements" required arbitration to be conducted by the "Cheyenne River Sioux Tribal Nation by an authorized representative," including by rules that did not exist. *Id*. As a result, the Seventh Circuit concluded that "there was simply no prospect 'of a meaningful and fairly conducted arbitration,'" and, instead, it labeled this aspect of the loan agreement as "a sham and an illusion." *Id*. (citation omitted).

Here, the contracts are even worse because the "tribal law" governing them deprives borrowers of any meaningful arbitration and gurantees victory for the tribe. Indeed, on three occasions, the Fourth Circuit has examined the substance of similar tribal laws to invalidate arbitration agreements. *See, e.g.*, *Haynes Investments*, 967 F.3d at 343 (finding that the arbitration agreements were unenforceable because the "relevant tribal codes would not permit" a borrower "to effectively vindicate the federal protections and remedies they seek"); *see also Hengle*, 19 F.4th 324 at 343 ("[W]e conclude that a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not

15

pursue RICO's treble damages remedy."); *Martorello*, 59 F.4th at 85 ("[T]he [Tribal] Code provisions referenced by the Loan Agreement would not permit the Borrowers to effectively vindicate their federal statutory rights."). In these cases, the Fourth Circuit took issue with three sections of the respective tribe's code—all of which mirror the Tribal Regulation here.

*First*, the Fourth Circuit in *Haynes* observed that "although § 5.1 of the Otoe-Missouria Tribal Consumer Financial Services Ordinance" provided that lenders shall comply with "federal laws as applicable," RICO was "noticeably absent from the list of federal consumer protection statutes with which a lender must apply." *Id*. at 343 (citing *Otoe-Missouria Tribal Consumer Fin. Servs. Ord*. §§ 5.2(a) (2018)).[4] "And even for the laws listed," the Fourth Circuit noted that the "Ordinance makes clear that a lender's compliance does not constitute 'consent . . . related to the applicability of federal laws[.]" *Id*. (citing § 5.2(a)). Since this Tribe appears to have been represented by the same law firm as the tribe in *Haynes*, it is no surprise that § 22-1 of the Tribal Regulation is *identical* in this respect. *Compare* Dkt. 21-4 at 14 (providing that a licensee "shall conduct business in a manner consistent with the principles of federal consumer protection law" and omitting any reference to RICO in the list of statutes); *with* Ex. 1 at pg. 12.

*Second*, although the tribal law in *Haynes* allowed for a claim against the lending entity, the Fourth Circuit further found a prospective waiver occurred because tribal law did not allow for claims against individuals or non-tribal entities. In particular, the Fourth Circuit explained: "[A] borrower's ability to assert a federal statutory claim under tribal law against an individual or entity (such as the Haynes Defendants) related to a lender remains even more elusive: although the Ordinance governs 'licensed lenders' and mandates their compliance with tribal and applicable

---

[4] For the convenience of the Court, attached hereto as Exhibit 1 is the Otoe-Missouria's Tribal Consumer Financial Services Regulatory Ordinance.

federal law, it says nothing about non-tribal entities or individuals associated with the lenders who may have violated RICO." *Id.* Once again, the Tribal Regulation at issue in this case is identical in this respect. *See* Dkt. 21-4 at § 22-9.

*Third*, "even if the borrowers could assert a RICO claim against the Haynes Defendants under tribal law," the Fourth Circuit concluded that "the rest of the Ordinance fail[ed] to clarify how any consumer could meaningfully pursue any claims under it." *Id.* at 344. Stated differently, "[a]lthough the Ordinance contain[ed] a consumer complaint procedure," the tribal code "does not provide for or establish a private right of action for violations of any provisions, let alone any federal laws." *Id.* (citing §§ 8.1-8.4). The same is true here—the Tribal Regulation allows only for the imposition of fines against the lender. *See* Dkt. 21-4 at §§ 22-9, 22-10 (establishing the enforcement power of the Authority).

Worst yet, tribal law does not even allow for arbitration. *Id* at § 22-10. Instead, the Tribal Regulation only provides for a "Formal dispute resolution procedure," whereby a tribal agency "may grant or deny a consumer complaint and grant or deny such relief, if any, as the Authority determines in its sovereign discretion." *Id* at § 22-10(7). The same was true in *Haynes*, where the Fourth Circuit found it problematic that the "tribal commission overseeing such a claim" was permitted to "grant or deny any relief as the Commission deems appropriate," thereby making it "clear that a claimant would be unable to assert a RICO claim against entities associated with a tribal lender." *Id.* So too here. Rather than allowing for arbitration, the very law governing the contract mandates that a tribal agency gets to determine the dispute "in its sovereign discretion."

The Tribal Regulation not only contains virtually identical code provisions to those considered and rejected as impermissible waivers in *Haynes*, *Hengle*, and *Martorello*, it goes several steps further. Most notably, in a section entitled "Application of Other Laws," it provides:

> Any federal law not applicable to Indian tribes or state law limiting the rate or amount of interest, discount, points, finance charges, service charges, or other charges which may be charged, taken, collected, received, or reserved shall not apply to extensions of credit under a loan operated in accordance with this section.

Dkt. 21-4, at 20 (§ 22-8(D)(5)). This provision operates as a prospective waiver twice over. First, by prohibiting the application of any federal law other than those "applicable to Indian *tribes*," it naturally excludes *every* other federal law, such as those that apply to businesses and individuals. The Tribal Regulation, in other words, waives all federal laws applicable to its business partners, such as Defendants Soaren Management and Kraken Holdings. This is the only and most harmonious construction of the phrase, and it is also consistent with the other provisions of the Tribal Regulation that carve out claims against "non-tribal entities or individuals associated with the lenders who may have violated RICO," as recognized by *Haynes*.

And second, by excluding any state law limiting the amount of interest, the Tribal Regulation surreptitiously waives borrowers' rights under the most relevant federal statute, the Racketeer and Corrupt Influenced Organizations Act, which is predicated on state usury laws. Indeed, because there is no federal usury statute, this provision ensures that a consumer may not bring a RICO claim for collection of unlawful debt—a result prohibited by *Hengle*. 19 F.4th at 343 (explaining "a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy," thereby violating the prospective waiver doctrine).

The Tribal Regulation not only prohibits the vindication of all relevant substantive rights, but it also guarantees victory for the Tribe, its employees, and any "vendor"—thereby further waiving any federal rights. This is accomplished through another section that provides:

> In *any proceeding* in which a licensee is a party in interest with respect to *any transactions* with a consumer, the licensee's rights and remedies shall be granted based upon prima facie proof and entitlement based upon the terms of the written

18

transaction documents and the payment and business records maintained by the licensee in the ordinary course of business.

Dkt. 21-4 at 20 (§ 22-8(D)(7)) (emphasis added).[5] Tribal law, in other words, mandates an automatic win for Defendants in "any proceeding," such as arbitration, so long as they: (1) produce the loan contract; and (2) any documents relating to payments. This unconscionable law ensures that consumers cannot vindicate their substantive rights in any proceeding, including arbitration.

Although easier to identify, an express waiver of federal law in a loan contract is not the only way to violate the prospective waiver doctrine. There is a myriad of ways in which creative legal minds can implicitly achieve the same result. One such way is to enact laws that prevent an arbitrator from applying any federal laws to non-tribal members like Soaren Management. Another way is to enact a law that disclaims state interest rate caps, thereby surreptitiously waiving a borrowers' relevant federal rights predicated on those very laws. Still another way is to enact a law that requires an automatic win for the tribal lending entity upon production of a loan contract and payment history. Here, the loan contracts and the Tribal Regulation accomplish all three forms of impermissible waivers, amounting to a trifecta of waivers that effectively nullify any rights or remedies to which Plaintiffs and other consumers are entitled under federal and state law. Just as in *Haynes*, *Hengle*, and *Martorello*, the Tribal Regulation in this case do not allow borrowers "to effectively vindicate the federal protections and remedies they seek." *Haynes*, 967 F.3d at 343. The Arbitration Provision is unenforceable for this independent reason, as well.

\* \* \*

The Arbitration Provision, including the delegation clause within it, are unenforceable as a matter of public policy, whether under the prospective waiver of state law rights and remedies

---

[5] The Tribal Regulation defines "Licensee" to include third parties such as Soaren Management, who are considered a "Vendor Licensee" under the Regulation. Dkt. 21-4 at § 22-3.

19

through the Governing Law and Arbitration Provisions, or the prospective waiver of federal statutory rights and remedies through the Tribal Regulation. Defendants' Motion to Compel should therefore be denied.

## MOTION TO DISMISS UNDER RULE 12(b)(1)

The Tribal Defendants also seek dismissal of Plaintiffs' claims against them under the doctrines of tribal sovereign immunity and absolute legislative immunity. Both arguments fail, however, and their Rule 12(b)(1) Motion to Dismiss should be denied.

### A.      Plaintiffs' Claims Do Not Implicate Tribal Sovereign Immunity

The Tribal Defendants first argue that tribal sovereign immunity precludes Plaintiffs' claims against them, as the claims are in fact against the sovereign Tribe and not them as individuals. Defs.' Br. at 17-18. However, the Tribal Defendants' argument runs aground when considering the nature of the relief that Plaintiffs seek. As explicitly stated in the Complaint, Plaintiffs seek monetary damages from the Tribal Defendants only in their individual capacities, while seeking injunctive and declaratory relief against them in their official capacities. Compl., Dkt. 1 ¶¶ 32-41. Both forms of relief are permissible either as an exception to tribal immunity (injunctive and declaratory relief) or as relief that does not implicate the sovereignty of the Tribe at all (monetary relief against the Tribal Defendants individually).

> 1.      *Plaintiffs may seek prospective relief from the Tribal Defendants in their official capacities for their violations of federal and state law.*

First, as the Fourth Circuit explained in *Hengle*, "the Supreme Court has consistently recognized that tribal immunity does not bar suits against 'individuals, including tribal officers, responsible for unlawful conduct.'" 19 F.4th at 345 (quoting *Bay Mills*, 572 U.S. at 796). This includes suits to enjoin violations of state law. *Id.* (citing *Puyallup Tribe v. Dep't of Game*, 433 U.S. 165, 171–72 (1977) (suit to enjoin off-reservation fishing in violation of state law)). "And,

20

by analogy to *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), tribal officers are 'not protected by the tribe's immunity from suit' when a plaintiff seeks to enjoin a violation of federal law." *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978) (suit for declaratory and injunctive relief alleging that tribal ordinance violated federal law)).

Applying this reasoning, the Fourth Circuit held that consumers could sue tribal officials in their official capacities to enjoin violations of state and federal law related to their off-reservation activities, including the payday lending at issue in this case. *See id.* at 345-47. Because Plaintiffs seek injunctive relief against the Tribal Defendants to force their compliance with federal law—namely, RICO—as well as declaratory relief that the disputed loans are void to the extent state law provides, such relief is permissible against them in their official capacities.

The Tribal Defendants do not challenge *Bay Mills* or its progeny. Instead, they argue that tribal sovereign immunity should nonetheless protect them from Plaintiffs' claims entirely, even to the extent they seek only injunctive and declaratory relief. But the Tribal Defendants ignore that *Ex parte Young* permits injunctive and declaratory relief against government and tribal officials as an ***exception to*** sovereign immunity, and thus even if immunity did apply to the Tribal Defendants here (it does not for the reasons stated below), such relief is still permissible. *See Crowe & Dunlevy v. Stidham*, 640 F.3d 1140, 1154-55 (10th Cir. 2011) (recognizing that *Ex parte Young* constitutes "an exception not just to state sovereign immunity but also tribal sovereign immunity" (collecting cases)). For this reason, the Tribal Defendants' Rule 12(b)(1) Motion should be denied with respect to Plaintiffs' claims for injunctive and declaratory relief.

> 2. *Plaintiffs may seek monetary relief from the Tribal Defendants in their individual capacities.*

Plaintiffs' claims for monetary relief from the Tribal Defendants in their individual capacities are also permissible, as they do not implicate the sovereignty of the Tribe.

To determine whether sovereign immunity applies to suits against government officials and employees, "courts should look to the whether the sovereign is the real party in interest." *Lewis v. Clarke*, 581 U.S. 155, 161-62 (2017) (citation omitted). "If, for example, an action is in essence against a State even if the State is not a named party, then the State is the real party in interest and is entitled to invoke [sovereign immunity]." *Id.* at 162. "Similarly, lawsuits brought against employees in their official capacities 'represent only another way of pleading an action against each entity of which an officer is an agent,' and they may also be barred by sovereign immunity." *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

As the Supreme Court explained in *Lewis*, however, the "distinction between individual- and official- capacity suits is paramount" to decisions of whether the sovereign entity is in fact implicated. *Id.* Indeed, while "the relief sought [in an official-capacity claim] is only nominally against the official and in fact against the official's office and thus the sovereign itself, . . . [p]ersonal-capacity suits . . . seek to impose *individual* liability upon a government officer for actions taken under color of state law." *Id.* (emphasis added) (citation omitted). To be sure, the government officer in a personal-capacity suit may be entitled to personal immunity defenses— such as the legislative immunity doctrine urged by Tribal Defendants here—but the immunity of the sovereign is not implicated. *See id.* at 163. This is because the "real party in interest is the individual, not the sovereign." *Id.* Sovereign immunity therefore "'does not erect a barrier against suits to impose individual and personal liability.'" *Id.* (quoting *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991)). This is true even for conduct performed by an individual in their capacity as an employee or officer of the sovereign. *See id.* at 163-64.

Applying this reasoning, the Western District of Virginia in *Fitzgerald* rejected the same argument raised by tribal officials sued personally for damages in another RICO action arising

22

from a tribal lending scheme.  There, as here, the plaintiffs had asserted RICO claims against the tribal officials in their individual capacities.  *Fitzgerald*, 687 F. Supp. 3d at 778-79.  As here, the tribal officials argued that they were entitled to the tribe's sovereign immunity.  *See id.*  However, the court found that because the claims were against the officers in their individual capacities, "'the real party in interest is the individual, not the sovereign,'" and thus the claims against them did not implicate tribal sovereign immunity.  *See id.* (quoting *Lewis*, 581 U.S. at 163).  The court found that the limited exceptions to this general principle, such as "when a plaintiff attempts to reach the tribal treasury or when a suit interferes with tribal self-government or undermines the tribal forum's authority'" were not implicated, as the claims clearly related to off-reservation lending activity that did not directly impact the Tribe's own governance.  *See id.*  Accordingly, the court rejected the claims to sovereign immunity.

So too here.  Plaintiffs' claims for monetary relief are directed explicitly against the Tribal Defendants as individuals for their role in a nationwide, off-reservation scheme that involved lending millions in high-interest loans to non-tribal consumers in other sovereign states. *See, e.g.*, Compl. at ¶¶ 32-41, 184, 197, 208.  The claims do not implicate the sovereign Tribe but seek the Tribal Defendants' personal assets because of their executive oversight and management of the scheme and creation of the tribal artifice that allows the enterprise to continue operating.  Plaintiffs are entitled to seek relief from the Tribal Defendants as individual tortfeasors, even if their conduct was within the scope of their duties for the Tribe.  *See Lewis*, 581 U.S. at 163-64 (finding that sovereign immunity did not extend to torts by tribal employee sued in his individual capacity even when "he was acting within the scope of his employment").

The Tribal Defendants' cited authority does not alter this analysis.  The Tribal Defendants rely primarily on *Mestek v. LAC Courte Oreilles Community Health Center,* 72 F.4th 255 (7th Cir.

2023), and *Miller v. Coyhis*, 877 F. Supp. 1262 (E.D. Wis. 1995). But in *Mestek*, the plaintiff sued a tribal health center and five of its employees seeking "front pay, back pay, damages, reinstatement, and injunctive relief prohibiting defendants from blacklisting or retaliating against her." 72 F.4th at 262. This relief—which related to the plaintiff's employment with the Health Center—would necessarily "come from the Health Center's coffers." *Id.* Accordingly, the court held, the suit was against the individuals in their official capacities and thus implicated the sovereign immunity of the tribe. *See id.* No such relief is implicated here. Instead, Plaintiffs explicitly seek damages from the tortious conduct of each *individual* Tribal Defendant, including their respective roles in overseeing and establishing the tribal façade that allowed the usurious lending enterprise to continue to profit from Plaintiffs and the class members.

Likewise, in *Miller*, the court relied on the fact that the only allegations of wrongdoing by the tribal official defendants related to drafting and voting on a resolution in their capacity as "members of the Community's governing body" and "informing Mr. Miller of the tribal council's actions." 877 F. Supp. at 1266. Because the plaintiff did not allege individual, non-legislative conduct giving rise to the alleged injury, the court found that the suit was against the officials in their official capacities and thus implicated the immunity of the tribe. *See id.*

Here, on the other hand, the Complaint alleges specific individual conduct by the Tribal Defendants beyond simply voting in a legislative capacity, including: (1) oversight and management of the lending entities and economic affairs of the Tribe (Compl. ¶¶ 6, 32-41, 140); (2) inviting and accepting rent-a-tribe partnerships (¶ 118); and (3) creating and maintaining the tribal façade that permits the lending entities to operate in the first place (¶¶ 140-41). These activities are not official legislative functions like voting to pass legislation, but individual conduct

24

that created the necessary foundation on which the usurious lending enterprise is built. Accordingly, *Miller* is inapposite, and the Tribal Defendants' claim to sovereign immunity fails.

**B. Legislative Immunity Does Not Shield the Tribal Defendants**

The Tribal Defendants' alternative request for legislative immunity similarly falls flat. According to the Tribal Defendants, they are entitled to absolute immunity from suit, including for injunctive relief, because their wrongful conduct was wholly legislative in nature and thus entitled to immunity under the legislative immunity doctrine. Br. at 26-27. This argument would be valid if all Plaintiffs had challenged were the Tribal Officials' votes on specific legislation, such as the Tribal Regulation, but that is not what the Plaintiffs challenge here.

Instead, as detailed above, Plaintiffs seek relief against the Tribal Defendants not for their voting records or for passing specific legislation, but for their management and oversight of the economic affairs of the Tribe, including the creation of the lending entities, the inviting and acceptance of rent-a-tribe partnerships, and their maintenance of the tribal façade that allows the entire scheme to continue functioning. Compl. ¶¶ 6, 32-41, 118, 140. As the court found in *Fitzgerald* when addressing the same argument, this conduct is inherently executive in nature and thus "not barred by absolute legislative immunity." 687 F. Supp. 3d at 781; *see also Hengle*, 433 F. Supp. 3d at 888 (finding that legislative immunity was not implicated when "Plaintiffs' limited relief did not seek to hold the Tribal Officials liable for passing the Ordinance or for licensing the Tribal Lending Entities, but merely for allowing the continued collection of loans deemed usurious under generally applicable Virginia law"). For the same reasons, the Court should reject the Tribal Defendants' claims to legislative immunity here.[6]

---

[6] Even if the Court disagrees with Plaintiffs, legislative immunity is only relevant to the claims against the Tribal Officials *in their individual capacities*. As the Supreme Court has explained, proper application of a public officials' immunity and liability "requires careful adherence to the

Finally, the Tribal Defendants seek to dismiss Plaintiffs' claims under Rule 12(b)(6), arguing that (1) the RICO claims are pled in a shotgun manner; (2) there are insufficient allegations that the Tribal Defendants were unjustly enriched by the scheme; and (3) the declaratory judgment claim fails to cite a statutory basis for the requested relief. Br. at 28-30. These arguments each fail, and Defendants' Motion to Dismiss under Rule 12(b)(6) should also be denied.

### A.      Plaintiffs Have Pled Sufficient Facts to Support their RICO Claims

The Tribal Defendants first argue that Plaintiffs' RICO claims rely on "shotgun" pleading that fails to notify them of the claims against them, in violation of Rule 8. Br. at 28-29.

But as the court in *Fitzgerald* found in rejecting the same argument based on very similar allegations, simply grouping the Tribal Defendants together and "alleg[ing] they committed the same conduct that allegedly violated RICO and state law . . . does not '*per se*' violate Rule 8." 687 F. Supp. 3d at 786 (quoting *Commonwealth of Pa. v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289, at *11 (E.D. Pa. Jan. 14, 2016) (emphasis in original), and citing *Frazier v. U.S. Bank Nat. Ass'n*, No. 11-c-8775, 2013 WL 1337263, at *3 (N.D. Ill. Mar. 29, 2013)). Instead, the question is whether the grouping still provides Tribal Defendants with "fair notice of what they are being accused." *Id.* (citation omitted). Notably, the Northern District of Illinois reached the same conclusion in *Dixon v. Gatzke*. *See* 2025 WL 1826106, at *14 (N.D. Ill. July 2, 2025) (same).

---

distinction between person—and official-capacity action suits." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). An "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," such as Fineday Funds. *Id*. at 166. "When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses," such as absolute or qualified immunity. *Id*. (gathering cases). But "[i]n an official-capacity action, these [personal immunity] defenses are unavailable." *Id*. at 167.

As in *Fitzgerald* and *Dixon*, the Complaint here provides such fair notice, as it informs the Tribal Defendants "'of what services they are alleged to have illegally undertaken to advance [the tribal lending] scheme,'" as well as "specific allegations regarding [the non-tribal participants'] conduct" that the Tribal Defendants enabled. *Fitzgerald*, 687 F. Supp. 3d at 786 (quoting *Think Fin.*, 2016 WL 183289, at *12).

Indeed, the Complaint first provides a background on the tribal lending model, including the typical arrangements and agreements that both (a) provide a tribal façade for the lending operation while (b) conceding nearly all control and most of the profits from the scheme to non-tribal participants who manage the entities' day-to-day operations. *See* Compl. ¶¶ 96-116. The Complaint then details how the Fineday Lending Enterprise follows this same model, including the facts that lead to the reasonable inference that despite the tribal façade provided by the Tribal Defendants, Fineday is in fact operated and managed by non-tribal outsiders, including Defendants Soaren Management and Kraken Holdings. *See id.* ¶¶ 117-124 (alleging, for example, that despite purporting to own and operate at least three lending entities including Fineday, the Tribe's annual reports identify minimal revenue from Wolf River, Fineday's parent company, and no revenue directly from Fineday or the other lending fronts).

The Complaint then explains that Fineday is in fact operated by Soaren Management, Kraken Holdings, and their yet-to-be-identified coconspirators, who have entered into agreements with the Tribe, Wolf River, and Fineday to make and collect on loans across the United States under the auspices of tribal ownership. *See id.* ¶¶ 124-130. Indeed, Soaren is the manager of Fineday's website, which is the only avenue through which it issues and collects payments on its loans. *Id.* ¶ 126. Finally, the Complaint explains that the Tribal Defendants provide the necessary oversight for this operation to happen, as without their sanctioning of the tribal façade in return for

27

a portion of the revenues, the tribal lending entities would not be able to issue and collect on their usurious loans. *Id.* ¶¶ 109-111, 140-141. After all, as the Complaint explains, the tribal façade created and perpetuated by the Tribal Defendants is precisely what props up the entire enterprise, for without that façade there is no basis to try and avoid state usury protections. *Id.* The Tribal Defendants are thus essential to the scheme, and just because other, non-tribal participants are involved in the day-to-day management of the enterprise does not absolve the Tribal Defendants of liability for their part in propping it up and allowing it to continue. *See Dixon*, 2025 WL 1826106, at *13 (explaining that "it is not necessary for the [defendants] to have exerted control over the alleged lending scheme," and that it was sufficient that the plaintiffs alleged that the defendants "directed, even indirectly, the operation or management of the lending enterprise").

These allegations are more than sufficient to put the Tribal Defendants on notice of the claims against them. Indeed, courts have found RICO claims plausibly alleged and rejected shotgun pleading arguments based on nearly identical allegations to those here. *See id.* at *14 (finding allegations that tribal defendants "participated in the lending scheme by agreeing to insulate third parties from state usury law liability by shrouding them in the Tribe's sovereign immunity" and that they "provided the corporate vehicle for the lending program" sufficient to state RICO claims against them); *Fitzgerald*, 687 F. Supp. 3d at 786; *see also Hengle*, 433 F. Supp. 3d at 897 (finding plausible RICO claims based on allegations that non-tribal members "established several of the Tribal Lending Entities" and "performed nearly all of the operations of the Tribal Lending Entities, working in tandem with those entities to issue and collect on triple-digit, high-interest loans"); *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 312 (E.D. Va. 2019) (finding plausible RICO claims based on allegations that defendants "helped design and implement the Tribal lending business through their ownership and control of Think Finance, which developed

28

the Tribal lending business model at the heart of this allegedly unlawful RICO enterprise").  As in these cases, the court should also find that the RICO allegations are not impermissible shotgun pleading and allow the claims to proceed to discovery.[7]

**B.      Plaintiffs Have Sufficiently Pled their Unjust Enrichment Claim.**

The Tribal Defendants argue that the unjust enrichment claim against them fails because there is no specific allegation that they received a benefit from the Plaintiffs.  Br. at 30.  However, contrary to the Tribal Defendants' argument, the Complaint in fact alleges that the Tribal Defendants received at least some of the profits from the overarching usurious scheme, and that they knew they were receiving this benefit.  Compl. ¶¶ 120, 226.  The Complaint also alleges that the Tribal Defendants were knowing participants in, and crucial contributors to, a nationwide lending scheme that reaped millions in profits from Plaintiffs and the class members.  *Id.* ¶¶ 131-135, 139-41, 176.  Courts have found similar allegations to be sufficient at the motion to dismiss stage.  *See Dixon*, 2025 WL 1826106, at *20 (finding that plaintiffs had stated a claim for unjust enrichment claim against technology provider who indirectly participated in the lending scheme); *Fitzgerald*, 687 F. Supp. 3d at 790-91 (finding sufficient allegations that the defendants received at least some of the profits on the loan payments); *Hengle*, 433 F. Supp. 3d at 896 (same); *Mao v. Global Trust Mgmt.*, 2022 WL 989012, at *13 (E.D. Va. Mar. 31, 2022) (denying motion to dismiss unjust enrichment claim based on allegations of "an overarching scheme to collect unlawful debt for the benefit of all parties to the scheme . . . .").[8]

---

[7] Should the Court find the pleadings to be deficient, Plaintiffs respectfully request leave to replead them.  *See Estate of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) (stating that a "court that receives a shotgun pleading should strike it and instruct counsel to replead the case").

[8] *See also Gibbs v. Haynes Investment, LLC*, 368 F. Supp. 3d 901, 933 (E.D. Va. 2019) (same); *Martorello*, 59 F.4th at 90-91 (finding unjust enrichment claim could proceed on classwide basis in tribal lending case).

In any case, should the Court find these allegations insufficient, Plaintiffs respectfully request leave to amend to correct any deficiencies.

### C. Plaintiffs Have Pled a Declaratory Judgment Claim

The Tribal Defendants argue that the declaratory judgment claim in Count Four cannot stand independently of the other claims and thus must also be dismissed. Br. at 30-31. Defendants appear to argue that there are no statutes cited in the Complaint on which the declaratory judgment count could be based. *See id.*

Contrary to Defendants' position, however, the Complaint in fact explains that Plaintiffs seek a declaratory judgment that the usurious loans issued to consumers in the identified states[9] be deemed void and uncollectible under those states' respective laws. Compl. ¶¶ 228-247. The Complaint then explains that in the identified states, the licensing and usury laws require a lender to be licensed and/or cap interest rates and, because of the violations of these provisions, the loans are null and void. *Id.* ¶¶ 241-243. The Complaint also specifically lists the provisions of each state's code that render the loans void for violating the licensing and usury lending requirements. *See id.* ¶ 175 n.14. Far from failing to identify the specific basis for the declaratory relief, Count Four identifies why the loans should be declared void, as well as the source of law for the theory.

Such allegations are more than sufficient to put the Tribal Defendants on notice of the claim against them. *See, e.g., Fitzgerald*, 687 F. Supp. 3d at 793 (denying motion to dismiss declaratory judgment claim and noting "several courts have concluded plaintiffs may seek a declaratory judgment declaring usurious loan agreements void."); *Dixon*, 2025 WL 1826106, at *21 (same). Their motion to dismiss Count Four should also be denied.

---

[9] The states identified in the class definition are Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin. Compl. ¶ 230.

30

# **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Tribal Defendants' Motion to Compel Arbitration and Stay, or in the Alternative, to Dismiss Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) be denied.

Respectfully submitted,

**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Andrew J. Guzzo*
Kristi Cahoon Kelly (*pro hac vice*)
Andrew J. Guzzo (*pro hac vice*)
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Thomas Scott-Railton[†]
Attorney Bar Number: 5687330
Attorneys for Plaintiffs
**GUPTA WESSLER LLP**
Email: thomas@guptawessler.com
Email: matt@guptawessler.com
2001 K Street NW, Suite 850 North
Washington, DC 20001
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

*Counsel for Plaintiffs*

---

[†] Admitted in New York; practicing under direct supervision of members of the District of Columbia Bar under Rule 49(c)(8).

31