# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

### GREEN BAY DIVISION

ALICE GILL, *et al.,*

        Plaintiffs,

v.

SOAREN MANAGEMENT, LLC, *et al.,*

        Defendants.

Civil Action No.: 1:25-cv-00489-BBC

Hon. Judge Byron B. Conway

### DECLARATION OF JUSTIN GRAY IN SUPPORT OF
### SPECIALLY APPEARING DEFENDANT SOAREN MANAGEMENT, LLC'S
### MOTION TO DISMISS PURSUANT TO FRCP 12(b)(1), 12(b)(6), 12(b)(4), and 12(b)(2)[1]

JUSTIN GRAY declares pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney at law admitted to practice before this Court, all courts in the State of Michigan, all courts in the State of Wisconsin, the United States Supreme Court, and several federal courts. I am an attorney with Mshkawzi Law, LLP, counsel of record for Specially Appearing Defendant Soaren Management, LLC ("Soaren"). I submit this Declaration in support of Soaren's Motion to Dismiss pursuant to FRCP 12(b)(1), 12(b)(6), 12(b)(4), and 12(b)(2).

2. Attached hereto are true and correct copies of the following:

---

[1] Soaren Management, LLC, a wholly-owned Tribal entity, appears for the limited purpose of contesting this Court's subject matter jurisdiction over this lawsuit. This special appearance shall not be construed as waiving sovereign immunity or any arguments that Soaren Management, LLC has with regard to its sovereign immunity or this Court's jurisdiction. Courts have routinely recognized that a sovereign's limited appearance in legal proceedings for the purposes of seeking dismissal for lack of jurisdiction does not waive any claims to sovereign immunity. See e.g., *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 327 F. Supp. 2d 995, 1000 (W.D. Wis. 2004) (a sovereign can appear for a limited purpose such as moving to dismiss the lawsuit for failure to join an indispensable party without waiving their sovereign immunity); *Kansas v. United States*, 249 F.3d 1213, 1220 (10th Cir. 2001) (same); *Zych v. Wrecked and Abandoned Vessel*, 960 F.2d 665, 667–68 (7th Cir. 1992); *Wyandotte Nation v. Kansas City*, 200 F. Supp. 2d 1279, 1287 (D. Kan. 2002); *Miami Tribe of Okla. v. Walden*, 206 F.R.D. 238 (S.D. Ill. 2001).

1

| Exhibit 1 | Articles of Organization of Soaren Management, LLC (filed May 29, 2020) |
|---|---|
| Exhibit 2 | Articles of Organization of Peak Servicing, LLC (filed May 29, 2020) |
| Exhibit 3 | Certificate of Merger of a Domestic Limited Liability Company into a Foreign Limited Liability Company (filed June 1, 2020) |
| Exhibit 4 | Plaintiffs' First Amended Complaint, *Dearry v. Soaren Management, LLC*, No. 2:21-cv-02548, ECF No. 33 (E.D. Pa. Oct. 14, 2021) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 26, 2025, Grand Rapids, Michigan.

Respectfully submitted,

/s/ *Justin Gray*

_____

Justin Gray
State Bar No. 11050509
Attorney for the Specially-Appearing
Defendant Soaren Management, LLC
MSHKAWZI LAW, LLP
44 Cesar E. Chavez Ave. SW
Suite 250
Grand Rapids, MI 49503
Telephone: (616) 655-1601
Email: jgray@mshkawzilaw.com

2

# EXHIBIT 1

DocuSign Envelope ID: 4E55999F-9291-4639-9E36-26BC289D0C39

# ARTICLES OF ORGANIZATION

## of

## SOAREN MANAGEMENT, LLC



**FILED**

MA[R] 2 9 2020

§lg VALLEY RANCHERIA

Peak Servicing, LLC ("Peak Servicing"), a wholly-owned limited liability company of the Big Valley Band of Pomo Indians of the Big Valley Rancheria, a federally recognized Indian tribe ("Tribe"), hereby authorizes these Articles of Organization to be filed with the Tribal Secretary pursuant to the Big Valley Band of Pomo Indians of the Big Valley Rancheria Business Ordinance ("Ordinance"), for the purpose of creating the Tribal subsidiary limited liability company called Soaren Management, LLC ("Company") described herein, as a subsidiary of Peak Servicing.

The Company described herein is to be a wholly-owned and operated economic arm of the Tribe, of which Peak Servicing is the sole member ("Member"). Management of the Company shall be vested in the Member, and the Company shall be Member-managed.

Section 1. <u>Name.</u> The name of the Company is:

Soaren Management, LLC

Section 2. <u>Duration.</u> The period of existence of the Company shall be perpetual, except that the Company may have these Articles of Organization amended or restated or the Company may be dissolved in accordance with the Ordinance.

Section 3. <u>Purposes and Powers.</u>

3.1. <u>Purposes.</u> The Company is formed pursuant to and shall be subject to the laws of the Tribe and shall at all times be a wholly-owned, separate limited liability entity acting as an economic arm of the Tribe. Peak Servicing, as the sole Member of the Company, shall have the sole proprietary interest in and shall have sole responsibility for the conduct of the activities of the Company. The purpose for which the Company is organized is to engage in all business activities allowable pursuant to applicable law, including but not limited to consumer finance, loan servicing and loan collection. The Company operates: (1) to serve the social, economic, educational and health needs of the Tribe; (2) to create and stimulate the economy of the Tribe, provide Tribal revenues and enhance the Tribe's economic self-sufficiency and efforts related to self-determination; (3) to provide positive, long-term social, environmental and economic benefits to Tribal members by enhancing the Tribe's business undertakings and prospects; (4) to generate revenues for the Company to utilize in furtherance of the purposes of the Company for the ultimate benefit of the Tribe and its members; (5) to engage in any lawful act or activity for which a limited liability company may be organized under the laws of the Tribe including creation of subordinate entities; and (6) to work cooperatively with other Tribal corporations, limited liability companies or entities of the Tribe and to chart and to fulfill the long-term and immediate business goals of the Tribe.

3.2. <u>Powers.</u> In order to effectuate the purposes set forth in Section 3.1, the Company has the power to engage, participate and provide any type of service in the consumer finance and loan servicing and loan collection sectors, and to engage in such business activity to generate additional revenues, enhance self-sufficiency and self-determination of the Tribe. In furtherance of the purposes set forth in Section 3.1, the Company shall have all of the rights, powers, privileges and federal immunities of the Tribe. The Company shall have the authority as an instrumentality and agency of the Tribe to carry out all responsibilities as necessary, suitable or proper for the accomplishment of any of its purposes consistent with Tribal law. Without in any way limiting the scope and generality of the foregoing, the Company shall have and may exercise all powers granted to limited liability companies as outlined in Chapter 3, Section 1.4 of the Ordinance, and as may be limited by the Operating Agreement.

3.3. <u>Purposes and Powers Not Limited.</u> The purposes and powers described herein shall not be held to limit or restrict the Company's general powers and privileges now or hereafter conferred by the laws of the Tribe upon limited liability companies formed under the Ordinance, or the accomplishment of any purpose now or hereafter permitted to the Company pursuant to these Articles of Organization.

Section 4. <u>Immunities of the Company and Personnel.</u>

4.1. <u>Jurisdictional Immunity of the Company.</u> The Company shall have all of the Tribe's rights, privileges and immunities concerning federal, state, and local taxes, regulation, and jurisdiction, to the same extent that the Tribe would have such rights, privileges, and immunities if it engaged in the activities undertaken by the Company.

4.2. <u>Sovereign Immunity of the Company and Personnel.</u> The Company shall have all of the rights and privileges afforded the Tribe, including but not limited to the fullest measure of the Tribe's sovereign immunity, which is extended to the Company as if the Tribe itself were engaged in the activities undertaken by the Company. It is the intention of the Tribe that, by conferring such privileges and immunities, sovereign immunity from unconsented suit shall also apply to the Company's managers, officers, subsidiaries, and employees acting on behalf of the Company. The Company shall have the power to sue and may consent to be sued in tribunals of competent jurisdiction (including arbitral forums), provided, however, that:

(a) No such consent to suit shall be effective against the Company in any manner and to any extent whatsoever unless such consent is:

(1) Explicit,

(2) Contained in a written contract or commercial document to which the Company is a party, and

(3) Approved by the Member;

(4)  Limited in duration and to a particular forum; and

(5) Any recovery against such Company shall be limited to the assets of the Company and shall not provide recourse to any other assets of the Tribe or other Tribal entity, and shall be in the manner and to the extent as explicitly set forth in such consent.

Unless approved by resolution of the Business Committee, consent to suit by the Company shall in no way extend to an action against the Tribe, nor shall consent to suit by the Company in any way be deemed a waiver of any of the rights, privileges, or immunities of the Tribe.  The Tribe shall not be liable for the payment or performance of any of the obligations of the Company, and no recourse shall be had against any assets or revenues of the Tribe, aside from those of the Company, in order to satisfy the obligations of the Company.

The sovereign immunity of the Company shall not extend to actions against the Company by the Tribe.

Section 5. Principal Place of Business; Mailing Address; Registered Agent.

5.1. Principal Place of Business.  The Company shall be a resident of and maintain its corporate headquarters on the Tribe's Rancheria, but may conduct its business activities any place in or outside of the United States.  The principal place of business of the Company shall initially be 2726 Mission Rancheria Rd., Lakeport, CA 95453.  The Company may have such other offices, either within or without the Tribe's Rancheria as the business of the Company may require from time to time.

5.2. Mailing Address and Registered Agent.  The mailing address of the Company's registered office is 2726 Mission Rancheria Rd., P.O. Box 102, Finley, CA 95435 and Ben Ray, III shall serve as the registered agent.

Section 6. Members.  Peak Servicing is the sole Member of the Company.

Section 7. Operational Requirements.

7.1. Operating Agreement. The Member shall adopt an Operating Agreement containing such provisions as the Member may deem proper, not inconsistent with the Ordinance and other Tribal laws, or these Articles of Organization.  The Operating Agreement and any amendment or modification thereto must be approved by the Member.

7.3 Annual Report.  Not more than 150 days following the end of each fiscal year of the Company, the Company shall prepare and deliver an annual report in accordance with the Ordinance.

7.4. Financial Report. Not more than 120 days following the end of the fiscal year of the Company, the Company shall prepare and deliver to the Member an audited financial

3

DocuSign Envelope ID: 4E55999F-9291-4639-9E36-26BC289D0C39

statement, including a balance sheet and a statement of income and expenses, including comparative figures from the preceding fiscal year, if applicable.

Section 8. <u>Management.</u> Management of the Company shall be vested in the Member.

Section 9. <u>Duties and Powers of Member.</u>

9.1. <u>Duties and Powers.</u>  The Member is vested with all powers necessary to carry out the day-to-day business and activities of the Company and shall have control and management of the business and activities of the Company.

Section 10. <u>Indemnification.</u>  The Company shall indemnify and hold harmless any Member, current or former executive employee, Manager, or officer, against all liability, loss and reasonable costs (including without limitation, attorney's fees) incurred by such person by reason of or arising from the fact that such person is or was a Member, executive employee, Manager or officer of the Company, or is or was serving at the request of the Company as an executive employee, manager, director, officer, partner, trustee, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise; provided, that, no Person named above shall be entitled to protection under this Section (i) when such Person acts recklessly or with gross negligence or with intent to defraud any person or for any fraudulent in carrying out the business of the Company;(ii) in respect of any fraudulent, negligent, default, breach of duty, or breach of trust which he or she may be guilty; or (iii) if the Person seeking indemnification acted beyond the scope of his or her employment or office. The indemnification provided in this Section shall not be exclusive of any other rights to which any person may be entitled under any statute, bylaw, agreement, resolution of Board of Managers or Member, contract, or otherwise.

Section 11. <u>Amendments.</u>  The Member may amend the Articles of Organization from time to time as necessary and appropriate and upon delivery to the Tribal Secretary.

*[Remainder of Page Intentionally Left Blank]*

4

Dated:   5/29/2020                            Organizer:

PEAK SERVICING, LLC, sole Member

Name:  —nEA04ACA06B488...  Ben G. Ray III  
Manager

5/29/2020  
Date

Name:  —230C37Fo92s34C4...  Philip Gomez  
Manager

5/29/2020  
Date

Name:  —A68111639ADD453...  Aleah Lerma  
Manager

5/29/2020  
Date

Name:  —FA24A74650AD4AB...  Brent McFarland  
Manager

5/29/2020  
Date

# EXHIBIT 2

WM FILED

MAY 2 9 2020

BIG VALLEY RANCHERIA

# ARTICLES OF ORGANIZATION

## of

## PEAK SERVICING, LLC

The Big Valley Band of Pomo Indians of the Big Valley Rancheria, a federally recognized Indian tribe ("*Tribe*"), acting through the Business Committee pursuant to the Tribe's Constitution, General Community Council Resolution No. 030197-4, and Chapter 3 of the Big Valley Band of Pomo Indians of the Big Valley Rancheria Business Ordinance ("*Ordinance*"), hereby authorizes these Articles of Organization to be filed with the Tribal Secretary, pursuant to Chapter 3 of the Ordinance, for the purpose of creating the Tribal limited liability company called Peak Servicing, LLC ("*Company*") described herein.

The Company described herein is to be a wholly-owned economic arm of the Tribe, with the Tribe, as its sole Member. The Company shall be manager-managed and management of the Company shall be vested in the Board of Managers ("*Board of Managers*").

Section 1. <u>Name.</u> The name of the Company is:

### Peak Servicing, LLC

Section 2. <u>Duration.</u> The period of existence of the Company shall be perpetual, except that the Company may have these Articles of Organization amended or restated or the Company may be dissolved in accordance with the Operating Agreement of the Company.

Section 3. <u>Purposes and Powers.</u>

3.1. <u>Purposes.</u> The Company is formed pursuant to and shall be subject to the laws of the Tribe and shall at all times be a wholly-owned, separate limited liability entity acting as an economic arm of the Tribe. The Tribe, as the sole Member, shall have the sole proprietary interest in the Company. The purposes for which the Company is organized are:

    (a) To serve the social, economic, educational and health needs of the Tribe;

    (b) To provide Tribal revenues and enhance the Tribe's economic self-sufficiency and efforts related to self-determination;

    (c) To provide positive, long-term social, environmental and economic benefits to Tribal members by enhancing the Tribe's business undertakings and prospects; and

    (d) To generate revenues for Company to use in furtherance of the purposes of the Company for the ultimate benefit of the Tribe and its members.

3.2. <u>Powers.</u> In furtherance of the foregoing purposes the Company shall have all of the rights, powers, privileges and federal immunities of the Tribe. The Company shall have the authority as an instrumentality and agency of the Tribe to carry out all responsibilities as necessary, suitable or proper for the accomplishment of any of its purposes. Without in any way limiting the scope

and generality of the foregoing, the Company shall have and may exercise the following powers, including but not limited:

(a) To engage in any lawful business which may generate revenue for the Tribe to be self-sufficient or provide economic support for the members of the Tribe;

(b) To engage, directly or through wholly owned subsidiary business entities, in business in operating a consumer financial services business that will provide full service internet-based, consumer loan management, servicing, and collections (the "*Company Business*") pursuant to Tribal law;

(c) To engage, participate and provide, directly or through wholly owned subsidiary business entities, the Company Business and other lawful businesses, enterprises or ventures under Tribal laws;

(d) To provide for Tribal economic development, Tribal e-commerce and Tribal internet related business activities;

(e) To create or form subsidiary business entities to engage in lawful acts or activities for which such entity may be allowed under the laws of the Tribe, and to enter into business associations, and other business arrangements designed for the economic benefit and well-being of the Tribe;

(f) To conduct and carry out business either within or outside of the exterior boundaries of the Reservation pursuant to Tribal laws;

(g) To buy, sell, lease, and otherwise acquire and maintain buildings, offices, and other appurtenances proper and necessary for the carrying on of said business;

(h) To guarantee, purchase, hold, assign, mortgage, pledge or otherwise dispose of capital stock or other equity interests, or any bonds, securities or other evidences of indebtedness created by any other corporation, entity or organization that is in existence under the laws of the United States, any state, Indian tribe, nation, government, or country and to exercise all the rights, privileges, and powers of ownership;

(i) To acquire through purchase, merger of subsidiaries, or any other lawful means, an interest in whole or in part of any pre-existing legal entity;

(k) To enter into and make contracts of every kind and nature, including loan agreements, promissory notes, security agreements, guaranties and any agreements or instruments relating thereto, with any person, tribal government agency, firm, association, corporation, municipality, nation and/or Indian tribe;

(1) To purchase, take by gift or bequest, acquire, own lease, manage, operate, deal in and dispose of real and personal property of all kinds and descriptions, whenever situated;

2

(m) To incur debts and raise, borrow and secure the payment of any money in any lawful manner, including the issue and sale or other disposal of stocks, bonds, indentures, obligations, loans, negotiable and transferable instruments and evidence of indebtedness of all kinds, including the provision of security interests as negotiated by the Company;

(n) To apply for, obtain, register, purchase, lease or otherwise acquire, own, hold, use, operate and introduce, and to sell, assign or otherwise dispose of any trademark, trade name, patent invention, improvements, and processes used in connection with or secured under letters patent, and to use, exercise, develop, grant and give licenses in respect thereto;

(o) To employ officers, employees, and agents of the Company, define their duties and set their compensation and benefits;

(p) To distribute revenues of the Company as set forth below:

1) To settle outstanding Company obligations;

2) To make distributions of Company's distributable cash to the Member as allowable by the Company; and/or

3) To donate, irrespective of corporate benefit, for the public welfare; for social, community, charitable, religious, educational, scientific, civic, literary and for similar or related purposes.

(q) To make distributions to its Member declared in cash or in property; and

(r) To exercise such powers as are incidental to the Company's powers and as may be at any time permitted under the Ordinance and deemed desirable to give effect to the Company's purpose.

3.3. Purposes and Powers Not Limited. The purposes and powers enumerated herein are not exhaustive and shall not be held to limit or restrict the Company's general powers and privileges now or hereafter conferred by the laws of the Tribe upon limited liability companies formed under the Ordinance, or the accomplishment of any purpose now or hereafter permitted to the Company pursuant to these Articles of Organization.

3.4. Limitation on Company Powers. The Company is not authorized to:

1) waive the sovereign immunity of the Tribe from suit or consent to any jurisdiction over the Tribe in any state, federal or tribal court;

2) allow recourse to any assets of the Tribe that are non-Company assets;

3) sell, mortgage, or lease for a period exceeding twenty-five (25) years any trust or restricted lands included in the limits of the Reservation;

3

4) expressly or implicitly enter into agreements of any kind on behalf of the Tribe;

5) pledge the credit of the Tribe;

6) dispose of, pledge, or otherwise encumber real or personal property of the Tribe;

7) waive any right, privilege, or immunity of, or release any obligation owed to, the Tribe; and/or

8) enter into any sublease or other encumbrance or other instrument respecting lands leased to the Company by the Tribe.

3.5 Business Committee Authority. The Business Committee, through the express and unequivocal enactment of a Resolution, compliant with applicable federal and Tribe law, in its sole and absolute discretion on a case-by-case basis, may approve and authorize Company to:

(1) waive the sovereign immunity of the Tribe from suit or consent to any jurisdiction in any state, federal or tribal court, including the Tribe's Court;

(2) allow recourse to any assets of the Tribe that are non-Company assets;

(3) expressly or implicitly enter into agreements of any kind on behalf of the Tribe;

(4) pledge the credit of the Tribe;

(5) dispose of, pledge, or otherwise encumber real or personal property of the Tribe;

(6) enter into any sublease or other encumbrance or other instrument respecting lands leased to Company by the Tribe.

3.6 Company Business. Notwithstanding the foregoing, without the express prior written consent of the Board of Managers, the Company shall not engage in, participate in or provide, directly or through wholly owned subsidiary business entities, in any business or activity other than the Company Business.

Section 4. Immunities of the Company and Personnel.

4.1. Jurisdictional Immunity of the Company. The Tribe hereby confers on the Company all of the Tribe's rights, privileges and federal immunities concerning federal, state, and local taxes, regulation, and jurisdiction, to the same extent that the Tribe would have such rights, privileges, and immunities, if it engaged in the activities undertaken by the Company.

4.2. Sovereign Immunity of the Company and Personnel. The Tribe hereby confers on the Company all of the rights and privileges afforded the Tribe, including but not limited to the fullest measure of the Tribe's sovereign immunity, which the Tribe extends to the Company as if the Tribe itself were engaged in the activities undertaken by the Company. It is the intention of the Tribe that, by conferring such privileges and immunities, sovereign immunity from unconsented suit shall also apply to the Company's managers, officers, subsidiaries, and

4

Case 1:25-cv-00489-BBC     Filed 09/26/25     Page 13 of 154     Document 31-2

employees acting on behalf of the Company. The Company shall have the power to sue and is authorized to consent to be sued in tribunals of competent jurisdiction (including arbitral forums), provided, however, that:

    (a) No such consent to suit shall be effective against the Company in any manner and to any extent whatsoever unless such consent is:

        (1) Explicit;

        (2) Contained in a written contract or commercial document to which the Company is a party;

        (3) Limited in scope, duration, and forum for dispute resolution; and

        (4) Duly authorized by a resolution of the Board of Managers.

    (b) Any recovery against the Company shall be limited to the assets of the Company and shall not provide recourse to any other assets of the Tribe or other Tribal entity, and shall be in the manner and to the extent as explicitly set forth in such consent.

Any consent to suit may, as explicitly set forth in such consent, be limited as to the tribunals in which suit may be brought, the matters that may be made the subject of a suit, and to the assets or revenues of the Company against which any judgment may be executed.

Unless approved by the Business Committee pursuant to Section 3.5, any consent to suit by the Company shall in no way extend to an action against the Tribe, nor shall consent to suit by the Company in any way be deemed a waiver of any of the rights, privileges, or immunities of the Tribe. The Tribe shall not be liable for the payment or performance of any of the obligations of the Company, and no recourse shall be had against any assets or revenues of the Tribe, aside from those of the Company, in order to satisfy the obligations of the Company.

The sovereign immunity of the Company shall not extend to actions against the Company by the Tribe.

Section 5. <u>Principal Place of Business; Mailing Address; Registered Agent.</u>

5.1. <u>Principal Place of Business.</u> The Company shall be a resident of and maintain its corporate headquarters on the Tribe's Reservation, but may conduct its business activities any place in or outside of the United States. The Company may have such other offices, either within or without the Tribe's Reservation as the business of the Company may require from time to time.

5.2. <u>Mailing Address and Registered Agent.</u> The mailing address of the Company's initial registered office is Ben G. Ray III and the name of the initial registered agent at this address is 2726 Mission Rancheria Rd., Lakeport, CA 95453.

## Section 6. Operational Requirements.

6.1. Operating Agreement. The Company shall prepare an Operating Agreement to set forth how the day-to-day operational duties and responsibilities will be carried out. The Operating Agreement and any amendments or modifications thereto must be approved by the Board of Managers.

6.2. Annual Report. Not less than 150 days following the end of each fiscal year, the Company shall prepare and deliver an annual report in accordance with the Ordinance.

6.3. Financial Report. Not less than 120 days following the end of the fiscal year, the Company shall prepare and deliver to the Member an audited financial statement, including a balance sheet and a statement of income and expenses, including comparative figures from the preceding fiscal year, if applicable.

## Section 7. Board of Managers.

7.1. Duties and Powers; Operating Agreement. The business and activities of the Company shall be managed by a Board of Managers. The Board of Managers is vested with all powers necessary to carry out the purposes of the Company and shall have control and management of the business and activities of the Company. The Board of Managers may adopt such provisions in an Operating Agreement for the conduct of their meetings and the management of the Company as the Board of Managers may deem proper, not inconsistent with the Ordinance and other Tribal laws, or these Articles of Organization.

7.2. Composition. The Board of Managers shall initially be comprised of four (4) members but shall be expanded to eight (8) members as set forth in the Operating Agreement and the Board shall be appointed, removed, and replaced as set forth in the Operating Agreement.

7.3. Manager Qualifications. Each Manager shall be at least eighteen (18) years of age and legally capable of entering into a binding contract.

7.4. Officers. The Company shall appoint a Chief Executive Officer and may appoint other officers as determined by the Board of Managers.

7.6. Manner of Acting. Unless the Operating Agreement requires a greater number, all actions by the Board of Managers shall require the consent of a majority of the members of the Board of Managers.

Section 8. Indemnification. The Company shall indemnify and hold harmless any Member, current or former executive employee, Manager, or officer, against all liability, loss and reasonable costs (including without limitation, attorney's fees) incurred by such person by reason of or arising from the fact that such person is or was a Member, executive employee, Manager or officer of the Company, or is or was serving at the request of the Company as an executive employee, manager, director, officer, partner, trustee, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise; provided, that, no Person named above shall be entitled to protection under this Section (i) when such Person acts recklessly or with gross negligence or with intent to defraud any person or for any fraudulent in

6

carrying out the business of the Company;(ii) in respect of any fraudulent, negligent, default, breach of duty, or breach of trust which he or she may be guilty; or (iii) if the Person seeking indemnification acted beyond the scope of his or her employment or office. The indemnification provided in this Section shall not be exclusive of any other rights to which any person may be entitled under any statute, bylaw, agreement, resolution of Board of Managers or Member, contract, or otherwise.

Section 9. Amendments. These Articles of Organization may be modified or amended only by written consent signed by all of the Managers. No amendments to the Articles of Organization shall become operative until, upon delivery to the Tribal Secretary, official approval is provided by the Board of Managers, and ratification by the Member.

**[Remainder of Page Intentionally Left Blank]**

72755963.19

Dated: 5/28/2020        Organizers:

_____

_____

# EXHIBIT 3

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 18 of 154    Document 31-2

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"SOAREN MANAGEMENT, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

WITH AND INTO "PINNACLE ACQUISITIONS, LLC" UNDER THE NAME OF "PINNACLE ACQUISITIONS, LLC", A LIMITED LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF CALIFORNIA, AS RECEIVED AND FILED IN THIS OFFICE ON THE FIRST DAY OF JUNE, A.D. 2020, AT 4:55 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

7996292  8100M
SR# 20205385915

Authentication: 203028453
Date: 06-02-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:55 PM 06/01/2020
FILED 04:55 PM 06/01/2020
SR 20205385915 - File Number 5737644

# CERTIFICATE OF MERGER
## OF
## A DOMESTIC LIMITED LIABILITY COMPANY
## INTO
## A FOREIGN LIMITED LIABILITY COMPANY

Pursuant to Title 6, Section 18-209 of the Delaware Limited Liability Company Act, the undersigned limited liability company hereby affirms, executes, certifies and delivers this Certificate of Merger:

**FIRST**: The name of the surviving limited liability company is Pinnacle Acquisitions, LLC, a Foreign limited liability company (the "Surviving Company").

**SECOND**: The jurisdiction in which the Surviving Company was formed is the jurisdiction of the Big Valley Band of Pomo Indians of the Big Valley Rancheria, located in Lakeport, California.

**THIRD**: The name of the Limited Liability Company being merged into the Surviving Company is Soaren Management, LLC, a Delaware limited liability company (the "Merging Company").

**FOURTH**: The agreement and plan of merger (the "Merger Agreement") has been approved and executed by each of the business entities which is to merge.

**FIFTH**: The name of the surviving foreign limited liability company is Pinnacle Acquisitions, LLC.

**SIXTH**: The executed Merger Agreement is on file at a place of business of the Surviving Company and the address thereof is 2726 Mission Rancheria Rd., Lakeport, CA 95453.

**SEVENTH**: A copy of the Merger Agreement will be furnished by the Surviving Company, on request and without cost, to any member of the Surviving Company or any person holding an interest in any other business entity which is to merge or consolidate.

**EIGHTH**: The Surviving Company agrees that it may be served with process in the State of Delaware in any action, suit or proceeding for the enforcement of any obligation of any domestic limited liability company which is to merge or consolidate, irrevocably appointing the Secretary of State as its agent to accept service of process in any action, suit or proceeding and the address to which a copy of such process shall be mailed to by the Secretary of State is 2726 Mission Rancheria Rd., Lakeport, CA 95453.

[*Signature Page Follows.*]

73592104.3

DocuSign Envelope ID: 1F804497-C824-48BC-9ECC-C19B52585B9F

**IN WITNESS WHEREOF**, said Surviving Company has caused this certificate to be signed by an authorized person, this 1st day of June, 2020.

PINNACLE ACQUISITIONS, LLC

By: **Peak Acquistion, LLC, as sole member**

By: _____

Name: Ben Ray III

Title: Manager

# EXHIBIT 4

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Idell Dearry and Penny Green, *individually and on behalf of all others similarly situated*, | |
| *Plaintiffs,* | Civil Action No. 2:21-cv-02548 (MAK) |
| v. | |
| Kraken Holdings, LLC, Andrew Dunn, Joshua Bickerstaff, FactorTrust, Inc., and various John Doe Persons and Entities, | Class Action |
| *Defendants.* | Jury Trial Demanded |

<u>**PLAINTIFFS' FIRST AMENDED COMPLAINT**</u>

Plaintiffs Idell Dearry and Penny Green, by and through their attorneys, on behalf of themselves and the Class defined below, allege the following based on the research of counsel, publicly available articles, reports, and other sources, a reasonable inquiry under the circumstances, and upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on their personal knowledge.

**I.   INTRODUCTION**

1.      Plaintiffs on their own behalf and on behalf of a proposed class of victimized consumers bring this action against Defendants and other associated, as yet unknown, persons. Defendants are being sued for their knowing participation in an illegal "payday lending" enterprise that operated over the Internet under the name of "Clarity Finance,"[1] and included an associated debt collection scheme that has persisted after the original enterprise ceased operations. Plaintiffs assert damage claims under the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.. §§ 1692a-p.

---

[1] By using the term "payday lending," Plaintiffs are not referencing a technically precise or statutory term, but rather are generically referencing the high-rate small loan products that appear through the course of any Internet search for "fast" or "easy" cash loans. Included in Plaintiffs' use of this term are the short-term loans for amounts less than $1,000 that dominated the market before when these lenders operated mainly out of storefronts, as well as the larger "installment loans" that dominate the Internet market today.

2.    Plaintiffs and the consumers in the putative classes were victimized by unlicensed, short-term loan products that were sold with crushing interest rates. By way of example, one of the Plaintiff's loans charged an interest rate of 407%, requiring her to pay $3,443 on a $1,100 loan in less than a year. This is more than 60 *times* the rate permitted by Pennsylvania law. These loans are originated over the Internet and promised to provide funds within a day of applying. Although this form of consumer credit is illegal under the law of Pennsylvania and most other states, well-lawyered, highly organized schemes to evade such legal restrictions have proliferated.

3.    One of the most common forms of these illegal schemes has been so-called "tribal lending" schemes. In such a scheme, otherwise known as "rent-a-tribe," a lender recruits a Native American tribe to establish a tribal business entity to function as the nominal, originating lender in order to create a tribal veneer for the business. The revenues of the business flow principally to the nontribal actors that market, underwrite, and collect the loans. The illicit lender uses the veneer of tribal participation to abuse the legal doctrine of tribal sovereign immunity in an effort to insulate the usurious schemes from state regulatory authority. These schemes originate their loans over the Internet, meaning that victims sign up for these loans on their computer devices throughout the United States, that is, far from the Native American reservations where such activity purports to be taking place.

4.    "Clarity Finance" was one of these lending websites. It was purportedly operated by a Native American tribe in Maine, but for all practical purposes it was in fact controlled by and for the profit of Defendants Kraken Holdings, LLC, Andrew Dunn, Joshua Bickerstaff and other nontribal persons and companies located elsewhere. Plaintiffs and the members of the putative class were Clarity Finance borrowers, many of whom continue to face the risk of illegal collection activity.

5.    All online lending enterprises rely on a variety of services, some provided in-house and some outsourced, as necessary components of the business operations, including: marketing the loans to prospective borrowers, providing the technology platforms to host the lending website and to make rapid decisions on loans, payment processing services to collect the payments (usually by direct ACH debits from the borrower's bank account) and call centers to communicate with

2

borrowers. One of the more prominent businesses servicing this fringe financial sector is Defendant FactorTrust, Inc., which provides a host of services to payday lenders, including data aggregation, lead generation and the technical means to provide lenders the capacity to deliver nearly instantaneous credit decisions on loan applications made on lending websites.

6. Plaintiff Dearry was ensnared in a 511% APR loan he obtained over his computer on a visit to the Clarity Finance website operated by Defendants Kraken, Dunn and Bickerstaff. One of the essential steps in the approval of Plaintiff's application for this illegal loan was a specialized "subprime" credit report that Defendant FactorTrust prepared for and delivered to Defendants Kraken, Dunn and Bickerstaff in a matter of seconds, pursuant to a complex technology structure designed and arranged for this specific purpose. Plaintiff suffered monetary damages from this illegal activity in the form of hundreds of dollars of usurious interest charges he paid.

7. Plaintiff Green obtained a 407% APR payday loan from the same Clarity Finance website, based on a loan agreement otherwise identical to Plaintiff Dearry's. In her case, nonpayment of the loan resulted in deceptive and abusive debt collection by Defendants or by an entity likely associated with them but whose identity has been deliberately hidden. Ms. Green incurred actual damages in the form of hundreds of dollars of payments to this entity.

8. The two Plaintiffs are filing this class action on behalf of all Clarity Finance borrowers. They are seeking treble damages under RICO and actual damages under the FDCPA, as well as attorney's fees and costs, for all payments made on these illegal loans.

## II. THE PARTIES
### A. Plaintiffs

9. Plaintiff Idell Dearry is a natural person over the age of 18 who resides in Philadelphia, PA.

10. Plaintiff Penny Green is a natural person over the age of 18 who resides in Troy, PA.

### B. Defendants

11. Kraken Holdings, LLC is a limited liability company with offices at 20830 N Tatum Blvd. #115, Phoenix, AZ, 85050. Kraken Holdings, LLC is not registered to do business in that

3

state. It is, however, registered with the Nevada Secretary of State as the manager of Soaren Management, LLC, an entity in whose name much of the underlying activity at issue here occurred.

12.     Andrew Dunn was the Chief Executive Officer of Soaren Management, LLC during the relevant time period. Upon information and belief, he resides in or around Phoenix, Arizona and/or in Nevada.

13.     Joshua Bickerstaff was the Chief Operating Officer of Soaren Management, LLC during the relevant time period. Upon information and belief, he resides in or around Phoenix, Arizona and/or in Nevada.

14.     Hereafter, Defendants Kraken Holdings, Dunn, and Bickerstaff will be referred to collectively as "the Dunn-Bickerstaff Defendants."

15.     FactorTrust, Inc. is a credit reporting agency incorporated in Delaware with its headquarters in Georgia. It is a subsidiary of TransUnion, Inc., a publicly owned company incorporated in Delaware with headquarters in Chicago, Illinois.

16.     Also named are various John Doe Defendants that have participated in the scheme, whose identities are unknown and being deliberatively hidden.

### C.  Non-Defendant Interested Parties

17.     Soaren Management, LLC, which was originally named as a Defendant, was a limited liability company incorporated in Delaware with offices at 4045 Spencer St., Suite 312, Las Vegas, Nevada 89119 and 7020 E Acoma Dr., Scottsdale, Arizona 85254. However, in June 2020, Soaren was purportedly dissolved by merger into an entity associated with a Native American tribe located in California. Plaintiffs are investigating the bona fides of that merger transaction.[2] Lacking a means

---

[2] The circumstances surrounding this merger are suspicious and appear to be a calculated attempt to exploit sovereign immunity by transferring paper ownership of Soaren Management to a Native American tribe. Despite the merger, Soaren Management appears to continue to be operated by non-tribal individuals who are located in Las Vegas and Arizona—thousands of miles away from reservation land occupied by the Big Valley Band of Pomo Indians of the Big Valley Rancheria. This is a commonly used ruse. At least two other pioneers of the tribal lending model have attempted to avoid liability through the merger of their companies with tribal entities. *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352 at *9-10 (E.D. Va. Nov. 18, 2020) (detailing extensive evidence regarding why a similar company was sold to a tribe "because of the threats of litigation and enforcement actions against him and his entities under the then-current lending arrangement"); *Solomon v. Am. Web Loan,*

to serve process on an LLC that purportedly no longer exists, Plaintiffs have dismissed Soaren, but without prejudice to a possible later rejoinder, after discovery.

18.      On information and belief, there are other persons or entities that have also been a part of the illegal enterprise described herein, or have provided essential services to the enterprise, with knowledge of its illegal purposes. For example, the attached Soaren website screenshots refer to Soaren as being owned by Peak Servicing, LLC, a company concerning which Plaintiffs have no knowledge. Similarly, it is likely that the alleged debt collection activity is being done by other unknown entities, either affiliated with the Defendants or acting pursuant to agreements with the Defendants. For that reason, Plaintiffs name John Doe defendants, whose current identities are unknown at this time.

## III.    JURISDICTION AND VENUE

19.      This Court has subject matter jurisdiction over this dispute pursuant to RICO, 18 U.S.C. § 1965, and pursuant to the FDCPA, 15 U.S.C. § 1692k. This Court also has federal question jurisdiction under 28 U.S.C. § 1331, jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), and supplemental jurisdiction over all state law claims as part of the same case or controversy under 28 U.S.C. § 1367.

20.      This Court has personal jurisdiction over Defendants because their activities that give rise to the claims in this action have been directed at and in the Commonwealth of Pennsylvania, conducted both directly and through their agents or alter egos. This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b).

21.      As to Defendant FactorTrust, its presence within the Commonwealth is further evidenced by the fact that, as indicated on the website of its parent company, TransUnion, *see* printout attached as Exhibit "A," it collects file requests from consumers throughout the United States from a postal box within this District, located in Woodlyne, Pennsylvania.

---

*Inc.*, 375 F. Supp. 3d 638, 654 (E.D. Va. 2019) (detailing how a non-tribal payday lender remained in control and received the majority of the profits following the merger of his company with a tribal entity).

22.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs are residents of this District and a substantial part of Plaintiffs' claims occurred in Pennsylvania.

## IV.   FACTUAL ALLEGATIONS

### A.  Usury and Licensing Laws Generally

23.     Usury laws prohibit lenders from charging borrowers excessively high rates of interest on loans.  These laws have ancient origins, as usury prohibitions have been part of every major religious tradition.  As Pope Francis has recently put it, "Usury humiliates and kills. Usury is a grave sin. It kills life, stomps on human dignity, promotes corruption, and sets up obstacles to the common good."[3] In the United States, every colony adopted a usury statute based on the English model.[4]  This trend continued after independence, with state usury laws protecting consumers from abusive lending.

24.     In addition to general usury laws, most states have adopted small-loan statutes that allow specifically defined, small-amount, loans at higher rates, conditioned on the lender obtaining a license and complying with the restrictions contained in the statute. For example, Pennsylvania has a small-loan statute that allows licensees to earn approximately 27% Annual Percentage Rate on a regulated loan that complies with statutory restrictions. *See* Consumer Discount Company Act, 7 P.S. § 6201 *et seq.* As to unlicensed lenders, on the other hand, the state's general usury law caps their permissible lending rate at 6% for unsecured loans in amounts less than $50,000. 41 P.S. § 201. *See Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC,* 596 Pa. 638, 948 A.2d 752 (2008).

25.     Almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here. *See, e.g.,* Alabama (Ala. Code § 5-18-4); Alaska (Alaska Stat. § 06.20.310); Arizona (Ariz. Rev. Stat. § 6-613(B)); Arkansas (Ark. Code §§ 4-57-104, 105); California (Cal. Fin. Code §§

---

[3] *See* Pope Francis: "Usury humiliates and kills," Vatican News (Feb. 3, 2018), https://www.vaticannews.va/en/pope/news/2018-02/pope-francis-usury-financial-exploitation.html

[4] *See* Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1117 (2008).

22303, 22750); Colorado (Colo. Rev. Stat. § 5-2-201); Connecticut (Conn. Gen. Stat. § 36a-573; District of Columbia (D.C. Code §§ 26-905, 28-3303); Florida (Fla. Stat. § 516.02); Georgia (Ga. Code § 7-3-50); Hawaii (Haw. Rev. Stat. § 478-4); Idaho (Idaho Code § 28-46-402); Illinois (815 Ill. Comp. Stat. 122/4-10); Indiana (Ind. Code § 24-4.5-5-202); Iowa (Iowa Code § 536.13); Kansas (Kan. Stat. § 16a-5-201); Kentucky (Ky. Rev. Stat. § 286.4-991); Louisiana (La. Stat. § 9:3552); Maine (Me. Rev. Stat. tit. 9-A, § 2-201); Maryland (Md. Code, Com. Law § 12-314); Massachusetts (Mass. Gen. Laws ch. 140, § 119); Michigan (Mich. Comp. Laws §§ 438.32, 445.1854); Minnesota (Minn. Stat. §§ 56.19, 334.02); Mississippi (Miss. Code. § 75-67-119); Missouri (Mo. Stat. § 408.020); Montana (Mont. Code § 31-1-108); Nebraska (Neb. Rev. Stat. § 45-1038); New Hampshire (N.H. Rev. Stat. § 399-A:23); New Jersey (N.J. Stat. §§ 31:1-1,  17:11C-32, 33); New Mexico (N.M. Stat. § 58-15-3); New York (N.Y. Gen. Oblig. Law §§ 5-501, 511, 513); North Carolina (N.C. Gen. Stat. §§ 24-2, 53-166); North Dakota (N.D. Cent. Code § 13-04.1-09.2); Ohio (Ohio Rev. Code § 1321.02); Oklahoma (14A Okla. Stat. §§ 3-201); Oregon (Or. Rev. Stat. § 725.045); Pennsylvania (41 P.S. §§ 501-502); Rhode Island (6 R.I. Gen. Laws § 6-26-4); South Carolina (S.C. Code § 34-29-140); South Dakota (S.D. Cod. Laws § 54-4-44); Tennessee (Tenn. Code §§ 47-14-110, 117); Texas (Tx. Fin. §§ 302.001-004); Vermont (Vt. Stat. tit. 9, § 50); Virginia (Va. Code § 6.2-303); Washington (Wash. Rev. Code § 19.52.020); West Virginia (W. Va. Code §§ 46A-5-101); Wisconsin (Wis. Stat. § 138.14); and Wyoming (Wyo. Stat. § 40-14-521).

26.　　Usury and licensing laws are vital public policy tools that state legislatures use to protect consumers in their states from the predatory conduct of high-APR small-loan lenders. The short-term, high-interest loans that usury laws regulate are targeted at the most economically vulnerable.[5] The CFPB has found that these products tend to create cycles of high-cost borrowing over extended periods of time; consumers find themselves caught in a "debt trap," as they take out

---

[5] *See* Mikella Hurley & Julius Adebayo, *Credit Scoring in the Era of Big Data*, 18 Yale J. L. & Tech. 148, 174 (2016) (on the use of "alternative" credit-scores and lead generation for payday loan vendors targeted at poor and minority communities).

additional payday loans to cover the costs of prior loans .[6] States use many policy tools to limit the proliferation of such loans, including, most commonly, limits on the maximum interest rates that can be charged and regulatory oversight through licensing regimes.

### B. Usury Law Avoidance Schemes

27.    To avoid the statutory licensing and interest-rate limits imposed by states across the country, lenders have taken advantage of two perceived loopholes in federal law: federal bank preemption doctrine and tribal sovereign immunity.

28.    The first model under which payday lenders attempted to evade state usury laws was widely referred to as the "rent-a-bank" model. Under this model, a payday lender who is by law prohibited from making loans in a particular state attempts to evade those legal restrictions by partnering with an out-of-state bank that, for a fee, acts as the nominal lender while the *de facto*, non-bank lender markets, funds and collects the loan, and performs most other lender functions.

29.    Because banks are insulated from state examination and regulation by virtue of federal bank pre-emption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like Pennsylvania, payday lending is illegal under state law. However, beginning in 2005, the Federal Deposit and Insurance Corporation (hereinafter "FDIC") began to crack down on its regulated banks' participation in such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005.

30.    Despite the FDIC guidance, due to the continuing profits available to banks and payday lenders that offer high-interest, short-term loan products in states where payday lending was formally prohibited, rent-a-bank schemes continued to proliferate in the shadows. The United States Department of Justice (hereinafter "DOJ") also began combating "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday

---

[6] *See* Consumer Financial Protection Bureau, White Paper: Payday Loans and Deposit Advance Products, at 43-44 (Apr. 24, 2013).

lending schemes and other financial scams. *See* Jessica Silver-Greenberg, *Justice Department Inquiry Takes Aim at Banks' Business with Payday Lenders*, N.Y. TIMES (Jan. 26, 2014), *available online.*

31.    Following the regulatory crackdowns on the rent-a-bank schemes led by the FDIC and the DOJ, online lenders in the early 2010s shifted to a new usury law avoidance model: the "rent-a-tribe" model. While, unlike banks, Native American tribes have no special legal status as lenders, they do enjoy general sovereign immunity from state law enforcement actions. *See, e.g., Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014). In a rent-a-tribe scheme, a non-tribal lending enterprise attempts to assume vicariously the protections of a sovereign nation and legitimize their otherwise illegal business by way of this tribal veneer.

32.    Under the rent-a-tribe model, the online lender contracts with a Native American tribe to originate loans in the name of a tribal entity, with that entity acting as the nominal lender. Generally, the tribal entity retains only nominal ownership of the loans, with most of the beneficial ownership being transferred to a non-tribal entity. In return, the tribe receives a small share of the profits generated, while the nontribal entity directing the scheme extracts most of the profits as payment for "services" provided to the lender.

33.    The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

34.    These illicit lenders have formed trade associations to attempt to bring respectability to their illegal activity and to lobby for legitimizing legislation. One of these, the Online Lenders Alliance, was founded, and until recently led, by Mark Curry, the millionaire lender behind the American Web Loan "tribal" lender. *See Solomon v. Am. Web Loan*, 4:17CV145 (E.D. Va.) (recently approved class action settlement against AWL and Curry) Another, the Native American Financial Services Association, was first organized by Think Finance, Inc., the now bankrupt Texas payday

lending company that ran three "tribal" lending websites. *See In re Think Finance, Inc.,* Case No. 33964-HDH11 (Bankr. N.D. Tex.).[7]

35.     The Federal Government has obtained highly publicized criminal convictions under RICO against two payday loan kingpins who used "rent-a-tribe" arrangements to attempt to evade state usury law. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them. *United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y.).[8]  On November 27, 2017, a jury in this District convicted Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts. *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.).[9]

36.     Civil suits brought both as civil law enforcement actions brought by state attorneys general and as private actions have similarly demonstrated the fragility of the sovereign immunity defense, particularly when actions are brought against the payday lending entities that are the real parties of interest in the "rent-a-tribe" scheme. *See, e.g., Commonwealth of Pennsylvania v. Think Fin., Inc.*, 14-CV-7139, 2016 WL 183289, *3-8 (E.D. Pa. Jan. 14, 2016) (tribes not indispensable parties to state-analogous RICO action brought by the Pennsylvania attorney general against non-tribal businesses operating a supposedly "tribal" lending enterprise); *Solomon v. Am. Web Loan*, 4:17CV145, 2019 WL 1320790, at *20-22 (E.D. Va. Mar. 22, 2019) (tribes not indispensable parties in private RICO action brought for unlawful debt collection); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014) (rejecting suit brought by tribes to challenge New York attorney general's enforcement of state usury laws against rent-a-tribe schemes).

---

[7] The CEO of Think Finance, Ken Rees, was also a long-time board member of the Online Lenders Alliance.

[8] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017), *available online.*

[9] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017), *available online.*

37.     These criminal and civil actions have also shed light on the role played in tribal lending schemes by other service providers. *See, e.g. Pennsylvania by Shapiro v. Think Fin., Inc.,* No. 14-CV-7139, 2018 WL 637656 (E.D. Pa. Jan. 31, 2018) (in enforcement action under state law version of RICO, denying motion to dismiss by hedge fund that provided lending capital to a tribal lending scheme); *United States v. Intercept*, Case No. 2:17-cr-00491-ER (E.D. Pa. 2017) (guilty plea by payment processor that assisted tribal lending scheme.).

### C.  Defendants' Lending Activities through the Pine Tree Lending Enterprise

38.     The payday loans at issue in this suit were offered through the Clarity Finance website at https://www.clarityfinance.com, which no longer is live. The earliest copy of the homepage available on the "Wayback Machine," from January 2020 (a copy of which is attached as Exhibit "B"), states that "Pine Tree Lending LLC dba Clarity Finance ("Clarity"), is a wholly-owned and operated limited liability company subsidiary of Indian Township Enterprises, a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Passamaquoddy Tribe of Indian Township ("Tribe"), a federally-recognized sovereign American Indian tribe," and states that all decisions on loan applications are made at the lender's office at 8 Kennebasis Road, Indian Township, ME 04668 "on the Tribe's reservation."

39.     However, a look under the hood shows that these representations were sham pretenses. For instance, the "chatbot" on the Clarity Finance website, which provides consumers with immediate access to a purported customer service representative for Clarity Finance, was operated by the Dunn-Bickerstaff Defendants. This is evident in the HTML source code of the home page, whose chatbot script source links to https://omniflex.soarenmanagement.com/v1/AirlineFlexCustomerIframe.js? updated=20200514-2. *See* attached Exhibit "C" (lines 446-448).

40.     The Dunn-Bickerstaff Defendants also operated the portal where borrowers managed their account. This is evident in the HTML source code of the login page (www.clarityfinance.com/login) where "Soaren Management" is identified in the meta data as the "author" of the login applet.  *See* attached Exhibit "D" (line 16 extension).

41.     Furthermore, trying to find any evidence of the Tribe's involvement in the lending enterprise outside of the website and the loan agreements is a fool's errand. A search of both the Tribe's own website, http://www.passamaquoddy.com/, and the Tribe's Facebook page, https://www.facebook.com/indtwptribe/,  returns zero results for "Clarity Finance," "Pine Tree Lending," "loan," or "lending." A search for almost all other supposed tribal entities mentioned on the loan agreement and the Clarity website also return zero search results. Such untraceable, paper entities include the "Tribal Financial Services Regulatory Authority," which, according to the loan agreements, supposedly arbitrates consumer disputes; the "Tribal Consumer Financial Services Regulatory Authority," which supposedly regulates consumer financial services for the Tribe including the issuance of financial service licenses;  and "Indian Township Enterprises," which is supposedly the economic arm of the tribe under which Pine Tree Lending is a subsidiary corporation.

42.     In reality, Pine Tree Lending d/b/a Clarity Finance was a "rent-a-tribe" scheme directed and operated by the Dunn-Bickerstaff Defendants. Under this scheme, payday loans were made in the name of a lender affiliated with the Tribe, but the Defendants, or entities with whom they contracted, provided the infrastructure to market, fund, underwrite and collect the loans.

43.     Among other things, the Dunn-Bickerstaff Defendants produced the customer leads; managed the technology platform, including the loan decisioning process; supplied the capital to make the loans; and managed the payment-processing and collection mechanisms used to obtain payments from consumers, including the sale of nonperforming loans to debt-buyers. Upon origination, the loans themselves, or a beneficial interest in the loans, would be transferred to a non-tribal entity in which, upon information and belief, the Defendants had an interest or affiliation.

44.     On the website for Soaren Management—which, despite Defendants' assertion of Soaren's nonexistence, appears to be very much alive—the company describes itself as "a Fintech company that helps lenders service the complete life cycle of their short-term loans. From lead qualification to collecting past-due payments, we can handle every human and automated contact

12

needed to service our clients' financial products." *See* https://www.soarenmanagement.com/about/. (Copy attached as Exhibit "E.")

45. Soaren Management's website, on a "What We Do" page, further advertises that it offers the following services: (1) "loan portfolio management," including "full service loan underwriting, loan verification, and loan origination solutions," (2) "customer support," including "inbound/outbound call center, online chat services, and application verification," (3) "turn key lending solutions," i.e., ready to operate "lending products from lead qualification to past-due collections," (4) "asset retention," including "collection of past-due and at-risk accounts," (5) "proprietary loan management software," which allows for "efficient loan management" to "improve portfolio performance," and (6) "marketing" and "lead gen[eration]," including "website development, email marketing, and lost-lead retargeting." (Copy attached as Ex. "F").

46. Upon information and belief, the Dunn-Bickerstaff Defendants directed each of these activities described above over the "complete life cycle" of loans originated on the Clarity Services website—and none of these activities were overseen or conducted by the Tribe or its representatives.

47. During the relevant time period, one of the operations centers for Soaren Management was at 20830 N. Tatum Blvd., Suite 115, Phoenix AZ 85050, which was also the registered address of Defendant Kraken Holdings, LLC, Soaren's manager.

48. In short, the lending activity that is designed to appear to be business conducted by a Native American tribe is, in actuality, a business enterprise directed by non-tribal Defendants that extracted most of the generated revenue, while creating a tribal veneer designed to hide their direction of the business. Upon information and belief, much of the revenue is likely disguised as fees for services provided by the Dunn-Bickerstaff Defendants, and even the net earnings, after these "services" are paid for, are, for the most part, diverted to the non-tribal purchasers of the loans.

49. Indeed, contrary to the front portrayed in the loan agreements, Defendant FactorTrust, whose involvement in the loan approval process is described below, identifies "Soaren

13

Management" as the lender on Plaintiff Dearry's loan. *Compare* Exhibit "G" (credit report identifying Soaren Management under column "Lender Name," but otherwise including all the details regarding Plaintiff Dearry's loan with Pine Tree Lending, such as December 20, 2018 as the "date opened"). Similarly, FactorTrust's credit report further reveals that Soaren Management—not Pine Tree Lending—obtained Plaintiff's credit report on December 20, 2018. *Id.* .

50.    FactorTrust's identification of "Soaren Management" as the lender on the loan and as the user of the report is significant because federal law requires consumer reporting agencies to adopt procedures to investigate the prospective users of their reports, including procedures requiring the user to "identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." 15 U.S.C. § 1681e(a).

51.    Meanwhile, the Dunn-Bickerstaff Defendants have taken steps to actively conceal their participation and involvement in this "rent-a-tribe" scheme. For instance, they purchased a website privacy service from Domains by Proxy for the web domain www.clarityfinance.com. This service ensures that anyone attempting to identify the owner of the website will be directed to a proxy agent instead of an actual agent of the owner, so that the Dunn-Bickerstaff Defendants cannot be identified as the owners of the website.

52.    Soaren Management and Defendant Dunn have been identified in other litigation alleging similar "rent-a-tribe" schemes where they were alleged to have been the true lenders in a payday lending enterprise operating behind a tribal façade in an attempt to avoid state usury laws. *See* Complaint, *Beckford v. Niibin*, Case No. 8:20-cv-02718, at ¶¶ 71-73 (M.D. Fla. Nov. 18, 2020); Complaint, *McIntosh v. Target Finance, LLC*, Case No. 2021-SC-000029, at ¶ 32 (Fla.,Pasco Cty. Cir. Ct.) (alleging, inter alia, that "Soaren, Kraken, and Dunn are the real owners of the Target Cash Now lending enterprise, and they pocket the vast majority of profits" with another tribe "receiving a little under 2 cents on each dollar of revenue.").

53.    Defendant Bickerstaff has been involved in running "rent-a-tribe" schemes for at least a decade. According to his LinkedIn profile, from Jan. 2011 until Mar. 2015 he was involved in

14

"Business Development" for Fresh Start Marketing, LLC, Atlas Intelligence, LLC, and DesTel, LLC. Defendant Bickerstaff describes the services these entities offered as:

**Fresh Start Marketing, LLC** – a "service company for a online tribal lending portfolio" that was created "expressly to create and manage online and offline marketing campaigns to generate responsive leads in the online micro-lending space."

**Atlas Intelligence, LLC** – a "service company for a online tribal lending portfolio" that was created "with three key objectives: create and administer a dynamic underwriting process to accurately predict lifetime customer value and provide loan approval recommendations in accordance with established revenue goals, curate all aspects of consumer data management and business analytics, and provide company executives with concise reporting on portfolio performance as well create and implement new strategies to achieve established goals."

**DesTel, LLC** – a "service company for a online tribal lending portfolio" that was created "expressly to manage all call center operations associated with loan verification, origination, collections and direct marketing."

54.     Each of those limited liability companies were part of a constellation of entities centered around Encore Services, LLC—owned and run by Zachary Roberts, Martin Mazzara, and Richard Lee Broome—that acted as the actual payday lending operation behind various "rent-a-tribe" enterprises. Fresh Start and DesTel, along with Encore and the principals, were in fact sued by a tribal client for fraud related to a rent-a-tribe scheme. *See Chippewa Cree Tribe of the Rocky Boy's Reservation of Montana v. Roberts*, CV 14-63-GF-BMM, 2015 WL 9239764 (D. Mont. Dec. 17, 2015). A criminal prosecution followed in which Roberts, Mazarra, and Encore were convicted for the fraud, with both individuals sentenced to prison terms. *United States v. Encore Servs., LLC*, GF-16-19-GF-BMM-JTJ (D. Mont. Feb. 21, 2017).[10]

55.     Upon information and belief, the Dunn-Bickerstaff Defendants were responsible for designing, organizing, and implementing all facets of the payday lending operation that offered usurious loans over the "Clarity Finance" website.

---

[10] *See* Press Release, United States Department of Justice, Las Vegas Businessmen Sentenced to Prison in Montana Public Corruption Case (Aug. 25, 2017), *available online.*

**D. Defendant FactorTrust's Role in the Scheme**

56.     One of the critical components of the lender functions performed by the Soaren technology platform used by the Dunn-Bickerstaff Defendants was the automated decisioning technology used to render rapid decisions on loan applications made over "tribal" websites such as Clarity Finance. In order to render nearly instantaneous loan approvals, the loan decisioning system requires a complex technology connection to the computer system of a third-party, specialized consumer reporting agency, that can quickly assess the credit risk of the loan applicant and communicate that assessment back to the loan decisioning platform.

57.     Defendant FactorTrust was, at least for a period of time that Clarity Finance loans were being made, the specialty consumer reporting agency that, pursuant to a contractual arrangement with the Dunn-Bickerstaff Defendants, was providing this essential service to them. Through the technology integration services described above, a loan application made on the Clarity Services website would automatically trigger an electronic transmission to FactorTrust, containing personal information about the applicant collected during the application process. In a matter of seconds, FactorTrust would scan its database containing, among other things, information about prior payday lending, and return to the Dunn-Bickerstaff platform the credit risk assessment needed to render an automated approval or denial.[11]

58.     In short, FactorTrust was not simply supplying credit reports to a lender that was using the reports as part of an independent loan underwriting process, but rather, was an essential participant in an elaborate, integrated technology network, established and maintained by the Defendants. Within this technology network, the personal information contained in loan applications initiated on the "Clarity Services" website—falsely represented to the applicant as being a tribal lending operation taking place on tribal lands—was automatically transmitted to FactorTrust.

---

[11] By referring to the technology platform as the Dunn-Bickerstaff platform, Plaintiffs do not wish to imply that the Defendants here devised all the technology themselves. More likely is that they licensed one of the third-party platforms, such as "Provenir," that are used to power most of the illegal websites operating currently.

16

The FactorTrust side of the network, in turn, would respond with a nearly instantaneous transmission, sending credit-risk information to "Soaren Management," the company which it knew to be the actual lender.

59.     This imbedding by FactorTrust into the "Clarity Services" decisioning platform operating by "Soaren Management" was not accidental or incidental to its business model; on the contrary, FactorTrust's core mission has, from its inception, been to service payday lenders such as the Dunn-Bickerstaff Defendants, many of whom have been actively engaged in deliberate efforts to circumvent state law. Indeed, in deposition testimony rendered in a different matter, FactorTrust's Vice President of Sales testified that his company's focus when it launched was "servicing the online payday guys."

60.     In a 2016 interview published on the website of Provenir, one of the vendors of the technology platforms used by online lenders, FactorTrust's CEO, Greg Rable, explained, "Integration into the systems that lenders use is essential." He boasted that, through the use of its proprietary database containing information about 200 million consumer transactions with "alternative" lenders, it was able to evaluate the credit risk and return a score to an online lender "in around a second to a second and a half." A copy of this interview is attached hereto as Exhibit "H."[12]

61.     At the time of that interview, Rable was a member of the Board of Directors of the Online Lenders Alliance, serving alongside several of the leading proponents of the "rent-a-tribe" lending model. *See* Paragraph 34, *supra*. He was also a donor to the organization's political action committee.

62.     Moreover, as mentioned above, being a "consumer reporting agency," FactorTrust operates under a federal statutory duty requiring it to maintain procedures for identifying the

---

[12] *See also* the results of a web search for "FactorTrust" that links to the "Short-Term Lending" page of the website of FactorTrust's parent company, TransUnion, offering, among other things, the means to "[p]ower underwriting models." (A copy of that "Short-Term Lending" page is attached as Exhibit I.)

17

businesses to whom it provides credit reports on loan applicants. 15 U.S.C. § 1681e(a). Upon information and belief, in compliance with this obligation, FactorTrust, knew the Dunn-Bickerstaff Defendants and the nature of the business they were conducting, including the exorbitant rates that they were charging to consumers.

63.     Indeed, in its contracting, FactorTrust routinely reserves the right to scrutinize the business of its customers to ensure that they meet "credentialling standards . . . which may include periodic physical inspection of Customer's premises, audit of Customer's business records relating to the Services, third-party Investigation of Customer and personal Interviews with Customer's officers and employees." Master Services Agreement, ¶ 13.1 (filed document 97-5, in *FactorTrust, Inc. v. Evanston Ins. Co.*, No. 1:16-cv-02711-LMM (N.D. Ga.).

64.     Upon information and belief, FactorTrust performed such credentialing of the Dunn-Bickerstaff Defendants consistent with its customary business practices, leading to its identification of "Soaren Management" as the "lender" of these loans. Further, FactorTrust knew— through this credentialing and through its awareness of rent-a-tribe arrangements—that Soaren Management was providing illegal loans to consumers and using FactorTrust's services as an essential component of the lending operation.

### E. Plaintiffs' Loans from Pine Tree Lending

#### Plaintiff Dearry

65.     On or about December 20, 2018, Plaintiff Dearry visited the Clarity Services website from his device in Pennsylvania and applied for a loan, inputting his private, personal information including his Social Security number and his bank account information.

66.     Within seconds, unbeknownst to him, the Dunn-Bickerstaff platform automatically transmitted a credit inquiry about him to FactorTrust, which, in turn, in a matter of seconds, and pursuant to an agreement between the Dunn-Bickerstaff Defendants and FactorTrust, returned a credit report to Soaren Management.

67.     Plaintiff Dearry discovered this when, in response to a request for his credit file, FactorTrust disclosed that, on December 20, 2018—*i.e.*, the date of the Clarity Services loan—it

18

provided a credit report to a lender it identified as Soaren Management LLC, at the address of 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050, *i.e.* the registered address of Kraken Holdings, LLC. (Exhibit "G").

68.     Based on that credit report, the Dunn-Bickerstaff platform approved a loan to Mr. Dearry and, that same day, December 20, 2018, a Clarity Finance loan was issued to him. The loan, effective December 21, 2018, was in the amount of $1,000, with an Annual Percentage Rate of 511%, and provided for monthly payments totaling $4,130.88, to be paid over the course of one year. (A copy of this loan agreement is attached as Exhibit "J.").

69.     Over the course of the following three months, in accordance with an automatic payment protocol arranged and managed by the Dunn-Bickerstaff Defendants, approximately $1,377 was debited from his bank account via ACH transfer.

**Plaintiff Green**

70.     On or about May 3, 2018, Plaintiff Green went to the Clarity Finance website from her device in Pennsylvania and applied for a loan, inputting her private, personal information including her Social Security number and her bank account location and number.

71.     Based on a credit report it obtained for her, the Dunn-Bickerstaff platform approved a loan to Ms. Green in the amount of $1,100, and, on or about that same day, a Clarity Finance loan was issued to her. The loan, effective May 6, 2018, was in the amount $1,100, with an Annual Percentage Rate of 408%, and provided for $4,543.92, to be paid over the course of a year.  (A copy of the Green loan agreement is attached as Exhibit "K.").

72.     On or about June 3, 2019, in accordance with an automatic payment protocol arranged and managed by the Dunn-Bickerstaff Defendants, a first loan payment of $378.66 was automatically withdrawn from Ms. Green's bank account via ACH transfer.

73.     At some point, Ms. Green managed to stop the automatic payments from her bank account, pursuant to her rights under the Electronic Funds Transfer Act, 15 U.S.C. § 1693e.

74.     Sometime thereafter, Ms. Green began receiving automated collection calls that bombarded her home multiple times daily, at all hours of the day. This went on from late 2019 into early 2021.

75.     At first, she accepted these calls and, although she received little information about who was calling, she made small monthly payments that, over time, added up to roughly $500. As directed by the phone calls, she made these payments via the ACH system.

76.     She eventually stopped these payments but has continued to receive these frequent robocalls.

77.     Ms. Green has no idea who is initiating these calls. Most recently, these calls have come from the numbers 844-501-0546, 484-341-7348, and 610-708-1864.

78.     The unknown entity that is making these constant, repetitive automated calls to Ms. Green is deliberately trying to hide its identity in plain violation of 15 U.S.C. § 1692d(6) (requiring "meaningful disclosure of the caller's identity" when collecting debts). Upon information and belief, the Clarity Finance website is no longer making loans, so this entity is likely associated with the Dunn-Bickerstaff Defendants who are continuing to try to extract whatever they can from Plaintiff and similarly situated "Clarity Finance" victims.

### The Illegality of the Plaintiffs' Loans

79.     Absent a state license to make certain kinds of regulated loans, no one may make an unsecured loan for $50,000 or less to a resident of the Commonwealth of Pennsylvania at an annual percentage rate greater than 6%. 41 Purdons Pa. St. § 201.

80.     At the time Plaintiffs Dearry and Green obtained their "Clarity Finance" loans, neither Pine Tree Lending nor any other Defendant had obtained a consumer finance license from the Commonwealth of Pennsylvania.

81.     Upon information and belief, neither Pine Tree Lending nor any other Defendant had obtained a consumer finance license from any of the other jurisdictions included in the class; and no Defendant has ever attempted to obtain such a license in connection with loans made in the name of Pine Tree Lending.

82.    Under Pennsylvania law, if a lender is not exempt from the 6% interest rate cap and has not obtained a consumer finance license, and nonetheless contracts to make a consumer loan and charges, contracts for, or receives interest or other compensation in excess of 6% per year, then any interest in excess of 6% per year is deemed to be null and void and the lender is not permitted to collect on it. 41 Purdons Pa. St. §§ 501-502.

83.    Plaintiffs' loans were unlawful and void under Pennsylvania law. The 407.67% interest rate charged Ms. Green was more than 67 times greater than the maximum allowable interest rate; the 511% charged Mr. Dearry was more than 85 times the legal limit.

### F.  Purported Arbitration Clauses in Plaintiffs' Loan Agreements Are Void and Unenforceable

84.    Pine Tree Lending's purported lending agreements—which were, upon information and belief, drafted by or for the Dunn-Bickerstaff Defendants—not only violated the usury laws or applicable interest rate caps in the borrowers' home state, they included unconscionable choice of law and arbitration provisions that unlawfully sought to disclaim the application of federal and state law and impose the law of the Tribe as the sole governing law.

85.    The language in the form Pine Tree Lending loan agreement stated the following regarding the applicable governing law:

> **GOVERNING LAW**: The laws of the Tribe and applicable federal law will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

86.    This is in addition to the second paragraph of the Pine Tree Lending loan agreement, which simply read: "This Agreement is governed by the laws of the Tribe."

87.    Through these provisions, the Pine Tree Lending loan agreement purported to disclaim and waive federal and state rights that cannot be waived by consumers.

88.    The Pine Tree Lending loan agreement also included an arbitration provision which it described as a "**TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION**" (the "Purported Arbitration Clause"). This provision purported to provide exclusive jurisdiction to the

21

complaints department of Clarity Finance, with additional review provided by a supposed "Tribal Financial Services Regulatory Authority." No other information besides an address was given for this purported "Authority." The address given is 8 Kennebasis Rd., Indian Township, ME, 04668. This is the same exact address as the address given in the loan agreement for Clarity Finance itself. There are no other indicia that the "Authority" which supposedly will arbitrate any dispute is in any way distinct from Clarity Finance, the party against which any claim might be brought.

89.     Determinations of that entity could supposedly be appealed to an entity called the "Tribal Court" for which there was no further definition, address, or means provided to find more information about the entity. There are no indicia that the "Tribal Court" is, as a matter of either form or substance, distinct from the purported "Authority."

90.     The mechanisms described in the Purported Arbitration Clause provide no option for third-party, neutral arbitrators that have no interest in the dispute. Indeed, in the loan agreement Pine Tree Lending both purports to be an "economic arm of the tribe" while reserving exclusive jurisdiction to the tribe to resolve consumer complaints. ("It is the express intention of the Tribe and us operating as an economic arm of the Tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign governmental immunity, and any other rights, titles, privileges, and immunities, to which we and the Tribe are entitled;" "**THIS DISPUTE RESOLUTION OPPORTUNITY IS INTENDED AS THE SOLE DISPUTE RESOLUTION MECHANISM FOR DISPUTES AND CLAIMS ARISING UNDER THIS LOAN AGREEMENT**." (emphasis in original)).

91.     Upon close examination, the Purported Arbitration Clause is more notable for what it did not contain than for what it did contain. In addition to providing no neutral arbiter or neutral means to appeal the decision, the Purported Arbitration Clause did not guarantee the consumer a right to an in-person hearing, did not guarantee that any hearing that took place would be accessible to the consumer, and did not provide a means to opt-out of the clause.

92.      Although "the Authority may offer the consumer an opportunity to be heard," this right was exclusively reserved for the "Authority" to offer. There was no reference to where the

22

rules or procedure of the "appellate" Tribal Court might be found, or even any indication of where the supposed court itself sits or who comprises it.

93.    The Purported Arbitration Clause is unconscionable and unenforceable for the same reasons articulated by the U.S. Court of Appeals for the Third Circuit in *MacDonald v. CashCall, Inc.* 883 F.3d 220 (3d Cir. 2018) and by courts in the Eastern District of Pennsylvania in *Smith v. Western Sky Financial, LLC* 168 F.Supp.3d 778 (E.D. Pa. 2016), and *Ryan v. Delbert Servs. Corp.*, 5:15-CV-05044, 2016 WL 4702352 (E.D. Pa. Sept. 8, 2016).

94.    Specifically, the Purported Arbitration Clause is invalid because "the arbitral forum provided for in the Loan Agreement is nonexistent." *MacDonald,* 883 F.3d at 227.

95.    Furthermore, "[a]n arbitration clause that 'purports to renounce wholesale the application of any federal law to [a plaintiff's] federal claims ... is simply unenforceable.'" *Ryan,* 2016 WL 4702352, at *4 (quoting *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673-674 (4th Cir. 2016)).

96.    The additional indicia of substantive and procedural unconscionability including the lack of impartial arbitrators, the lack of meaningful process of appeal, the lack of in person hearings, the lack of a local forum, and the lack of a meaningful opportunity to opt-out of the arbitration agreement further emphasize the extent to which the Purported Arbitration Clause is a naked and deliberate attempt to avoid the application of federal and state law through the use of unconscionable choice of law and arbitration provisions. The use of arbitration as a means of circumventing the application of federal and state law, particularly in a law avoidance scheme like the one engaged in by Defendants here, is not permitted under controlling law in this judicial circuit.

97.    Moreover, under controlling authority in this Circuit, no part of the unlawful Purported Arbitration Clause may be severed to preserve the remainder of Defendants' integrated scheme to contravene public policy. *See MacDonald,* 883 F.3d at 230-232.

98.    Plaintiffs are therefore entitled to a declaratory judgment that the governing law, forum selection, and Purported Arbitration Clause provisions of the Pine Tree Lending loan agreements are unenforceable in their entirety.

## V.    CLASS ALLEGATIONS

99.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure Rule 23(a) and 23(b)(l), (b)(2), and (b)(3), as representatives of the following Class:

> All persons who obtained loans from Pine Tree Lending d/b/a Clarity Finance from the beginning of the period commencing four years prior to the filing of this action, who, at the time the loan was made, were residents of any states or the District of Columbia, other than Nevada or Utah, and who made payments on such loans.

100.    This action is brought, and may properly be maintained, as a class action pursuant to Rule 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions. The members of the Class are readily ascertainable from records maintained by Defendants.

101.    **Numerosity**. Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs, Plaintiffs believe that there are likely tens of thousands of individuals who are members of the Class. The exact number of Class members and their identities are known by Defendants or are readily ascertainable in Defendants' records.

102.    **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' claims are based on the same facts and legal theories as each of the members of the Class. Plaintiffs and all Class members were charged interest rates on online payday loans obtained through the Clarity Finance website that exceeded the lawful interest rate caps in their states of residence. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants in connection with the operation of the above-described online lending scheme.

103.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs have retained counsel that are competent and experienced in the prosecution of complex class action litigation and have experience with class action litigation involving tribal lending schemes. Plaintiffs' counsel will undertake to vigorously protect the interests of the Class.

24

104.    **Commonality & Predominance**. Questions of law and fact are common to the members of the Class and predominate over any questions that may affect only individual Class members. The claims of all Class members originate from the same misconduct and violations of law perpetrated by Defendants. The common questions include, but are not limited to:

a.  Whether the PTL Lending Organization (defined below) is an enterprise under 18 U.S.C. § 1961(4);

b.  Whether the Dunn-Bickerstaff Defendants engaged and/or are engaging in the collection of unlawful debt in violation of 18 U.S.C. § 1962(c);

c.  Whether Defendant FactorTrust conspired with the PTL Payday Lending Organization in violation of 18 U.S.C. § 1962(d);

d.  Whether the Dunn-Bickerstaff Defendants and the unknown entities who are attempting to collect these illegal loans are violating the Fair Debt Collect Practices Act, 15 U.S.C. §§ 1692d, 1692e, 1692f, & 1692g.

e.  Whether the purported arbitration agreement in Plaintiffs' and the Class' loan agreements is void and/or unenforceable; and

f.  Whether Defendants are liable to Plaintiffs and members of the Class for damages or other relief.

105.    **Superiority**. Under Rule 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common, small-dollar claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would entail. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

106.    This action is also maintainable as a class action under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

107.    With respect to Rule 23(b)(1)(B), the prosecution of separate actions by each Class member would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests. Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

108.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.    CLAIMS FOR RELIEF

<div align="center">

**COUNT ONE**
**RICO, 18 U.S.C. § 1962(c) – Collection of Unlawful Debt**
**(Against Defendants Kraken, Dunn and Bickerstaff)**

</div>

109.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

110.    At all relevant times, Defendants Kraken Holdings, Dunn and Bickerstaff were members and associates of an online lending enterprise operating on the Internet as Pine Tree Lending, LLC d/b/a Clarity Finance (the "PTL Lending Organization"), whose members and associates engaged in the collection of unlawful debt.

111.    The PTL Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) - that is, a group of individuals and entities associated in fact. This association in fact shared a common purpose (the direction and management of the Clarity Finance lending business); relationships among those associated ("Soaren Management" or some other named, affiliated entity being the entity running the business in its capacity as a purported "servicer" hired by the nominal lender and, itself, in these

26

activities being managed by Kraken, Dunn and Bickerstaff); and a longevity sufficient to originate and collect thousands of illicit loans. Other unnamed participants in the association in fact include the as-yet unclear newly merged version of Soaren Management, LLC, and other, as yet unknown John Doe entities that have been involved in the described debt collection activities.

112.    The enterprise has been engaged in, and its activities affected, interstate commerce. The PTL Lending Organization has leadership based in Arizona and Nevada and has been operating throughout the United States, including the Eastern District of Pennsylvania.

113.    The PTL Lending Organization constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

114.    The PTL Lending Organization has been led, controlled, and/or managed by Defendants Kraken, Dunn and Bickerstaff and the purpose of the said enterprise was and continues to be the enrichment of the said Defendants through the collection of unlawful debt.

115.    RICO defines an "unlawful debt" as debt incurred in connection with "the business of lending money or a thing of value at a usurious rate under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

116.    The means and methods by which the Defendants conducted and participated in the conduct of the affairs of the PTL Lending Organization was the operation, direction, and control of a business of lending money at usurious rates more than two times the legal limit in Pennsylvania and the other forty-nine jurisdictions listed in Paragraph 25, above.

117.    The said Defendants have violated RICO through the "collection of unlawful debt," as that term is defined in RICO, 18 U.S.C. § 1962(c), from consumers throughout the United States,

118.    As a result of the unlawful collection of illegal debt, Plaintiffs Dearry and Green and members of the Class have been injured in their property through the payments made to the Defendants.

119.    As a direct and proximate cause of the Defendants' violations of RICO, they are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

27

<u>COUNT TWO</u>
**RICO, 18 U.S.C. § 1962(c) – Interstate Wire Fraud**
**(Against Defendants Kraken, Dunn and Bickerstaff)**

120.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

121.    The PTL Lending Organization described above has been engaged in activities which affect interstate commerce, more specifically, in collection activity directed against consumers throughout the United States who entered into loan transactions over the Clarity Finance website.

122.    The Defendants have participated in the conduct of the affairs of that enterprise through a "pattern of racketeering activity," as that phrase is defined in 18 U.S.C. § 1961(5).

123.    The collection activity described above constituted the execution of a scheme and artifice to obtain revenues by means of fraudulent pretenses and representations through the use of the interstate wire network, in violation of 18 U.S.C. § 1343.  Defendants' use of the telephone wire network formed a central feature of the scheme and included, by way of example and as described above, a system of repetitive robocalls, sent from disguised numbers and directed to consumers such as Plaintiff Green, who had taken out and not repaid the "Clarity Finance" loans arranged by Defendants. In addition, Defendants had consumers such as Plaintiff Green use the ACH wire system to send payments to them.

124.    The conduct described above constituted multiple violations of 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

125.    The unlawful conduct by the Defendants alleged above, conducted through the PTL Lending Organization, injured numerous victims, was continuous and open ended and was intended to continue, and indeed, it does continue today.

126.    Plaintiffs and the members of the class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the RICO Defendants.  The financial harms suffered by plaintiffs and members of the class were the direct result of said conduct and were the intended and reasonably foreseeable consequence of such conduct.

Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the members of the class are entitled to threefold the damages they sustained, together with reasonable attorney's fees and costs.

<p align="center"><u>COUNT THREE</u><br/>
RICO, 18 U.S.C. 1962(d) – RICO Conspiracy<br/>
(Against ALL Defendants)</p>

127. Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

128. Besides the PTL Lending Organization described above, Pine Tree Lending LLC, doing business as Clarity Finance, was also an "enterprise," as defined in 18 U.S.C. § 1961(4). The conduct of the Dunn-Bickerstaff Defendants, with knowledge, agreeing to support and assist, and in fact, supporting and assisting the illegal loan business described above, violated 18 U.S.C. § 1962(d).

129. Defendant FactorTrust knew that the PTL Lending Organization was using its services to further a "rent-a-tribe" scheme and thereby facilitate decisions on high-rate, small loans that it knew or should have known were illegal in Pennsylvania and in nearly every other state.

130. Defendant FactorTrust, with knowledge that the PTL Lending Organization made and collected unlawful debts and was engaged in a pattern of racketeering activity, purposely and knowingly agreed to assist and facilitate this unlawful activity by providing an essential component of the loan decisioning process.

131. Defendant FactorTrust knew or should have known that the true lender to whom it supplied the credit reports at issue, which it identifies as "Soaren Management," was in actuality a sham tribal lending enterprise operating behind a "tribal" façade.

132. The acts of Defendant FactorTrust were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

133. Various as-yet unknown John Doe Defendants, with knowledge that the PTL Lending Enterprise, have also been facilitating this illegal activity, including those involved in the purported merger transaction with Soaren Management and those who are collecting the unlawful

<p align="center">29</p>

debts, originated by the Enterprise, with knowledge of their illegality, in violation of 18 U.S.C. § 1962(d).

134.    As a result of this violation of RICO, Defendants are jointly and severally liable to Plaintiff and the putative members of the Class for all the damages caused by the PTL Lending Enterprise, including hundreds of millions of dollars in illegal interest paid, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

<div align="center">

**COUNT FOUR**
**FDCPA, 15 U.S.C. §1692k**
**(Against Defendants and John Doe Entities)**

</div>

135.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

136.    The consumer debt created by the above-described lending enterprise is "debt" within the meaning of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692a(5).

137.    Under the FDCPA, the term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.  15 U.S.C. § 1692a(6).

138.    Whoever it is that has been robocalling Plaintiff Green and similarly situated class members—whether the named Dunn-Bickerstaff Defendants or a third party John Doe that is deliberately hiding its identity— is a "debt collector."

139.    During the year preceding the commencement of this action, the Defendants and/or said John Doe have engaged in multiple violations of the FDCPA, including the following:

    a.    Defendants violate 15 U.S.C. §1692e(2)(A) by misrepresenting the character, amount, and legal status of the debt;

    b.    Defendants violate 15 U.S.C. §1692e(14) by using a business, company, or organization name other than the true name of the debt collector's business, company, or organization;

<div align="center">30</div>

c.       Defendants violate 15 U.S.C. § 1692f(1) by collecting or attempting to collect amounts clearly not owing under state law;

d.       Defendants violate 15 U.S.C. § 1692d(5) by causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

e.       Defendants violate 15 U.S.C. § 1692d(6) by placing telephone calls without meaningful disclosure of the caller's identity.

f.       Defendants violate 15 U.S.C. § 1692g by systematically failing to provide the validation notice required by that section, which failure adds to the unfair and deceptive nature of Defendants' communications.

140.    Plaintiff Green and the members of the class suffered actual damages from these violations, namely the amounts they paid to Defendants.

141.    Pursuant to 15 U.S.C. § 1692k, Plaintiff and the class members are entitled to actual damages, and reasonable attorney's fees and costs.

<div align="center">

**COUNT FIVE**
**Unjust Enrichment**
**(Against ALL Defendants)**

</div>

142.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

143.    Defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiffs and members of the Class who were experiencing financial difficulties and taken advantage of through the Pine Tree Lending online payday lending scheme.

144.    In equity and good conscience, those funds collected in excess of the legal rate of interest permitted by Class members' home states should be returned to the people victimized by Defendants' unlawful scheme.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully seek the following relief:

<div align="center">31</div>

A.  Certification of this action as a class action and appointing Plaintiffs and their counsel (listed below) to represent the Class;

B.  A finding that the Defendants have violated § 1962(c) of RICO through the collection of unlawful debt;

C.  A finding that the Defendants have violated § 1962(c) of RICO through a pattern of wire fraud;

D.  A finding that Defendants have violated § 1962(d) of RICO through their conspiracy to facilitate the collection of unlawful debt and/or the pattern of wire fraud;

E.  A finding that Defendants have violated 15 U.S.C. §§ 1692d-1692g through their illegal debt collection conduct;

F.  A finding that Defendants have been unjustly enriched through their participation the describe scheme;

G.  Treble damages under 18 U.S.C. § 1964.

H.  Actual damages under 15 U.S.C. § 1692k and under the common law;

I.  An order awarding attorneys' fees and costs; and

J.  An award of any such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Respectfully submitted,

/s/ *Irv Ackelsberg*
Irv Ackelsberg
John J. Grogan
LANGER, GROGAN & DIVER, PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com

32

Kristi C. Kelly (admitted *pro hac vice*)
Andrew J. Guzzo (admitted *pro hac vice*)
J. Patrick McNichol (admitted *pro hac vice*)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
kkelly@kellyguzzo.com

Dated:  October 14, 2021

33

# Exhibit A


(/)

## FactorTrust FAQs

- Who is FactorTrust and what do you do?
- My request for a loan was denied. What role did FactorTrust play in my lender's credit decision?
- How did FactorTrust get my information?
- Why did a company use my credit report in order for me to receive a loan?
- I received a Notice of Adverse Action. What is this?
- Who can I contact if I need further explanation of why I was denied credit?
- How do I get a copy of my FactorTrust credit report?
- Can I request Lenders stop sending me credit offers in the mail?
- What should I do if I believe someone stole and used my personal information? How do I report identity theft?
- How do I place an active duty alert on my credit report?

## Who is FactorTrust and what do you do?

FactorTrust is a consumer reporting agency. As a consumer reporting agency, we may disclose information about you only to companies that you have authorized to access your information, or otherwise have a permissible purpose to access this information.

## My request for a loan was denied. What role did FactorTrust play in my lender's credit decision?

Please note that FactorTrust does not approve or deny applications for credit. FactorTrust provides the lender a credit report (if authorized by you or permissible by law) a credit report that they may, or may not, use in their decision process. Each lender has their own decision-making requirements for approving a loan.

## How did FactorTrust get my information?

Various entities may furnish credit information to FactorTrust such as by banks, debt collectors, loan companies, and other creditors.

## Why did a company use my credit report in order for me to receive a loan?

Lenders may decide to review your credit report to determine if you meet their requirements for a loan. Your credit report may be used to verify your identity or to review your payment history performance on other obligations.

## I received a Notice of Adverse Action. What is this?

A notice of Adverse Action is what you receive from the lender when you applied and have been denied credit.

The letter may include specific information such as your credit score, factors that affect your score, the contact information of the credit reporting agency that was used, and other information

## Who can I contact if I need further explanation of why I was denied credit?

Please note that FactorTrust does not approve or deny applications for credit. FactorTrust provides the lender a credit report (if authorized by you or permissible by law) a credit report that they may, or may not, use in their decision process. Each lender has their own decision-making requirements for approving a loan. FactorTrust does not have information as to the reasons an application was denied. You should contact the business, where you applied for credit, to obtain this information.

## How do I get a copy of my FactorTrust credit report?

- TO VIEW ONLINE: You can view your FactorTrust credit report online by following this link* (https://www.factortrust.com/consumer/ReportRequest.aspx).
  *Note: Your FactorTrust credit report, if obtained online, is best viewed from a computer. Mobile or tablet type devices may not display properly.*
- Alternatively, you may also request for your credit report to be sent to you BY MAIL by filling out this form (/resources/transunion/doc/industry/resources/Consumer-Inquiry-Form-2020.pdf). Once complete, please mail the form to FactorTrust with a copy of your driver's license or valid ID. This will be for your FactorTrust credit report only.
  - Mail: FactorTrust Attn: Consumer Inquiries, PO BOX 390, Woodlyn, PA 19094

- You may contact other credit reporting agencies to request a copy of your report within their database.
- Your free credit report does not include a credit score. It is important to check your credit report to make sure the information is accurate because your credit score is based on the information in your credit report.

## Can I request Lenders stop sending me credit offers in the mail?

You can opt out of certain lists by calling FactorTrust at 1-866-910-8497. This service allows you to remove your name from certain lists supplied to credit companies and insurers by FactorTrust. FactorTrust will implement this opt-out request within five business days, though for a period of time you may still continue to see credit offers because your name may already have been provided to companies who have not yet mailed their offers to you. This does not opt you out of the Big 3 Bureau's – Equifax, Experian, and TransUnion or other Credit Reporting Agencies.

## What should I do if I believe someone stole and used my personal information? How do I report identity theft?

If someone is using your personal information to open new accounts or make purchases, take these steps as soon as possible:

1. Visit Identity Theft.gov (https://identitytheft.gov/), a one-stop resource to help you report and recover from identity theft.

2. Call the companies where you know fraud occurred.

3. Click here (https://www.factortrust.com/consumer/Alerts.aspx) to place a fraud alert on your credit report. Also, pull your FactorTrust credit report to see if unauthorized data is reflected on your record.

4. Report identity theft to the FTC.

5. File a report with your local police department.

6. If an authorized account or loan is located on your FactorTrust credit report, you may start a dispute (https://www.factortrust.com/consumer/Disputes.aspx) with FactorTrust.

## How do I place an active duty alert on my credit report?

Please visit us here (https://www.factortrust.com/consumer/Alerts.aspx) to place an active duty alert on your FactorTrust credit report.

Return to top

Case 2:21-cv-02548-MAK    Document 33-1    Filed 10/14/21    Page 6 of 7

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 61 of 154    Document 31-2

## About Us

## Client Support

## Information for

HAVE QUESTIONS?

CONSUMER (/CUSTOMER-SUPPORT/CONTACT-US-CONSUMERS)    BUSINESS (/BUSINESS-CONTACT)

    

(https://www.facebook.com/TransUnion) (https://twitter.com/TransUnion) (https://www.youtube.com/user/TransUnionvideo) (https://www.linkedin.com/company/transunion/) (https://www.instagram.com/transunion/) (http://www.transunion.com/blog/)



Privacy (/privacy)    Terms of use (/legal/terms-of-use)    Sitemap (/sitemap)    FCPA policy (/legal/fcpa-policy)

© Copyright 2021 TransUnion LLC. All Rights Reserved.

# Exhibit B

Case 2:21-cv-02548-MAK   Document 33-2   Filed 10/14/21   Page 2 of 3

The Wayback Machine - https://web.archive.org/web/20200128165648/https://clarityfinance.com/home

📞 1-877-632-4223 | Login





If you need assistance or have questions about your account, our professional Customer Success Agents and Loan Specialists are available 24 hours a day.

📞 1-877-632-4223     ✉ CustomerService@ClarityFinance.com

## Quick Links

**Account Login**
**Privacy Policy**
**Terms & Conditions**
**License**

Pine Tree Lending LLC dba Clarity Finance ("Clarity"), is a wholly-owned and operated limited liability company subsidiary of Indian Township Enterprises, a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Passamaquoddy Tribe of Indian Township ("Tribe"), a federally-recognized sovereign American Indian tribe.

All loan application decisions are made at Clarity's office located at 8 Kennebasis Road, Indian Township, ME 04668 on the Tribe's reservation. If your loan application is approved by Clarity, your loan will be governed by Tribal law, applicable federal law, and the terms and conditions of your loan agreement.

This is an expensive form of borrowing. Clarity loans are designed to assist you in meeting your short-term borrowing needs and are not intended to be a long-term financial solution. The Annual Percentage Rate ("APR") as applied to your loan will range from 720% to 795% depending on your payment schedule, pay frequency, loan term, and the amount of your loan. Late payments and non-payment may result in additional fees and collection activities as described in your loan agreement and as allowed by Tribal and applicable federal law. Clarity does not lend to residents of CT, PA, ME, NY, VA, VT, and WV. Availability of installment loans are subject to change at any time at Clarity's sole discretion.

*Priority Funding Disclaimer: Priority Funding may be limited by funding time frames and cut-off times. Applications processed and approved before 7:00 p.m. EST Monday – Friday are typically funded on the next business day. If you require funds the current business day, you can request a wire transfer up to 4:00 p.m EST Monday – Friday. For loans processed on weekends or bank holidays, you will receive the wire transfer the next business day. Please verify with your bank as additional incoming wire fees may be assessed.

Case 1:25-cv-00489-BBC     Filed 09/26/25     Page 64 of 154     Document 31-2

Clarity Finance LLC | Priority Funding & Signature Service You Deserve

### Call Us

1-877-632-4223

### Email Us

CustomerService@ClarityFinance.com

### Mail Us

PO Box 8, Princeton, ME 04668

Copyright © 2020 Clarity Finance All rights reserved

### Call Us

1-877-632-4223

### Email Us

CustomerService@ClarityFinance.com

### Mail Us

PO Box 8, Princeton, ME 04668

# Exhibit C

Line wrap ☐

```
<!doctype html>
<html class="no-js" lang="">
<head><script src="//archive.org/includes/analytics.js?v=cf34f82" type="text/javascript"></script>
<script type="text/javascript">window.addEventListener('DOMContentLoaded',function(){var v=archive_analytics.values;v.service='wb';v.server_name='wwwb-
<script type="text/javascript" src="/_static/js/bundle-playback.js?v=UfTkgsKx" charset="utf-8"></script>
<script type="text/javascript" src="/_static/js/wombat.js?v=UHAOicsW" charset="utf-8"></script>
<script type="text/javascript">
  __wm.init("https://web.archive.org/web");
  __wm.wombat("https://clarityfinance.com/home","20200128165648","https://web.archive.org/","web","/_static/",
      "1580230608");
</script>
<link rel="stylesheet" type="text/css" href="/_static/css/banner-styles.css?v=omkqRugM" />
<link rel="stylesheet" type="text/css" href="/_static/css/iconochive.css?v=qtvMKcIJ" />
<!-- End Wayback Rewrite JS Include -->

    <meta charset="utf-8">
<meta http-equiv="x-ua-compatible" content="ie=edge">

<title>    Clarity Finance | Priority Funding &amp; Signature Service You Deserve
</title>
<meta name="description" content="    Clarity Finance offers short-term personal loans with priority funding, signature state-side service, exclusive
">

<meta name="subject" content="Fast Loans and Funding">
<meta name="keywords" content="Clarity Finance, Funding, funds, loan, borrowing, money, available, installment">
<meta name="news_keywords" content="Clarity Finance, Funding, funds, loan, borrowing, available, money, installment">
<meta name="csrf-token" content="g02bkpWViDSvEkEnFY7vkNeDt2jtfKyECVEELanF">
<meta name="viewport" content="width=device-width, initial-scale=1">

<link rel="manifest" href="https://web.archive.org/web/20200128165648/https://clarityfinance.com/3/site.webmanifest">
<link rel="icon" type="image/png" href="https://web.archive.org/web/20200128165648im_/https://clarityfinance.com/3/img/favicon.png" type="image/png">

<!-- CSS here -->
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/bootstrap.min.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/owl.carousel.min.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/animate.min.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/magnific-popup.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/fontawesome-all.min.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/slick.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/base.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/default.css">
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/nice-select.css">

<!-- Custom CSS -->
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/3/css/3.css">

<link href="https://web.archive.org/web/20200128165648cs_/https://cdnjs.cloudflare.com/ajax/libs/jqueryui/1.12.1/jquery-ui.css" rel="stylesheet">
<link href="https://web.archive.org/web/20200128165648cs_/https://cdnjs.cloudflare.com/ajax/libs/bootstrap-datepicker/1.8.0/css/bootstrap-datepicker.cs
<link rel="stylesheet" href="https://web.archive.org/web/20200128165648cs_/https://clarityfinance.com/base/css/sweetalert2.css"/>

<!-- Google Tag Manager -->
<script>
    //add UserID for Google Analytics

    </script>
<!-- TrustBox script -->
<script type="text/javascript" src="//web.archive.org/web/20200128165648js_/https://widget.trustpilot.com/bootstrap/v5/tp.widget.bootstrap.min.js" asy
<!-- End TrustBox script -->
<script>

    (function (w, d, s, l, i) {
        w[l] = w[l] || [];
        w[l].push({
            'gtm.start':
                new Date().getTime(), event: 'gtm.js'
        });
        var f = d.getElementsByTagName(s)[0],
            j = d.createElement(s), dl = l != 'dataLayer' ? '&l=' + l : '';
        j.async = true;
        j.src =
            'https://web.archive.org/web/20200128165648/https://www.googletagmanager.com/gtm.js?id=' + i + dl;
        f.parentNode.insertBefore(j, f);
    })(window, document, 'script', 'dataLayer', "GTM-KG8WBNH");

    //console.log(window.UserID);
</script>
<!-- End Google Tag Manager -->


</head>
<body><!-- BEGIN WAYBACK TOOLBAR INSERT -->
<style type="text/css">
body {
  margin-top:0 !important;
  padding-top:0 !important;
  /*min-width:800px !important;*/
}
</style>
<script>__wm.rw(0);</script>
<div id="wm-ipp-base" lang="en" style="display:none;direction:ltr;">
<div id="wm-ipp" style="position:fixed;left:0;top:0;right:0;">
<div id="wm-ipp-inside">
  <div style="position:relative;">
    <div id="wm-logo" style="float:left;width:110px;padding-top:12px;">
      <a href="/web/" title="Wayback Machine home page"><img src="/_static/images/toolbar/wayback-toolbar-logo-200.png" srcset="/_static/images/toolbar
    </div>
```

view-source:https://web.archive.org/web/20200128165648/https://clarityfinance.com/home                                                          1/5

```html
      <div class="r" style="float:right;">
        <div id="wm-btns" style="text-align:right;height:25px;">
                <div id="wm-save-snapshot-success">success</div>
          <div id="wm-save-snapshot-fail">fail</div>
          <a id="wm-save-snapshot-open" href="#"
          title="Share via My Web Archive" >
            <span class="iconochive-web"></span>
          </a>
          <a href="https://archive.org/account/login.php"
            title="Sign In"
            id="wm-sign-in"
          >
            <span class="iconochive-person"></span>
          </a>
          <span id="wm-save-snapshot-in-progress" class="iconochive-web"></span>
            <a href="http://faq.web.archive.org/" title="Get some help using the Wayback Machine" style="top:-6px;"><span class="iconochive-question"
      <a id="wm-tb-close" href="#close" onclick="__wm.h(event);return false;" style="top:-2px;" title="Close the toolbar"><span class="iconochive-remove-
        </div>
        <div id="wm-share">
            <a href="/web/20200128165648/http://web.archive.org/screenshot/https://clarityfinance.com/home"
            id="wm-screenshot"
            title="screenshot">
            <span class="wm-icon-screen-shot"></span>
          </a>
          <a href="#"
            id="wm-video"
            title="video">
            <span class="iconochive-movies"></span>
          </a>
      <a id="wm-share-facebook" href="#" data-url="https://web.archive.org/web/20200128165648/https://clarityfinance.com/home" title="Share on Facebook"
      <a id="wm-share-twitter" href="#" data-url="https://web.archive.org/web/20200128165648/https://clarityfinance.com/home" title="Share on Twitter" st
        </div>
      </div>
      <table class="c" style="">
        <tbody>
      <tr>
        <td class="u" colspan="2">
          <form target="_top" method="get" action="/web/submit" name="wmtb" id="wmtb"><input type="text" name="url" id="wmtbURL" value="https://clarityf
        </td>
        <td class="n" rowspan="2" style="width:110px;">
          <table>
            <tbody>
          <!-- NEXT/PREV MONTH NAV AND MONTH INDICATOR -->
          <tr class="m">
            <td class="b" nowrap="nowrap">Dec</td>
            <td class="c" id="displayMonthEl" title="You are here: 16:56:48 Jan 28, 2020">JAN</td>
            <td class="f" nowrap="nowrap"><a href="https://web.archive.org/web/20200814081408/https://clarityfinance.com/home" title="14 Aug 2020"><stron
          </tr>
          <!-- NEXT/PREV CAPTURE NAV AND DAY OF MONTH INDICATOR -->
          <tr class="d">
            <td class="b" nowrap="nowrap"><img src="/_static/images/toolbar/wm_tb_prv_off.png" alt="Previous capture" width="14" height="16" border="0" ,
            <td class="c" id="displayDayEl" style="width:34px;font-size:24px;white-space:nowrap;" title="You are here: 16:56:48 Jan 28, 2020">28</td>
            <td class="f" nowrap="nowrap"><a href="https://web.archive.org/web/20200814081408/https://clarityfinance.com/home" title="08:14:08 Aug 14, 20
          </tr>
          <!-- NEXT/PREV YEAR NAV AND YEAR INDICATOR -->
          <tr class="y">
            <td class="b" nowrap="nowrap">2019</td>
            <td class="c" id="displayYearEl" title="You are here: 16:56:48 Jan 28, 2020">2020</td>
            <td class="f" nowrap="nowrap"><a href="https://web.archive.org/web/20210228125805/https://clarityfinance.com/home" title="28 Feb 2021"><stron
          </tr>
            </tbody>
          </table>
        </td>
      </tr>
      <tr>
        <td class="s">
                <div id="wm-nav-captures">
                    <a class="t" href="/web/20200128165648*/https://clarityfinance.com/home" title="See a list of every capture for this URL">7 captures
          <div class="r" title="Timespan for captures of this URL">28 Jan 2020 - 28 Feb 2021</div>
          </div>
        </td>
        <td class="k">
          <a href="" id="wm-graph-anchor">
            <div id="wm-ipp-sparkline" title="Explore captures for this URL" style="position: relative">
            <canvas id="wm-sparkline-canvas" width="650" height="27" border="0"></canvas>
            </div>
          </a>
        </td>
      </tr>
        </tbody>
      </table>
      <div style="position:absolute;bottom:0;right:2px;text-align:right;">
        <a id="wm-expand" class="wm-btn wm-closed" href="#expand" onclick="__wm.ex(event);return false;"><span id="wm-expand-icon" class="iconochive-down
      </div>
  </div>
      <div id="wm-capinfo" style="border-top:1px solid #777;display:none; overflow: hidden">
              <div id="wm-capinfo-collected-by">
      <div style="background-color:#666;color:#fff;font-weight:bold;text-align:center">COLLECTED BY</div>
      <div style="padding:3px;position:relative" id="wm-collected-by-content">
          <div style="display:inline-block;vertical-align:top;width:50%;">
          <span class="c-logo" style="background-image:url(https://archive.org/services/img/webwidecrawl);"></span>
        Organization: <a style="color:#33f;" href="https://archive.org/details/webwidecrawl" target="_new"><span class="wm-title">Internet Archive</spa
          <div style="max-height:75px;overflow:hidden;position:relative;">
        <div style="position:absolute;top:0;left:0;width:100%;height:75px;background:linear-gradient(to bottom,rgba(255,255,255,0) 0%,rgba(255,255,255,0)
        The Internet Archive discovers and captures web pages through many different web crawls.

At any given time several distinct crawls are running, some for months, and some every day or longer.
```

```
View the web archive through the <a href="http://archive.org/web/web.php">Wayback Machine</a>.
    </div>
        </div>
    <div style="display:inline-block;vertical-align:top;width:49%;">
        <span class="c-logo" style="background-image:url(https://archive.org/services/img/liveweb)"></span>
      <div>Collection: <a style="color:#33f;" href="https://archive.org/details/liveweb" target="_new"><span class="wm-title">Live Web Proxy Crawls</
      <div style="max-height:75px;overflow:hidden;position:relative;">
      <div style="position:absolute;top:0;left:0;width:100%;height:75px;background:linear-gradient(to bottom,rgba(255,255,255,0) 0%,rgba(255,255,255,0)
        Content crawled via the <a href="http://archive.org/web/web.php">Wayback Machine</a> Live Proxy mostly by the Save Page Now feature on web.archiv
<br><br>
Liveweb proxy is a component of Internet Archive's wayback machine project. The liveweb proxy captures the content of a web page in real time, archives
<br>
    </div>
        </div>
    </div>
    </div>
    <div id="wm-capinfo-timestamps">
    <div style="background-color:#666;color:#fff;font-weight:bold;text-align:center" title="Timestamps for the elements of this page">TIMESTAMPS</div>
    <div>
      <div id="wm-capresources" style="margin:0 5px 5px 5px;max-height:250px;overflow-y:scroll !important"></div>
      <div id="wm-capresources-loading" style="text-align:left;margin:0 20px 5px 5px;display:none"><img src="/_static/images/loading.gif" alt="loading'
    </div>
    </div>
  </div></div></div></div><div id="wm-ipp-print">The Wayback Machine - https://web.archive.org/web/20200128165648/https://clarityfinance.com/home</div:
<div id="donato" style="position:relative;width:100%;">
  <div id="donato-base">
    <iframe id="donato-if" src="https://archive.org/includes/donate.php?as_page=1&amp;platform=wb&amp;referer=https%3A//web.archive.org/web/2020012816!
        scrolling="no" frameborder="0" style="width:100%; height:100%">
    </iframe>
  </div>
</div><script type="text/javascript">
  __wm.bt(650,27,25,2,"web","https://clarityfinance.com/home","20200128165648",1996,"/_static/",["/_static/css/banner-styles.css?v=omkqRugM","/_static/cs
    __wm.rw(1);
</script>
<!-- END WAYBACK TOOLBAR INSERT -->

<!-- Google Tag Manager (noscript) -->
<noscript>
    <iframe src="https://web.archive.org/web/20200128165648if_/https://www.googletagmanager.com/ns.html?id=GTM-KG8WBNH" height="0" width="0" style="di:
    </iframe>
</noscript>
<!-- End Google Tag Manager (noscript) -->


<!--[if lte IE 9]>
<p class="browserupgrade">You are using an <strong>outdated</strong> browser. Please <a href="https://browsehappy.com/">upgrade
    your browser</a> to improve your experience and security.</p>
<![endif]-->

<!-- header-start -->
<header>
    <!-- header-top-area-start -->
<div class="header-top-area theme-bg">
    <div class="container">
        <div class="row">
            <div class="col-xl-9 col-lg-8 col-md-8 col-sm-12">

            </div>
            <div class="col-xl-3 col-lg-4 col-md-4 col-sm-12">
                <div class="header-right-wrapper">
                    <ul class="header-wrapper">
                        <li>
                            <div class="header-icon">
                                <i class="fas fa-phone"></i>
                            </div>
                            <div class="header-text">
                                <a href="">1-877-632-4223|</a><a href="https://web.archive.org/web/20200128165648/https://clarityfinance.com/login">Lo;
                        </li>
                    </ul>

                </div>
            </div>
        </div>
</div>
<!-- header-top-area-end -->
<div class="header-menu">
    <div class="container">
        <div class="row">
            <div class="col-xl-3 col-lg-3 pr-0">
                <div class="logo">
                    <a href="https://web.archive.org/web/20200128165648/https://clarityfinance.com/home"><img src="/web/20200128165648im_/https://clar:
                </div>
            </div>
            <div class="col-12"><div class="mobile-menu"></div></div>
        </div>
</div>
</header>
<!-- header-end -->


<!-- JS start here -->
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/vendor/jquery-1.12.4.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/vendor/bootstrap.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/vendor/modernizr-3.5.0.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/popper.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/vendor/menu.js"></script>
```

```
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/owl.carousel.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/isotope.pkgd.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/waypoints.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/jquery.counterup.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/jquery.nice-select.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/slick.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/ajax-form.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/jquery.easypiechart.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/wow.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/jquery.scrollUp.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/imagesloaded.pkgd.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/jquery.magnific-popup.min.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://maps.googleapis.com/maps/api/js?key=AIzaSyAJ97zN_MClQ8BnmJJOCY165S2QEYvbIis"></scri
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/plugins.js"></script>
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/main.js"></script>

<script src="https://web.archive.org/web/20200128165648js_/https://cdnjs.cloudflare.com/ajax/libs/bootstrap-datepicker/1.8.0/js/bootstrap-datepicker.js
<script src="https://web.archive.org/web/20200128165648js_/https://clarityfinance.com/base/js/sweetalert2.js"></script>
<!-- JS end here -->
<!-- content area -->
    <div class="container mt-150 mb-200">
        <div class="row">
            <div class="col-lg-12 home-main">
                <img src="/web/20200128165648im_/https://clarityfinance.com/3/images/site-logo.png" alt=""/>

                <p class="pt-20">If you need assistance or have questions about your account, our professional Customer Success Agents and Loan Specialists
                <div class="footer-icon-area pt-20 pb-10">

                    <div>
                        <span class="text-nowrap"><i class="fas fa-phone fa-rotate-90 color-clarity "></i>  <a href="https://web.archive.org/web/
                            
                        <span class="ml-10 text-nowrap"><i class="far fa-envelope color-clarity"></i>  <a href="https://web.archive.org/web/20200
                    </div>

                </div>
            </div>
        </div>
    </div>
<!-- content area -->

<!-- footer-start -->
<footer>

    <div class="footer-text">
    <div class="footer-top-area theme-bg pt-80">
        <div class="container">
            <div class="pb-45">
                <div class="row">
                    <div class="col-xl-10 col-lg-9 col-md-9 col-sm-12">
                        <div class="footer-wrapper mb-30">
                            <div class="footer-logo">
                                <a href="https://web.archive.org/web/20200128165648/https://clarityfinance.com/home">
                                    <img src="/web/20200128165648im_/https://clarityfinance.com/3/images/site-img-white.png" alt=""/>
                                </a>
                            </div>
                            <div class="footer-text mr-4">

                                <p>Pine Tree Lending LLC dba Clarity Finance ("Clarity"), is a wholly-owned and operated limited liability company subs

                                <p>All loan application decisions are made at Clarity's office located at 8 Kennebasis Road, Indian Township, ME 04668

                                <p>This is an expensive form of borrowing. Clarity loans are designed to assist you in meeting your short-term borrowin

                                <p>*Priority Funding Disclaimer: Priority Funding may be limited by funding time frames and cut-off times. Applications

                            </div>
                        </div>
                    </div>

                    <div class="col-xl-2 col-lg-3 col-md-3 col-sm-12">
                        <div class="footer-wrapper mb-30">
                            <h3 class="footer-title">Quick Links</h3>
                            <ul class="font-weight-bold">
                                <li>
                                                                        <a href="https://web.archive.org/web/20200128165648/https://clarityfinance
                                    </li>

                                <li>
                                    <a href="https://web.archive.org/web/20200128165648/https://clarityfinance.com/privacy">Privacy Policy</a>
                                </li>
                                <li>
                                    <a href="https://web.archive.org/web/20200128165648/https://clarityfinance.com/terms">Terms &amp; Conditions</a>
                                </li>
                                <li>
                                    <a href="/web/20200128165648/https://clarityfinance.com/3/docs/site_license.pdf" target="_blank">License</a>
                                </li>
                            </ul>
                        </div>
                    </div>
                </div>

                <div class="footer-icon-area pt-20 pb-10">
                    <div class="row">
                        <div class="col-xl-4 col-lg-4 col-md-6 col-sm-6 col-12">
                            <div class="footer-icon-wrapper mb-30" style="padding-top: 10px;">
```

```
                            <a href="#">
                                <i class="fas fa-phone fa-rotate-90"></i>
                            </a>
                        </div>
                        <div class="footer-icon-text">
                            <h4>call Us</h4>
                            <span><a href="https://web.archive.org/web/20200128165648/tel:1-877-632-4223">1-877-632-4223</a></span>
                        </div>
                    </div>
                </div>
                <div class="col-xl-4 col-lg-4 col-md-6 col-sm-6 col-12">
                    <div class="footer-icon-wrapper mb-30" style="padding-top: 10px;">
                        <div class="footers-icon">
                            <a href="https://web.archive.org/web/20200128165648/mailto:CustomerService@ClarityFinance.com">
                                <i class="far fa-envelope"></i>
                            </a>
                        </div>
                        <div class="footer-icon-text">
                            <h4>Email Us</h4>
                            <span><a href="https://web.archive.org/web/20200128165648/mailto: CustomerService@ClarityFinance.com">CustomerServ
                        </div>
                    </div>
                </div>
                <div class="col-xl-4 col-lg-4 col-md-12 text-sm-center col-sm-12 col-12">
                    <div class="footer-icon-wrapper mb-30">
                        <div class="footers-icon" style="padding-top: 10px;">
                            <a href="#">
                                <i class="fas fa-map-marker-alt" aria-hidden="true"></i>
                            </a>
                        </div>
                        <div class="footer-icon-text">
                            <h4>Mail Us</h4>
                            <span>PO Box 8,</span>
                            <span>Princeton, ME 04668</span>
                        </div>
                    </div>
                </div>
            </div>
        </div>
        <div class="footer-bottom-area pt-20 pb-20">
            <div class="row">
                <div class="col-xl-12">
                    <div class="copyright text-center">
                        <p>Copyright
                            <i class="far fa-copyright"></i> 2020 Clarity Finance All rights reserved</p>
                    </div>
                </div>
            </div>
        </div>
    </div>
    </div>
    </div>
</div>

<!-- CHATBOT INCLUDE -->

<script async src="https://web.archive.org/web/20200128165648js_/https://omniflex.soarenmanagement.com/v1/AirlineFlexCustomerIframe.js" onload="DVELP./
            license_id: '8b638a115f09f9079acb',
            account_sid: 'AC846e37c8df72186ab56a9f38d5aa26b8',
            flex_flow_sid: 'FO0834b7f3cf9f67a8e8f0f4ed1a9627ce',
            logo_url: 'https://web.archive.org/web/20200128165648/https://clarityfinance.com/3/images/site-logo.png',
            logo_size: 35,
            portfolio_id: '3',
            customer_uuid: ''
            })"></script>

</footer>
<!-- footer-end -->


</body>
</html>
<!--
    FILE ARCHIVED ON 16:56:48 Jan 28, 2020 AND RETRIEVED FROM THE
    INTERNET ARCHIVE ON 15:55:10 Oct 13, 2021.
    JAVASCRIPT APPENDED BY WAYBACK MACHINE, COPYRIGHT INTERNET ARCHIVE.

    ALL OTHER CONTENT MAY ALSO BE PROTECTED BY COPYRIGHT (17 U.S.C.
    SECTION 108(a)(3)).
-->
<!--
playback timings (ms):
  RedisCDXSource: 20.934
  LoadShardBlock: 365.118 (3)
  exclusion.robots: 0.747
  exclusion.robots.policy: 0.474
  esindex: 0.102
  PetaboxLoader3.resolve: 60.669
  PetaboxLoader3.datanode: 234.636 (4)
  captures_list: 426.037
  load_resource: 139.727
  CDXLines.iter: 33.023 (3)
-->
```

# Exhibit D

Line wrap ☐

```
<!doctype html>
<html lang="en" data-n-head="%7B%22lang%22:%7B%221%22:%22en%22%7D%7D">
<head><script src="//archive.org/includes/analytics.js?v=cf34f82" type="text/javascript"></script>
<script type="text/javascript">window.addEventListener('DOMContentLoaded',function(){var v=archive_analytics.values;v.service='wb';v.server_name='wwwb-app204.us.archive.org';v.server_ms=454;archive_ana
<script type="text/javascript" src="/_static/js/bundle-playback.js?v=UfTkgsKx" charset="utf-8"></script>
<script type="text/javascript" src="/_static/js/wombat.js?v=UHAOicsW" charset="utf-8"></script>
<script type="text/javascript">
  __wm.init("https://web.archive.org/web");
  __wm.wombat("https://clarityfinance.com/login","20200919174934","https://web.archive.org/","web","/_static/",
      "1600537774");
</script>
<link rel="stylesheet" type="text/css" href="/_static/css/banner-styles.css?v=omkqRugM" />
<link rel="stylesheet" type="text/css" href="/_static/css/iconochive.css?v=qtvMKcIJ" />
<!-- End Wayback Rewrite JS Include -->

  <title>portfolios-spa</title><meta data-n-head="1" charset="utf-8"><meta data-n-head="1" name="viewport" content="width=device-width,initial-scale=1"><meta data-n-head="1" data-hid="description" name
</head>
<body><!-- BEGIN WAYBACK TOOLBAR INSERT -->
<style type="text/css">
body {
  margin-top:0 !important;
  padding-top:0 !important;
  /*min-width:800px !important;*/
}
</style>
<script>__wm.rw(0);</script>
<div id="wm-ipp-base" lang="en" style="display:none;direction:ltr;">
<div id="wm-ipp" style="position:fixed;left:0;top:0;right:0;">
<div id="wm-ipp-inside">
  <div style="position:relative;">
    <div id="wm-logo" style="float:left;width:110px;padding-top:12px;">
      <a href="/web/" title="Wayback Machine home page"><img src="/_static/images/toolbar/wayback-toolbar-logo-200.png" srcset="/_static/images/toolbar/wayback-toolbar-logo-100.png, /_static/images/too
    </div>
    <div class="r" style="float:right;">
      <div id="wm-btns" style="text-align:right;height:25px;">
              <div id="wm-save-snapshot-success">success</div>
          <div id="wm-save-snapshot-fail">fail</div>
          <a id="wm-save-snapshot-open" href="#"
          title="Share via My Web Archive" >
            <span class="iconochive-web"></span>
          </a>
          <a href="https://archive.org/account/login.php"
            title="Sign In"
            id="wm-sign-in"
          >
            <span class="iconochive-person"></span>
          </a>
          <span id="wm-save-snapshot-in-progress" class="iconochive-web"></span>
            <a href="http://faq.web.archive.org/" title="Get some help using the Wayback Machine" style="top:-6px;"><span class="iconochive-question" style="color:rgb(87,186,244);font-size:160%;"></spa
      <a id="wm-tb-close" href="#close" onclick="__wm.h(event);return false;" style="top:-2px;" title="Close the toolbar"><span class="iconochive-remove-circle" style="color:#888888;font-size:240%;"></sp
      </div>
      <div id="wm-share">
        <a href="/web/20200919174934/http://web.archive.org/screenshot/https://clarityfinance.com/login"
          id="wm-screenshot"
          title="screenshot">
          <span class="wm-icon-screen-shot"></span>
        </a>
        <a href="#"
          id="wm-video"
          title="video">
          <span class="iconochive-movies"></span>
        </a>
      <a id="wm-share-facebook" href="#" data-url="https://web.archive.org/web/20200919174934/https://clarityfinance.com/login" title="Share on Facebook" style="margin-right:5px;" target="_blank"><span c
      <a id="wm-share-twitter" href="#" data-url="https://web.archive.org/web/20200919174934/https://clarityfinance.com/login" title="Share on Twitter" style="margin-right:5px;" target="_blank"><span cla
      </div>
    </div>
    <table class="c" style="">
      <tbody>
      <tr>
        <td class="u" colspan="2">
          <form target="_top" method="get" action="/web/submit" name="wmtb" id="wmtb"><input type="text" name="url" id="wmtbURL" value="https://clarityfinance.com/login" onfocus="this.focus();this.select
        </td>
```

```
<td class="n" rowspan="2" style="width:110px;">
  <table>
    <tbody>
    <!-- NEXT/PREV MONTH NAV AND MONTH INDICATOR -->
    <tr class="m">
      <td class="b" nowrap="nowrap">Aug</td>
      <td class="c" id="displayMonthEl" title="You are here: 17:49:34 Sep 19, 2020">SEP</td>
      <td class="f" nowrap="nowrap"><a href="https://web.archive.org/web/20201028134037/https://clarityfinance.com/login" title="28 Oct 2020"><strong>Oct</strong></a></td>
    </tr>
    <!-- NEXT/PREV CAPTURE NAV AND DAY OF MONTH INDICATOR -->
    <tr class="d">
      <td class="b" nowrap="nowrap"><img src="/_static/images/toolbar/wm_tb_prv_off.png" alt="Previous capture" width="14" height="16" border="0" /></td>
      <td class="c" id="displayDayEl" style="width:34px;font-size:24px;white-space:nowrap;" title="You are here: 17:49:34 Sep 19, 2020">19</td>
      <td class="f" nowrap="nowrap"><a href="https://web.archive.org/web/20201028134037/https://clarityfinance.com/login" title="13:40:37 Oct 28, 2020"><img src="/_static/images/toolbar/wm_tb_nxt_o
    </tr>
    <!-- NEXT/PREV YEAR NAV AND YEAR INDICATOR -->
    <tr class="y">
      <td class="b" nowrap="nowrap">2019</td>
      <td class="c" id="displayYearEl" title="You are here: 17:49:34 Sep 19, 2020">2020</td>
      <td class="f" nowrap="nowrap">2021</td>
    </tr>
    </tbody>
    </table>
  </td>
</tr>
<tr>
  <td class="s">
      <div id="wm-nav-captures">
          <a class="t" href="/web/20200919174934*/https://clarityfinance.com/login" title="See a list of every capture for this URL">3 captures</a>
      <div class="r" title="Timespan for captures of this URL">19 Sep 2020 - 28 Feb 2021</div>
      </div>
  </td>
  <td class="k">
    <a href="" id="wm-graph-anchor">
      <div id="wm-ipp-sparkline" title="Explore captures for this URL" style="position: relative">
      <canvas id="wm-sparkline-canvas" width="650" height="27" border="0"></canvas>
      </div>
    </a>
  </td>
</tr>
  </tbody>
</table>
<div style="position:absolute;bottom:0;right:2px;text-align:right;">
  <a id="wm-expand" class="wm-btn wm-closed" href="#expand" onclick="__wm.ex(event);return false;"><span id="wm-expand-icon" class="iconochive-down-solid"></span> <span style="font-size:80%">About
</div>
</div>
<div id="wm-capinfo" style="border-top:1px solid #777;display:none; overflow: hidden">
          <div id="wm-capinfo-collected-by">
<div style="background-color:#666;color:#fff;font-weight:bold;text-align:center">COLLECTED BY</div>
<div style="padding:3px;position:relative" id="wm-collected-by-content">
  <div style="display:inline-block;vertical-align:top;width:49%;">
      <span class="c-logo" style="background-image:url(https://archive.org/services/img/commoncrawl)"></span>
    <div>Collection: <a style="color:#33f;" href="https://archive.org/details/commoncrawl" target="_new"><span class="wm-title">Common Crawl</span></a></div>
    <div style="max-height:75px;overflow:hidden;position:relative;">
    <div style="position:absolute;top:0;left:0;width:100%;height:75px;background:linear-gradient(to bottom,rgba(255,255,255,0) 0%,rgba(255,255,255,0) 90%,rgba(255,255,255,255) 100%);"></div>
    Web crawl data from Common Crawl.
  </div>
  </div>
</div>
</div>
<div id="wm-capinfo-timestamps">
<div style="background-color:#666;color:#fff;font-weight:bold;text-align:center" title="Timestamps for the elements of this page">TIMESTAMPS</div>
<div>
  <div id="wm-capresources" style="margin:0 5px 5px 5px;max-height:250px;overflow-y:scroll !important"></div>
  <div id="wm-capresources-loading" style="text-align:left;margin:0 20px 5px 5px;display:none"><img src="/_static/images/loading.gif" alt="loading" /></div>
</div>
</div>
</div></div></div></div><div id="wm-ipp-print">The Wayback Machine - https://web.archive.org/web/20200919174934/https://clarityfinance.com/login</div>
<div id="donato" style="position:relative;width:100%;">
  <div id="donato-base">
    <iframe id="donato-if" src="https://archive.org/includes/donate.php?as_page=1&amp;platform=wb&amp;referer=https%3A//web.archive.org/web/20200919174934/https%3A//clarityfinance.com/login"
        scrolling="no" frameborder="0" style="width:100%; height:100%">
    </iframe>
  </div>
```

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 74 of 154    Document 31-2

```
</div><script type="text/javascript">
__wm.bt(650,27,25,2,"web","https://clarityfinance.com/login","20200919174934",1996,"/_static/",["/_static/css/banner-styles.css?v=omkqRugM","/_static/css/iconochive.css?v=qtvMKcIJ"], "False");
  __wm.rw(1);
</script>
<!-- END WAYBACK TOOLBAR INSERT -->
<div id="__nuxt"><style>#nuxt-loading{background:#fff;visibility:hidden;opacity:0;position:absolute;left:0;right:0;top:0;bottom:0;display:flex;justify-content:center;align-items:center;flex-direction:c
<div id="dialog-root"></div>
<script src="/web/20200919174934js_/https://clarityfinance.com/3_spa/_nuxt/runtime.5cc03b5.js"></script><script src="/web/20200919174934js_/https://clarityfinance.com/3_spa/_nuxt/vendors/commons.63c507
</html>
<!--
     FILE ARCHIVED ON 17:49:34 Sep 19, 2020 AND RETRIEVED FROM THE
     INTERNET ARCHIVE ON 16:54:07 Oct 13, 2021.
     JAVASCRIPT APPENDED BY WAYBACK MACHINE, COPYRIGHT INTERNET ARCHIVE.

     ALL OTHER CONTENT MAY ALSO BE PROTECTED BY COPYRIGHT (17 U.S.C.
     SECTION 108(a)(3)).
-->
<!--
playback timings (ms):
  captures_list: 270.145
  exclusion.robots: 0.305
  exclusion.robots.policy: 0.292
  RedisCDXSource: 29.445
  esindex: 0.013
  LoadShardBlock: 220.125 (3)
  PetaboxLoader3.datanode: 170.563 (4)
  CDXLines.iter: 17.528 (3)
  load_resource: 179.215
  PetaboxLoader3.resolve: 86.435
-->
```

[Extension of Line 16:]

```
<meta data-n-head="1" data-hid="description" name="description" content="Soaren Management - Portfolios SPA (with SSV)">
```

Exhibit E

Case 2:21-cv-02548-MAK   Document 38-5   Filed 10/14/21   Page 2 of 9



Case 1:25-cv-00489-BBC      Filed 09/26/25      Page 78 of 154      Document 31-2

Case 2:21-cv-02548-MAK    Document 38-5    Filed 10/14/21    Page 3 of 9

## WHO WE ARE

Soaren is a fast-growing and forward-thinking Fintech company with multiple verticals

## WHAT WE DO

Soaren offers portfolio management, software development, customer service telecom

## WORK WITH US

We recruit, hire, mentor and promote talented professionals in Analytics, Customer S

# BUILDING
## A BETTER EXPERIENCE

**S**oaren Management combines time-tested business practices with bleeding-financial products and services. Our greatest strengths, technology and cust partners and employees.

We're a collaboration of puzzle solvers, futurists, fixers, designers, builders, dream answer phones, we constantly ask ourselves, "How can this be done better?" Our

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 79 of 154    Document 31-2

Case 2:21-cv-02548-MAK   Document 33-5   Filed 10/14/21   Page 4 of 9

conversions, and deliver superior results for our clients and customers.

More About Us →

# **OUR** VISION

Soaren Management works to build a future where all consumers have broad and immediate access to a range of reliable, efficient and secure financial products and services, expedited by constantly evolving technologies.

## TRANSPARENCY

Soaren is committed to conducting our business honestly and openly with the highest level of integrity.

Case 1:25-cv-00489-BBC   Filed 09/26/25   Page 80 of 154   Document 31-2

## ADVOCACY

Soaren will continue to advocate for sensible compliance and regulation in the financial service industry in order to protect consumers from bad actors without limiting their ability to access credit products.

## SECURITY

Safeguarding our customers' data is a responsibility Soaren takes very seriously. Industry-leading physical and digital protocols are employed to ensure our customers' personal information is secure at all times.

Case 2:21-cv-02548-MAK Document 33-5 Filed 10/14/21 Page 6 of 9

Case 1:25-cv-00489-BBC Document 31-2 Filed 09/26/25 Page 82 of 154



Case 2:21-cv-02548-MAK   Document 33-5   Filed 10/14/21   Page 7 of 9



## MOVE FORWARD
WITH US

Complacency is not in our vocabulary. If you thrive on solving comp
moving forward, we have a place for you at Soaren.

Case 1:25-cv-00489-BBC   Filed 09/26/25   Page 83 of 154   Document 31-2

Case 2:21-cv-02548-MAK     Document 33-5     Filed 10/14/21     Page 8 of 9

# MESSAGE FROM OUR CEO

It's vital that we create and support a culture of curiosity, innovation and professional growth that attracts and nurtures highly talented and driven individuals. Soaren only moves forward when our employees move with us.

- Andrew Dunn, Soaren Management CEO



8235 S Eastern Ave

Las Vegas, NV 89123

7020 E Acoma Dr

Scottsdale, AZ 85254

QUICK LINKS

Case 1:25-cv-00489-BBC     Filed 09/26/25     Page 84 of 154     Document 31-2

Case 2:21-cv-02548-MAK    Document 33-5    Filed 10/14/21    Page 9 of 9

Careers

Privacy Policy

Terms and Conditions

**SOCIAL**

Facebook

LinkedIn

Indeed

Glassdoor

**CONTACTS**

✉ info@soaren-management.com

▯ phone: 888-977-7849

Contact us

Soaren Management © 2021 All Rights Reserved.

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 85 of 154    Document 31-2

# Exhibit F

8235 S Eastern Ave, Las Vegas, NV 89123    7020 E Acoma Dr, Scottsdale, AZ 85254

   INFO@SOAREN-MANAGEMENT.COM


Management

HOME        WHO WE ARE        WHAT WE DO        CAREERS        CONTACT US

# What We Do

**ABOVE ALL,** WE ARE CONSTANTL

We crunch numbers and data; we write copy and code. We forecast financials and

through reports. We answer millions of questions, phone calls, emails, and chats.

We communicate with customers, partners, clients, and vendors to solve problem

product that doesn't exist, we build it. Above all, we are constantly moving forward

## SERVICES

### LOAN PORTFOLIO MANAGEMENT

Full service loan underwriting, loan verification, and loan origination solutions

### TURN KEY LENDING SOLUTIONS

Turn key lending products from lead qualification to past-due collections

### PROPRIETARY LOAN MANAGEMENT SOFTWARE

Nimble, efficient loan management platform to improve portfolio performance

### CUSTOMER SUPPORT

Includes inbound/outbound call center, online chat services, and application verification

Case 2:21-cv-02548-MAK     Document 33-6     Filed 10/14/21

## ASSET RETENTION

Collection of past-due and at-risk accounts

## MARKETING & LEAD GEN

Including website development, email marketing, and lost-lead retargeting

## LOAN UNDERWRITING

Automated and customized underwriting algorithm optimized for desired KPIs

## LENDING STRATEGY

Automated portfolio analytics and adaptive optimization

## DEVELOPMENT

Custom online development, software integrations, and advanced programming



Management

8235 S Eastern Ave

Las Vegas, NV 89123

7020 E Acoma Dr

Scottsdale, AZ 85254

Case 1:25-cv-00489-BBC     Filed 09/26/25     Page 89 of 154     Document 31-2

## QUICK LINKS

Careers

Privacy Policy

Terms and Conditions

## SOCIAL

Facebook

LinkedIn

Indeed

Glassdoor

## CONTACTS

✉ info@soaren-management.com

📱 phone: 888-977-7849

Contact us

Soaren Management © 2021. All Rights Reserved.

# Exhibit G



5/6/2019

Idell Dearry
1936 W. Westmoreland Street
Philadelphia, PA 19140

RE: Consumer Report Inquiry

We have received an inquiry from you seeking a copy of your credit report from FactorTrust, Inc. Attached please find a copy of your credit report. Please note that the lender may employ additional validation services, along with the FactorTrust Report, when determining acceptance or decline of an application.

If you have any questions regarding this matter, feel free to contact us toll free at 844-773-3321. Our hours of operation are Monday – Friday from 8:30am to 5:30pm EST.

Thank you,


Consumer Support
FactorTrust, Inc.

*Para información en español, visite www.consumerfinance.gov/learnmore o escribe a la Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.*

## A Summary of Your Rights Under the Fair Credit Reporting Act

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under the FCRA. **For more information, including information about additional rights, go to www.consumerfinance.gov/learnmore or write to: Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.**

- **You must be told if information in your file has been used against you.** Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment – or to take another adverse action against you – must tell you, and must give you the name, address, and phone number of the agency that provided the information.

- **You have the right to know what is in your file.** You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security number. In many cases, the disclosure will be free. You are entitled to a free file disclosure if:
  - a person has taken adverse action against you because of information in your credit report;
  - you are the victim of identity theft and place a fraud alert in your file;
  - your file contains inaccurate information as a result of fraud;
  - you are on public assistance;
  - you are unemployed but expect to apply for employment within 60 days.

  In addition, all consumers are entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.consumerfinance.gov/learnmore for additional information.

- **You have the right to ask for a credit score.** Credit scores are numerical summaries of your credit-worthiness based on information from credit bureaus. You may request a credit score from consumer reporting agencies that create scores or distribute scores used in residential real property loans, but you will have to pay for it. In some mortgage transactions, you will receive credit score information for free from the mortgage lender.

- **You have the right to dispute incomplete or inaccurate information.** If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.consumerfinance.gov/learnmore for an explanation of dispute procedures.

- **Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.** Inaccurate, incomplete, or unverifiable information must be removed or corrected, usually within 30 days. However, a consumer reporting agency may continue to report information it has verified as accurate.

- **Consumer reporting agencies may not report outdated negative information.** In most cases, a consumer reporting agency may not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.

- **Access to your file is limited.** A consumer reporting agency may provide information about you only to people with a valid need -- usually to consider an application with a creditor, insurer, employer, landlord, or other business. The FCRA specifies those with a valid need for access.

- **You must give your consent for reports to be provided to employers.** A consumer reporting agency may not give out information about you to your employer, or a potential employer, without your written consent given to the employer. Written consent generally is not required in the trucking industry. For more information, go to www.consumerfinance.gov/learnmore.

- **You many limit "prescreened" offers of credit and insurance you get based on information in your credit report.** Unsolicited "prescreened" offers for credit and insurance must include a toll-free phone number you can call if you choose to remove your name and address from the lists these offers are based on. You may opt out with the nationwide credit bureaus at 1-888-5-OPTOUT (1-888-567-8688).

- **You may seek damages from violators.** If a consumer reporting agency, or, in some cases, a user of consumer reports or a furnisher of information to a consumer reporting agency violates the FCRA, you may be able to sue in state or federal court.

- **Identity theft victims and active duty military personnel have additional rights.** For more information, visit www.consumerfinance.gov/learnmore.

**States may enforce the FCRA, and many states have their own consumer reporting laws. In some cases, you may have more rights under state law. For more information, contact your state or local consumer protection agency or your state Attorney General. For information about your federal rights, contact:**

| TYPE OF BUSINESS: | CONTACT: |
|---|---|
| 1.a. Banks, savings associations, and credit unions with total assets of over $10 billion and their affiliates | a. Consumer Financial Protection Bureau 1700 G Street, N.W. Washington, DC 20552 |
| b. Such affiliates that are not banks, savings associations, or credit unions also should list, | b. Federal Trade Commission: Consumer Response Center – FCRA |

| | |
|---|---|
| in addition to the CFPB: | Washington, DC 20580<br>(877) 382-4357 |
| 2. To the extent not included in item 1 above:<br><br>a. National banks, federal savings associations, and federal branches and federal agencies of foreign banks<br><br>b. State member banks, branches and agencies of foreign banks (other than federal branches, federal agencies, and Insured State Branches of Foreign Banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act<br><br>c. Nonmember Insured Banks, Insured State Branches of Foreign Banks, and insured state savings associations<br><br>d. Federal Credit Unions | a. Office of the Comptroller of the Currency Customer Assistance Group 1301 McKinney Street, Suite 3450 Houston, TX 77010-9050<br><br>b. Federal Reserve Consumer Help Center P.O. Box. 1200 Minneapolis, MN 55480<br><br>c. FDIC Consumer Response Center 1100 Walnut Street, Box #11 Kansas City, MO 64106<br><br>d. National Credit Union Administration Office of Consumer Protection (OCP) Division of Consumer Compliance and Outreach (DCCO) 1775 Duke Street Alexandria, VA 22314 |
| 3. Air carriers | Asst. General Counsel for Aviation Enforcement & Proceedings Aviation Consumer Protection Division Department of Transportation 1200 New Jersey Avenue, S.E. Washington, DC 20590 |
| 4. Creditors Subject to the Surface Transportation Board | Office of Proceedings, Surface Transportation Board Department of Transportation 395 E Street, S.W. Washington, DC 20423 |
| 5. Creditors Subject to the Packers and Stockyards Act, 1921 | Nearest Packers and Stockyards Administration area supervisor |
| 6. Small Business Investment Companies | Associate Deputy Administrator for Capital Access United States Small Business Administration 409 Third Street, S.W., 8th Floor Washington, DC 20416 |
| 7. Brokers and Dealers | Securities and Exchange Commission 100 F Street, N.E. |

| | Washington, DC 20549 |
|---|---|
| 8. Federal Land Banks, Federal Land Bank Associations, Federal Intermediate Credit Banks, and Production Credit Associations | Farm Credit Administration 1501 Farm Credit Drive McLean, VA 22102-5090 |
| 9. Retailers, Finance Companies, and All Other Creditors Not Listed Above | FTC Regional Office for region in which the creditor operates or Federal Trade Commission: Consumer Response Center – FCRA Washington, DC 20580 (877) 382-4357 |



CONSUMER RIGHTS – DISPUTED ACCURACY

## NOTICE

The purpose of this document is to let you know that you are entitled to certain notifications and have certain rights when you dispute the accuracy or completeness of an item in your credit report. Please review this document thoroughly. If you have any questions, please call us at 1-844-773-3321.

1.  Please be advised that we have completed our investigation into your dispute. The resolution of your dispute is detailed in the accompanying letter.

2.  If your consumer file was revised as a result of our investigation, we have enclosed a current copy of your consumer report, which includes any and all changes made.

3.  Upon your request, we will provide you with a description of the procedures we used to determine the accuracy and completeness of your disputed information.

4.  Upon your request, we will provide you with the business name, address and phone number (to the extent the number is available to us) of all companies that we contacted regarding your disputed information.

5.  If we did not delete your disputed information, you have the right to add a statement to your file disputing the accuracy or completeness of that information.

6.  If we have deleted information in your credit report, or if you have added a statement as described in paragraph 5 above, you have the right to request that we send a notice of such deletion or statement to anyone you designate that had previously received a copy of your consumer report within the prior six months. This will be done free of charge.

Consumer Rights - Dispute Notice (23OCT2014).docx

# FactorTrust

## Consumer Disclosure Credit Report

### Report Number: 0000024289

### Report Date: 05/06/2019

To view a summary of your rights under the Fair Credit Reporting Act, please click on the following link: https://www.factortrust.com/Consumer/content/Summary_of_Consumer_Rights_FCRA.pdf

| Subject | |
|---|---|
| Name: Idell Dearry | Social Security Number: ***-**-▮ |
| In File since: 08/01/2009 | Date of Birth: ▮ |
| Dispute Date: | |

## ADDRESSES

| Date Reported | Address | Dispute Date |
|---|---|---|
| 04/30/2019 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA PA | |
| 03/28/2019 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA PA | |
| 02/27/2019 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA PA | |
| 01/30/2019 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA PA | |
| 01/16/2019 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA PA | |
| 12/20/2018 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA 19140 | |
| 12/20/2018 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA 19140 | |
| 12/08/2018 | 1936 W WESTMORELAND PHILADELPHIA, PA 19140 | |
| 08/23/2017 | 1936 W WESTMORELAND ST PHILADELPHIA, PA 19140 | |
| 08/23/2017 | 1936 W WESTMORELAND ST PHILADELPHIA, PA 19140 | |
| 03/10/2017 | 1936 W WESTMORELAND ST PHILADELPHIA, PA 19140 | |
| 02/20/2017 | 1936 W WESTMORELAND ST PHILADELPHIA, PA 19140 | |
| 12/16/2016 | 1936 WESTMORELAND ST PHILADELPHIA, PA 19140 | |
| 05/08/2015 | 1936 W WESTMORELAND ST PHILADELPHIA, PA 19140 | |
| 03/09/2011 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA | |
| 02/15/2011 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA | |
| 08/01/2009 | 1936 W. WESTMORELAND ST. PHILADELPHIA, PA 19140 | |

## DRIVER LICENSES

| Date Reported | Driver License Number | Dispute Date |
|---|---|---|
| 12/20/2018 | ****▮ | |
| 12/20/2018 | ****▮ | |
| 12/08/2018 | 768 | |
| 08/23/2017 | ****▮ | |
| 03/10/2017 | ****▮ | |
| 02/20/2017 | ****▮ | |
| 12/16/2016 | 1597 | |
| 05/08/2015 | ▮ | |

## EMPLOYERS

| Date Reported | Employer | Stated Monthly Income | Payroll Frequency | Dispute Date |
|---|---|---|---|---|
| 12/20/2018 | CITY OF PHILADELPHIA | $2,500.00 | Monthly | |
| 12/20/2018 | CITY OF PHILADELPHIA | $2,500.00 | Monthly | |
| 12/08/2018 | SS/MILITARY PENS/CITY PENS | $5,453.00 | Monthly | |
| 08/23/2017 | SSI | $0.00 | Monthly | |
| 03/10/2017 | SOICAL SECURITY ADM | $0.00 | Monthly | |
| 02/20/2017 | OTHER INCOME | $4,200.00 | Monthly | |
| 12/16/2016 | HOME MAKER | $3,843.00 | Monthly | |
| 05/08/2015 | RETIRED | $4,000.00 | Monthly | |

| File Summary | | | | | |
|---|---|---|---|---|---|
| Public Records: | | Collections: 0 | | Total Trades: 2 | |
| Negative Trades: 0 | | Open Trades: 2 | | Inquiries: 5 | |

https://factortrust.com/Admin/CreditReport/ConsumerCreditReportView.aspx?ccrid=24289                1/7

| Type | High Credit/Limit | Current Balance | Total Currently Past Due | Periodic Payment | Available Credit |
|------|-------------------|-----------------|--------------------------|------------------|------------------|
| Payday | $4,131.00 | $4,066.00 | $0.00 | NA | 33% |

## ALERTS

| |
|---|
| No Alerts on file |

## SECURITY FREEZE

| |
|---|
| None |

## CONSUMER STATEMENTS

| |
|---|
| None |

## OPT OUT

| |
|---|
| None |

## Public Records sourced by LexisNexis®

| |
|---|
| No Bankruptcies on file |

| |
|---|
| No Judgements/Liens on file |

**Public Record Dispute Information:** If you have questions or would like to file a dispute, please contact LNRS by phone at 888-497-0011 or mail at LexisNexis Consumer Center, P.O. Box 105108, Atlanta, GA, 30348.

## TRADES

| Lender Name | Customer ID | Consumer Contact | Credit Type | Date Opened | Date Last Reported | High Credit/Limit | Balance | Past Due Amt | Terms | Loan Status | 15 | 30 | 60 | 90 | 120 | 150+ | Months Reviewed | Loan ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acima | 2765 | AL 801.297.1982 customers@acimacredit.com | PD | 03/20/2017 | 07/09/2017 | $624.00 | $624.00 | $0.00 | 15 | Too new to rate | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 7434345 |
| Acima | 2765 | AL 801.297.1982 customers@acimacredit.com | PD | 03/20/2017 | 07/09/2017 | $1,308.00 | $0.00 | $0.00 | 15 | Paid as agreed | 0 | 0 | 0 | 5 | 0 | 0 | 4 | 7392060 |
| Soaren Management LLC | 3944 | 20830 N. Tatum Blvd, Suite 115 Phoenix, AZ 85050 480-550-8178 Info@soaren-management.com | PD | 12/20/2018 | 04/30/2019 | $4,131.00 | $3,442.00 | $0.00 | 360 | Too new to rate | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4895815 |

## BANK ACCOUNTS

| Date Reported | Routing Number | Account Number | Dispute Date |
|---|---|---|---|
| 12/20/2018 9:24:50 AM | ▮▮▮▮▮ | *********7190 | |
| 12/20/2018 9:24:48 AM | ▮▮▮▮▮ | *********7190 | |
| 8/23/2017 11:17:00 AM | ▮▮▮▮▮ | *********7190 | |
| 8/23/2017 10:50:30 AM | ▮▮▮▮▮ | *********7190 | |
| 3/10/2017 5:12:49 PM | ▮▮▮▮▮ | *********7190 | |
| 2/20/2017 2:27:09 PM | ▮▮▮▮▮ | *********7190 | |

## PAYMENTS

| | 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 120 Days | 121 - 150 Days | 151 - 180 Days |
|---|---|---|---|---|---|---|
| Good Payments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Bad Payments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

## INQUIRIES INITIATED BY CONSUMER ACTION

Inquiries Initiated By Consumer Action refers to inquiries resulting from a transaction initiated by you. These include applying for a credit card or completing an application at a financial institution. Please note that the inquiries are part of your credit history and may be included in our reports to others.

https://factortrust.com/Admin/CreditReport/ConsumerCreditReportView.aspx?ccrid=24289    2/7

| Date | Customer ID | Name | Consumer Contact | Dispute Date |
|---|---|---|---|---|
| 12/20/2018 | 3945 | Soaren Management LLC | 20830 N. Tatum Blvd, Suite 115<br>Phoenix, AZ 85050<br>480-550-8178<br>Info@soaren-management.com | |
| 12/20/2018 | 3944 | Soaren Management LLC | 20830 N. Tatum Blvd, Suite 115<br>Phoenix, AZ 85050<br>480-550-8178<br>Info@soaren-management.com | |
| 12/08/2018 | 2024 | Exeter Finance | AL<br>(800) 321-9637 | |
| 08/23/2017 | 2562 | Okinus | PO Box 691<br>Pelham, GA 31779<br>229-261-8959<br>information@okinus.com | |
| 08/23/2017 | 2140 | American First Finance | TX<br>855-721-1188<br>info@americanfirstfinance.com | |

## PROMOTIONAL INQUIRIES

The companies listed received your name, address and other limited information about you so they could make a firm offer of credit or insurance. They did not receive your full credit report. These inquiries are not seen by anyone but you and do not affect your score.

| None |
|---|

## ACCOUNT REVIEW INQUIRIES

The listing of a company's inquiry in this section means that they obtained information from your credit file in connection with an account review or other business transaction with you. These inquiries are not seen by anyone but you and will not be used in scoring your credit file (except insurance companies may have access to other insurance company inquiries, certain collection companies may have access to other collection company inquiries, and users of a report for employment purposes may have access to other employment inquiries, where permitted by law).

| None |
|---|

## ADDITIONAL INFORMATION FROM: ChexSystems

Additional information may be provided to FactorTrust by ChexSystems. The most recent information FactorTrust received from ChexSystems relative to you is listed below, however, the information contained on the files of ChexSystems, may have changed since it was provided to FactorTrust. If you have questions or wish to dispute the accuracy of the information reported below, please see the Notices section of this correspondence for more information regarding how to submit a dispute.

**Date information received:**

| No data |
|---|

**Date information received:** 12/20/2018

| Name | Value | Dispute Date |
|------|-------|--------------|
| Account Closures (Forcible) None Found | Y | |
| Check Orders None Found | Y | |
| Consumer SSN | XXXXX▮ | |
| Consumer First Name | IDELL | |
| Consumer Last Name | DEARRY | |
| Consumer Address | 1936 W WESTMORELAND ST | |
| Consumer City | PHILADELPHIA | |
| Consumer State | PA | |
| Consumer Zip | 191404811 | |
| Consumer Drivers License State | PA | |
| Consumer Drivers License Number | ▮ | |
| Consumer Home Phone | 2▮ | |
| Consumer Alternate First Name 1 | IDELL | |
| Consumer Alternate Last Name 1 | DEARY | |
| DDA and Non DDA Previous Account Inquiries None Found | N | |
| DDA and Non DDA Previous Account Inquiries Number Past 3 Years | 0012 | |
| Drivers License Validation Message Text | VALID DRIVERS LICENSE FORMAT | |
| Fraud Account Closures None Found | Y | |
| No Data Found | N | |
| Government Number Validation Message Text | BECAME AVAILABLE FOR ISSUANCE IN 1968 IN PA | |
| Non DDA Previous Account Inquiries None Found | N | |
| Non DDA Previous Account Inquiries Number Past 30 Days | 0003 | |
| Non DDA Previous Account Inquiries Number Past 60 Days | 0004 | |
| Non DDA Previous Account Inquiries Number Past 90 Days | 0004 | |
| Non DDA Previous Account Inquiries Number Past 180 Days | 0004 | |
| Non DDA Previous Account Inquiries Number Past Year | 0004 | |
| Non DDA Previous Account Inquiries Number Past 2 Years | 0010 | |
| Non DDA Previous Account Inquiries Number Past 3 Years | 0012 | |
| Non DDA Previous Account Inquiries Number Days Since Recent Inquiry | 0012 | |
| Non DDA Previous Account Inquiries Number Days Since First Inquiry | 0734 | |
| Non DDA Previous Auto Account Inquiries None Found | N | |
| Non DDA Previous Auto Account Inquiries Number Past 30 Days | 0002 | |
| Non DDA Previous Auto Account Inquiries Number Past 60 Days | 0002 | |
| Non DDA Previous Auto Account Inquiries Number Past 90 Days | 0002 | |
| Non DDA Previous Auto Account Inquiries Number Past 180 Days | 0002 | |
| Non DDA Previous Auto Account Inquiries Number Past Year | 0002 | |
| Non DDA Previous Auto Account Inquiries Number Past 2 Years | 0002 | |
| Non DDA Previous Auto Account Inquiries Number Past 3 Years | 0004 | |
| Non DDA Previous Auto Account Inquiries Number Days Since Recent Inquiry | 0012 | |
| Non DDA Previous Auto Account Inquiries Number Days Since First Inquiry | 0734 | |
| Non DDA Previous Credit Account Inquiries None Found | Y | |
| Non DDA Previous Other Account Inquiries None Found | N | |
| Non DDA Previous Other Account Inquiries Number Past 30 Days | 0000 | |
| Non DDA Previous Other Account Inquiries Number Past 60 Days | 0000 | |
| Non DDA Previous Other Account Inquiries Number Past 90 Days | 0000 | |
| Non DDA Previous Other Account Inquiries Number Past 180 Days | 0000 | |
| Non DDA Previous Other Account Inquiries Number Past Year | 0000 | |
| Non DDA Previous Other Account Inquiries Number Past 2 Years | 0001 | |
| Non DDA Previous Other Account Inquiries Number Past 3 Years | 0001 | |
| Non DDA Previous Other Account Inquiries Number Days Since Recent Inquiry | 0668 | |
| Non DDA Previous Other Account Inquiries Number Days Since First Inquiry | 0668 | |
| Non DDA Previous Payday Account Inquiries None Found | Y | |
| Non DDA Previous Utility Account Inquiries None Found | Y | |
| Previous Account Inquiry Detail 1 Date | 12082018 | |
| Previous Account Inquiry Detail 1 CustName | EXETER FINANCE | |
| Previous Account Inquiry Detail 1 State | TX | |
| Previous Account Inquiry Detail 1 Zip | 75039 | |
| Previous Account Inquiry Detail 2 Date | 12082018 | |
| Previous Account Inquiry Detail 2 CustName | ALLY BANK | |
| Previous Account Inquiry Detail 2 State | MI | |
| Previous Account Inquiry Detail 2 Zip | 48226 | |
| Previous Account Inquiry Detail 3 Date | 12042018 | |
| Previous Account Inquiry Detail 3 CustName | AMERICAN WEB LOAN | |
| Previous Account Inquiry Detail 3 State | OK | |
| Previous Account Inquiry Detail 3 Zip | 74651 | |
| Previous Account Inquiry Detail 4 Date | 10222018 | |
| Previous Account Inquiry Detail 4 CustName | AMERICAN WEB LOAN | |
| Previous Account Inquiry Detail 4 State | | |

| | |
|---|---|
| Previous Account Inquiry Detail 4 Zip | 74651 |
| Previous Account Inquiry Detail 5 Date | 08232017 |
| Previous Account Inquiry Detail 5 CustName | OKINUS, INC. |
| Previous Account Inquiry Detail 5 State | GA |
| Previous Account Inquiry Detail 5 Zip | 30024 |
| Previous Account Inquiries None Found | Y |
| Privacy Msg ID | 000 |
| Privacy Msg Text | NO CONSUMER PRIVACY DATA ON FILE |
| Retail None Found | Y |
| Score Value | 9999 |
| Score Reason Code 1 | Z3 |
| Score Reason Text 1 | INSUFFICIENT DATA FOUND |
| US DDA Previous Account Inquiries None Found | Y |
| US Non DDA Previous Account Inquiries None Found | Y |
| US Non DDA Previous Auto Account Inquiries US None Found | Y |
| US Non DDA Previous Credit Account Inquiries None Found | Y |
| US Non DDA Previous Other Account Inquiries None Found | Y |
| US Non DDA Previous Payday Account Inquiries None Found | Y |
| US Non DDA Previous Utility Account Inquiries None Found | Y |

**ADDITIONAL INFORMATION FROM: TransUnion LLC**

Additional information may be provided to FactorTrust by TransUnion LLC. The most recent information FactorTrust received from TransUnion LLC relative to you is listed below, however, the information contained on the files of TransUnion LLC, may have changed since it was provided to FactorTrust. If you have questions or wish to dispute the accuracy of the information reported below, please see the Notices section of this correspondence for more information regarding how to submit a dispute.

| |
|---|
| No data |

**ADDITIONAL INFORMATION FROM: LexisNexis Risk Solutions Bureau LLC**

Additional information may be provided to FactorTrust by LexisNexis Risk Solutions Bureau LLC. The most recent information FactorTrust received from LexisNexis Risk Solution Bureau LLC relative to you is listed below, however, the information contained on the files of LexisNexis Risk Solutions Bureau LLC, may have changed since it was provided to FactorTrust. If you have questions or wish to dispute the accuracy of the information reported below, please see the Notices section of this correspondence for more information regarding how to submit a dispute.

**Date information received:** 3/10/2017

| Name | Value | Dispute Date |
|------|-------|--------------|
| Current address tax assessed market value | 38000 | |
| Derogatory severity index based on the type of record | 0 | |
| Evictions in last 60 months | 0 | |
| Federal tax liens filed | 0 | |
| Index indicating how often subject has changed addresses | 6 | |
| Indicates if a subject's last name is listed on input address deed or tax record, but first name is not (likely family owned) | 0 | |
| Indicates if input phone number is associated with transient or institutional address, such as hotel, campground, warehouse, mail drop, institutional, or correctional facility | 0 (Phone number is for residential or non-transient address, or unknown) | |
| Indicates if input SSN was issued within last 12 months | 0 (SSN was not issued within last 12 months) | |
| Indicates if subject first and last name are listed on current address deed or tax record | 0 | |
| Indicates if subject has ownership of assets (watercraft, aircraft, or real property) | 0 | |
| Indicates if subject owned or rented next most recent previous address | U | |
| Indicates if the input address in address history | 2 | |
| Indicates if the input address is verified | 1 | |
| Indicates if the subject's input SSN is verified | 2 | |
| Indicates if there have been one or more collection inquiries in the last 12 months | 0 (Subject has no collection inquiries in the last 12 months) | |
| Indicates if there have been one or more inquiries not classified as collections or personal finance inquiries in the last 12 months | 1 | |
| Indicates if there have been one or more personal finance inquiries in the last 12 months | 0 (Subject has no personal finance inquiries in the last 12 months) | |
| Indicates input phone validation status | 0 | |
| Indicates subject's input address may not be primary residence | 0 | |
| Indicates the field study type - grouped based on similar areas of study and average incomes for occupations typically associated with those fields of study | -1 | |
| Input address most recent tax assessed value | 0 | |
| Input address tax assessed market value | 38000 | |
| Liens filed in last 24 months | 0 | |
| Most recent real property sale price | -1 | |
| Non-derogatory public records updated in past 60 months | 1 | |
| Number of addresses first seen for subject in last 12 months | 0 | |
| Number of addresses first seen for subject in last 24 months | 1 | |
| Number of addresses first seen for subject in last 60 months | 1 | |
| Number of addresses first seen for subject in last month | 0 | |
| Number of addresses first seen for subject in last six months | 0 | |
| Number of addresses first seen for subject in last three months | 0 | |
| Number of derogatory public records within the last 12 months | 0 | |
| Number of real property ever owned | 0 | |
| Personal finance inquiries or requested offers for subprime credit services (Ex. Short-term loans or high rate credit cards) associated with the subject | 0 | |
| Previous address most recent tax assessed value | 10000 | |
| Requested offers for subprime credit services by subject in the last 24 months | 0 | |
| Requested offers for subprime credit services by subject in the last 60 months | 0 | |
| Risk index summarizing recent activity for the subject as reported within the past three months | 4 | |
| Risk Logic Score | 554 | |
| Subject has requested alert on their file indicating their identity may have been stolen | 0 (No request found) | |
| Subject has requested an alert on their file | 0 (No request found) | |
| Subject has requested security freeze on their file | 0 (No request found) | |
| Subject's estimated annual income rounded to the nearest $1000 | 27000 | |
| Sum of tax assessed values for all real property currently owned | 0 | |
| Time between first and last date reported at current address | 318 | |
| Time between first and last date reported at input address | 318 | |
| Time since earliest recorded real property purchase | -1 | |
| Time since most recently recorded derogatory public record (Most derogatroy records limited to 84 months, and only bankruptcies can return values up to 120 months) | -1 | |
| Time since most recently recorded felony conviction | -1 | |
| Time since phone service first seen in the Electronic Directory Assistance (EDA) records | -1 | |
| Time since subject was first reported at input address | 319 | |
| Time since subject was first reported at the current address | 319 | |
| Time since subject was most recently reported at input address | 1 | |
| Time since the oldest recorded event for subject | 327 | |
| Time since the subject last moved | 23 | |
| Time since the subject was first reported at the previous address | 23 | |
| Time since the subject was most recently reported at the current address | 1 | |
| Time since the subject was most recently reported at the previous address | 2 | |
| Time since the subject was most recently reported in other phone sources | -1 | |

| | | |
|---|---|---|
| Total bankruptcy filings | 0 | |
| Total derogatory public records (felonies, liens, bankruptcies, and evictions) | 0 | |
| Total dollar amount of all liens filed | 0 | |
| Total dollar amount of filed court judgment liens, for example collections debt or civil damages | 0 | |
| Total evictions | 0 | |
| Total felony convictions | 0 | |
| Total filed lien records | 0 | |
| Total non-derogatory public records, for example, phone records, professional licenses, and property records | 1 | |
| Unique addresses found with SSN | 6 | |
| Unique addresses, first reported in last six months, found with subject | 0 | |
| Unique identities found with input phone number | 0 | |
| Unique SSNs found with subject | 1 | |
| Wealth index based on relative value of real property and other assets on file | 1 | |

## NOTICES

You have a right to dispute any item of information contained in your consumer file. If you believe information in your file may be inaccurate or incomplete, please submit your dispute online at https://www.factortrust.com/Consumer/Disputes.aspx. Under normal circumstances, FactorTrust will inform you of the results of the investigation within approximately 30 days.

You may be entitled to place a statement of dispute on your consumer file. Your statement must not exceed two hundred and fifty characters. Your statement must not include the names of other individuals or businesses. Your statement must pertain to the information contained in your consumer file and must not contain profanity. You may submit your statement to FactorTrust by calling 1-844-773-3321.

## CONTACT INFORMATION

**FactorTrust, Inc.**
P.O. Box 3653
Alpharetta, GA 30023
(844)773-3321

**LexisNexis Risk Solutions Consumer Center**
PO BOX 105289
Atlanta, GA 30348
(866)323-0932
(800)831-2578

**ChexSystems**
7805 Hudson Road
Suite 100
Woodbury, MN 55125
(800)513-7125

**TransUnion LLC**
P.O. Box 1000
Chester, PA 19016
(800)916-8800

https://factortrust.com/Admin/CreditReport/ConsumerCreditReportView.aspx?ccrid=24289     7/7

# Exhibit H

Case 2:21-cv-02549-MAK   Document 33-8   Filed 10/14/21   Page 2 of 7

 PROVENIR



BLOG

# 113 Million US Adults Have Non-Prime Credit Scores – What Are We Doing About It?

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

Case 1:25-cv-00489-BBC   Filed 09/26/25   Page 106 of 154   Document 31-2

Case 2:21-cv-02548-MAK   Document 33-8   Filed 10/14/21   Page 3 of 7

 PROVENIR

account at a bank or other financial institution. They are the unbanked; outside the financial system. PwC puts [the unmet deposit demand of the un(der)banked at $360 billion](). How can forward-thinking companies help close the big gap that exists between the banked and underbanked? We sat down to ask Greg Rable, CEO of FactorTrust, which helps lenders manage the credit lifecycle of underbanked consumers.

## Greg, tell us about FactorTrust. What's the vision?

Alternative financial services has always been our business at FactorTrust but we used to focus on identity verification. We turned our expertise towards [credit risk]() because the companies we talked to were saying, "please help us with this." The rise in alternative credit for 'non-prime' borrowers has been significant and is indicative of the situation that many people from many different walks of life find themselves in – nearly 113 million US adults have non-prime credit scores, which is an astonishing number.

Alternative finance has been around for some time, but the advent of digital services caused a significant shift in the industry to online. And this created additional challenges for [risk management](), not only the need to return credit risk assessment results at speed – as

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

Case 1:25-cv-00489-BBC   Filed 09/26/25   Page 107 of 154   Document 31-2

Case 2:21-cv-02548-MAK Document 33-8 Filed 10/14/21 Page 4 of 7

 PROVENIR



## Who are the underbanked and what trends are you seeing in this market segment?

They can be anyone and everyone; people facing a range of everyday circumstances that have placed them outside regular criteria for many traditional lenders.

The thing is, there's a lot of misinformation about the underbanked – about levels of education, employment and so on. Our data spans upwards of 22 million consumers, with around half a million added each month, so we consider ourselves well-placed to address misconceptions. To help with this we launched the FactorTrust Underbanked Index three years ago. It tells the story of the underbanked and delves into particular aspects of the market segment in more detail.

For example, the typical underbanked consumer we see is employed and has a primary banking relationship. The top three employers of these consumers are fast food restaurants, government agencies and – perhaps surprisingly – big banks.

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 108 of 154    Document 31-2

Case 2:21-cv-02549-MAK   Document 33-8   Filed 10/14/21   Page 5 of 7

 

finance simply because they like the speed and convenience of the service.

## How does FactorTrust help lenders serve the underbanked?

It's all about data. We have a real-time database of more than 200 million loan transactions from alternative lenders which provides lenders with a holistic view of the creditworthiness of underbanked consumers and their ability to repay loans. 'Real-time' is important – we capture data from the time a consumer's application reaches a lender; we also then capture it throughout the process of advancing the loan and repayments being made against that loan. That's what generates the value, it's unique alternative credit information – proprietary data – augmented through third-party sources to meet, for example, anti-money laundering criteria.

## And what role does technology play in what you do?

An essential role. Technology is central to our entire operation. You have to remember that our ten-year-old business grew up in the online world. It's what we know; it's what we've always done.

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 109 of 154    Document 31-2

10/14/21, 10:29 AM

113 Million US Adults Have Non-Prime Credit Scores. What Are We Doing About It? | Provenir

Case 2:21-cv-02548-MAK  Document 33-8  Filed 10/14/21  Page 6 of 7

 

be flexible, as there's such a range of systems in use out there, and convenient to set up. This is where strategic partnering with key solutions providers that lenders use – like Provenir – is important.

## Risk analytics is so important in this industry. What trends are you seeing and what influence are they having?

I would say three things – flexibility, data, and collaboration. Flexibility, because companies are realising that the traditional ways of doing things don't work in every situation – 113 million is a lot of unserved customers; it's hard to think of an industry to compare that level of unmet need to. When we take alternative credit data into account we see that this population deserves credit options and that it is possible to offer them.

Data, because that's where the value is. So much data is generated about and by individuals every day. And the right technology can capture it and work it to provide something of real value.

And collaboration because there are so many specialisms now that couldn't have been envisaged ten, fifteen, twenty years ago. They

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

Case 1:25-cv-00489-BBC   Filed 09/26/25   Page 110 of 154   Document 31-2



NEXT BLOG

[A New Bank and Not a Ball Chain Pen in Sight](#)

← **Back to Blog Posts**



## Stay up to date

EMAIL ADDRESS: *

Subscribe

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

# Exhibit I

Case 1:25-cv-00489-BBC     Filed 09/26/25     Page 112 of 154     Document 31-2



(/)

⊘ **Are you a consumer or customer looking for the FactorTrust login?**

**We're here to help > (/client-support/factortrust-consumer)**

SHORT-TERM LENDING INDUSTRY

# Understand consumers' ability to pay and grow your business

FIND YOUR SOLUTION

Acquire more customers

Power underwriting models

Protect against fraud

Reduce losses

## Alternative lending trends

## Stay informed about consumers with short-term loans





**30%** OF ALTERNATIVE CREDIT CONSUMERS HAVE A NEAR PRIME OR BETTER CREDIT SCORE*

**68 million+** U.S. CONSUMERS ARE CONSIDERED UNDERBANKED**

**74%** OF ALTERNATIVE CREDIT PARTICIPANTS HAVE OPEN CREDIT PRODUCT

https://www.transunion.com/industry/short-term-lending



(/)

## Short-term lending strategies during economic stress

<div style="border: 2px solid gold; text-align: center;">

**WATCH NOW (/WEBINARS/SHORT-TERM-LENDING-WEBINAR)**

</div>

## Short-term Lending Solutions for Your Business

We provide solutions and products that offer deeper insights, provide greater certainty and help you make smarter decisions.

*Audience Segmentation for Digital Marketing*

Target your marketing efforts more precisely to drive growth.

LEARN MORE

(/solution/marketing-audience-segmentation)

*Customer Acquisition*

Cover the complete customer acquisition cycle.

LEARN MORE
(/solution/customer-acquisition)

## Customer Credit Reporting

Our database contains more than 200 million files profiling nearly every credit-active consumer in the U.S.

LEARN MORE
(/solution/customer-credit-check)

## Debt Recovery

Optimize your entire collections lifecycle for more profitable operations.

LEARN MORE
(/solution/debt-recovery)

## Global Fraud Solutions

Insights that makes trust possible between businesses and consumers.

FRAUD AND IDENTITY SOLUTIONS
(/solution/truvalidate)

## Portfolio Management

Continuously monitor your risk, improve decisions, take action and increase profitability

LEARN MORE

Case 2:21-cv-02548-MAK    Document 33-9    Filed 10/14/21    Page 6 of 7

Short-term lending | TransUnion

(/solution/portfolio-management)

**TransUnion**

(/)

## CONTACT US

* Required field

| First Name:* | | Company:* |
|---|---|---|

| Last Name:* | | Title:* |
|---|---|---|

| Email:* | | State:* ⌄ |
|---|---|---|

| Phone:* | | Industry:* ⌄ |
|---|---|---|

How can we help you?*

REQUEST MORE INFORMATION

Case 1:25-cv-00489-BBC    Filed 09/26/25    Page 117 of 154    Document 31-2


(/)

## Sources

*Source: TransUnion alternative lending database

**Source: FDIC

## About Us

About TransUnion (/about-us/about-transunion)

Sustainability (/about-us/sustainability)

Investor relations (https://investors.transunion.com/)

Newsroom (https://newsroom.transunion.com/)

Careers (/careers/careers-at-tu)

Diversity, Equity & Inclusion (/about-us/diversity-inclusion-report)

## Client Support

Business Support Services (/client-support/business-support-services)

Compliance and permissible purpose (/client-support/compliance-legislative-updates)

Data reporting FAQs (/data-reporting/data-reporting-faqs)

Data security (/client-support/data-security)

## Information for

Data reporting (/data-reporting/data-reporting)

Credit data resellers (/data-reporting/credit-data-resellers)

Accessibility (/Accessibility-Statement)

DO NOT SELL MY PERSONAL INFORMATION - CA RESIDENTS ONLY (/optout)

Cookie Settings ()

HAVE QUESTIONS?

CONSUMER (/CUSTOMER-SUPPORT/CONTACT-US-CONSUMERS)

BUSINESS (/BUSINESS-CONTACT)

Privacy (/privacy)

Terms of use (/legal/terms-of-use)

Sitemap (/sitemap)

FCPA policy (/legal/fcpa-policy)

© Copyright 2021 TransUnion LLC. All Rights Reserved.

(http://www.facebook.com/TransUnion)

# Exhibit J

## Consumer Installment Loan Agreement

**REVIEW THIS LOAN AGREEMENT CAREFULLY. YOU WILL BE REQUIRED TO ELECTRONICALLY SIGN AND DATE IT. YOU WILL ALSO ELECTRONICALLY SIGN AND DATE THE DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATIONS.**

Loan # 3712929

| | |
|---|---|
| **Agreement Date: 12/20/2018** <br> **Effective Date: 12/21/2018** | **Loan #: 3712929** <br> **Loan Type: Installment Loan** |
| **Pine Tree Lending, LLC d/b/a** <br> Clarity Finance <br> 8 Kennabis Rd. <br> Indian Township, ME, 04668 | Name: Idell Dearry <br> Address: 1936 W. Westmoreland St. <br> City: Philadelphia <br> State: PA, Zip:19140 <br> Phone: 2673191793 <br> Email Address: dearryidell@yahoo.com |

In this Agreement ("Agreement") the words "we", "us" and "our" mean Pine Tree Lending, LLC d/b/a Clarity Finance, an economic development arm of, instrumentality of, and a limited liability company wholly-owned and controlled by, the Passamaquoddy Tribe of Indian Township ("Tribe"), and any authorized representative, agent, independent contractor, affiliate or assignee we use in the provision of your loan. "You" and "your" means the consumer who signs the Agreement electronically. The term "business day" means any calendar day other than a Saturday, Sunday or a bank or federal holiday, between the hours of 8AM and 5PM MST.

This Agreement is governed by the laws of the Tribe.

In order to complete your transaction with us, you must electronically sign and date this Agreement. We cannot commit to make a loan to you unless your completed application is approved by our underwriting department, located on the Tribe's Reservation. Once you sign and submit this Agreement, we will either approve or deny your request for credit from our office located on tribal land. If your information cannot be verified by the Effective Date, your request for credit will not approved, we will not fund the loan, and you will not incur any finance charge or fees.

### TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 510.984% | $3130.88 | $1000 | $4130.88 |

**Your Payment Schedule will be:**

| Number of Payment | Payment Amount | Payment Date |
|---|---|---|
| 1 | $344.24 | 12/31/2018 |
| 2 | $344.24 | 01/31/2019 |
| 3 | $344.24 | 02/28/2019 |
| 4 | $344.24 | 03/29/2019 |
| 5 | $344.24 | 04/30/2019 |
| 6 | $344.24 | 05/31/2019 |
| 7 | $344.24 | 06/28/2019 |
| 8 | $344.24 | 07/31/2019 |
| 9 | $344.24 | 08/30/2019 |
| 10 | $344.24 | 09/30/2019 |
| 11 | $344.24 | 10/31/2019 |
| 12 | $344.24 | 11/29/2019 |

**Security**: You are giving a security interest in your EFT authorization.

**Late Charge:** If a payment is 5 days or more late, you will be charged $30 per late scheduled payment.

**Prepayment:** If you pay off early, you will not have to pay a penalty.

See the terms of the Agreement below for any additional information about nonpayment, default, any repayment in full before the schedule date, and prepayment penalties.

ITEMIZATION OF AMOUNT FINANCED: Amount Financed/Amount given to you directly $1000

### PAYMENT DISBURSEMENT OPTIONS

**DISBURSEMENT:** If your Loan is approved, we will process disbursement of your loan proceeds within one (1) business day of the day your loan is approved. You authorize us to use commercially reasonable efforts to initiate a credit entry by depositing the proceeds of your loan into your Bank Account as described in your Disbursement Authorization. The date that your loan proceeds are deposited to your Bank Account is the "Disbursement Date." Unavoidable delays that occur as a result of bank holidays, the processing schedule of your individual bank, inadvertent processing errors, "acts of God", and/or "acts of terror" may extend the time for the deposit and may cause a change in the Disbursement Date and your Annual Percentage Rate ("APR") as disclosed herein. In the event that disbursement is delayed, the Disbursement Date will automatically adjust to the actual date of disbursement.

**AUTHORIZATION FOR ACH CREDIT:** You agree that we may initiate a credit entry to your Bank Account for an amount consistent with this Agreement on or before the Effective Date. If you revoke this authorization before we credit the loan proceeds to you, then we will not be able to deposit the loan proceeds into your Bank Account. To find out whether or not a deposit has been made, you may contact customer service at (877) 632-4223.

**EXPEDITED FUNDING SERVICE:** If you want to receive your loan proceeds at least one (1) business day sooner than through an ACH Credit, we offer you an Expedited Funding Service. If you choose this Expedited Funding Service, your loan proceeds are deposited into your Bank Account on the same business day as your Loan is approved (if before 11 a.m. MST) time or the next business day if after that time.

*For example,* if your loan was approved at 12:30 p.m. on Friday, your loan proceeds would likely be deposited into your Bank Account on Monday. *But,* if you wanted to use the Expedited Funding Service, then your loan proceeds would be disbursed to you on Friday.

Note that the timing of when your bank actually makes these funds available to you is entirely controlled by your bank and not us.

| DISBURSEMENT CHOICE AUTHORIZATION for Pine Tree Lending, LLC d/b/a Clarity Finance | Loan #: 3712929 |
|---|---|
| REVIEW VERY CAREFULLY BEFORE EXECUTING THIS DISBURSEMENT AUTHORIZATION | |

### DISBURSEMENT AUTHORIZATION

**Your ACH Credit Disbursement Authorization**

By electronically signing this Disbursement Authorization below, you voluntarily authorize us to initiate disbursement credit to the bank account you provide below. This Disbursement Authorization is a part of and relates to this Agreement dated 12/20/2018 (the "Agreement"). The words "you" and "your" mean the borrower who has electronically signed this Disbursement Authorization. The words "we", "us" and "our" meanPine Tree Lending, LLC d/b/a Clarity Finance and our successors and assigns.

**Disbursements to your Bank Account**. Unless otherwise agreed, disbursement credits of your loan proceeds will be made to the following bank account ("your Bank Account")

| DISBURSEMENT CHOICE AUTHORIZATION for Pine Tree Lending, LLC d/b/a Clarity Finance | Loan #: 3712929 |
|---|---|
| REVIEW VERY CAREFULLY BEFORE EXECUTING THIS DISBURSEMENT AUTHORIZATION | |

### DISBURSEMENT AUTHORIZATION

**Your ACH Credit Disbursement Authorization**

By electronically signing this Disbursement Authorization below, you voluntarily authorize us to initiate disbursement credit to the bank account you provide below. This Disbursement Authorization is a part of and relates to this Agreement dated 12/20/2018 (the "Agreement"). The words "you" and "your" mean the borrower who has electronically signed this Disbursement Authorization. The words "we", "us" and "our" meanPine Tree Lending, LLC d/b/a Clarity Finance and our successors and assigns.

**Disbursements to your Bank Account**. Unless otherwise agreed, disbursement credits of your loan proceeds will be made to the following bank account ("your Bank Account")

| Bank Name: | American Heritage Fcu |
|---|---|
| Transit ABA Number: | 236082944 |
| Deposit Account Number: | 1010800017190 |

We will make these disbursement credits by Automated Clearing House (ACH) entries, unless you have requested Expediting Funding Service via wire transfer.

**BY TYPING YOUR NAME AND CLICKING THE "I AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS DISBURSEMENT AUTHORIZATION AND AGREEING TO ALL THE TERMS OF THIS AUTHORIZATION.**

**YOU ALSO ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS DISBURSEMENT AUTHORIZATION FOR YOUR RECORDS.**

*Idell Dearry*   I agree that Pine Tree Lending, LLC d/b/a/ Clarity Finance and its successors and assigns may initiate an ACH credit disbursement to My Bank Account.

**ERROR RESOLUTION NOTICE:** In the event (i) you have a question about an electronic transfer or if (ii) you find an error, you must telephone us at 877-632-4223, email us at CustomerService@ClarityFinance.com, or contact us by mail at 8 Kennebasis Rd., Indian Township, ME, 04668. We must hear from you no later than sixty (60) days after the FIRST debit or credit that is the basis of the problem or error.  (1) Tell us your name and account number (if any); (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information; and (3) Tell us the dollar amount of the suspected error.  If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days. We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to do this, we will credit your account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not credit your account. For errors involving new accounts, we may take up to ninety (90) days to investigate your complaint or question. For new accounts, we may take up to twenty (20) business days to credit your account for the amount you think is in error.  We will tell you the results within three (3) business days after completing our investigation. If we decide that there  was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**CONFIDENTIALITY:** We will disclose information to third parties about your account or the transfers you make: (1) where it is necessary for completing transfers; or (2) in order to verify the existence and condition of your account to a third party, such as a credit bureau or merchant; or (3) in order to comply with a government agency or court orders; or (4) as described in our privacy notice, provided separately.

## PAYMENT METHOD OPTIONS

**PAYMENTS:** You are required to make the payments for each period outlined in the payment schedule above ("Installment Period") on or before the payment due dates in the payment schedule ("Payment Due Dates"). If you would like to repay your loan according to a payment plan other than as set forth herein, you must contact a customer service representative no later than three (3) days prior to your next scheduled Payment Due Date to make those payment schedule modifications if you would like them in effect for the next Payment Due Date. You will make your payments on or before every Payment Due Date until you have paid the entire principal and accrued finance charge(s) and any other charges as described in this Agreement. If on the final scheduled Payment Due Date ("Maturity Date"), you still owe amounts under this Agreement, you will pay those amounts in full on that date. You may elect to make your payments electronically: by ACH debit, by debit card, or by Remotely Created Check. You may also elect to make your payments by check and mail your payments to us.

**ELECTRONIC PAYMENT:** If you elect to make your payments electronically, then your payment plus any NSF, Late or Refused Instrument Charge fees due to us, if applicable, will be debited electronically from your Bank Account on each Payment Due Date as set forth in your payment schedule (see "**PAYMENT CHOICE AUTHORIZATION**" below) through one of the electronic methods described below. **You may revoke your payments** by contacting customer service at (877) 632-4223 or emailing us at CustomerService@ClarityFinance.com. Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s). For the purposes of these disclosures, our business days are Mon-Fri 8am - 5pm MST. Saturdays, Sundays, and Holidays are not included.

**PAYMENTS BY ACH DEBIT:** If you elect to pay by ACH debit, then you authorize us, our successors and assigns to initiate automatic debits for payments from your Bank Account. You agree that we will initiate debit entries on each scheduled payment date or thereafter for the scheduled amount, or any lesser amount you owe. You authorize us to initiate separate ACH debit entries to your Bank Account identified in the Payment Choice Authorization for any returned payment and NSF, Late or Refused Instrument Charge fees in the amounts set forth in this Agreement. You agree that we may reinitiate any ACH up to two (2) additional times for the same amount if an ACH is dishonored. **You do not have to authorize payments by ACH debit in order to receive a loan from us. If you do not want to make payments by ACH debit, please review the other available payment options below.**

**You may revoke this authorization** by contacting customer service at (877) 632-4223 or emailing us at CustomerService@ClarityFinance.com not less than three (3) business days prior to your scheduled payment. Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s).

You have the right to receive notice of all transfers that vary in amount. You acknowledge that we elected to offer you a specified range of amounts for the recurring ACH processing rather than providing you with a notice of transfer for each varying amount. The ACH debit may range from the amount provided in this Agreement, which may be a scheduled payment amount or less if partial prepayments have been made, to the scheduled payment amount plus applicable NSF, Late or Refused Instrument Charge fees. We will send you a notice if a charge exceeds this range.

You authorize us to verify any information that you provide to us, including past and current information from whatever source. You agree that the ACH entries authorized here are voluntary, and that certain entries will recur as defined in this Agreement at substantially regular intervals. If there is any missing or erroneous information in or with your loan application regarding your Bank Account, then you authorize us to verify and correct the information. If any payment cannot be obtained by ACH, you remain responsible for such payment and any resulting fees under this Agreement.

Your Bank Account associated with this authorization is listed in the Payment Choice Authorization.

**PAYMENT BY DEBIT CARD:** If you elect to pay by debit card, you agree that we may initiate debit entries to your debit card on each scheduled payment date or thereafter for the scheduled amount, or any lesser amount you owe, in three (3) instances: 1) if we cannot process your authorized ACH debits for any reason other than your revocation of ACH authorization, 2) if you specifically authorize that we debit your debit card identified in this Agreement, or 3) if you default on a payment.

You authorize us to initiate a separate debit to your debit card for any applicable NSF, Late or Refused Instrument Charge fees set forth in this Agreement. If the debit entries are dishonored, you authorize us to initiate separate debit entries to your debit card for the dishonored amount and any late fees or NSF fees.

You may revoke this authorization by contacting customer service at (877) 632-4223 or emailing us at CustomerService@ClarityFinance.com not less than three (3) business days prior to your scheduled payment. Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s).

You have the right to receive notice of all transfers that vary in amount. You acknowledge that we elected to offer you a specified range of amounts for the recurring debit card processing rather than providing you with a notice of transfer for each varying amount. The debit may range from the amount provided in this Agreement, which may be a scheduled payment amount or less if partial prepayments have been made, to the scheduled payment amount plus applicable NSF, Late or Refused Instrument Charge fees. We will send you a notice if a charge exceeds this range.

**PAYMENT BY REMOTELY CREATED CHECK:** If you elect to pay by remotely created check, you agree that we may create checks bearing your typed name and other information as may be required under applicable law, rather than your handwritten signature, drawn on your Bank Account, and to submit each check for payment to the Bank or other financial institution in the amount of each payment owing to us under this Agreement on or after each scheduled payment date ("Remotely Created Check"), otherwise known as a demand draft, telecheck, preauthorized draft or paper draft in four (4) instances: 1) if you have specifically elected to make your payments by Remotely Created Check, 2) if you elected to make payments by debit card or ACH and you subsequently revoke either authorization, 3) if we are unable to process your payments by debit card or ACH for any other reason, and 4) if you have defaulted on a payment.

If a Remotely Created Check is returned unpaid by the Bank or other financial institution, then you authorize us to create and submit a Remotely Created Check for any NSF, Late or Refused Instrument Charge fees or other amounts accrued pursuant to this Agreement. You agree that your typed name will constitute your authorized signature fully reflecting your intent to authenticate any such Remotely Created Check. You authorize us to vary the amount of any preauthorized payment by Remotely Created Check as needed to repay amounts owing, as modified by any partial prepayment.

If you would like to dispute a payment related to a Remotely Created Check, determine whether a payment was genuine, withhold payment of a Remotely Created Check, or obtain re-crediting of amounts we obtain via Remotely Created Check, contact us (877) 632-4223 or emailing us at CustomerService@ClarityFinance.com.

**PAYMENT BY CHECK:** If you elect to pay by check, then you agree to repay all amounts due pursuant to this Agreement via check by mailing your payments to us at 8 Kennebasis, Rd, Indian Township, ME, 04668. All mailed payments must reach us by 4PM MST on or before 1 business days prior to the Payment Due Date to ensure timely processing of your payment. If you provide a check as a payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day that we receive your payment, and you will not receive your check back from your financial institution.

**PREPAYMENT:** You may prepay all or part of the amount you owe us at any time before the Maturity Date without penalty. If you prepay in full, you must pay the finance charge(s) accrued on your Loan and all other amounts due up to the date of your next scheduled payment. If you wish to prepay your loan, then you must contact a customer service representative at (877) 632-4223 to obtain an accurate payoff amount and either provide us with authorization to effect a debit entry to your bank account for the prepayment, or otherwise advise us of your intended method of prepayment. If you prepay all or part of the principal amount due on your loan, your finance charges on the amount prepaid will be calculated as of the date of your next scheduled payment.

**LATE CHARGE:** You agree to pay a late charge of $30 if a payment is 3 days or more late. If you authorized debits from your Bank Account or debit card in your Payment Choice Authorization, you agree that we may debit your Bank Account or debit card, as applicable, for any late charges.

**REFUSED INSTRUMENT CHARGE:** If your payment method is stopped, denied or otherwise dishonored, then you agree to pay us a fee of $30. If you authorized debits from either your Bank Account or debit card in your Payment Choice Authorization, you agree that we may debit your Bank Account or debit card, as applicable, for any refused instrument charges. Your refused instrument may also cause your payment to be late which could result in your having to also pay a late charge.

| PAYMENT CHOICE AUTHORIZATION for Pine Tree Lending, LLC d/b/a Clarity Finance | Loan #: 3712929 |
| --- | --- |
| REVIEW VERY CAREFULLY BEFORE EXECUTING THIS PAYMENT CHOICE AUTHORIZATION | |

### PAYMENT CHOICE AUTHORIZATION

**Your** PAYMENT CHOICE **AUTHORIZATION**

By electronically signing this Payment Choice Authorization below, you voluntarily authorize us to initiate debits you have authorized. This Payment Choice Authorization is a part of and relates to this Agreement dated 12/20/2018 ("Agreement"). The words "you" and "your" mean the borrower who has electronically signed this Payment Choice Authorization. The words "we", "us" and "our" mean Pine Tree Lending, LLC d/b/a Clarity Finance and our successors and assigns.

**Automatic Payment from Your Bank Account.** You authorize us and our successors and assigns to process payment debit entries out of your Bank Account by the payment process you have authorized above, such as ACH entries, Remotely Created Checks or transactions through your debit card accessing your Bank Account listed below:

| Bank Name: | American Heritage Fcu |
| --- | --- |
| Transit ABA Number: | 236082944 |
| Deposit Account Number: | 1010800017190 |

You specifically authorize us to use this PAYMENT CHOICE to process debit entries from your Bank Account for all payments due under this Agreement in a sum equal to your payment amount due under the Agreement; provided, however, that you preauthorize us to vary the amount of any debit entry on each Payment Due Date as needed to adjust a payment due on the Loan to reflect: (1) any payment you make; (2) any amounts you still owe under this Agreement on the final scheduled Payment Due Date; and, (3) for any late, returned item charges, nonsufficient fund fees and other fees imposed under the Agreement.

| Number of Payment | Payment Amount | Payment Date |
| --- | --- | --- |
| 1 | $344.24 | 12/31/2018 |
| 2 | $344.24 | 01/31/2019 |
| 3 | $344.24 | 02/28/2019 |
| 4 | $344.24 | 03/29/2019 |
| 5 | $344.24 | 04/30/2019 |
| 6 | $344.24 | 05/31/2019 |
| 7 | $344.24 | 06/28/2019 |
| 8 | $344.24 | 07/31/2019 |
| 9 | $344.24 | 08/30/2019 |
| 10 | $344.24 | 09/30/2019 |
| 11 | $344.24 | 10/31/2019 |
| 12 | $344.24 | 11/29/2019 |

If you are in default, you authorize us to process one or more debit entries to pay all principal, finance charges

and other amounts due to us as provided in the Agreement. You authorize us to re-process debit entries for the same amounts if any attempted payment transaction is dishonored.

We will provide you with ten (10) days' notice prior to processing a preauthorized debit entry that varies from the scheduled amounts detailed above, unless the variance results from your request and your new authorization for us to change the amount of your payments going forward.

**YOU MAY REVOKE YOUR AUTHORIZATION TO AUTOMATIC PAYMENTS AT ANY TIME BY CONTACTING US DIRECTLY AT (877) 632-4223 OR** CustomerService@ClarityFinance.com. Your revocation must be received no less than three (3) business days prior to your scheduled payment date. Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s). **YOU UNDERSTAND THAT REVOKING YOUR AUTHORIZATION DOES NOT RELIEVE YOU OF THE RESPONSIBILITY OF PAYING ALL AMOUNTS DUE IN FULL THAT ARE OWED BY YOU UNDER THE LOAN AGREEMENT.**

**BY TYPING YOUR NAME AND CLICKING THE "I AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS PAYMENT CHOICE AUTHORIZATION AND AGREEING TO ALL THE TERMS OF THIS AUTHORIZATION.**

**YOU ALSO ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION FOR YOUR RECORDS.**

_Idell Dearry_ I agree that Pine Tree Lending, LLC d/b/a/ Clarity Finance and its successors and assigns may initiate electronic fund transfer payments from My Bank Account, via the PAYMENT CHOICE. **PLEASE NOTE, YOU ARE NOT REQUIRED TO AUTHORIZE THIS PAYMENT CHOICE AUTHORIZATION OPTION IN ORDER TO BE APPROVED FOR A LOAN FROM US. YOU MAY CHOOSE TO PAY BY CHECK BY FOLLOWING THE INSTRUCTIONS IN THE "PAY BY CHECK" SECTION OF THIS AGREEMENT AND ON THE APPLICATION SCREEN.**

**ERROR RESOLUTION NOTICE:** In the event (i) you have a question about an electronic transfer or if (ii) you find an error, you must telephone us at (877) 632-4223 , email us at CustomerService@ClarityFinance.com, or contact us by mail at 8 Kennebasis, Rd, Indian Township, ME, 04668. We must hear from you no later than sixty (60) days after the FIRST debit or credit that is the basis of the problem or error. (1) Tell us your name and account number (if any); (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information; and (3) Tell us the dollar amount of the suspected error. If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days. We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to do this, we will credit your account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not credit your account. For errors involving new accounts, we may take up to ninety (90) days to investigate your complaint or question. For new accounts, we may take up to twenty (20) business days to credit your account for the amount you think is in error. We will tell you the results within three (3) business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**CONFIDENTIALITY:** We will disclose information to third parties about your account or the transfers you make: (1) where it is necessary for completing transfers; or (2) in order to verify the existence and condition of your account to a third party, such as a credit bureau or merchant; or (3) in order to comply with a government agency or court orders; or (4) as described in our privacy notice, provided separately.

**SPECIAL NOTICES:**

- **YOUR LOAN IS AN EXPENSIVE FORM OF BORROWING.**
- **YOU CAN SAVE FINANCE CHARGES BY PAYING OFF YOUR LOAN EARLY EITHER IN PART OR IN FULL.**
- **YOUR LOAN IS DESIGNED TO ASSIST YOU IN MEETING YOUR SHORT-TERM CASH NEEDS. IT IS NOT A SOLUTION FOR LONGER TERM FINANCIAL PROBLEMS.**
- **NON-PROFIT CREDIT COUNSELING SERVICES ARE AVAILABLE IN YOUR COMMUNITY FOR CONSUMERS EXPERIENCING FINANCIAL PROBLEMS.**

**YOUR PROMISE TO PAY:** You promise to pay us, or any subsequent holder of this Agreement, the Amount Financed and finance charges according to the payment schedule in the Truth in Lending Disclosures plus all other amounts owed to us under this Agreement. You agree that your finance charges will be calculated at the Annual Percentage Rate in the Truth in Lending Disclosures. All payments will be applied first to finance charges and fees and then to principal. If you prepay all or part of the principal amount due on your loan, your finance charges on the amount prepaid will be calculated as of the date your next payment is due.

**WHEN YOU BEGIN PAYING FINANCE CHARGE(S):** You begin to accrue finance charge(s) for the loan on the Disbursement Date. The first Installment Period on the loan begins on the Disbursement Date and ends on the first Payment Due Date. Thereafter, each Installment Period begins on the first date following the Payment Due Date and ends on the next Payment Due Date. You will be charged finance charge(s) on the entire Installment Period beginning on the first day of the Installment Period. In calculating your payments, we have assumed you will make each payment on the day and in the amount due as outlined within your payment schedule. If any payment is made before the Payment Due Date, the finance charge(s) are due for the entire Installment Period and no refund shall be made for the finance charge(s) charged for the Installment Period. Time is of the essence, which means that there are no grace periods for when payments must be made.

**ASSIGNMENT:** This Agreement may not be assigned by you. We may assign or transfer this Agreement and our related rights and obligations without notice to you and your consent is not required if we make such an assignment or transfer.

**VERIFICATION:** You authorize us to verify the information you provided to us in connection with your loan application. You give us consent to obtain information about you from consumer reporting agencies or other sources at any time. We reserve the right to withhold funding of this Loan, at any time prior to disbursement, to allow us to verify the information you have provided to us.

**CREDIT REPORTING:** We may report information about your loan to consumer reporting agencies. Late payments, missed payments, or other reportable events may be reflected on your credit report.

**CANCELLATION:** You may cancel your payment obligations under this Agreement, without cost or finance charges, no later than 3PM MST of the second business day immediately following the Disbursement Date ("Cancellation Deadline"). Your right to cancel your loan only applies if your loan either hasn't funded or, if it has, the funds are returned to us as explained below. To cancel your payment obligations on this loan, you must inform us **in writing**, by or before the Cancellation Deadline, by email to CustomerService@ClarityFinance.com, that you want to cancel the future payment obligations on this loan. If we timely receive your written notice of cancellation on or before the Cancellation Deadline but **before** the loan proceeds have been deposited into your Bank Account, then we will not debit your Bank Account and both your and our obligations under this Agreement will be rescinded. However, if we timely receive your written notice of cancellation on or before the Cancellation Deadline but **after** the loan proceeds have been deposited into your Bank Account, then you authorize us to effect a debit to your Bank Account or your debit card as you chose in your Payment Choice Authorization for the principal amount of this Agreement. If we receive payment of the principal amount via the debit, then both your and our obligations under this Agreement will be rescinded. If we do not receive payment of the principal amount by debit to your Bank Account or your debit card, then this Agreement will remain in full force and effect.

**DEFAULT:** You will be in default under this Agreement if you do not pay us a scheduled payment or any other amounts you owe us when due or your chosen payment method is stopped, denied or otherwise dishonored. If you default on your loan, we can choose to declare all principal, finance charges and other amounts that you owe us to be immediately due and payable in full. If you are in default and you authorized debits from your Bank Account, you agree that we can debit your Bank Account or debit card, as applicable, for the full amount that you owe us. Additionally, if you do not cooperate with us on repaying your debt to us we may submit your name to a collection agency and we may also report the incident to a consumer reporting agency database.

This may negatively impact your ability to write checks or to receive loans or advances from other companies.

**CONSEQUENCES OF DEFAULT:** Upon a default by you under this Agreement, we may, at our sole option, take any one or more of the following actions:

Agree to permit you to cure a payment default before the loan goes into collection by modifying your Payment Schedule and/or payment amounts (a "Cure Arrangement"). This option is not available for all customers and/or all loan products. If we agree to a Cure Arrangement and you fail to honor its terms, then we will have the right, at our sole discretion, to terminate the Cure Arrangement and immediately and without notice declare the entire unpaid principal balance and all accrued unpaid finance charge(s) and fees immediately due under your Loan ("Accelerate Your Loan");

Automatically and without further action or notice Accelerate Your Loan and require you to immediately pay us all amounts due and owing pursuant to such Acceleration;

If you have elected to repay your Loan electronically, we may automatically and without further action or notice withdraw from your designated account(s) an amount equal to the amount owed and unpaid as of your last scheduled payment date up to an amount equal to the amount owed if we have Accelerated Your Loan; and

Pursue all legally available means to collect what you owe us.

By electing any one of these options, we do not waive or release our right to subsequently elect and apply any other options to collect the amounts due and owing to us.

**GOVERNING LAW:** The laws of the Tribe and applicable federal law will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

**SOVEREIGN IMMUNITY:** This Agreement and all related documents are being submitted by you to us as an economic arm, instrumentality, and limited liability company of the Tribe. The Tribe is a federally recognized Indian Tribe and enjoys governmental sovereign immunity. Because we and the Tribe are entitled to sovereign immunity, you will be limited as to what claims, if any, you may be able to assert against the Tribe and us. To encourage resolution of consumer complaints, any complaint may be submitted by you or on your behalf to the Tribe for review as described below.

**PRESERVATION OF SOVEREIGN IMMUNITY:** It is the express intention of the Tribe and us operating as an economic arm of the Tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign governmental immunity, and any other rights, titles, privileges, and immunities, to which we and the Tribe are entitled. To protect and preserve the rights of the parties, no person may assume a waiver of sovereign immunity. No waiver is or can be made except by express written declaration of the Tribe's Tribal Council specifically authorizing a waiver for the matter in question. No such waiver has been made with respect to either your Agreement or your Disbursement and Payment Choice Authorization.

**TRIBAL HOTLINE:** If you have already contacted Customer Service in an attempt to resolve an issue or concern and still need additional assistance, please contact the Passamaquoddy Tribal Hotline at 1-800-316-4260 between the hours of 9am and 5pm EST.

## TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION

As an accommodation to consumers, the Tribe has established the following Tribal Dispute Resolution Procedure to receive, review, and consider any and all types of complaints made by or on behalf of our consumers. A consumer who, in the course of his or her otherwise lawful and proper use of our business, has concerns about the operation of any part of us or who otherwise believes himself or herself to be aggrieved by some aspect of any part of our operation shall direct his or her concerns

in the first instance to our management, in writing at Contact@ClarityFinance.com. A consumer's complaint to us shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights. We will investigate the consumer's complaint and provide our initial determination as soon as is reasonably practicable. In the event that the consumer is dissatisfied with our initial determination, then he or she may request review of our initial determination by submitting such request in writing t o the Tribal Financial Services Regulatory Authority ("Authority") at 8 Kennebasis Rd., Indian Township, ME, 04668 no later than ninety (90) days after receiving our initial determination.

The Authority may offer the consumer an opportunity to be heard and the consumer may be represented by legal counsel at his or her own expense. If a hearing is granted, it will take place no less than ten (10) days and no more than sixty (60) days after the Authority receives the consumer's written request. The Authority will notify the consumer in writing with its opinion regarding our initial determination.

A consumer may appeal an Authority opinion by filing a written appeal to the Tribal Court within twenty (20) days of receiving the Authority's final written opinion in accordance with the rules of court and procedures of the Tribal Court.

**THIS DISPUTE RESOLUTION OPPORTUNITY IS INTENDED AS THE SOLE DISPUTE RESOLUTION MECHANISM FOR DISPUTES AND CLAIMS ARISING UNDER THIS LOAN AGREEMENT. THIS MEANS THAT YOU ARE EFFECTIVELY WAIVING YOUR RIGHT TO A JURY TRIAL.**

The words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Tribal Dispute Resolution Provision, ("this Provision"), the validity and scope of this Provision and any claim or attempt to set aside this Provision? (b) all U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Loan Agreement, the information you gave u s before entering into this Loan Agreement, including the customer information application, and/or any past Loan Agreement or Agreements between you and us? (c) all counterclaims, cross claims and third-party claims? (d) all common law claims, based upon contract, tort, fraud, or other intentional torts? (e) all claims based upon a violation of any state or federal constitution, statute or regulation? (f) all claims asserted by us against you, including claims for money damages to collect any sum we claim you owe us? (g) all claims asserted by you individually against the Tribe, us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, "related third parties"), including claims for money damages and/or equitable or injunctive relief? (h) all claims asserted on your behalf by another person? (i) all claims asserted by you as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against us and/or related third parties ("Representative Claims")? and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us or related third parties of any nonpublic personal information about you.

All disputes including any Representative Claims against us and/or related third parties shall be resolved by the Tribal Dispute Resolution Procedure in this Provision only on an individual basis with you. Any party to a dispute, including related third parties, may send the other party written notice by certified mail return receipt requested of their dispute and setting forth the subject of the dispute along with the relief requested

This Provision is binding upon and benefits you, your respective heirs, successors and assigns. This Provision is binding upon and benefits the Tribe, us, our successors and assigns, and related third parties. This Provision continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. This Provision survives any cancellation, termination, amendment, expiration or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing.

**THIS TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION MEANS THAT:**

- **YOUR RIGHT TO FILE SUIT AGAINST US FOR ANY CLAIM OR DISPUTE REGARDING THIS AGREEMENT IS LIMITED BY THIS PROVISION AND SOVEREIGN IMMUNITY.**

- **YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES.**

- **YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES? AND**

- YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT OR ARBITRATION FILED AGAINST US AND/OR RELATED THIRD PARTIES.

## CONSENT TO ELECTRONIC COMMUNICATIONS

- The following terms and conditions govern electronic communications in connection with this Agreement and the transaction evidenced hereby (this Consent). By electronically signing this Agreement by clicking the "I AGREE" button and entering your name below, you are confirming that you have agreed to the terms and conditions of this Consent and that you have the ability to download or print a copy of this Consent for your records. you agree that:

- Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, this Agreement, this Consent, disclosures, change-in-term notices, fee and transaction information, statements, delayed disbursement letters, notices of adverse action, and transaction information (collectively, Communications), may be sent to you electronically by sending it to you by e-mail or by posting the information at Our web site, ClarityFinance.com.

- We will not be obligated to provide any Communication to you in paper form unless you specifically request us to do so.

- You may obtain a copy of any Communication by contacting us at ClarityFinance.com, writing to Us at CustomerService@ClarityFinance.com, or by calling us at (877) 632-4223 . You also can withdraw your consent to ongoing electronic communications in the same manner, and ask that they be sent to you in paper or non-electronic form. If you choose to receive Communications in paper or non-electronic form, we may elect to terminate this Agreement and demand payment of the amount then due by the date of your withdrawal of consent; or by the expiration of any minimum term mandated by law, whichever is later.

- You agree to provide us with your current e-mail address for notices at the address or phone number indicated above. If your e-mail address changes, you must send us a notice of the new address by writing to us or sending us an e-mail, using secure messaging, at least 5 days before the change.

- In order to receive electronic communications in connection with this transaction, you will need a working connection to the Internet. Your browser must support the Secure Sockets Layer (SSL) protocol. SSL provides a secure channel to send and receive data over the Internet. Microsoft Internet Explorer 6 or equivalent browser and above supports this feature. You will also need either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information (e.g., 1 megabyte or more). You must have your own Internet service provider. We may amend (add to, delete or change) the terms of this Consent to electronic communication by providing you with advance notice.

## CONSENT TO RECEIVE TEXT MESSAGES

- As used in this text messaging consent, 'Text Message' means any text messaging communication from us to you pertaining to your loan, including but not limited to: (1) your payment information; (2) your account information; (3) your payment due dates; (4) information regarding any delinquent accounts; and (5) program updates relating to your loan. We will not send you any advertising or telemarketing Text Messages unless you authorize us to do so by signing the Consent to Receive Advertising or Telemarketing Text Messages and Telephone Calls below.  All Text Messages from us in electronic format to you will be considered "in writing."

- How To Unsubscribe: You may withdraw your consent to receive Text Messages by texting "STOP" to the message you receive, calling us at (877) 632-4223  or emailing us at CustomerService@ClarityFinance.com. At our option, we may treat your provision of an invalid mobile phone number, or the subsequent malfunction of a previously valid mobile phone number, as a withdrawal of your consent to receive Text Messages. We will not impose any fee upon you to process the withdrawal of your consent to receive Text Messages. Any withdrawal of your consent to use Text Messages will be effective only after we have a reasonable period of time to process your withdrawal.

- In order to access, view, and retain Text Messages that we make available to you, you must have: (1) a Text Message-capable mobile phone, (2) an active mobile phone account with a communication service provider? and (3) sufficient

storage capacity on your mobile phone.

- To request additional information, text "HELP" to the message you receive or contact us by telephone at (877) 632-4223

- The services are available from most of the carriers that offer Text Messaging. Consult your mobile service carrier to confirm that they offer Text Messaging.

- There is no service fee for Text Messages but you are responsible for all charges imposed by your communications service provider, such as fees associated with Text Messaging. Consult your mobile service carrier's pricing plan to determine the charges for sending and receiving Text Messages. These charges will appear on your phone bill. Message frequency depends on account settings.

- You agree that we may send any Text Messages related to your loan through your communication service provider in order to deliver them to you and that your communication service provider is acting as your agent in this capacity. You agree to indemnify, defend, and hold us harmless from and against all claims, losses, liability, costs, and expenses (including reasonable attorneys' fees) arising from your provision of a mobile phone number that is not your own or your violation of applicable federal, state, or local law, or regulation or ordinance relating to Text Messages. Your obligation under this paragraph shall survive termination of this Loan Agreement. You agree that Text Messages are provided for your convenience only.

- Receipt of each Text Message may be delayed or impacted by factors pertaining to your communications service provider. We will not be liable for losses or damages arising from any disclosure of account information to third parties, nondelivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in, the Text Messages sent by us.

- We may modify or terminate our Text Messaging services from time to time, for any reason, with or without notice, and without liability to you, any other user or third party.

**CONSENT TO RECEIVE ADVERTISING OR TELEMARKETING TEXT MESSAGES AND TELEPHONE CALLS**

- By signing this section, you consent to our sending you Advertising and Telemarketing Text Messages to the mobile phone number you have provided below. You also consent to our making advertising or telemarketing calls to you at your mobile phone number using automatic telephone dialing system or an artificial or prerecorded voice.

- _Idell Dearry_  Signing this section will be deemed to be your signature acknowledging your consent to receive Advertising and Telemarketing Text Messages and telephone calls as described above to your mobile phone at 2679846494.

- You are not required to consent to Advertising or Telemarketing Text Messages or calls to obtain credit or other services from us. At any time, you may withdraw your consent to receive Advertising or Telemarketing Text Messages or marketing calls to the mobile number provided by calling us at (877) 632-4223  or emailing us at CustomerService@ClarityFinance.com.

- You understand that: any Advertising and Telemarketing Text Messages we send you may be accessed by anyone with access to your Text Messages? and your mobile phone service provider may charge you fees for Advertising and Telemarketing Text Messages that we send you, and you agree that we shall have no liability for the cost of any Advertising and Telemarketing Text Messages.

**COVERED BORROWER IDENTIFICATION STATEMENT**

We provide important protections to active duty members of the Armed Forces and their dependents. To ensure that these protections are provided to eligible applicants, we require you to select and electronically sign ONE of the following statements as

applicable:

☐

- I AM a regular or reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard, serving on active duty under a call or order that does not specify a period of thirty (30) days or fewer, or such member serving on Active National Guard duty.

☐

- I AM a dependent of a member of the Armed Forces on active duty as described above, because I am the member's spouse, the member's child under the age of eighteen years old or I am an individual for whom the member provided more than onehalf of my financial support for one hundred eighty (180) days immediately preceding today's date.

OR

☒

- I AM NOT a regular or reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard, serving on active duty under a call or order that does not specify a period of thirty (30) days or fewer (or a dependent of such a member).

--OR—

You represent and warrant that you are not a regular or reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard serving on active duty under a call or order that does not specify a period of thirty (30) days or fewer, or a dependent of such member. You understand that we will verify this statement and be making this loan in reliance on the truth of this statement.

### SIGNATURE AND ACCEPTANCE OF ALL TERMS AND CONDITIONS

**BY ENTERING YOUR NAME AND CLICKING THE "I AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS LOAN AGREEMENT AND AGREEING TO ALL THE TERMS OF THIS LOAN AGREEMENT INCLUDING:**

- **THE TRIBAL DISPUTE RESOLUTION PROCEDURES PROVISION**
- **THE CONSENT TO ELECTRONIC COMMUNICATIONS**
- **THE CONSENT TO RECEIVE TEXT MESSAGES**
- **THE COVERED BORROWER IDENTIFICATION STATEMENT**

**YOU ALSO ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS LOAN AGREEMENT FOR YOUR RECORDS.**

**[I AGREE]** *Idell Dearry*
**DATE: 12/20/2018**

## PRIVACY POLICY

Rev. November 2012

| | WHAT DOES PINE TREE LENDING, LLC DBA CLARITY FINANCE DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| | |
|---|---|
| | Financial companies choose how they share your personal information. Consumers have the right to limit some but not all sharing.  This notice tells you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| | The types of personal information we collect and share depend on the product or service you have with us.  This information can include:<br>" Social Security number and checking account information<br>" Payment history and income<br>" Employment information and wire transfer instructions |
| | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers personal information; the reason Pine Tree Lending, LLC chooses to share; and whether you can limit this sharing. |

| | | |
|---|---|---|
| For our everyday business purposes - such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus. | YES | NO |
| For our marketing purposes to offer our products and services to you | YES | NO |
| For joint marketing with other financial companies | NO | WE DO NOT SHARE |
| For our affiliates everyday business purposes information about your transactions and experiences | YES | NO |
| For our affiliates everyday business purposes information about your creditworthiness | YES | YES |
| For our affiliates to market to you | YES | YES |
| For nonaffiliates to market to you | YES | YES |

| | " Call (877) 632-4223 - our menu will prompt you through your choices or<br>" Visit us on the web at ClarityFinance.com |
| --- | --- |
| | " Contact us via email at CustomerService@ClarityFinance.com |
| | Please note:<br>If you are a new customer, we can begin sharing your information 30 days from the date we sent this notice.  When you are no longer our customer, we can share your information as described in this notice.<br>However, you can contact us at any time to limit our sharing. |
| | Call (877) 632-4223 or go to ClarityFinance.com |

| | |
| --- | --- |
| Who is providing this notice? | Pine Tree Lending LLC d/b/a/ Clarity Finance business entity of the Passamaquoddy Tribe of Indian Township, is providing this privacy policy. |

| | |
| --- | --- |
| How does Pine Tree Lending, LLC protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures. These measures include computer safeguards and secured files and buildings. |
| How does Pine Tree Lending, LLC collect my personal information? | We collect your personal information, for example, when you<br>" Apply for a loan<br>" Give us your income information<br>" Tell us where to send the money<br>" Provide account information<br>" Provide employment information<br>we also collect your personal information from others, such as credit bureaus, affiliates or other companies. |
| Why can't I limit all sharing? | You have the right to limit only<br>" sharing for affiliates' everyday business purposes - information about your creditworthiness<br>" affiliates from using your information to market to you<br>" sharing for nonaffiliates to market to you |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account. |

| | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>*Our affiliates include other business entities of the Passamaquoddy Tribe of Indian Township.* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies. Nonaffiliates we share with can include service providers, data processors, and advertisers. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>Pine Tree Lending, *LLC* does not jointly market. |

# Exhibit K

## Consumer Installment Loan Agreement

**REVIEW THIS LOAN AGREEMENT CAREFULLY. YOU WILL BE REQUIRED TO ELECTRONICALLY SIGN AND DATE IT. YOU WILL ALSO ELECTRONICALLY SIGN AND DATE THE DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATIONS.**

Loan # 3785280

| | |
|---|---|
| **Agreement Date: 05/03/2019**<br>**Effective Date: 05/06/2019** | **Loan #: 3785280**<br>**Loan Type: Installment Loan** |
| **Pine Tree Lending, LLC d/b/a**<br>Clarity Finance<br>8 Kennebasis Rd.<br>Indian Township, ME, 04668 | Name: Penny Green<br>Address: 71 Red Oak Ln<br>City: Troy<br>State: PA, Zip:16947<br>Phone: 5705068364<br>Email Address: pdgreen63@yahoo.com |

In this Agreement ("Agreement") the words "we", "us" and "our" mean Pine Tree Lending, LLC d/b/a Clarity Finance, an economic development arm of, instrumentality of, and a limited liability company wholly-owned and controlled by, the Passamaquoddy Tribe of Indian Township ("Tribe"), and any authorized representative, agent, independent contractor, affiliate or assignee we use in the provision of your loan. "You" and "your" means the consumer who signs the Agreement electronically. The term "business day" means any calendar day other than a Saturday, Sunday or a bank or federal holiday, between the hours of 8AM and 5PM MST.

This Agreement is governed by the laws of the Tribe.

In order to complete your transaction with us, you must electronically sign and date this Agreement.  We cannot commit to make a loan to you unless your completed application is approved by our underwriting department, located on the Tribe's Reservation.  Once you sign and submit this Agreement, we will either approve or deny your request for credit from our office located on tribal land.  If your information cannot be verified by the Effective Date, your request for credit will not approved, we will not fund the loan, and you will not incur any finance charge or fees.

### TRUTH IN LENDING DISCLOSURES

| **ANNUAL PERCENTAGE RATE**<br><br>The cost of your credit as a yearly rate.<br><br>407.67% | **FINANCE CHARGE**<br><br>The dollar amount the credit will cost you.<br><br>$3443.92 | **Amount Financed**<br><br>The amount of credit provided to you or on your behalf.<br><br>$1100.00 | **Total of Payments**<br><br>The amount you will have paid after you have made all payments as scheduled.<br><br>$4543.92 |
|---|---|---|---|

**Your Payment Schedule will be:**

| Number of Payment | Payment Amount | Payment Date |
|---|---|---|
| 1 | $378.66 | 06/03/2019 |
| 2 | $378.66 | 07/03/2019 |
| 3 | $378.66 | 08/02/2019 |
| 4 | $378.66 | 09/03/2019 |
| 5 | $378.66 | 10/03/2019 |
| 6 | $378.66 | 11/01/2019 |
| 7 | $378.66 | 12/03/2019 |
| 8 | $378.66 | 01/03/2020 |
| 9 | $378.66 | 02/03/2020 |
| 10 | $378.66 | 03/03/2020 |
| 11 | $378.66 | 04/03/2020 |
| 12 | $378.66 | 05/01/2020 |

**Security**: You are giving a security interest in your EFT authorization.

**Late Charge:** If a payment is 5 days or more late, you will be charged $30 per late scheduled payment.

**Prepayment:** If you pay off early, you will not have to pay a penalty.

See the terms of the Agreement below for any additional information about nonpayment, default, any repayment in full before the schedule date, and prepayment penalties.

ITEMIZATION OF AMOUNT FINANCED: Amount Financed/Amount given to you directly $1100.00

### PAYMENT DISBURSEMENT OPTIONS

**DISBURSEMENT:** If your Loan is approved, we will process disbursement of your loan proceeds within one (1) business day of the day your loan is approved. You authorize us to use commercially reasonable efforts to initiate a credit entry by depositing the proceeds of your loan into your Bank Account as described in your Disbursement Authorization. The date that your loan proceeds are deposited to your Bank Account is the "Disbursement Date."  Unavoidable delays that occur as a result of bank holidays, the processing schedule of your individual bank, inadvertent processing errors, "acts of God", and/or "acts of terror" may extend the time for the deposit and may cause a change in the Disbursement Date and your Annual Percentage Rate ("APR") as disclosed herein. In the event that disbursement is delayed, the Disbursement Date will automatically adjust to the actual date of disbursement.

**AUTHORIZATION FOR ACH CREDIT:** You agree that we may initiate a credit entry to your Bank Account for an amount consistent with this Agreement on or before the Effective Date.  If you revoke this authorization before we credit the loan proceeds to you, then we will not be able to deposit the loan proceeds into your Bank Account.  To find out whether or not a deposit has been made, you may contact customer service at (877) 632-4223.

**EXPEDITED FUNDING SERVICE:**  If you want to receive your loan proceeds at least one (1) business day sooner than through an ACH Credit, we offer you an Expedited Funding Service. If you choose this Expedited Funding Service, your loan proceeds are deposited into your Bank Account on the same business day as your Loan is approved (if before 11 a.m. MST) time or the next business day if after that time.

*For example*, if your loan was approved at 12:30 p.m. on Friday, your loan proceeds would likely be deposited into your Bank Account on Monday. *But,* if you wanted to use the Expedited Funding Service, then your loan proceeds would be disbursed to you on Friday.

Note that the timing of when your bank actually makes these funds available to you is entirely controlled by your bank and not us.

| DISBURSEMENT CHOICE AUTHORIZATION for Pine Tree Lending, LLC d/b/a Clarity Finance | Loan #: 3785280 |
|---|---|
| REVIEW VERY CAREFULLY BEFORE EXECUTING THIS DISBURSEMENT AUTHORIZATION | |

## DISBURSEMENT AUTHORIZATION

**Your ACH Credit Disbursement Authorization**

By electronically signing this Disbursement Authorization below, you voluntarily authorize us to initiate disbursement credit to the bank account you provide below. This Disbursement Authorization is a part of and relates to this Agreement dated 05/03/2019 (the "Agreement"). The words "you" and "your" mean the borrower who has electronically signed this Disbursement Authorization. The words "we", "us" and "our" meanPine Tree Lending, LLC d/b/a Clarity Finance and our successors and assigns.

**Disbursements to your Bank Account**. Unless otherwise agreed, disbursement credits of your loan proceeds will be made to the following bank account ("your Bank Account")

| DISBURSEMENT CHOICE AUTHORIZATION for Pine Tree Lending, LLC d/b/a Clarity Finance | Loan #: 3785280 |
|---|---|
| REVIEW VERY CAREFULLY BEFORE EXECUTING THIS DISBURSEMENT AUTHORIZATION | |

## DISBURSEMENT AUTHORIZATION

**Your ACH Credit Disbursement Authorization**

By electronically signing this Disbursement Authorization below, you voluntarily authorize us to initiate disbursement credit to the bank account you provide below. This Disbursement Authorization is a part of and relates to this Agreement dated 05/03/2019 (the "Agreement"). The words "you" and "your" mean the borrower who has electronically signed this Disbursement Authorization. The words "we", "us" and "our" meanPine Tree Lending, LLC d/b/a Clarity Finance and our successors and assigns.

**Disbursements to your Bank Account**. Unless otherwise agreed, disbursement credits of your loan proceeds will be made to the following bank account ("your Bank Account")

| Bank Name: | Chemung Canal Trust Co |
|---|---|
| Transit ABA Number: | 021301115 |
| Deposit Account Number: | 179011782 |

We will make these disbursement credits by Automated Clearing House (ACH) entries, unless you have requested Expediting Funding Service via wire transfer.

**BY TYPING YOUR NAME AND CLICKING THE "I AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS DISBURSEMENT AUTHORIZATION AND AGREEING TO ALL THE TERMS OF THIS AUTHORIZATION.**

**YOU ALSO ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS DISBURSEMENT AUTHORIZATION FOR YOUR RECORDS.**

 *Penny Green*   I agree that Pine Tree Lending, LLC d/b/a/ Clarity Finance and its successors and assigns may initiate an ACH credit disbursement to My Bank Account.

**ERROR RESOLUTION NOTICE:** In the event (i) you have a question about an electronic transfer or if (ii) you find an error, you must telephone us at 877-632-4223, email us at CustomerService@ClarityFinance.com, or contact us by mail at 8 Kennebasis Rd., Indian Township, ME, 04668. We must hear from you no later than sixty (60) days after the FIRST debit or credit that is the basis of the problem or error.  (1) Tell us your name and account number (if any); (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information; and (3) Tell us the dollar amount of the suspected error.  If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days. We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to do this, we will credit your account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not credit your account. For errors involving new accounts, we may take up to ninety (90) days to investigate your complaint or question. For new accounts, we may take up to twenty (20) business days to credit your account for the amount you think is in error.  We will tell you the results within three (3) business days after completing our investigation. If we decide that there  was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**CONFIDENTIALITY:** We will disclose information to third parties about your account or the transfers you make: (1) where it is necessary for completing transfers; or (2) in order to verify the existence and condition of your account to a third party, such as a credit bureau or merchant; or (3) in order to comply with a government agency or court orders; or (4) as described in our privacy notice, provided separately.

## PAYMENT METHOD OPTIONS

**PAYMENTS:** You are required to make the payments for each period outlined in the payment schedule above ("Installment Period") on or before the payment due dates in the payment schedule ("Payment Due Dates"). If you would like to repay your loan according to a payment plan other than as set forth herein, you must contact a customer service representative no later than three (3) days prior to your next scheduled Payment Due Date to make those payment schedule modifications if you would like them in effect for the next Payment Due Date. You will make your payments on or before every Payment Due Date until you have paid the entire principal and accrued finance charge(s) and any other charges as described in this Agreement. If on the final scheduled Payment Due Date ("Maturity Date"), you still owe amounts under this Agreement, you will pay those amounts in full on that date. You may elect to make your payments electronically: by ACH debit, by debit card, or by Remotely Created Check. You may also elect to make your payments by check and mail your payments to us.

**ELECTRONIC PAYMENT:** If you elect to make your payments electronically, then your payment plus any NSF, Late or Refused Instrument Charge fees due to us, if applicable, will be debited electronically from your Bank Account on each Payment Due Date as set forth in your payment schedule (see "**PAYMENT CHOICE AUTHORIZATION**" below) through one of the electronic methods described below. **You may revoke your payments** by contacting customer service at (877) 632-4223 or emailing us at CustomerService@ClarityFinance.com. Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s). For the purposes of these disclosures, our business days are Mon-Fri 8am - 5pm MST. Saturdays, Sundays, and Holidays are not included.

**PAYMENTS BY ACH DEBIT:** If you elect to pay by ACH debit, then you authorize us, our successors and assigns to initiate automatic debits for payments from your Bank Account. You agree that we will initiate debit entries on each scheduled payment date or thereafter for the scheduled amount, or any lesser amount you owe. You authorize us to initiate separate ACH debit entries to your Bank Account identified in the Payment Choice Authorization for any returned payment and NSF, Late or Refused Instrument Charge fees in the amounts set forth in this Agreement. You agree that we may reinitiate any ACH up to two (2) additional times for the same amount if an ACH is dishonored. **You do not have to authorize payments by ACH debit in order to receive a loan from us. If you do not want to make payments by ACH debit, please review the other available payment options below.**

**You may revoke this authorization** by contacting customer service at (877) 632-4223 or emailing us at CustomerService@ClarityFinance.com not less than three (3) business days prior to your scheduled payment. Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s).

You have the right to receive notice of all transfers that vary in amount. You acknowledge that we elected to offer you a specified range of amounts for the recurring ACH processing rather than providing you with a notice of transfer for each varying amount. The ACH debit may range from the amount provided in this Agreement, which may be a scheduled payment amount or less if partial prepayments have been made, to the scheduled payment amount plus applicable NSF, Late or Refused Instrument Charge fees. We will send you a notice if a charge exceeds this range.

You authorize us to verify any information that you provide to us, including past and current information from whatever source. You agree that the ACH entries authorized here are voluntary, and that certain entries will recur as defined in this Agreement at substantially regular intervals. If there is any missing or erroneous information in or with your loan application regarding your Bank Account, then you authorize us to verify and correct the information. If any payment cannot be obtained by ACH, you remain responsible for such payment and any resulting fees under this Agreement.

Your Bank Account associated with this authorization is listed in the Payment Choice Authorization.

**PAYMENT BY DEBIT CARD:** If you elect to pay by debit card, you agree that we may initiate debit entries to your debit card on each scheduled payment date or thereafter for the scheduled amount, or any lesser amount you owe, in three (3) instances: 1) if we cannot process your authorized ACH debits for any reason other than your revocation of ACH authorization, 2) if you specifically authorize that we debit your debit card identified in this Agreement, or 3) if you default on a payment.

You authorize us to initiate a separate debit to your debit card for any applicable NSF, Late or Refused Instrument Charge fees set forth in this Agreement.  If the debit entries are dishonored, you authorize us to initiate separate debit entries to your debit card for the dishonored amount and any late fees or NSF fees.

You may revoke this authorization by contacting customer service at (877) 632-4223 or emailing us at CustomerService@ClarityFinance.com not less than three (3) business days prior to your scheduled payment. Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s).

You have the right to receive notice of all transfers that vary in amount.  You acknowledge that we elected to offer you a specified range of amounts for the recurring debit card processing rather than providing you with a notice of transfer for each varying amount.  The debit may range from the amount provided in this Agreement, which may be a scheduled payment amount or less if partial prepayments have been made, to the scheduled payment amount plus applicable NSF, Late or Refused Instrument Charge fees.  We will send you a notice if a charge exceeds this range.

**PAYMENT BY REMOTELY CREATED CHECK:** If you elect to pay by remotely created check, you agree that we may create checks bearing your typed name and other information as may be required under applicable law, rather than your handwritten signature, drawn on your Bank Account, and to submit each check for payment to the Bank or other financial institution in the amount of each payment owing to us under this Agreement on or after each scheduled payment date ("Remotely Created Check"), otherwise known as a demand draft, telecheck, preauthorized draft or paper draft in four (4) instances: 1) if you have specifically elected to make your payments by Remotely Created Check, 2) if you elected to make payments by debit card or ACH and you subsequently revoke either authorization, 3) if we are unable to process your payments by debit card or ACH for any other reason, and 4) if you have defaulted on a payment.

If a Remotely Created Check is returned unpaid by the Bank or other financial institution, then you authorize us to create and submit a Remotely Created Check for any NSF, Late or Refused Instrument Charge fees or other amounts accrued pursuant to this Agreement.  You agree that your typed name will constitute your authorized signature fully reflecting your intent to authenticate any such Remotely Created Check.  You authorize us to vary the amount of any preauthorized payment by Remotely Created Check as needed to repay amounts owing, as modified by any partial prepayment.

If you would like to dispute a payment related to a Remotely Created Check, determine whether a payment was genuine, withhold payment of a Remotely Created Check, or obtain re-crediting of amounts we obtain via Remotely Created Check, contact us (877) 632-4223  or emailing us at CustomerService@ClarityFinance.com.

**PAYMENT BY CHECK:**  If you elect to pay by check, then you agree to repay all amounts due pursuant to this Agreement via check by mailing your payments to us at 8 Kennebasis, Rd, Indian Township, ME, 04668.  All mailed payments must reach us by 4PM MST  on or before 1 business days prior to the Payment Due Date to ensure timely processing of your payment.  If you provide a check as a payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.  When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day that we receive your payment, and you will not receive your check back from your financial institution.

**PREPAYMENT:** You may prepay all or part of the amount you owe us at any time before the Maturity Date without penalty. If you prepay in full, you must pay the finance charge(s) accrued on your Loan and all other amounts due up to the date of your next scheduled payment. If you wish to prepay your loan, then you must contact a customer service representative at  (877) 632-4223 to obtain an accurate payoff amount and either provide us with authorization to effect a debit entry to your bank account for the prepayment, or otherwise advise us of your intended method of prepayment. If you prepay all or part of the principal amount due on your loan, your finance charges on the amount prepaid will be calculated as of the date of your next scheduled payment.

 **LATE CHARGE:** You agree to pay a late charge of $30 if a payment is 3 days or more late. If you authorized debits from your Bank Account or debit card in your Payment Choice Authorization, you agree that we may debit your Bank Account or debit card, as applicable, for any late charges.

**REFUSED INSTRUMENT CHARGE:** If your payment method is stopped, denied or otherwise dishonored, then you agree to pay us a fee of $30. If you authorized debits from either your Bank Account or debit card in your Payment Choice Authorization, you agree that we may debit your Bank Account or debit card, as applicable, for any refused instrument charges. Your refused instrument may also cause your payment to be late which could result in your having to also pay a late charge.

| | |
|---|---|
| PAYMENT CHOICE AUTHORIZATION for Pine Tree Lending, LLC d/b/a Clarity Finance | Loan #: 3785280 |
| REVIEW VERY CAREFULLY BEFORE EXECUTING THIS PAYMENT CHOICE AUTHORIZATION | |

### PAYMENT CHOICE AUTHORIZATION

**Your** PAYMENT CHOICE **AUTHORIZATION**

 By electronically signing this Payment Choice Authorization below, you voluntarily authorize us to initiate debits you have authorized. This Payment Choice Authorization is a part of and relates to this Agreement dated 05/03/2019 ("Agreement"). The words "you" and "your" mean the borrower who has electronically signed this Payment Choice Authorization. The words "we", "us" and "our" mean Pine Tree Lending, LLC d/b/a Clarity Finance and our successors and assigns.

**Automatic Payment from Your Bank Account.** You authorize us and our successors and assigns to process payment debit entries out of your Bank Account by the payment process you have authorized above, such as ACH entries, Remotely Created Checks or transactions through your debit card accessing your Bank Account listed below:

| Bank Name: | Chemung Canal Trust Co |
|---|---|
| Transit ABA Number: | 021301115 |
| Deposit Account Number: | 179011782 |

You specifically authorize us to use this PAYMENT CHOICE to process debit entries from your Bank Account for all payments due under this Agreement in a sum equal to your payment amount due under the Agreement; provided, however, that you preauthorize us to vary the amount of any debit entry on each Payment Due Date as needed to adjust a payment due on the Loan to reflect: (1) any payment you make; (2) any amounts you still owe under this Agreement on the final scheduled Payment Due Date; and, (3) for any late, returned item charges, nonsufficient fund fees and other fees imposed under the Agreement.

| Number of Payment | Payment Amount | Payment Date |
|---|---|---|
| 1 | $378.66 | 06/03/2019 |
| 2 | $378.66 | 07/03/2019 |
| 3 | $378.66 | 08/02/2019 |
| 4 | $378.66 | 09/03/2019 |
| 5 | $378.66 | 10/03/2019 |
| 6 | $378.66 | 11/01/2019 |
| 7 | $378.66 | 12/03/2019 |
| 8 | $378.66 | 01/03/2020 |
| 9 | $378.66 | 02/03/2020 |
| 10 | $378.66 | 03/03/2020 |
| 11 | $378.66 | 04/03/2020 |
| 12 | $378.66 | 05/01/2020 |

 If you are in default, you authorize us to process one or more debit entries to pay all principal, finance charges

and other amounts due to us as provided in the Agreement. You authorize us to re-process debit entries for the same amounts if any attempted payment transaction is dishonored.

We will provide you with ten (10) days' notice prior to processing a preauthorized debit entry that varies from the scheduled amounts detailed above, unless the variance results from your request and your new authorization for us to change the amount of your payments going forward.

**YOU MAY REVOKE YOUR AUTHORIZATION TO AUTOMATIC PAYMENTS AT ANY TIME BY CONTACTING US DIRECTLY AT (877) 632-4223 OR** CustomerService@ClarityFinance.com. Your revocation must be received no less than three (3) business days prior to your scheduled payment date.  Please note: if your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payment(s).  **YOU UNDERSTAND THAT REVOKING YOUR AUTHORIZATION DOES NOT RELIEVE YOU OF THE RESPONSIBILITY OF PAYING ALL AMOUNTS DUE IN FULL THAT ARE OWED BY YOU UNDER THE LOAN AGREEMENT**.

**BY TYPING YOUR NAME AND CLICKING THE "I AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS PAYMENT CHOICE AUTHORIZATION AND AGREEING TO ALL THE TERMS OF THIS AUTHORIZATION.**

**YOU ALSO ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION FOR YOUR RECORDS.**

 *Penny Green*  I agree that Pine Tree Lending, LLC d/b/a/ Clarity Finance and its successors and assigns may initiate electronic fund transfer payments from My Bank Account, via the PAYMENT CHOICE.  **PLEASE NOTE, YOU ARE NOT REQUIRED TO AUTHORIZE THIS** PAYMENT CHOICE **AUTHORIZATION OPTION IN ORDER TO BE APPROVED FOR A LOAN FROM US.  YOU MAY CHOOSE TO PAY BY CHECK BY FOLLOWING THE INSTRUCTIONS IN THE "PAY BY CHECK" SECTION OF THIS AGREEMENT AND ON THE APPLICATION SCREEN.**

**ERROR RESOLUTION NOTICE:** In the event (i) you have a question about an electronic transfer or if (ii) you find an error, you must telephone us at (877) 632-4223 , email us at CustomerService@ClarityFinance.com, or contact us by mail at 8 Kennebasis, Rd, Indian Township, ME, 04668. We must hear from you no later than sixty (60) days after the FIRST debit or credit that is the basis of the problem or error.  (1) Tell us your name and account number (if any); (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information; and (3) Tell us the dollar amount of the suspected error.  If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.  We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to do this, we will credit your account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not credit your account. For errors involving new accounts, we may take up to ninety (90) days to investigate your complaint or question. For new accounts, we may take up to twenty (20) business days to credit your account for the amount you think is in error.  We will tell you the results within three (3) business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.  You may ask for copies of the documents that we used in our investigation.

**CONFIDENTIALITY:** We will disclose information to third parties about your account or the transfers you make: (1) where it is necessary for completing transfers; or (2) in order to verify the existence and condition of your account to a third party, such as a credit bureau or merchant; or (3) in order to comply with a government agency or court orders; or (4) as described in our privacy notice, provided separately.

**SPECIAL NOTICES:**

- **YOUR LOAN IS AN EXPENSIVE FORM OF BORROWING.**
- **YOU CAN SAVE FINANCE CHARGES BY PAYING OFF YOUR LOAN EARLY EITHER IN PART OR IN FULL.**
- **YOUR LOAN IS DESIGNED TO ASSIST YOU IN MEETING YOUR SHORT-TERM CASH NEEDS. IT IS NOT A SOLUTION FOR LONGER TERM FINANCIAL PROBLEMS.**
- **NON-PROFIT CREDIT COUNSELING SERVICES ARE AVAILABLE IN YOUR COMMUNITY FOR CONSUMERS EXPERIENCING FINANCIAL PROBLEMS.**

**YOUR PROMISE TO PAY:** You promise to pay us, or any subsequent holder of this Agreement, the Amount Financed and finance charges according to the payment schedule in the Truth in Lending Disclosures plus all other amounts owed to us under this Agreement. You agree that your finance charges will be calculated at the Annual Percentage Rate in the Truth in Lending Disclosures.  All payments will be applied first to finance charges and fees and then to principal. If you prepay all or part of the principal amount due on your loan, your finance charges on the amount prepaid will be calculated as of the date your next payment is due.

**WHEN YOU BEGIN PAYING FINANCE CHARGE(S):** This is a 'simple finance charge' loan. Your loan bears finance charges on the outstanding principal from the date your loan proceeds are disbursed to you until paid in full, at a fixed rate of 407.67 per year. Your actual finance charges may be more than the disclosed Finance Charge if you make your payments late or less if you make your payments early. Finance charges are earned by us on a daily basis by applying the finance charge rate to your unpaid principal balance (without including any accrued Late Payment Fees, Returned Payment Fees, finance charges or other fees and charges) for the time that your principal balance is owed based on a 365-day year. We will apply payments first to any Late Payment Fees, Returned Payment Fees and other fees and charges under this Agreement, then to finance charges and lastly to the unpaid principal balance of your loan.

**ASSIGNMENT:** This Agreement may not be assigned by you. We may assign or transfer this Agreement and our related rights and obligations without notice to you and your consent is not required if we make such an assignment or transfer.

**VERIFICATION:** You authorize us to verify the information you provided to us in connection with your loan application. You give us consent to obtain information about you from consumer reporting agencies or other sources at any time. We reserve the right to withhold funding of this Loan, at any time prior to disbursement, to allow us to verify the information you have provided to us.

**CREDIT REPORTING:** We may report information about your loan to consumer reporting agencies. Late payments, missed payments, or other reportable events may be reflected on your credit report.

**CANCELLATION:** You may cancel your payment obligations under this Agreement, without cost or finance charges, no later than 3PM MST  of the second business day immediately following the Disbursement Date ("Cancellation Deadline"). Your right to cancel your loan only applies if your loan either hasn't funded or, if it has, the funds are returned to us as explained below. To cancel your payment obligations on this loan, you must inform us **in writing**, by or before the Cancellation Deadline, by email to CustomerService@ClarityFinance.com, that you want to cancel the future payment obligations on this loan. If we timely receive your written notice of cancellation on or before the Cancellation Deadline but **before** the loan proceeds have been deposited into your Bank Account, then we will not debit your Bank Account and both your and our obligations under this Agreement will be rescinded. However, if we timely receive your written notice of cancellation on or before the Cancellation Deadline but **after** the loan proceeds have been deposited into your Bank Account, then you authorize us to effect a debit to your Bank Account or your debit card as you chose in your Payment Choice Authorization for the principal amount of this Agreement. If we receive payment of the principal amount via the debit, then both your and our obligations under this Agreement will be rescinded. If we do not receive payment of the principal amount by debit to your Bank Account or your debit card, then this Agreement will remain in full force and effect.

**DEFAULT:** You will be in default under this Agreement if you do not pay us a scheduled payment or any other amounts you owe us when due or your chosen payment method is stopped, denied or otherwise dishonored. If you default on your loan, we can choose to declare all principal, finance charges and other amounts that you owe us to be immediately due and payable in full. If you are in default and you authorized debits from your Bank Account, you agree that we can debit your Bank Account or debit card, as applicable, for the full amount that you owe us. Additionally, if you do not cooperate with us on repaying your debt to us we may submit your name to a collection agency and we may also report the incident to a consumer reporting agency database.

This may negatively impact your ability to write checks or to receive loans or advances from other companies.

**CONSEQUENCES OF DEFAULT:** Upon a default by you under this Agreement, we may, at our sole option, take any one or more of the following actions:

Agree to permit you to cure a payment default before the loan goes into collection by modifying your Payment Schedule and/or payment amounts (a "Cure Arrangement"). This option is not available for all customers and/or all loan products. If we agree to a Cure Arrangement and you fail to honor its terms, then we will have the right, at our sole discretion, to terminate the Cure Arrangement and immediately and without notice declare the entire unpaid principal balance and all accrued unpaid finance charge(s) and fees immediately due under your Loan ("Accelerate Your Loan");

Automatically and without further action or notice Accelerate Your Loan and require you to immediately pay us all amounts due and owing pursuant to such Acceleration;

If you have elected to repay your Loan electronically, we may automatically and without further action or notice withdraw from your designated account(s) an amount equal to the amount owed and unpaid as of your last scheduled payment date up to an amount equal to the amount owed if we have Accelerated Your Loan; and

Pursue all legally available means to collect what you owe us.

By electing any one of these options, we do not waive or release our right to subsequently elect and apply any other options to collect the amounts due and owing to us.

**GOVERNING LAW:** The laws of the Tribe and applicable federal law will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

**SOVEREIGN IMMUNITY:** This Agreement and all related documents are being submitted by you to us as an economic arm, instrumentality, and limited liability company of the Tribe. The Tribe is a federally recognized Indian Tribe and enjoys governmental sovereign immunity. Because we and the Tribe are entitled to sovereign immunity, you will be limited as to what claims, if any, you may be able to assert against the Tribe and us. To encourage resolution of consumer complaints, any complaint may be submitted by you or on your behalf to the Tribe for review as described below.

**PRESERVATION OF SOVEREIGN IMMUNITY:** It is the express intention of the Tribe and us operating as an economic arm of the Tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign governmental immunity, and any other rights, titles, privileges, and immunities, to which we and the Tribe are entitled. To protect and preserve the rights of the parties, no person may assume a waiver of sovereign immunity. No waiver is or can be made except by express written declaration of the Tribe's Tribal Council specifically authorizing a waiver for the matter in question. No such waiver has been made with respect to either your Agreement or your Disbursement and Payment Choice Authorization.

**TRIBAL HOTLINE:** If you have already contacted Customer Service in an attempt to resolve an issue or concern and still need additional assistance, please contact the Passamaquoddy Tribal Hotline at 1-800-316-4260 between the hours of 9am and 5pm EST.

## TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION

As an accommodation to consumers, the Tribe has established the following Tribal Dispute Resolution Procedure to receive, review, and consider any and all types of complaints made by or on behalf of our consumers. A consumer who, in the course of his or her otherwise lawful and proper use of our business, has concerns about the operation of any part of us or who otherwise believes himself or herself to be aggrieved by some aspect of any part of our operation shall direct his or her concerns

in the first instance to our management, in writing at Contact@ClarityFinance.com. A consumer's complaint to us shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights. We will investigate the consumer's complaint and provide our initial determination as soon as is reasonably practicable. In the event that the consumer is dissatisfied with our initial determination, then he or she may request review of our initial determination by submitting such request in writing t o the Tribal Financial Services Regulatory Authority ("Authority") at 8 Kennebasis Rd., Indian Township, ME, 04668 no later than ninety (90) days after receiving our initial determination.

The Authority may offer the consumer an opportunity to be heard and the consumer may be represented by legal counsel at his or her own expense. If a hearing is granted, it will take place no less than ten (10) days and no more than sixty (60) days after the Authority receives the consumer's written request. The Authority will notify the consumer in writing with its opinion regarding our initial determination.

A consumer may appeal an Authority opinion by filing a written appeal to the Tribal Court within twenty (20) days of receiving the Authority's final written opinion in accordance with the rules of court and procedures of the Tribal Court.

**THIS DISPUTE RESOLUTION OPPORTUNITY IS INTENDED AS THE SOLE DISPUTE RESOLUTION MECHANISM FOR DISPUTES AND CLAIMS ARISING UNDER THIS LOAN AGREEMENT. THIS MEANS THAT YOU ARE EFFECTIVELY WAIVING YOUR RIGHT TO A JURY TRIAL.**

The words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Tribal Dispute Resolution Provision, ("this Provision"), the validity and scope of this Provision and any claim or attempt to set aside this Provision? (b) all U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Loan Agreement, the information you gave u s before entering into this Loan Agreement, including the customer information application, and/or any past Loan Agreement or Agreements between you and us? (c) all counterclaims, cross claims and third-party claims? (d) all common law claims, based upon contract, tort, fraud, or other intentional torts? (e) all claims based upon a violation of any state or federal constitution, statute or regulation? (f) all claims asserted by us against you, including claims for money damages to collect any sum we claim you owe us? (g) all claims asserted by you individually against the Tribe, us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, "related third parties"), including claims for money damages and/or equitable or injunctive relief? (h) all claims asserted on your behalf by another person? (i) all claims asserted by you as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against us and/or related third parties ("Representative Claims")? and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us or related third parties of any nonpublic personal information about you.

All disputes including any Representative Claims against us and/or related third parties shall be resolved by the Tribal Dispute Resolution Procedure in this Provision only on an individual basis with you. Any party to a dispute, including related third parties, may send the other party written notice by certified mail return receipt requested of their dispute and setting forth the subject of the dispute along with the relief requested

This Provision is binding upon and benefits you, your respective heirs, successors and assigns. This Provision is binding upon and benefits the Tribe, us, our successors and assigns, and related third parties. This Provision continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. This Provision survives any cancellation, termination, amendment, expiration or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing.

**THIS TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION MEANS THAT:**

- **YOUR RIGHT TO FILE SUIT AGAINST US FOR ANY CLAIM OR DISPUTE REGARDING THIS AGREEMENT IS LIMITED BY THIS PROVISION AND SOVEREIGN IMMUNITY.**

- **YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES.**

- **YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES? AND**

- **YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT OR ARBITRATION FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

## CONSENT TO ELECTRONIC COMMUNICATIONS

- The following terms and conditions govern electronic communications in connection with this Agreement and the transaction evidenced hereby (this Consent). By electronically signing this Agreement by clicking the "I AGREE" button and entering your name below, you are confirming that you have agreed to the terms and conditions of this Consent and that you have the ability to download or print a copy of this Consent for your records. you agree that:

- Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, this Agreement, this Consent, disclosures, change-in-term notices, fee and transaction information, statements, delayed disbursement letters, notices of adverse action, and transaction information (collectively, Communications), may be sent to you electronically by sending it to you by e-mail or by posting the information at Our web site, ClarityFinance.com.

- We will not be obligated to provide any Communication to you in paper form unless you specifically request us to do so.

- You may obtain a copy of any Communication by contacting us at ClarityFinance.com, writing to Us at CustomerService@ClarityFinance.com, or by calling us at (877) 632-4223 . You also can withdraw your consent to ongoing electronic communications in the same manner, and ask that they be sent to you in paper or non-electronic form. If you choose to receive Communications in paper or non-electronic form, we may elect to terminate this Agreement and demand payment of the amount then due by the date of your withdrawal of consent; or by the expiration of any minimum term mandated by law, whichever is later.

- You agree to provide us with your current e-mail address for notices at the address or phone number indicated above. If your e-mail address changes, you must send us a notice of the new address by writing to us or sending us an e-mail, using secure messaging, at least 5 days before the change.

- In order to receive electronic communications in connection with this transaction, you will need a working connection to the Internet. Your browser must support the Secure Sockets Layer (SSL) protocol. SSL provides a secure channel to send and receive data over the Internet. Microsoft Internet Explorer 6 or equivalent browser and above supports this feature. You will also need either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information (e.g., 1 megabyte or more). You must have your own Internet service provider. We may amend (add to, delete or change) the terms of this Consent to electronic communication by providing you with advance notice.

## CONSENT TO RECEIVE TEXT MESSAGES

- As used in this text messaging consent, 'Text Message' means any text messaging communication from us to you pertaining to your loan, including but not limited to: (1) your payment information; (2) your account information; (3) your payment due dates; (4) information regarding any delinquent accounts; and (5) program updates relating to your loan. We will not send you any advertising or telemarketing Text Messages unless you authorize us to do so by signing the Consent to Receive Advertising or Telemarketing Text Messages and Telephone Calls below.  All Text Messages from us in electronic format to you will be considered "in writing."

- How To Unsubscribe: You may withdraw your consent to receive Text Messages by texting "STOP" to the message you receive, calling us at (877) 632-4223  or emailing us at CustomerService@ClarityFinance.com. At our option, we may treat your provision of an invalid mobile phone number, or the subsequent malfunction of a previously valid mobile phone number, as a withdrawal of your consent to receive Text Messages. We will not impose any fee upon you to process the withdrawal of your consent to receive Text Messages. Any withdrawal of your consent to use Text Messages will be effective only after we have a reasonable period of time to process your withdrawal.

- In order to access, view, and retain Text Messages that we make available to you, you must have: (1) a Text Message-capable mobile phone, (2) an active mobile phone account with a communication service provider? and (3) sufficient

storage capacity on your mobile phone.

- To request additional information, text "HELP" to the message you receive or contact us by telephone at (877) 632-4223

- The services are available from most of the carriers that offer Text Messaging. Consult your mobile service carrier to confirm that they offer Text Messaging.

- There is no service fee for Text Messages but you are responsible for all charges imposed by your communications service provider, such as fees associated with Text Messaging. Consult your mobile service carrier's pricing plan to determine the charges for sending and receiving Text Messages. These charges will appear on your phone bill. Message frequency depends on account settings.

- You agree that we may send any Text Messages related to your loan through your communication service provider in order to deliver them to you and that your communication service provider is acting as your agent in this capacity. You agree to indemnify, defend, and hold us harmless from and against all claims, losses, liability, costs, and expenses (including reasonable attorneys' fees) arising from your provision of a mobile phone number that is not your own or your violation of applicable federal, state, or local law, or regulation or ordinance relating to Text Messages. Your obligation under this paragraph shall survive termination of this Loan Agreement. You agree that Text Messages are provided for your convenience only.

- Receipt of each Text Message may be delayed or impacted by factors pertaining to your communications service provider. We will not be liable for losses or damages arising from any disclosure of account information to third parties, nondelivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in, the Text Messages sent by us.

- We may modify or terminate our Text Messaging services from time to time, for any reason, with or without notice, and without liability to you, any other user or third party.

**CONSENT TO RECEIVE ADVERTISING OR TELEMARKETING TEXT MESSAGES AND TELEPHONE CALLS**

- By signing this section, you consent to our sending you Advertising and Telemarketing Text Messages to the mobile phone number you have provided below. You also consent to our making advertising or telemarketing calls to you at your mobile phone number using automatic telephone dialing system or an artificial or prerecorded voice.

- _Penny Green_   Signing this section will be deemed to be your signature acknowledging your consent to receive Advertising and Telemarketing Text Messages and telephone calls as described above to your mobile phone at 5705068364.

- You are not required to consent to Advertising or Telemarketing Text Messages or calls to obtain credit or other services from us. At any time, you may withdraw your consent to receive Advertising or Telemarketing Text Messages or marketing calls to the mobile number provided by calling us at (877) 632-4223  or emailing us at CustomerService@ClarityFinance.com.

- You understand that: any Advertising and Telemarketing Text Messages we send you may be accessed by anyone with access to your Text Messages? and your mobile phone service provider may charge you fees for Advertising and Telemarketing Text Messages that we send you, and you agree that we shall have no liability for the cost of any Advertising and Telemarketing Text Messages.

**COVERED BORROWER IDENTIFICATION STATEMENT**

We provide important protections to active duty members of the Armed Forces and their dependents. To ensure that these protections are provided to eligible applicants, we require you to select and electronically sign ONE of the following statements as

applicable:

☐

- I AM a regular or reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard, serving on active duty under a call or order that does not specify a period of thirty (30) days or fewer, or such member serving on Active National Guard duty.

☐

- I AM a dependent of a member of the Armed Forces on active duty as described above, because I am the member's spouse, the member's child under the age of eighteen years old or I am an individual for whom the member provided more than onehalf of my financial support for one hundred eighty (180) days immediately preceding today's date.

OR

X

- I AM NOT a regular or reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard, serving on active duty under a call or order that does not specify a period of thirty (30) days or fewer (or a dependent of such a member).

**--OR—**

You represent and warrant that you are not a regular or reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard serving on active duty under a call or order that does not specify a period of thirty (30) days or fewer, or a dependent of such member.  You understand that we will verify this statement and be making this loan in reliance on the truth of this statement.

### SIGNATURE AND ACCEPTANCE OF ALL TERMS AND CONDITIONS

**BY ENTERING YOUR NAME AND CLICKING THE "I AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS LOAN AGREEMENT AND AGREEING TO ALL THE TERMS OF THIS LOAN AGREEMENT INCLUDING:**

- **THE TRIBAL DISPUTE RESOLUTION PROCEDURES PROVISION**
- **THE CONSENT TO ELECTRONIC COMMUNICATIONS**
- **THE CONSENT TO RECEIVE TEXT MESSAGES**
- **THE COVERED BORROWER IDENTIFICATION STATEMENT**

**YOU ALSO ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS LOAN AGREEMENT FOR YOUR RECORDS.**

**[I AGREE]  *Penny Green***
**DATE: 05/03/2019**

## PRIVACY POLICY

Rev. November 2012

| | WHAT DOES PINE TREE LENDING, LLC DBA CLARITY FINANCE DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| | |
|---|---|
| | Financial companies choose how they share your personal information. Consumers have the right to limit some but not all sharing.  This notice tells you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| | The types of personal information we collect and share depend on the product or service you have with us.  This information can include:<br>" **Social Security number and checking account information**<br>" **Payment history and income**<br>" **Employment information and wire transfer instructions** |
| | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers personal information; the reason Pine Tree Lending, LLC chooses to share; and whether you can limit this sharing. |

| | | |
|---|---|---|
| For our everyday business purposes - such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus. | YES | NO |
| For our marketing purposes to offer our products and services to you | YES | NO |
| For joint marketing with other financial companies | NO | WE DO NOT SHARE |
| For our affiliates everyday business purposes information about your transactions and experiences | YES | NO |
| For our affiliates everyday business purposes information about your creditworthiness | YES | YES |
| For our affiliates to market to you | YES | YES |
| For nonaffiliates to market to you | YES | YES |

|  | " **Call (877) 632-4223 - our menu will prompt you through your choices or**<br>" **Visit us on the web at ClarityFinance.com** |
|  | " **Contact us via email at CustomerService@ClarityFinance.com** |
|  | **Please note:**<br>**If you are a new customer, we can begin sharing your information 30 days from the date we sent this notice.  When you are no longer our customer, we can share your information as described in this notice.**<br>**However, you can contact us at any time to limit our sharing.** |
|  | **Call (877) 632-4223 or go to ClarityFinance.com** |

| Who is providing this notice? | **Pine Tree Lending LLC d/b/a/ Clarity Finance business entity of the Passamaquoddy Tribe of Indian Township, is providing this privacy policy.** |

| **How does Pine Tree Lending, LLC protect my personal information?** | **To protect your personal information from unauthorized access and use, we use security measures. These measures include computer safeguards and secured files and buildings.** |
| **How does Pine Tree Lending, LLC collect my personal information?** | **We collect your personal information, for example, when you**<br>" **Apply for a loan**<br>" **Give us your income information**<br>" **Tell us where to send the money**<br>" **Provide account information**<br>" **Provide employment information**<br>**we also collect your personal information from others, such as credit bureaus, affiliates or other companies.** |
| **Why can't I limit all sharing?** | **You have the right to limit only**<br>" **sharing for affiliates' everyday business purposes - information about your creditworthiness**<br>" **affiliates from using your information to market to you**<br>" **sharing for nonaffiliates to market to you** |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | **Your choices will apply to everyone on your account.** |

| | |
|---|---|
| **Affiliates** | **Companies related by common ownership or control. They can be financial and nonfinancial companies.**<br><br>***Our affiliates include other business entities of the Passamaquoddy Tribe of Indian Township.*** |
| **Nonaffiliates** | **Companies not related by common ownership or control. They can be financial and nonfinancial companies.  Nonaffiliates we share with can include service providers, data processors, and advertisers.** |
| **Joint marketing** | **A formal agreement between nonaffiliated financial companies that together market financial products or services to you.**<br>**Pine Tree Lending, *LLC* does not jointly market.** |