# Exhibit 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH FISHER, on behalf of himself and all others similarly situated,<br><br>                                    Plaintiff,<br><br>v.<br><br>ERIC WELCH; JAY MCGRAW; CREDITSERVE, INC.; SHANE THIN ELK; PETER LENGKEEK; RORY-ANNE ZIEGLER; SUMMER DRAPEAU; CHRISTINE OBAGO; MARK WELLS; FABIAN HOWE, SR.; KYLE LOUDNER; and DOES 1–40,<br><br>                                    Defendants. | Case No.:  25-cv-1698-WQH-BJW<br><br>**ORDER** |

HAYES, Judge:

The matters before the Court are: (1) the Motion to Compel Arbitration and Stay Action (ECF No. 17) filed by Defendants Eric Welch ("Welch"), Jay McGraw ("McGraw"), and CreditServe, Inc. ("CreditServe") (collectively, the "CreditServe Defendants"); (2) the Motion to Dismiss or Strike Class Allegations (ECF No. 18) filed by the CreditServe Defendants; (3) the Motion to Dismiss (ECF No. 35) filed by Defendants

Peter Lengkeek ("Lengkeek"), Rory-Anne Ziegler ("Ziegler"), Summer Drapeau ("Drapeau"), Christine Obago ("Obago"), Mark Wells ("Wells"), Fabian Howe, Sr. ("Howe"), and Kyle Loudner ("Loudner") (collectively, the "Tribal Defendants"); (4) the Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 36) filed by the Tribal Defendants; (5) the Motion to Compel Arbitration and Stay Action (ECF No. 37) filed by the Tribal Defendants and Defendant Shane Thin Elk ("Thin Elk"); and (6) the Motion to Strike Class Allegations (ECF No. 38) filed by the Tribal Defendants and Defendant Thin Elk.

## I.    BACKGROUND

On July 3, 2025, Plaintiff Kenneth Fisher ("Plaintiff"), proceeding on behalf of himself and all others similarly situated, filed a Complaint against the CreditServe Defendants, the Tribal Defendants, and Defendant Thin Elk. (Compl., ECF No. 1.)

On September 8, 2025, the CreditServe Defendants filed a Motion to Compel Arbitration and Stay Action ("Motion to Compel Arbitration") (ECF No. 17.) On October 20, 2025, Plaintiff filed an Opposition. (ECF No. 33.) On December 12, 2025, the CreditServe Defendants filed a Reply (ECF No. 51.)

On September 8, 2025, the CreditServe Defendants filed a Motion to Dismiss or Strike Class Allegations ("Motion to Dismiss") (ECF No. 18). On October 20, 2025, Plaintiff filed an Opposition. (ECF No. 34.) On December 12, 2025, the CreditServe Defendants filed a Reply (ECF No. 52) and a Request for Judicial Notice in Support of Reply Briefs (ECF No. 53).

On October 24, 2025, the Tribal Defendants filed a Motion to Dismiss. (ECF No. 35.) On November 21, 2025, Plaintiff filed an Opposition. (ECF No. 44.) On December 12, 2025, the Tribal Defendants filed a Reply. (ECF No. 56.)

On October 24, 2025, the Tribal Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction. (ECF No. 36.) On November 21, 2025, Plaintiff filed an Opposition. (ECF No. 43.) On December 12, 2025, the Tribal Defendants filed a Reply. (ECF No. 57.)

2

25-cv-1698-WQH-BJW

On October 24, 2025, the Tribal Defendants and Defendant Thin Elk filed a Motion to Compel Arbitration and Stay Action ("Motion to Compel Arbitration"). (ECF No. 37.) On November 21, 2025, Plaintiff filed an Opposition. (ECF No. 42.) On December 12, 2025, the Tribal Defendants and Defendant Thin Elk filed a Reply. (ECF No. 54.)

On October 24, 2025, the Tribal Defendants and Defendant Thin Elk filed a Motion to Strike Class Allegations. (ECF No. 38.) On November 21, 2025, Plaintiff filed an Opposition. (ECF No. 41.) On December 12, 2025, the Tribal Defendants and Defendant Thin Elk filed a Reply. (ECF No. 55.)

On January 13, 2026, the Court heard Oral Argument on the pending motions (ECF Nos. 17, 18, 35, 36, 37, 38). (*See* ECF No. 60.)

On January 30, 2026, the Tribal Defendants filed a Notice of Supplemental Authority (ECF No. 61), which the CreditServe Defendants adopted through a Notice of Joinder (ECF No. 62) on the same day. On February 5, 2026, Plaintiff filed a Response to the Notice of Supplemental Authority. (ECF No. 63.)

## II.    ALLEGATIONS IN THE COMPLAINT

This action arises from high-interest, short-term loans made by a lending entity associated with an American Indian tribe. Plaintiff alleges that although the tribe purports to operate the lending entity, non-tribal actors—namely, the CreditServe Defendants and Defendant Thin Elk—exercise actual control over the operation. (Compl. ¶ 70.) The CreditServe Defendants and Defendant Thin Elk hope to "cloak themselves in the Tribe's sovereign immunity" to circumvent usury laws. *Id.* ¶ 6.

### A. Background on Tribal Lending Schemes

Tribal lending schemes involve "predatory lenders" using tribal sovereign immunity to evade usury laws. *Id.* ¶¶ 26, 28. In these schemes, a "non-tribal lender affiliates with a Native American tribe." *Id.* ¶ 26. The tribe "serves as the face of the online lending enterprise—in exchange for a small portion of the revenues generated—while the [non-tribal lender] actually calls all of the shots, controlling all substantive aspects of the business." *Id.* "[B]ecause the tribe authorizes the lending operation," the tribe's sovereign

3

immunity "insulate[s] [] loans from state and federal usury laws," allowing "non-tribal schemers" to "issue loans to consumers with triple-digit interest rates." *Id.* ¶ 28.

### B. Background on Defendants

Defendant CreditServe is a California corporation that manages consumer loans. *Id.* ¶¶ 18, 43. Defendant Welch serves as the CEO, Secretary, and CFO of CreditServe. *Id.* ¶ 16. Defendant McGraw previously served as CreditServe's President and now "provides the capital used to fund loans nominally made by River Valley Loans," the lending entity at issue in this case. *Id.* ¶ 17.

As of 2018, CreditServe's website described the corporation as a "consumer loan servicing company" with "over 15 years in consumer short-term lending." *Id.* ¶ 41. "[T]his language has been scrubbed from the CreditServe website," which now describes CreditServe as a "management consulting company." *Id.* ¶ 42. However, the LinkedIn profiles of CreditServe employees suggest that CreditServe "manages [its] customers' loans, from acquisition to collections." *Id.* ¶¶ 43–48.

The Crow Creek Sioux Tribe (the "Tribe") is a federally recognized Indian tribe located in South Dakota. *See id.* ¶ 53. The Dakota Economic Development Corporation ("DEDC") is a "sovereign economic arm, enterprise, and instrumentality of, and [was] created under the laws of and for the benefit of" the Tribe. *Id.* ¶ 7 (quotations omitted).

The Tribal Defendants are members and either officers or councilmembers of the Tribe. *Id.* ¶¶ 20–24. Defendant Lengkeek is Chairman of the DEDC and the Tribe, Defendant Ziegler is Vice-Chair of the DEDC and the Tribe, Defendant Drapeau is Secretary of the DEDC and the Tribe, and Defendant Obago is Treasurer of the DEDC and the Tribe. *Id.* ¶¶ 20–23. Defendants Wells, Howe, and Loudner are councilmembers of the DEDC and the Tribe. *Id.* ¶ 24.

Defendant Thin Elk is not a member of the Tribe. *Id.* ¶ 20. "[H]e is an enrolled member of a different Native American tribe located hundreds of miles from South Dakota." *Id.* ¶ 59. He is the sole "Commissioner" of the Crow Creek Financial Services Licensing & Regulatory Commission. *Id.* ¶ 58.

25-cv-1698-WQH-BJW

## C. River Valley Loans

In October and November of 2020, the Tribe established the DEDC. *Id.* ¶ 55. On February 16, 2021, the DEDC Board "authorized and approved the charter of Wahido Lending, for the purpose of creating an arm and entity of the Tribe to foster economic development for the Tribe and its members." *Id.* ¶ 56 (quotations omitted). Wahido Lending is also known as River Valley Loans ("RVL"). *See id.* ¶ 6. RVL is a "wholly owned subsidiary" of the DEDC. *Id.* ¶ 57.

Plaintiff's Complaint incorporates by reference the Wahido Charter, which established RVL and empowers the DEDC

> 4.1 To review existing contracts and enter into contracts with any person, partnership, or Corporation or delegate this authority as the Board of Directors deems appropriate;
>
> 4.2 To consent to a waiver of sovereign immunity limited only to WAHIDO Lending via Board resolution . . .
>
> 4.3 To prudently invest funds as are not required for immediate disbursement;
>
> 4.4 To establish and maintain such bank accounts as may be necessary or convenient;
>
> 4.5 To buy, sell, lease and otherwise acquire real estate and maintain buildings, offices, shops and other appurtenances proper and necessary for the conduct of business in accordance with applicable law.
>
> 4.6 To guarantee, purchase, hold, assign, mortgage, pledge or otherwise dispose of capital stock or any bonds, securities or other evidences of indebtedness created by any other corporation or organization that is in existence under the laws of the United States, any state, Indian tribe or nation, Tribal corporation, government or country, and to exercise all the rights, privileges and powers of such ownership.
>
> 4.7 To adopt bylaws and policies for the regulation of the internal affairs of WAHIDO Lending consistent with this Charter. The said bylaws shall be followed in all pertinent aspects by the Board of Directors, officers, employees, agents and assigns;

25-cv-1698-WQH-BJW

4.8 To take such further actions as are necessary to carry out the purposes as described by this document, and applicable tribal or federal law.

(ECF No. 1-2 at 9–17 ("Wahido Charter").)

The Wahido Charter states that "Wahido Lending, as a DEDC subsidiary entity, shall be governed by the DEDC Board of Directors in accordance with the DEDC Charter." *Id.* at 5. The Wahido Charter further states that the DEDC Board "may authorize any officer or agent to enter into any contract or execute and deliver any instrument in the name of and on behalf of Wahido Lending." *Id.* at 6.

Defendant Thin Elk signed RVL's "certificate of licensure" and issued RVL's license pursuant to and in accordance with the Tribe's Tribal Credit Code. *Id.* ¶ 58.

RVL issues loans for "small sums of money," with "annual percentage rates that often exceed 700%." *Id.* ¶¶ 63, 90. The interest rates RVL charges "are many times the caps imposed by state law in a number of jurisdictions." *Id.* ¶ 91. RVL "is not licensed to lend in the states in which it is lending, and it is lending at interest rates that are illegal in many states. The only license that [RVL] purports to have is the one, signed by Thin Elk, that was issued by the Tribe's purported Commission." *Id.* ¶ 89.

The CreditServe Defendants and Defendant Thin Elk use the Tribe as a "front" for "numerous predatory lending enterprises," including RVL. *Id.* ¶ 6. RVL "purports to be a tribal lending business" owned by the DEDC. *Id.* ¶ 7. "But, in reality, the Tribe has virtually nothing to do with the operation of the lending business." *Id.* ¶ 8. The CreditServe Defendants and Defendant Thin Elk "provide the infrastructure to market, underwrite, service, fund, and collect the loans." *Id.* They also retain the bulk of the profit, with "only a small portion of the illegal revenues generated flowing to the tribe." *Id.*

**D. The Tribe's Other Lending Entities and Defendant Thin Elk's Involvement**

On March 11, 2021, Buffalo Lake Lending was established as an "economic arm and instrumentality' of the Tribe. *Id.* ¶ 60. Buffalo Lake Lending's certificate of licensure "is also signed by [Defendant] Thin Elk[] and is substantively identical to the RVL license." *Id.* In 2023, Rise Up Lending was established as a "wholly owned subsidiary" of

25-cv-1698-WQH-BJW

DEDC. *Id.* ¶ 61. Like the certificates establishing Buffalo Lake Lending and RVL, Rise Up Lending's certificate of licensure is signed by Defendant Thin Elk and contains "largely identical" provisions. *Id.* "In addition to the foregoing lending businesses, the Tribe has also claimed to be behind two others: Basswood Lending, d/b/a Level Up Funding and Koda Lending, DBA Helpful Lending." *Id.* ¶ 62.

### E. The Relative Involvement of the CreditServe Defendants, Defendant Thin Elk, and the Tribe in RVL

The Tribe "is not as involved in the RVL enterprise as it claims." *Id.* ¶ 66. It "does not meaningfully participate in the day-to-day lending operations" of RVL. *Id.* ¶ 87. Neither the Tribe nor the DEDC mention RVL, the Tribal Credit Code, Defendant Thin Elk, or any of the Tribe's other lending entities on their websites. *Id.* ¶ 67–68.

"[T]he CreditServe Defendants, not the Tribe, are in control of the RVL operation." *Id.* ¶ 70. Defendant Thin Elk "lends credence to the scheme by issuing the sham 'certificate of licensure' that is prominently displayed on the RVL website." *Id.* The CreditServe Defendants "operat[e] all substantive aspects of the business, including the funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections of the illegal loans." *Id.* ¶ 87.

Evidence suggests that the CreditServe Defendants are "controlling" another tribal lending operation. *Id.* ¶ 86. "There are striking similarities between RVL and Minto Money," "another tribal lender 'run' by a different tribe that is (supposedly) based more than 3,000 miles away" from the Tribe. *Id.* ¶ 75. For instance, RVL's and Minto Money's websites have "exactly the same" navigation bars, "identical features," and "strikingly similar" content. *Id.* ¶¶ 76–82. Both RVL and Minto Money use the same company to process payments and Defendant Welch "has provided a client testimonial" to that company "on behalf of CreditServe." *Id.* ¶ 84. Additionally, Defendant Thin Elk serves as the Commissioner of both the RVL Commission and the Minto Financial Services Licensing & Regulatory Commission. *Id.* ¶ 85. The "purported tribal licenses of both entities contain the same verbiage, formatting, and signature." *Id.* (quotations omitted).

25-cv-1698-WQH-BJW

These similarities suggest that the CreditServe Defendants "are behind both enterprises." *Id.* ¶ 75.

### F.  Plaintiff's Loan with RVL

While located in California, Plaintiff took out a loan with RVL online in May 2024. *Id.* ¶ 92.

> Plaintiff's loan from River Valley Loans was for $600 and had an interest rate of 494.76%. According to the loan agreement, the finance charges on the loan were $4,007.95. Absent the final payment, the monthly payment on the loan was $288.05. If Plaintiff had made all of the payments on his loan according to the payment schedule, he would have ended up paying Defendants $4,607.95 for his $600 loan—more than seven times what he borrowed. Plaintiff paid $2,016.35 for this loan—more than three times what he borrowed—before he ceased making payments once he learned that his loan from River Valley Loans was usurious.

*Id.* ¶ 93.

Under California law, interest rates on consumer loans cannot exceed 10%. *Id.* ¶ 94. RVL's loans to Plaintiff and other California residents "all carried interest rates that were many times California's 10% interest rate cap." *Id.* ¶ 95.

### G. Class Allegations

Plaintiff asserts claims on behalf of two putative classes: (1) the National Class and (2) the California Class. The proposed National Class consists of: "All United States residents who entered into loan agreements with River Valley Loans within the applicable statute of limitations. This Class does not include loans that were taken out while a consumer was located in Utah or Nevada." *Id.* ¶ 98. The proposed California Class consists of: "All California residents who entered into loan agreements with River Valley Loans within the applicable statute of limitations." *Id.* ¶ 99.

### H. Summary of the Allegations

Plaintiff brings four claims on behalf of himself and the National Class against the CreditServe Defendants and Defendant Thin Elk: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) violation of RICO, 18 U.S.C. § 1962(d); (3) unjust enrichment; and (4) civil conspiracy.

Plaintiff brings two claims on behalf of himself and the California Class against the CreditServe Defendants and Defendant Thin Elk: (1) violation of California's usury law; and (2) violations of California Business and Professions Code § 17200.

Plaintiff also brings two claims on behalf of himself and the California Class against the Tribal Defendants in their official capacities: (1) a claim for declaratory relief; and (2) a claim for injunctive relief for violations of state law.

## III.  RELEVANT TERMS OF THE LOAN AGREEMENT[1]

On May 22, 2024, Plaintiff electronically signed an agreement with RVL ("Loan Agreement"). (Declaration of Trista Medicine Crow ("Crow Decl."), ECF No. 17-1, ¶ 8.) The RVL website allowed Plaintiff the opportunity to download and print the Loan Agreement during the loan application process. *Id.* ¶ 9.

The Loan Agreement's Governing Law Clause provides in relevant part:

> The laws of the Tribe and applicable federal law will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by applicable Tribal and federal law, and in the event of a bona fide dispute between you and us, (as defined below), any arbitration conducted pursuant to the terms of this agreement shall be governed by tribal law, federal law and the Federal Arbitration Act (9 U.S.C. §§ 1-16).

(Crow Decl., Ex. 1, at 8–9.)

The Loan Agreement's Arbitration Provision states in relevant part:

> **WE, AS A WHOLLY OWNED ECONOMIC DEVELOPMENT ARM AND INSTRUMENTALITY, AND LIMITED LIABILITY COMPANY OF THE TRIBE, AND OUR DIRECTORS, OFFICERS, AND EMPLOYEES ACTING WITHIN THE SCOPE OF THEIR AUTHORITY, ARE NOT SUBJECT TO SUIT IN ANY COURT IN ANY JURISDICTION, OR ANY OTHER FORUM, ABSENT A WAIVER OF SOVEREIGN IMMUNITY.** In order to resolve any past,

---

[1] Plaintiff does not include the terms of the Loan Agreement in his Complaint. (*See* ECF No. 1.) However, when deciding motions to compel arbitration, the Court "must consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 705 (9th Cir. 2024) (quotations and citations omitted).

present, or future dispute that we cannot resolve to your satisfaction informally or as set forth in the above Voluntary Dispute Resolution Provision, we consent to a limited waiver of sovereign immunity as expressly authorized by our Tribal Council in the Tribal Credit Code set forth below, which is expressly limited by the binding Arbitration Provision in this Agreement. Any such dispute shall be resolved by binding arbitration under the Consumer Arbitration Rules ("The Consumer Rules") of the American Arbitration Association ("AAA") (1-800-778-7879; www.adr.org). All parties to such dispute will be governed by the rules and procedures of the American Arbitration Association applicable to consumer disputes, to the extent those rules and procedures do not contradict either the law of the Tribe, applicable federal law, the Federal Arbitration Act (9 U.S.C. §§ 1-16), or the express terms of this Agreement or this Arbitration Provision, including the limitations on the arbitrator below . . . This limited waiver is strictly limited to individual arbitration claims set forth below and judicial actions to enforce such individual arbitration awards as strictly limited herein.

…This Arbitration Provision is binding upon and benefits you, your respective heirs, successors, and assigns. This Arbitration Provision is binding upon and benefits us, our successors, and assigns, and related third parties.

*Id.* at 9–10.

The Arbitration Provision further states:

**Definitions:** The words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Dispute Resolution Procedure and Arbitration Provision, the validity and scope of this Provision and any claim or attempt to set aside this Arbitration Provision? (b) all tribal, U.S. federal or state law claims, disputes, or controversies, arising from or relating directly or indirectly to this Agreement, the information you gave us before entering into this Loan Agreement, including the customer information application, and/or any past Agreement or Agreements between you and us? (c) all counterclaims, cross-claims and third-party claims? (d) all common law claims, based upon contract, tort, fraud, or other intentional acts? (e) all claims based upon a violation of any tribal, federal, or state constitution, statute, or regulation? (f) all claims asserted by us against you, including claims for money damages to collect any sum we claim you owe us? (g) all claims asserted by you individually against the Tribe, us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, "related third parties"), including claims for money damages and/or equitable or injunctive relief? (h) all claims

asserted on your behalf by another person? (i) all claims asserted by you as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against us and/or related third parties ("Representative Claims") ? and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us or related third parties of any non-public personal information about you.

*Id.* at 9–10.

The Delegation Clause, located within the Arbitration Provision, states:

The words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Dispute Resolution Procedure and Arbitration Provision, the validity and scope of this Provision and any claim or attempt to set aside this Arbitration Provision[] . . . .

*Id.* at 9.

## IV.    PERSONAL JURISDICTION

The Tribal Defendants, who live on the Tribe's reservation in South Dakota, move under Federal Rule of Civil Procedure 12(b)(2) to dismiss the claims against them for lack of personal jurisdiction. (ECF No. 36.)

### A. Legal Standard

On a motion to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction. *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 912 (9th Cir. 1990). Where the motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to satisfy this burden. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002). While the plaintiff cannot "simply rest on the bare allegations of its complaint," *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977), uncontroverted allegations in the complaint must be taken as true. *AT&T v. Campagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id.* "[I]f a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to

dismiss." *Data Disc, Inc. v. Sys. Tech. Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

The exercise of personal jurisdiction over a nonresident defendant must be authorized under the state's long-arm statute and must satisfy the due process clause of the United States Constitution. *Pac. Atl. Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985). California's long-arm statute permits the exercise of personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." Cal. Code Civ. Proc. § 410.10. "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Dole Food Co.*, 303 F.3d at 1110. "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Under due process analysis, a defendant may be subject to either general or specific personal jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 (1984).

The Ninth Circuit analyzes specific jurisdiction according to a three-prong test:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Briskin v. Shopify, Inc.*, 135 F.4th 739, 750–51 (9th Cir. 2025) (en banc) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

The plaintiff bears the burden of satisfying the first two prongs of this test. *Briskin*,

135 F.4th at 751 (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). If the plaintiff fails to meet this burden, California courts lack specific personal jurisdiction. *Briskin*, 135 F.4th at 751. If the plaintiff succeeds, the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable" under the third prong. *Id.* (quotations and citation omitted).

### B. Purposeful Direction

Plaintiff contends that the Court has specific personal jurisdiction over the Tribal Defendants because they "regularly and intentionally issue usurious loans to California consumers." (ECF No. 43 at 11.)

For claims sounding in tort, the Ninth Circuit uses the "purposeful direction" analysis to determine if the first element of specific jurisdiction exists. *Briskin*, 135 F.4th at 751. The purposeful direction test, often referred to as the "effects" test, derives from *Calder v. Jones*, 465 U.S. 783 (1984). *Id.* The *Calder* test "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co.*, 303 F.3d at 1111. Because Plaintiff alleges that the Tribal Defendants intentionally violated California usury laws, the Court applies the *Calder* test. *See Smith v. Martorello*, No. 3:18-cv-01651-AC, 2021 WL 1257941, at *7–8 (D. Or. Jan. 5, 2021) (applying *Calder* test to fraud claims in case involving alleged tribal lending scheme); *FTC v. Apex Cap. Grp., Inc.*, No. CV 18-9573-JFW(JPRx), 2019 WL 9077469, at *6–7 (C.D. Cal. Sept. 16, 2019) (applying *Calder* test in action alleging credit card laundering).

### 1. Intentional Act

First, the Court must determine whether Plaintiff sufficiently alleges that the Tribal Defendants committed an intentional act. The Ninth Circuit "construe[s] 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806.

13

25-cv-1698-WQH-BJW

Plaintiff contends that the Tribal Defendants committed the following intentional acts:

> joining and continuing to serve on the DEDC Board; in their capacity on the DEDC Board, governing River Valley Loans; establishing and maintaining the River Valley Loans website, through which they make usurious loans available to consumers; on behalf of RVL, in fact issuing usurious loans to consumers; entering into contracts on behalf of River Valley Loans, including Plaintiff's Loan Agreement; attempting to collect on such loans; and "adopt[ing] bylaws and policies for the regulation of the internal affairs" of River Valley Loans.

(ECF No. 43 at 14 (citing Wahido Charter).)

The Tribal Defendants contend that, of Plaintiff's list of supposed intentional acts, "only two of them have any arguable basis in fact: (1) the Tribal Defendants served [on] both [the] Tribal Council and the DEDC Board; and (2) the Tribal Defendants, in their capacity as DEDC Board members, adopted bylaws for Wahido Lending, DEDC's wholly owned subsidiary." (ECF No. 57 at 15.) The Tribal Defendants contend that these acts are not "intentional acts" under the *Calder* test; instead, these acts merely "descri[be] the routine operation and governance of any parent-subsidiary relationship." *Id.*

The Tribal Defendants dispute Plaintiff's attempt to attribute the remaining "intentional acts"—governing RVL, maintaining RVL's website, issuing usurious loans, and collecting on those loans—to them. *Id.* at 15. The Tribal Defendants contend that Plaintiff's allegations demonstrate that RVL and the CreditServe Defendants committed these acts, not the Tribal Defendants. *Id.* at 15–16.

Plaintiff alleges that "the Tribe has virtually nothing to do with the operation of the lending business," the "Tribe does not meaningfully participate in the day-to-day lending operations" of RVL, and the "Tribe's control over the RVL lending enterprise is nothing more than a façade: it is the Non-Tribal Defendants . . . that provide the infrastructure to market, underwrite, service, fund, and collect the loans." (Compl. ¶¶ 8, 87.) Plaintiff further alleges that the CreditServe Defendants "call[] all of the shots" and "exercise control of the illegal lending enterprise by operating all substantive aspects of the business, including the

funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections of the illegal loans." *Id.* ¶¶ 26, 87.

The Complaint contains only two factual allegations concerning the Tribal Defendants. However, neither of these allegations establish that the Tribal Defendants took affirmative steps related to Plaintiff's loan with RVL. First, Plaintiff describes each Tribal Defendant's position on the Tribal Council and the DEDC Board. *Id.* ¶¶ 20–24. Second, Plaintiff alleges that "the Non-Tribal Defendants have convinced the Tribal Defendants to *let them* use the [Tribe] as a 'front' for numerous predatory lending enterprises, including [RVL]." *Id.* ¶ 6 (emphasis added). These allegations do not establish that the Tribal Defendants committed intentional acts with respect to RVL's allegedly usurious loans. In fact, they suggest the opposite—that the Tribal Defendants were passive and the CreditServe Defendants took the necessary actions to run the lending scheme.

The Complaint also incorporates by reference RVL's founding document, the Wahido Charter. The Wahido Charter states that RVL, "as a DEDC subsidiary entity, shall be governed by the DEDC Board of Directors in accordance with the DEDC Charter." (Wahido Charter at 13.) The Wahido Charter further states that the DEDC Board "may authorize any officer or agent to enter into any contract or execute and deliver any instrument in the name of and on behalf of Wahido Lending" and empowers the DEDC to "review existing contracts and enter into contracts with any person, partnership, or Corporation or delegate this authority as the Board . . . deems appropriate." *Id.* at 9, 14. Relatedly, the Wahido Charter gives the DEDC Board the power to "adopt bylaws and policies for the regulation of the internal affairs of [RVL] consistent with this Charter." *Id.* at 10. Although these provisions demonstrate that the DEDC has the authority to govern the affairs of RVL, Plaintiff fails to allege that the Tribal Defendants actually did anything with respect to RVL's alleged issuance of usurious loans. Plaintiff alleges only that the Tribal Defendants served on the DEDC Board, an entity that has the formal power to govern RVL.

25-cv-1698-WQH-BJW

The evidence submitted by Plaintiff also does not establish that the Tribal Defendants committed intentional acts regarding RVL's allegedly illegal loans. Plaintiff submits as an exhibit a copy of the DEDC's website. (ECF No. 43-2.) The website states: "The management and control of the affairs of the [DEDC] is solely invested in its Board of Directors." *Id.* at 3. The DEDC's website also lists what appears to be the first names and respective Board positions of the Tribal Defendants under the heading "Board of Directors." (ECF No. 43-3 at 29–36.) Just like the allegations in Plaintiff's Complaint, this evidence merely establishes that the Tribal Defendants serve on the DEDC Board and that the DEDC Board has the formal authority to manage and control RVL. The Court does not find that this evidence contradicts the Complaint, which alleges that the CreditServe Defendants, not the DEDC or the Tribal Defendants, "operat[e] all substantive aspects" of RVL's lending business. (Compl. ¶ 87.)

For the purposes of the *Calder* purposeful direction analysis, the Court will consider the Tribal Defendants' intentional acts to be only: (1) serving as DEDC Board members and (2) adopting RVL's bylaws in their role on the DEDC Board.

### 2. Express Aiming

The second prong of the *Calder* purposeful direction analysis requires the Court to assess whether the Tribal Defendants' intentional acts—serving on the DEDC Board and adopting RVL's bylaws—were "expressly aimed" at California. *See Dole Food Co.*, 303 F.3d at 1111.

Plaintiff contends that the Tribal Defendants' actions were expressly aimed at California because, "through the DEDC Board's management of [RVL], the Tribal Defendants have offered loans to consumers in California" via RVL's website, entered into loan agreements with California consumers, and collected on those loans. (ECF No. 43 at 15.) The Tribal Defendants contend that Plaintiff's theory of express aiming is too attenuated because he seeks to impute RVL's alleged contacts with California to the Tribal Defendants. (ECF No. 57 at 16–17.)

As discussed above, Plaintiff fails to allege or prove with evidence that the individual Tribal Defendants committed intentional acts that were sufficiently related to RVL's loan agreements with California consumers. Plaintiff's arguments rely on *RVL's* contacts with California, not on the individual *Tribal Defendants'* contacts with California. However, courts may not "aggregate[e] the contacts" of multiple defendants or entities to establish personal jurisdiction. *Sher*, 911 F.2d at 1365 (quotations and citation omitted). Instead, *International Shoe*'s minimum contacts requirements "must be met as to each defendant." *Sher*, 911 F.2d at 1365–66 (quotations and citation omitted) (holding that although court could exercise personal jurisdiction over partnership, it "has jurisdiction over only those individual partners who personally established the requisite minimum contacts with California").

Here, the Tribal Defendants' alleged actions are two steps removed from RVL's contacts with California. First, the Tribal Defendants serve on the DEDC Board, which established RVL as its "wholly owned subsidiary." (Compl. ¶ 57.) RVL then issued loans to California residents. However, "it is well-established that a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes." *Harris v. Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.2d 1122, 1134 (9th Cir. 2003) (citations omitted). Two exceptions to this rule exist: "a subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent." *Id.* The mere fact that "a parent company is 'closely associated' with a subsidiary that itself has minimum contacts is insufficient to establish personal jurisdiction." *Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822, 835 (9th Cir. 2024) (citing *In re Boon, Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019)). Plaintiff fails to allege or prove with evidence that RVL acted as the DEDC's alter ego or its agent. Although the DEDC has the nominal authority to manage RVL, Plaintiff alleges that the Tribe's control over RVL is "nothing more than a façade" and that "the CreditServe Defendants, not the Tribe, are in control of the RVL operation." (Compl. ¶¶ 8, 70.) Accordingly, the subsidiary (RVL)'s contacts cannot be imputed to the

parent (the DEDC) and cannot establish personal jurisdiction over the parent's board members (the Tribal Defendants).

The only actions by the Tribal Defendants that Plaintiff either alleges or has proved—serving on the DEDC Board and adopting bylaws to establish RVL—were not expressly aimed at California. The DEDC was "created under the laws of" the Tribe, a federally recognized Indian tribe located on a reservation in South Dakota. (ECF No. 36-1 at 3–4.) RVL's founding documents describe RVL as "an arm and entity of the Tribe to foster economic development for the Tribe." (Wahido Charter at 9.) Those documents do not mention the state of California. *See id.* Plaintiff fails to establish that the Tribal Defendants' membership on the DEDC Board or their establishment of RVL were expressly aimed at California.

Plaintiff fails the second prong of the *Calder* test. Accordingly, he does not meet his burden of establishing that the Tribal Defendants purposefully directed their conduct at California. *See Briskin*, 135 F.4th at 751 (citing *Sher*, 911 F.2d at 1361). Because Plaintiff fails to establish purposeful direction, the Court does not reach Plaintiff's arguments regarding RVL's nationwide operation (*see* ECF No. 43 at 15–16), the Tribal Defendants' knowledge that harm would be suffered in California (*see id.* at 16–17), whether Plaintiff's claims arise out of the Tribal Defendants' forum-related activities (*see id.* at 17–18), or the reasonableness of exercising jurisdiction over the Tribal Defendants (*see id.* at 18–21). The Tribal Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 36) is granted.

### C. Jurisdictional Discovery

Plaintiff requests leave to conduct jurisdictional discovery, in the event that the Court finds it lacks personal jurisdiction over the Tribal Defendants. (ECF No. 43 at 24.) Plaintiff contends that jurisdictional discovery would allow him to uncover facts establishing the Tribal Defendants' contacts with California, including evidence that RVL solicited business from California residents, that the Tribal Defendants (in their role as DEDC Board members) partnered with California service providers, that RVL issued other

loans to California residents and collected or attempted to collect on those loans, and that the Tribal Defendants decided to offer loans to California borrowers. *Id.* at 25–26.

The Tribal Defendants contend that any facts uncovered in discovery could not overcome Plaintiff's allegations that the Tribal Defendants had minimal involvement in the alleged lending scheme. (ECF No. 36 at 13–14.)

District courts have "broad discretion" to permit or deny jurisdictional discovery. *Data Disc*, 557 F.2d at 1285 n.1 (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)). "Discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (quoting *Data Disc*, 557 F.2d at 1285 n.1). A district court does not abuse its discretion by denying jurisdictional discovery "when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014) (quoting *Wells Fargo*, 556 F.2d at 430 n.24).

Plaintiff's own allegations contradict his argument that discovery would  help him establish personal jurisdiction over the Tribal Defendants. Plaintiff alleges that the "Tribe has virtually nothing to do with the operation of the lending business" and its "control over the RVL lending enterprise is nothing more than a façade." (Compl. ¶ 8.) Plaintiff further alleges that the Tribe plays a "limited role" in RVL, *id.* at 17, and "does not meaningfully participate in the day-to-day lending operations" of RVL, *id.* ¶ 87. Rather, Plaintiff alleges, "the CreditServe Defendants[] and other non-tribal schemers . . . exercise control of the illegal lending enterprise." *Id.* ¶ 87. "[F]actual assertions in pleadings . . . are considered judicial admissions conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (citations omitted). Because Plaintiff alleges that the Tribal Defendants did not manage RVL's operations,  jurisdictional discovery would not "demonstrate facts sufficient to constitute a basis for jurisdiction"—

25-cv-1698-WQH-BJW

that the Tribal Defendants took affirmative steps to conduct business with California residents. *Martinez*, 764 F.3d at 1070 (quoting *Wells Fargo*, 556 F.2d at 430 n.24).

The Court denies Plaintiff's request for jurisdictional discovery.

## V.    MOTIONS TO COMPEL ARBITRATION

The CreditServe Defendants and Defendant Thin Elk move to compel arbitration of the claims against them.[2] (ECF Nos. 17, 37.)

### A. Legal Standard

The Federal Arbitration Act ("FAA") provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "reflect[s] both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotations and citations omitted).

Two "gateway" arbitrability issues must be determined before arbitration begins: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 84 (2002)). Although the court generally determines these gateway issues, they "can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably*'" do so in a delegation provision of the arbitration agreement. *Brennan*, 796 F.2d at 1130 (quoting *AT & T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 649 (1986)). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract"

---

[2] Because the Court dismisses the Tribal Defendants for lack of personal jurisdiction, the Motion to Compel Arbitration (ECF No. 37) is denied as moot with respect to the Tribal Defendants. If the Court could exercise personal jurisdiction over the Tribal Defendants, the Court would grant the Tribal Defendants' Motion to Compel Arbitration (ECF No. 37) and compel arbitration of the claims against the Tribal Defendants, for the reasons discussed below in Section V.

and "possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

### B. Delegation Clause

Defendants contend that  the Arbitration Provision's Delegation Clause requires the arbitrator—not the Court—to decide "gateway" questions of arbitrability. (ECF No. 17-1 at 13–16; ECF No. 37-1 at 13–16.)

Plaintiff contends that the Delegation Clause, "when coupled with the Governing Law Clause," is unenforceable, which makes the entire Arbitration Provision unenforceable. (ECF No. 42 at 27.)

In response, Defendants contend that Plaintiff impermissibly challenges the Governing Law Clause and the entire Arbitration Provision, instead of mounting a "specific" challenge that is "isolated to the language of the [D]elegation [C]lause itself." (ECF No. 54 at 7; *see also* ECF No. 51 at 21–22.) Defendants further contend that the Delegation Clause is enforceable because it allows the arbitrator to consider the FAA and other federal law when assessing arbitrability. (ECF No. 54 at 11; *see also* ECF No. 51 at 19 –21.)

The Ninth Circuit has set forth three principles concerning who should decide arbitrability:

> First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause. Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance.

*Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). Plaintiff does not argue that an arbitration agreement was never formed. The Court moves to the next step of the analysis and considers whether Plaintiff directed his challenge specifically to the enforceability of the Delegation Clause.

25-cv-1698-WQH-BJW

### *1. Specific Challenge to the Delegation Clause*

"An agreement to arbitrate a gateway issue"—also known as a delegation clause within a larger arbitration agreement—"is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010). If the parties do not "directly challenge[]" the delegation clause itself, "a challenge to the validity of an entire arbitration agreement . . . must be decided by the arbitrator," not the court. *Caremark, LLC*, 43 F.4th at 1029 (citing *Rent-A-Center*, 561 U.S. at 70–72). In other words, "a party must 'challenge the delegation provision specifically' for a court to intervene." *Caremark, LLC*, 43 F.4th at 1029 (quoting *Rent-A-Center*, 561 U.S. at 71–72); *see also Brennan*, 796 F.3d at 1133 (quoting *Rent-A-Center*, 561 U.S. at 74) (affirming decision to compel arbitration where the plaintiff did not raise arguments "specific to the delegation provision").

The Delegation Clause—located within the Arbitration Provision of Plaintiff's Loan Agreement—defines a "dispute" as "all claims, disputes, or controversies arising from or relating directly or indirectly to . . . the validity and scope of this Provision and any claim or attempt to set aside this Arbitration Provision." (Loan Agreement at 9.) The Arbitration Provision provides that:

> [a]ny such dispute shall be resolved by binding arbitration under the Consumer Arbitration Rules . . . of the American Arbitration Association [("AAA")]. . . to the extent those rules and procedures do not contradict either the law of the Tribe, applicable federal law, the [FAA], or the express terms of this Agreement or this Arbitration Provision.

*Id.*

The Governing Law Clause—located in a different part of the Loan Agreement—states: "[t]he laws of the Tribe and applicable federal law will govern this Agreement, without regard to the laws of any state . . . [A]ny arbitration conducted pursuant to the terms of this agreement shall be governed by tribal law, federal law and the [FAA]." *Id.* at 8–9.

As an initial matter, the Court finds that the Delegation Clause clearly and unmistakably evinces intent to delegate gateway issues of arbitrability to the arbitrator. *See Brennan*, 796 F.3d at 1130 ("[I]ncorporation of the AAA rules [in a delegation provision] constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."). The Court thus must treat the Delegation Clause as valid and enforce it, unless Plaintiff raises a specific challenge to the Delegation Clause itself. *Rent-A-Center*, 561 U.S. at 72.

The Court now considers whether Plaintiff specifically targets the validity of the Delegation Clause. Plaintiff contends that the Delegation Clause is invalid "when coupled with the Governing Law Clause" because it forces the arbitrator to decide the gateway question of the Arbitration Provision's validity without resorting to state law. (ECF No. 42 at 27.) Defendants contend that Plaintiff fails to challenge the specific language of the Delegation Clause, instead attacking the Governing Law Clause and larger Arbitration Provision. (ECF No. 54 at 10.) Therefore, Defendants contend, the Court must uphold the Delegation Clause and delegate gateway arbitrability issues to the arbitrator. *Id.*

Plaintiff's challenge necessarily relies on language external to the Delegation Clause: the Governing Law Clause. The Delegation Clause is a "severable" agreement to arbitrate gateway arbitrability questions, nestled inside the larger Arbitration Provision. *Brennan*, 796 F.3d at 1133 (citing *Rent-A-Center*, 561 U.S. at 72). Because the Delegation Clause is a separate agreement, the issue of "whether the [external] choice-of-law provisions . . . render the [entire] arbitration agreement[] unenforceable do[es] not pertain to the enforceability of the delegation provision[]." *Dunn v. Glob. Tr. Mgmt.*, No. 21-10120, 2024 WL 4379966, at *13 (11th Cir. Oct. 3, 2024). Instead, challenges like Plaintiff's "pertain to the [] validity, enforceability, and scope of the choice-of-law provisions and their application to the arbitration agreement[] as a whole, and have been delegated to the arbitrator." *Id.* (quotations omitted). Given that Plaintiff challenges the interaction of several contractual provisions, instead of directing his challenge specifically to the Delegation Clause, the Court "need not consider" Plaintiff's challenge. *Brennan*, 796

F.3d at 1133. "[I]t is for the arbitrator to decide." *Id.*[3]

### *2. Validity of the Delegation Clause*

Even if Plaintiff had raised a specific challenge to the Delegation Clause, the Court would nevertheless find the Delegation Clause enforceable.

Plaintiff contends that the Court should not apply the Delegation Clause to delegate arbitrability questions to the arbitrator. He argues that because the Governing Law Clause prevents the arbitrator from considering state law when assessing arbitrability, it "prospectively waives all state law defenses to arbitrability," rendering the Delegation Clause "ineffective and unenforceable." (ECF No. 42 at 27.)

The Court notes that Plaintiff does not raise any state law defenses to the Arbitration Provision. (*See* ECF Nos. 33, 42.) In any event, Plaintiff's prospective waiver challenge to the Delegation Clause fails because the prospective waiver doctrine does not extend to rights arising under state law. The prospective waiver doctrine[4] "originated in dictum" in a case involving federal antitrust claims, when the United States Supreme Court "expressed a willingness to invalidate, on 'public policy' grounds, arbitration agreements that

---

[3] The Ninth Circuit engaged in a similar analysis in another tribal lending case, *Brice v. Haynes Invs., LLC*, 13 F.4th 823, 830–32 (9th Cir. 2021), *vacated by,* 35 F.4th 1219 (9th Cir. 2022). The opinion was vacated for rehearing en banc but the case settled before the Ninth Circuit could rehear it. *Brice*, 25 F.4th at 1219; *Brice*, No. 19-15707, ECF No. 99 (9th Cir. Sept. 8, 2022). The Court does not rely on the vacated *Brice* opinion as binding authority but takes notice of its reasoning as persuasive. *See Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002) (citations omitted) ("Vacated opinions remain persuasive, although not binding, authority."). The holding in *Avery v. TEKsystems, Inc.*, No. 24-5810, ___ F.4th ___, 2026 U.S. App. LEXIS 2091 (9th Cir. Jan. 28, 2026) does not compel a different result in this case. *Avery* concerned the conditions under which an arbitration agreement arose and the district court's broad authority to regulate class action opt-out procedures under Federal Rule of Civil Procedure 23(d). In that case, the defendant employer emailed a mandatory arbitration agreement to the plaintiff employees after class certification briefing had closed. *Id.* at *5–8. The Ninth Circuit found that the defendant's communications regarding the arbitration agreement were "misleading and threatened the fairness of the class action proceedings," invalidating the agreement as to every provision—including the delegation provision. *Id.* at *26–31. Here, Plaintiff challenges the Arbitration Provision itself, not the conditions under which it arose.

[4] The prospective waiver doctrine is also known as the "effective vindication exception" to the FAA. *Italian Colors*, 570 U.S. at 235.

'operat[e] . . . as a prospective waiver of a party's *right to pursue* statutory remedies.'" *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (quoting *Mitsubishi Motors Corp. v. Soler-Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)). The doctrine, "which permits the invalidation of an arbitration agreement when arbitration would prevent the 'effective vindication' of a federal statute, does not extend to state statutes." *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 936 (9th Cir. 2013) (citing *Italian Colors*, 570 U.S. at 252 (Kagan, J., dissenting)). The prospective waiver doctrine "rest[s] on the principle that other federal statutes stand on equal footing with the FAA"—a rationale that does not apply to state statutes. *Id.*

Plaintiff contends that the Supreme Court extended the doctrine to invalidate prospective waivers of state statutory rights in *Viking River Cruises, Inc. v. Moriana*. In a footnote, the *Viking River* Court stated:

> Viking argued that the principle that the FAA does not mandate enforcement of provisions waiving substantive rights is limited to federal statutes. This argument is erroneous. The basis of this principle is not anything unique about federal statutes. It is that the FAA requires only the enforcement of "provision[s]" to settle a controversy "by arbitration," § 2, and not any provision that happens to appear in a contract that features an arbitration clause. That is why we mentioned this principle in *Preston*, which concerned claims arising under state law.

*Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 n.5 (2022).

*Viking River* did not apply the prospective waiver doctrine. Instead, it upheld arbitration and found that the FAA preempted a rule of California law that discriminated against arbitration. *Id.* at 660–62. This Court is not aware of a case in which the Ninth Circuit or any federal district court within the Ninth Circuit has interpreted *Viking River* to extend the prospective waiver doctrine to state rights. In a non-binding opinion, the Ninth Circuit explicitly stated post-*Viking River* that the prospective waiver doctrine applies only to federal rights. *Rivas v. Coverall N. America, Inc.*, No. 22-56192, 2024 WL 1342738, at *2 (9th Cir. Mar. 29, 2024). Following binding Ninth Circuit precedent, *see Ferguson*, 733

F.3d at 936, the Court declines to extend the prospective waiver doctrine to rights arising under state law.

Plaintiff cites several decisions from out-of-circuit courts of appeals to support his contention that the Governing Law Clause renders the Delegation Clause unenforceable on a prospective waiver theory. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229 (3d Cir. 2020); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020); *Gingras v. Think Fin.*, 922 F.3d 112 (2d Cir. 2019). Unlike this action, those cases involved choice-of-law provisions that exclusively permitted consideration of tribal law—barring the arbitrator from considering both *federal and* state law when evaluating arbitrability. *See Williams*, 965 F.3d at 240; *Gibbs*, 967 F.3d at 342 (finding that the arbitration agreement "provide[d] that tribal law preempts the application of any contrary law"); *Gingras*, 922 F.3d at 127 & n.4. The courts in those cases found that the prospective waiver doctrine invalidated the delegation clauses because the arbitrator could not consider federal law when assessing arbitrability.[5] *See Williams*, 965 F.3d at 243 n.14 (citation omitted). The reasoning of those cases does not apply here because the Governing Law Clause expressly allows the arbitrator to consider the FAA *and federal law*—just not state law. (Loan Agreement at 8–9.) And, as discussed, the prospective waiver doctrine does not extend to state rights. The Court declines to follow out-of-circuit district court decisions that reach a different conclusion. *Contra Harris v. W6LS, Inc.*, No. 23 CV 16429, 2024 WL 2319716, at *9 (N.D. Ill. May 22, 2024); *Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 777 (W.D. Va. 2023); *Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 803–04 (N.D. Ill. 2024).

As discussed above, the parties agreed to a Delegation Clause that clearly and unmistakably delegates gateway issues of arbitrability to the arbitrator. Having considered and rejected Plaintiff's prospective waiver challenge to the Delegation Clause itself, the

---

[5] The Court notes that the Ninth Circuit upheld a delegation clause in the now-vacated *Brice* opinion that directed the arbitrator to "apply Tribal Law and the terms of this Agreement." *Brice v. Haynes Invs., LLC*, 13 F.4th 823, 830–32 (9th Cir. 2021), *vacated by,* 35 F.4th 1219 (9th Cir. 2022).

Court finds the Delegation Clause valid and enforceable. Accordingly, Plaintiff's "arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance"—not the Court. *Caremark*, 43 F.4th at 1030.

### C. Validity of the Entire Arbitration Provision

Plaintiff also raises prospective waiver challenges to the Arbitration Provision as a whole. He argues that the entire Arbitration Provision is invalid because it prospectively waives Plaintiff's rights under California statutes. (ECF No. 42 at 18–19.) He also contends that the Arbitration Provision serves as an "implicit waiver" of Plaintiff's federal RICO rights because it prevents the arbitrator from considering state law to establish RICO predicate offenses. *Id.* at 20–21. Because these arguments address the entire Arbitration Provision—not the Delegation Clause, specifically—the Court declines to consider them and instead leaves them "for the arbitrator to decide in light of the parties' 'clear and unmistakable' delegation" of arbitrability issues. *Brennan*, 796 F.3d at 1133 (citing *Rent-A-Center*, 561 U.S. at 73–75.)

### D. CreditServe Defendants' Power to Enforce the Delegation Clause

Although they are non-signatories to the Loan Agreement, the CreditServe Defendants contend that they can enforce its Arbitration Provision on at least one of three theories: (1) as agents of RVL, (2) as third-party beneficiaries of the Loan Agreement, and/or (3) through the doctrine of equitable estoppel. (ECF No. 17 at 18–23.)

"[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013). To assess whether the Court should compel arbitration of disputes between Plaintiff and the CreditServe Defendants, the Court must apply California law to determine if the Delegation Clause encompasses such disputes. *See id.* at 1127 (assessing whether there was "clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with non[-]signatories").

The Delegation Clause includes in its definition of "disputes": "all claims asserted by you individually against the Tribe, us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, 'related third parties')." (Loan Agreement at 9.) "Us" refers to RVL, a signatory to the Loan Agreement. *Id.* at 1.

### 1. Agency

The CreditServe Defendants contend that they can enforce the Arbitration Provision as "agents" of signatory RVL. (ECF No. 17 at 19.) The CreditServe Defendants contend that Plaintiff's allegations of "extensive control of River Valley by the CreditServe Defendants" establish that the CreditServe Defendants are agents of RVL. *Id.* Additionally, the CreditServe Defendants contend that they can enforce the Arbitration Provision as agents of RVL because Plaintiff alleges civil conspiracy and RICO claims, and "co-conspirators are agents of one another without regard to" who controls who. (ECF No. 51 at 7–10.)

Plaintiff contends that the CreditServe Defendants are not agents of RVL. (ECF No. 33 at 12.) Instead, Plaintiff contends, "Plaintiff alleges the opposite: that [the CreditServe] *Defendants* exert 'extensive control' over the RVL enterprise." *Id.*

Under agency theory, a non-signatory "defendant may enforce [an] arbitration agreement[] when a plaintiff alleges a defendant acted as an agent of a party to an arbitration agreement . . . ." *Soltero v. Precise Distrib., Inc.*, 322 Cal. Rptr. 3d 133, 143 (Cal. Ct. App. 2024) (quotations and citations omitted). Plaintiff contends that California agency law only works one way—the principal (RVL) must control the agent (the CreditServe Defendants), not the other way around. *Id.* However, the cases cited by Plaintiff belie this conclusion. In *Soltero*, the California Court of Appeal found that no agency relationship existed where the plaintiff "[did] not allege that [the non-signatory entity] acted as an agent of [the signatory entity] *or vice versa*." *Soltero*, 322 Cal. Rptr. 3d at 143 (emphasis added). The court continued, "[t]he record includes no allegation or evidence that *either entity* had control over or a right to control the other or authority to act

on the other's behalf." *Id.* (emphasis added). Similarly, in *Borelli*, the Eastern District of California held that no agency relationship existed where "plaintiffs [did] not argue or show [the non-signatory entity] exercised control over [the signatory entity], *or vice versa*." *Borelli v. Black Diamond Aggregates, Inc.*, No. 2:14-cv-02093-KJM-KJN, 2017 WL 1063564, at *12 (E.D. Cal. Mar. 21, 2017) (emphasis added). Under these cases, the Court can consider whether RVL exercised control over the CreditServe Defendants—or *vice versa*.

"Control is the key characteristic of the agent/principal relationship." *Sonora Diamond Corp. v. Superior Ct.*, 99 Cal. Rptr. 2d 84, 838 (Cal. Ct. App. 2000). Plaintiff alleges that the "CreditServe Defendants, not the Tribe, are in control of the RVL operation." (Compl. ¶ 70.) Plaintiff further alleges that the CreditServe Defendants "call[] all of the shots" and "exercise control of the illegal lending enterprise by operating all substantive aspects of the business, including the funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections of the illegal loans." *Id.* ¶¶ 26, 87. Unlike the non-signatory entity in *Soltero*, Plaintiff alleges that the CreditServe Defendants "had control over" RVL, demonstrating the existence of an agency relationship. *Soltero*, 322 Cal. Rptr. 3d at 1.

Courts have also recognized co-conspirators as agents of one another in the RICO and civil conspiracy contexts. *See, e.g.*, *Labajo v. First Int'l Bank & Tr.*, No. EDCV 14-00627-VAP (DTBx), 2014 WL 4090527, at *7 (C.D. Cal. July 9, 2014) (finding that non-signatory loan originator could enforce arbitration agreement as agent of signatory payday lender in alleged RICO conspiracy; collecting cases). Plaintiff alleges that the CreditServe Defendants formed a RICO "enterprise" with RVL and others, which "associated for the common purpose of profiting off of the collection on unlawful debt." (Compl. ¶ 120.) Plaintiff further alleges that the CreditServe Defendants "conspir[ed] to use the Enterprise to collect unlawful debt" and "conspired amongst themselves and with other actors to violate state usury and lending laws." *Id.* ¶¶ 122, 142. These allegations establish that the

29

25-cv-1698-WQH-BJW

CreditServe Defendants, as co-conspirators of RVL, are agents who can enforce the Arbitration Provision.

### 2. Third-Party Beneficiary Theory

The CreditServe Defendants contend that they can enforce the Arbitration Provision on an additional, independent basis: as third-party beneficiaries of the Loan Agreement. (ECF No. 17 at 20.)

The Arbitration Provision states that it is "binding upon and benefits us [RVL] and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, 'related third parties')." (Loan Agreement at 9.) The CreditServe Defendants contend that they are "affiliated entities" of RVL and thus intended third-party beneficiaries of the Loan Agreement. (ECF No. 17 at 21.) In response, Plaintiff argues that the agreement's "affiliated entities" language does not apply to the CreditServe Defendants because they have no formal corporate affiliation with RVL. (ECF No. 33 at 13–14.)

"It is well established that a non-signatory beneficiary of an arbitration clause is entitled to require arbitration." *Harris v. Superior Ct.*, 233 Cal. Rptr. 186, 188 (Cal. Ct. App. 1986) (citations omitted). "The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract." *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1162 (9th Cir. 2010) (quoting *Spinks v. Equity Residential Briarwood Apartments*, 90 Cal. Rptr. 3d 453, 468 (Cal. Ct. App. 2009)). "[I]t is not enough that the third party would incidentally have benefited from performance." *Spinks*, 90 Cal. Rptr. 3d at 468 (quotations and citation omitted). "However, a third party beneficiary need not be named in the contract where the agreement reflects the intent of the contracting parties to benefit the unnamed party." *Cargill, Inc. v. Souza*, 134 Cal. Rptr. 3d 39, 42 (Cal. Ct. App. 2011) (citing *Sessions Payroll Mgmt., Inc. v. Noble Constr. Co., Inc.*, 101 Cal. Rptr. 2d 127, 133 (Cal. Ct. App. 2000)). "If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person. The parties

are presumed to intend the consequences of a performance of the contract." *Spinks*, 90 Cal. Rptr. 3d at 468 (quotations and citations omitted).

California courts interpret contractual provisions according to the "'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.'" *Santisas v. Goodin*, 951 P.2d 399, 405 (Cal. 1998) (quoting Cal. Civ. Code §§ 1638, 1644). Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control . . . ." *Affiliate*, Black's Law Dictionary (12th ed. 2024). The online Oxford English Dictionary defines the verb "affiliate" similarly:

> To be connected with a larger or more established organization, as a branch or subsidiary part; to adhere or belong to an organization or group; to be a member or affiliate of a certain body. Also more generally: to be a part of something . . . . To join or unite with an organization or group; *esp.* to connect or align oneself with a larger or more established group of people; to attach oneself to an organization as a branch, subsidiary part, or affiliate.

*Affiliate*, Oxford English Dictionary (Feb. 9, 2026).[6] And the online Brittanica Dictionary defines the verb "affiliate" as "to closely connect . . . with or to something (such as a program or organization) as a member or partner." *Affiliate*, The Brittanica Dictionary (Feb. 9, 2026).[7]

Plaintiff alleges that the CreditServe Defendants and RVL formed a RICO "Enterprise" that "associated for the common purpose of profiting off . . . unlawful debt by offering and collecting on loans . . . through online lenders *affiliated with* the Non-Tribal Defendants."[8] (Compl. ¶ 120 (emphasis added).) Plaintiff further alleges that the

---

[6] *See* https://www.oed.com/dictionary/affiliate_v?tab=meaning_and_use#9321996.

[7] *See* https://www.britannica.com/dictionary/affiliate.

[8] Plaintiff uses "Non-Tribal Defendants" to refer to the CreditServe Defendants and Defendant Thin Elk, collectively. (Compl. at 1–2.)

31

25-cv-1698-WQH-BJW

CreditServe Defendants "primarily profit" from the loans, "are in control of the RVL operation," and "exercise control of the illegal lending enterprise by operating all substantive aspects of the business." *Id.* ¶¶ 8, 70, 87. Plaintiff also describes tribal lending schemes more generally as occurring when "a non-tribal lender *affiliates with* a Native American tribe." *Id.* ¶ 26 (emphasis added). In other words, Plaintiff alleges that the CreditServe Defendants affiliated themselves with RVL, formed a united operation to collect on illegal loans, and controlled the bulk of that operation. The Court finds that CreditServe (and Welch and McGraw, as the company's current and former officers) constitutes an "affiliated entity" under the ordinary meaning of that term. *See Huntley v. Rosebud Econ. Dev. Corp.*, No. 22-cv-1172-L-MDD, 2023 WL 5186247, at *3 (S.D. Cal. Aug. 11, 2023) (finding that non-signatory, non-tribal loan servicer was affiliate of signatory lending entity in case with similar facts).

The CreditServe Defendants can enforce the Arbitration Provision as intended third-party beneficiaries of that agreement. The Court accordingly compels arbitration of Plaintiff's claims against the CreditServe Defendants.

### 3. *Equitable Estoppel*

Because the Court finds that the CreditServe Defendants can enforce the Arbitration Provision as agents of RVL and third-party beneficiaries, it does not reach the parties' equitable estoppel arguments.

### E. Defendant Thin Elk's Power to Enforce the Delegation Clause

Although he is not a signatory, Defendant Thin Elk contends that he can enforce the Arbitration Provision (1) as a third-party beneficiary of the agreement and (2) under the doctrine of equitable estoppel. (ECF No. 54 at 19–23.)

### 1. *Third-Party Beneficiary Theory*

Defendant Thin Elk contends that he is a "related third party" under the Arbitration Provision because he qualifies as an "agent, director, officer, governor, or manager" of a Tribal entity through his position as Commissioner of the Crow Creek Financial Services Licensing and Regulatory Commission. (ECF No. 54 at 20.) Plaintiff contends that

32

Defendant Thin Elk's status as Commissioner does not make him a "related third party" under the Arbitration Provision because Defendant Thin Elk is not a member of the Tribe and he holds the same Commissioner position with at least one other tribe. (ECF No. 42 at 13.)

Plaintiff alleges that Defendant Thin Elk is the "sole Commissioner of the Crow Creek Financial Services Licensing & Regulatory Commission." (Compl. ¶ 58 (quotations omitted).) Plaintiff alleges that Defendant Thin Elk issued and signed RVL's "certificate of licensure" through his role as Commissioner and "pursuant to and in accordance with the Tribal Credit Code of the Crow Creek Sioux Tribe." *Id.* (quotations omitted). Plaintiff further alleges that Defendant Thin Elk is not a member of the Tribe, that RVL's certificate of licensure is a "sham," and that Defendant Thin Elk holds the Commissioner position and signed an identical certificate of licensure for another tribe. *Id.* ¶¶ 58, 70, 85. Even assuming that RVL's certificate of licensure is in fact a sham, Defendant Thin Elk holds a formal position with the Tribe as Commissioner and he signed RVL's license. This affiliation with RVL suffices to render Defendant Thin Elk a "related third party" and intended third-party beneficiary of the Arbitration Provision.

Defendant Thin Elk can enforce the Arbitration Provision as an intended third-party beneficiary of that agreement. The Court accordingly compels arbitration of Plaintiff's claims against Defendant Thin Elk.

### 2. Equitable Estoppel

Because the Court finds that Defendant Thin Elk can enforce the Arbitration Provision as a third-party beneficiary of that agreement, it does not reach the parties' equitable estoppel arguments.

### F. Mandatory Stay

The CreditServe Defendants and Defendant Thin Elk request that the Court stay this action pending completion of the arbitration. (ECF No. 17 at 30; ECF No. 37-1 at 29.)

The FAA provides that, when a court finds that a dispute is subject to arbitration, the court "shall on application of one of the parties stay the trial of the action until such

arbitration" has concluded. 9 U.S.C. § 3. Entry of a stay under these circumstances is mandatory. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Accordingly, the Court stays the entire action until arbitration of Plaintiff's claims against the CreditServe Defendants and Defendant Thin Elk has concluded.

## VI.   CONCLUSION

IT IS HEREBY ORDERED that the Tribal Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 36) is granted. The Tribal Defendants are dismissed from this action.

IT IS FURTHER ORDERED that the Tribal Defendants' Motion to Compel Arbitration (ECF No. 37) is granted as to Defendant Thin Elk and denied as moot with respect to the Tribal Defendants. The CreditServe Defendants' Motion to Compel Arbitration (ECF No. 17) is granted.

IT IS FURTHER ORDERED that the remaining pending motions (ECF Nos. 18, 35, 38) are denied as moot.

IT IS FURTHER ORDERED that, pursuant to the FAA's mandatory stay provision, the entire action is stayed pending completion of the arbitration.

Dated:  February 17, 2026

_____
Hon. William Q. Hayes
United States District Court